# 15-cv-03828 (GBD)

## United States District Court

### *for the*

## Southern District of New York

_____

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ARCAPITA BANK B.S.C.(C), ET AL.,

*Appellant,*

—against—

BAHRAIN ISLAMIC BANK,

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (LANE, J.)

IN RE ARCAPITA BANK B.S.C.(C), *ET. AL.*, BANKR. CASE NO. 12-11076

## APPENDIX TO BRIEF FOR APPELLANT – VOLUME I

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
DENNIS F. DUNNE
EVAN R. FLECK
ANDREW M. LEBLANC
28 Liberty Street
New York, New York 10005-1413
(212) 530-5000
aleblanc@milbank.com

*Attorneys for the Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

## TABLE OF CONTENTS

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| **VOLUME I** | | | |
| Complaint Against Bahrain Islamic Bank | August 26, 2013 | 13-1434: Dkt. No. 1 | APP001 |
| Complaint Against Tadhamon Capital | August 26, 2013 | 13-1435: Dkt. No. 1 | APP015 |
| Notice of Motion of Defendant Bahrain Islamic Bank to Dismiss the Complaint | November 18, 2013 | 13-1434: Dkt. No. 8 | APP030 |
| Notice of Motion of Defendant Tadhamon Capital to Dismiss the Complaint | November 18, 2013 | 13-1435: Dkt. No. 8 | APP048 |
| Declaration of Nicholas A. Bassett in Support of the Committee's Objection to Bahrain Islamic Bank's Motion to Dismiss | January 28, 2014 | 13-1434: Dkt. No. 15 | APP077 |
| **VOLUME II** | | | |
| Transcript Regarding Hearing Held on March 9, 2014 re: Motion to Dismiss Adversary Proceeding | March 28, 2014 | 13-1434: Dkt. No. 20; 13-1435: Dkt. No. 18 | APP092 |
| Bankruptcy Court's Memorandum of Decision | April 17, 2015 | 13-1434: Dkt. No. 23; 13-1435: Dkt. No. 21 | APP267 |
| Order Granting Motion to Dismiss the Complaint Against Bahrain Islamic Bank | April 28, 2015 | 13-1434: Dkt. No. 24 | APP291 |
| Order Granting Motion to Dismiss the Complaint Against Tadhamon Capital | April 28, 2015 | 13-1435: Dkt. No. 22 | APP294 |
| Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against Bahrain Islamic Bank | May 12, 2015 | 13-1434: Dkt. No. 25 | APP297 |
| Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against Tadhamon Capital | May 12, 2015 | 13-1435: Dkt. No. 23 | APP303 |

Complaint Against Bahrain Islamic Bank

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Official Committee of*
*Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                :

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ARCAPITA BANK B.S.C.(c), et al., | : | Case No. 12-11076 |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

------------------------------------------------------------x
                                                :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF ARCAPITA BANK B.S.C.(C), | : | |
| ET AL., | : | |
| | : | Adv. Pro. No. _____ |
| v. | : | |
| | : | |
| BAHRAIN ISLAMIC BANK | : | |
| | : | |

------------------------------------------------------------x

# <u>COMPLAINT</u>

      The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Arcapita

Bank B.S.C.(c) ("<u>Arcapita</u>") and each of its affiliated debtors-in-possession (collectively, the

"Debtors," with the bankruptcy estate being the "Arcapita Estate"), by and through its attorneys,

Milbank, Tweed, Hadley & McCloy LLP, and on behalf of the Debtors, alleges as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding for breach of contract, turnover, the
avoidance of a preferential transfer, violation of the automatic stay, and claim disallowance
arises from a short-term debt investment for $10 million (the "Placement") that Arcapita made
with Bahrain Islamic Bank ("BIB") on March 14, 2012—just five days before Arcapita's
bankruptcy filing on March 19, 2012.

2.      Arcapita and BIB entered into the Placement pursuant to an agreement
(the "Placement Agreement") that required BIB to pay Arcapita the Placement funds, plus
generated proceeds, less agency fees (the "Placement Proceeds"), upon maturity.  The Placement
matured on March 29, 2012, resulting in more than $10 million owed by BIB to Arcapita.  BIB
has not paid any of this debt, and continues to owe Arcapita $10,002,292 in outstanding
Placement Proceeds.  Despite Arcapita's demands, BIB has refused to turn over these funds.

3.      The Placement—and resulting creation of more than $10 million worth
of debt owed to Arcapita by BIB—did not occur on a blank financial slate.  At the time of the
Placement, Arcapita owed nearly $10 million in unmatured debt to BIB (the "Antecedent Debt")
as a result of certain investment transactions entered into by the parties beginning in December
2011.  The more than $10 million that Arcapita transferred to BIB pursuant to the Placement was
thus sufficient to cover the Antecedent Debt.

4.      BIB and Arcapita entered into the Placement on the eve of Arcapita's
bankruptcy filing, while Arcapita was insolvent.  To the extent that the Placement was made on
account of the Antecedent Debt, it is an avoidable preference.

APP003

5. Before the Placement on March 14, 2012, Arcapita only rarely made similar placements with BIB and had not done so for approximately one year. As a result of the Placement, BIB was able to recover its entire claim to the Antecedent Debt rather than be exposed to the lengthy bankruptcy process and suffer the same decreased recoveries that all of Arcapita's non-preferred creditors received through Arcapita's chapter 11 proceedings.

6. The Committee, on behalf of the Arcapita Estate, brings this adversary proceeding to, among other things, compel BIB to comply with its obligations under the Placement Agreement and turn over the outstanding funds currently due and owing to the Arcapita Estate or, alternatively, to have the Placement avoided and recovered as an improper payment of the Antecedent Debt under sections 547(b) and 550 of the United States Bankruptcy Code.

## JURISDICTION, VENUE AND STATUTORY PREDICATES

7. On March 19, 2012, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

8. On April 5, 2012, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.

9. On August 2, 2013, the Court entered the Order Granting Committee's Motion for Leave, Standing and Authority to Prosecute Avoidance Claims [Docket No. 1411], which, *inter alia*, authorized the Committee to pursue the claims asserted herein against BIB.

10. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

APP004

## PARTIES

12.     Plaintiff is the Official Committee of Unsecured Creditors for Arcapita and each of its affiliated debtors-in-possession.  Arcapita was licensed as an Islamic wholesale bank by the Central Bank of Bahrain.  Founded in 1996, Arcapita (collectively, with its affiliates, the "Arcapita Group"), was a leading global manager of *Shari'ah*-compliant alternative investments and operated as an investment bank.  Prior to its bankruptcy filing, the Arcapita Group employed 268 people and, together with the other Debtors and their non-Debtor subsidiaries, had offices in Atlanta, London, Hong Kong, and Singapore in addition to its headquarters in Bahrain.

13.     Defendant BIB was established in 1979 as the first Islamic commercial bank in Bahrain.  BIB is owned by, among other investors, the Islamic Development Bank and the Kuwait Investment Company.

14.     BIB maintains correspondent bank accounts in the United States at Deutsche Bank, Standard Chartered Bank, and JP Morgan Chase Bank.  In connection with these accounts, BIB has designated an agent for service of process in the United States as required under the Patriot Act and participates in the Clearing House Interbank Payments System, located in New York.

15.     To effectuate the Placement, Arcapita, at BIB's direction, transferred funds from its account at JP Morgan Chase Bank in New York to BIB's correspondent bank account at JP Morgan Chase Bank in New York.

APP005

## FACTUAL BACKGROUND

### A. **BIB Agreement**

16.     On May 7, 2006, Arcapita entered into an agreement with BIB (the "BIB Agreement").

17.     Pursuant to the BIB Agreement, BIB would transfer funds to Arcapita for the purchase of certain commodities.  After purchasing the commodities, Arcapita would sell the commodities, on BIB's behalf, to a third party in exchange for deferred payment on an agreed-upon maturity date.  Arcapita also reserved the right under the BIB Agreement to purchase the commodities directly from BIB for its own account.  On the maturity date, Arcapita would transfer the deferred payment to BIB, thereby returning to BIB the value of its investment, plus an agreed upon return.

18.     On or about December 1, 2011, pursuant to the BIB Agreement, BIB made two investments totalling nearly $10 million with Arcapita for the purchase of commodities on BIB's behalf.

19.     As of March 14, 2012—the date of the Placement—Arcapita had not transferred the deferred payments owed to BIB as a result of these transactions.

20.     BIB was thus a creditor of Arcapita to whom Arcapita owed the Antecedent Debt of $9,774,096.15.

21.     All of the Antecedent Debt was scheduled to mature within two weeks of the Placement.

22.     The BIB investments made pursuant to the BIB Agreement are identified below.

- 5 -

| BIB Investment Amount | Investment Date[1] | Maturity Date | Total Amount of Antecedent Debt as of March 14, 2012 |
|---|---|---|---|
| BHD1,800,000 | December 1, 2011 | March 22, 2012 | $9,774,096.15 |
| $5,000,000 | December 1, 2011 | March 23, 2012 | |

### B. Placement Agreement

23.     On or about July 10, 2003, BIB and Arcapita entered into an investment agreement (previously defined as the "Placement Agreement").

24.     Pursuant to the Placement Agreement, Arcapita appointed BIB to serve as its agent with respect to the purchase of certain commodities (each such investment a "placement").  Following BIB's purchase of commodities for Arcapita's account, BIB was obligated under the Placement Agreement to repurchase the same commodities from Arcapita on a deferred payment basis for an amount equal to the original investment, plus an agreed upon return.  BIB was required to transfer this payment to Arcapita on the designated maturity date of the placement.

25.     Arcapita did not enter into placement transactions with BIB as part of the ordinary course of its business.

26.     Prior to March 2012, Arcapita and BIB only entered into five placements during the previous two years: four in May and June of 2010 and another in March of 2011.

---

[1]     BIB made initial short-term investments with Arcapita on December 1, 2011 and then continuously rolled-over those investments at various intervals leading up to the chapter 11 filing date.

- 6 -

### C. **Placement**

27.    On March 14, 2012, pursuant to the Placement Agreement, Arcapita entered into the Placement for $10 million.  The Placement had a prescribed maturity date of March 29, 2012.

28.    To execute the Placement, Arcapita, at BIB's direction, transferred $10 million in funds from its account at JP Morgan Chase Bank in New York to BIB's account at JP Morgan Chase Bank in New York.

29.    Arcapita was insolvent on March 14, 2012 when it (i) entered into the Placement and (ii) paid the $10 million in Placement funds to BIB.

30.    Just five days later, on March 19, 2012, Arcapita filed petitions for relief under chapter 11 of the Bankruptcy Code.

31.    On March 29, 2012, BIB was required pursuant to the Placement Agreement to return to Arcapita its Placement of $10 million, plus a profit at the rate of .55% per annum, minus BIB's agency fee, resulting in Placement Proceeds in the amount of $10,002,292.

### D. **BIB's Failure to Complete the Placement Upon Maturity**

32.    Notwithstanding its binding obligations under the Placement Agreement, BIB failed to deliver any of the Placement Proceeds due to Arcapita upon maturity.

33.    On or about April 30, 2012, Arcapita, through its counsel, Gibson, Dunn & Crutcher LLP, sent a letter addressed to Mohammed Ebrahim Mohammed, Chief Executive Officer of BIB.  The letter demanded payment of the Placement Proceeds, noting that the funds "are property of the bankruptcy estate of Arcapita and must immediately be remitted to Arcapita . . . pursuant to the provisions of section 542 of the Bankruptcy Code," and BIB's "failure

APP008

immediately to turnover these funds to Arcapita will force us to commence an action to compel turnover."

34.     On or about June 25, 2012, BIB, through its counsel, K&L Gates LLP, sent a letter addressed to Arcapita's counsel refusing to turn over the Placement Proceeds.  BIB claimed to be taking a "setoff" on account of the Antecedent Debt.

35.     BIB has neither sought nor obtained an order of the Court allowing it to set off the Antecedent Debt against the Placement Proceeds.

36.     The outstanding balance of Placement Proceeds due and owing from BIB to the Arcapita Estate is $10,002,292.  BIB has failed to turn over any portion of these funds to the Arcapita Estate.

37.     To the extent Arcapita and BIB entered into the Placement as a means of paying the Antecedent Debt, this allowed BIB to recover more on its claim against Arcapita than it otherwise would have been able to recover had the claim been resolved through Arcapita's chapter 11 proceedings or through a chapter 7 liquidation.

## COUNT I
### (Breach of the Placement and the Placement Agreement)

38.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 37 as though fully set forth herein.

39.     The Placement is a valid, enforceable, and legally binding contract between Arcapita and BIB.

40.     BIB is in default under the Placement and the Placement Agreement for failing to transfer the Placement Proceeds as required on the maturity date.

41.     Thus, BIB has breached its obligations to Arcapita under the Placement.

APP009

42.     The Court granted the Committee standing to prosecute claims relating to the Placement on behalf of the Arcapita Estate.  As such, the Committee, on behalf of the Arcapita Estate, is entitled to (i) an award of damages equal to $10,002,292, plus interest, and (ii) reimbursement of, among other things, fees and costs (including reasonable attorneys' fees) expended in effecting compliance with the Placement, as well as fees and costs expended in any proceeding to recover sums owed under the same.

## COUNT II
### (Turnover of Assets – 11 U.S.C. §§ 541, 542 and 550)

43.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 42 as though fully set forth herein.

44.     The Placement is a valid, enforceable, and legally binding contract between Arcapita and BIB.

45.     The Placement is specific in its terms as to both the maturity date of BIB's obligation and the amount of that obligation.  The Placement matured on March 29, 2012.  At maturity, BIB owed Arcapita $10,002,292 on account of the Placement.

46.     By virtue of the Placement, after accounting for amounts previously remitted, BIB is wrongfully in possession of property of the Arcapita Estate in the amount of $10,002,292, plus accrued interest thereon from the Placement's maturity date.

47.     The amount owed by BIB to the Arcapita Estate on account of the Placement is payable immediately without legitimate offset of any kind.

48.     As a result of the foregoing, the Arcapita Estate is entitled to (i) an award of damages equal to $10,002,292, plus interest, and (ii) reimbursement of any and all fees and costs (including reasonable attorneys' fees) expended in effecting compliance with the

APP010

Placement, as well as fees and costs expended in any proceeding to recover sums owed under the same.

## COUNT III
### (Preferential Transfer – 11 U.S.C. §§ 547 and 550)

49.       The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 48 as though fully set forth herein.

50.       Arcapita transferred the placed funds to BIB under the Placement (the "Placement Transfer") on March 14, 2012.

51.       At the time of the Placement Transfer, BIB was a "creditor" of Arcapita within the meaning of section 101(10) of the Bankruptcy Code.

52.       The Placement Transfer was to or for the benefit of BIB.

53.       The Placement Transfer was made on account of the Antecedent Debt owed by Arcapita to BIB.

54.       The Placement Transfer was made while Arcapita was insolvent and within 90 days before Arcapita filed its petition for relief under chapter 11 of the Bankruptcy Code.

55.       The Placement Transfer enabled BIB to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) BIB received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

56.       The Placement Transfer constitutes a preferential transfer avoidable pursuant to section 547(b) of the Bankruptcy Code and recoverable from BIB pursuant to section 550(a).

APP011

57. As a result of the foregoing, the Committee is entitled to a judgment pursuant to sections 547(b) and 550 of the Bankruptcy Code: (i) avoiding the Placement Transfer; (ii) directing that the Placement Transfer be set aside; and (iii) recovering the amounts due and owing under the Placement for the benefit of the Arcapita Estate.

## COUNT IV
### (Violation of Automatic Stay – 11 U.S.C. §362)

58. The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 57 as though fully set forth herein.

59. Pursuant to sections 362(a)(3) of the Bankruptcy Code, upon the commencement of a chapter 11 case, "any act to . . . exercise control over property of the estate" constitutes a violation of the automatic stay.

60. Pursuant to section 362(a)(7) of the Bankruptcy Code, "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor" also constitutes a violation of the automatic stay.

61. BIB has and continues to exercise control over the Placement Proceeds, which are property of the Arcapita Estate.

62. On or about June 28, 2012, BIB informed Arcapita by letter that it would not relinquish control over the Placement Proceeds. BIB claimed to be taking a setoff on account of the Antecedent Debt.

63. BIB has neither sought nor obtained an order of the Court allowing it to set off the Antecedent Debt against the Placement Proceeds.

64. BIB's actions are in direct violation of the automatic stay imposed by section 362 of the Bankruptcy Code.

APP012

65.     As a result of the foregoing, the Arcapita Estate is entitled to (i) an award of damages equal to $10,002,292, and (ii) reimbursement of any and all fees and costs (including reasonable attorneys' fees) associated with BIB's violation of the automatic stay.

## COUNT V
## (Claim Objection – 11 U.S.C. § 502(d))

66.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 65 as though fully set forth herein.

67.     The Committee has asserted causes of action, enumerated above, against BIB that seek turnover of the Placement Proceeds pursuant to sections 542 and 550 of the Bankruptcy Code or, alternatively, avoidance of the Placement Transfer and recovery of the Placement Proceeds pursuant to sections 547 and 550 of the Bankruptcy Code.

68.     Arcapita included on its Schedule F liabilities in the amount of $9,774,096.15 owing to BIB on account of the Antecedent Debt.   Absent objection by a party in interest or an amendment to Schedule F, BIB will have allowed claims against Arcapita in the amount of $9,774,096.15.

69.     The Committee is entitled to a judgment under section 502(d) of the Bankruptcy Code disallowing all claims held by BIB, including claims on account of the Antecedent Debt, pending payment or turnover of the Placement Proceeds.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully prays that the Court award the following relief:

(i)     payment to the Arcapita Estate of $10,002,292 plus all interest that may be earned thereon from the March 29, 2012 maturity date of the Placement;

(ii)    disallowance of any and all claims that BIB holds against the Arcapita Estate;

- 12 -

APP013

    (iii)      reimbursement of, among other things, fees and costs (including reasonable attorneys'
fees) expended in effecting compliance with the Placement, as well as fees and costs
expended in any proceeding to recover sums owed under the same; and

    (iv)      such other and further relief as the Court deems just.

      Dated:  August 26, 2013
      New York, New York

          By:  */s/*  Evan R. Fleck_____
          Dennis F. Dunne
          Evan R. Fleck
          1 Chase Manhattan Plaza
          New York, NY 10005
          Telephone: (212) 530-5000

          Andrew M. Leblanc
          1850 K Street, NW, Suite 1100
          Washington, DC 20006
          Telephone: (202) 835-7500

          Counsel for the Official Committee of Unsecured
          Creditors of Arcapita Bank B.S.C.(c), *et al.*

- 13 -

APP014

Complaint Against Tadhamon Capital B.S.C.

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Official Committee of*
*Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                     :

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ARCAPITA BANK B.S.C.(c), <u>et al.</u>, | : | Case No. 12-11076 |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF ARCAPITA BANK B.S.C.(C), | : | |
| <u>ET AL.</u>, | : | |
| | : | Adv. Pro. No. _____ |
| v. | : | |
| | : | |
| TADHAMON CAPITAL B.S.C. | : | |
| | : | |

-------------------------------------------------------------x

# <u>COMPLAINT</u>

       The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Arcapita

Bank B.S.C.(c) ("<u>Arcapita</u>") and each of its affiliated debtors-in-possession (collectively, the

"Debtors," with the bankruptcy estate being the "Arcapita Estate"), by and through its attorneys,

Milbank, Tweed, Hadley & McCloy LLP, and on behalf of the Debtors, alleges as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding for breach of contract, turnover, the

avoidance of preferential transfers, violation of the automatic stay, and claim disallowance arises

from two short-term debt investments for $10 million each (as amended or rolled-over from time

to time, the "Placements") that Arcapita made with Tadhamon Capital B.S.C. ("Tadhamon") on

March 15, 2012—just four days prior to Arcapita's bankruptcy filing on March 19, 2012.

2.      Arcapita and Tadhamon entered into the Placements pursuant to an

agreement (the "Placement Agreement") that the parties executed that same day.  Under the

Placement Agreement, Tadhamon was required to pay Arcapita the Placement funds, plus

generated proceeds, less agency fees (the "Placement Proceeds"), upon maturity.  The

Placements matured on March 30, 2012 and April 16, 2012, respectively, resulting in more than

$20 million owed by Tadhamon to Arcapita.  Tadhamon paid a small fraction of this debt, but

continues to owe Arcapita $18,480,269 in outstanding Placement Proceeds.  Despite Arcapita's

demands, Tadhamon has refused to turn over these funds.

3.      The Placements—and resulting creation of $20 million worth of debt

owed to Arcapita by Tadhamon—did not occur on a blank financial slate.  At the time of the

Placements, Arcapita owed more than $18 million in unmatured debt to Tadhamon (the

"Antecedent Debt") as a result of certain investment transactions entered into by the parties

between September 2009 and January 2012.  The $20 million that Arcapita transferred to

Tadhamon pursuant to the Placements was thus sufficient to cover the Antecedent Debt.

2

4.     Tadhamon and Arcapita entered into the Placements on the eve of Arcapita's bankruptcy filing, while Arcapita was insolvent.  To the extent that the Placements were made on account of the Antecedent Debt, they are avoidable preferences.

5.     Before entering into the Placement Agreement on March 15, 2012, Arcapita and Tadhamon had never before executed or operated under any similar Placement Agreement, nor had Arcapita entered into any Placement or made any similar investment with Tadhamon.  As a result of the Placements, Tadhamon was able to recover its entire claim to the Antecedent Debt rather than be exposed to the lengthy bankruptcy process and suffer the same decreased recoveries that all of Arcapita's non-preferred creditors received through Arcapita's chapter 11 proceedings.

6.     The Committee, on behalf of the Arcapita Estate, brings this adversary proceeding to, among other things, compel Tadhamon to comply with its obligations under the Placement Agreement and turn over the outstanding funds currently due and owing to the Arcapita Estate or, alternatively, to have the Placements avoided and recovered as an improper payment of the Antecedent Debt under sections 547(b) and 550 of the United States Bankruptcy Code.

## **JURISDICTION, VENUE AND STATUTORY PREDICATES**

7.     On March 19, 2012, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

8.     On April 5, 2012, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.

9.     On August 2, 2013, the Court entered the Order Granting Committee's Motion for Leave, Standing and Authority to Prosecute Avoidance Claims [Docket No. 1411],

3

APP018

which, *inter alia*, authorized the Committee to pursue the claims asserted herein against Tadhamon.

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

12.     Plaintiff is the Official Committee of Unsecured Creditors for Arcapita and each of its affiliated debtors-in-possession.  Arcapita was licensed as an Islamic wholesale bank by the Central Bank of Bahrain.  Founded in 1996, Arcapita (collectively, with its affiliates, the "Arcapita Group"), was a leading global manager of *Shari'ah*-compliant alternative investments and operated as an investment bank.  Prior to its bankruptcy filing, the Arcapita Group employed 268 people and, together with the other Debtors and their non-Debtor subsidiaries, had offices in Atlanta, London, Hong Kong, and Singapore in addition to its headquarters in Bahrain.

13.     Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon International Islamic Bank ("TIIB").  TIIB was established in 1995 and is the largest bank in Yemen that offers Islamic banking and investment services to its customers in Yemen and abroad.  Defendant Tadhamon, as the investment arm of TIIB, offers Islamic financial services and alternative investments.

14.     TIIB maintains correspondent bank accounts in the United States at Mashreq Bank and the Bank of New York Mellon.  In connection with these accounts, TIIB has

APP019

designated an agent for service of process in the United States as required under the Patriot Act

and participates in the Clearing House Interbank Payments System, located in New York.

## FACTUAL BACKGROUND

### A.  Tadhamon Agreements

15.     Between September 2009 and January 2012, Arcapita entered into

multiple agreements with Tadhamon (the "Tadhamon Agreements"), pursuant to which

Tadhamon would transfer funds to Arcapita for investment in certain commodities on

Tadhamon's behalf.

16.     Immediately after acquiring the commodities for Tadhamon, Arcapita

was required under the Tadhamon Agreements to re-purchase the commodities from Tadhamon

in exchange for deferred payment on an agreed-upon maturity date.  On the maturity date,

Arcapita would transfer the deferred payment to Tadhamon, thereby returning to Tadhamon the

value of its investment, plus an agreed upon return.

17.     Between September 2009 and January 2012, Tadhamon transferred a

total of approximately $18 million to Arcapita for the purchase of commodities under the

Tadhamon Agreements.

18.     As of March 15, 2012—the date of the Placements—Arcapita had not

re-purchased the commodities and transferred the deferred payment to Tadhamon as required by

the Tadhamon Agreements.

19.     Tadhamon was thus a creditor of Arcapita to whom Arcapita owed the

Antecedent Debt of $18,497,734.48.

20.     All of the Antecedent Debt was scheduled to mature within

approximately two months or less of the Placements.

APP020

21.     The Tadhamon investments made pursuant to the Tadhamon

Agreements are identified below.

| Tadhamon Investment Amount | Investment Date | Maturity Date | Total Amount of Antecedent Debt as of March 15, 2012 |
|---|---|---|---|
| $5,000,000 | Between September 24, 2009 and January 9, 2012[1] | April 9, 2012 | $18,497,734.48 |
| $12,000,000 | November 17, 2011 | May 17, 2012 | |
| $1,000,000 | January 9, 2012 | April 9, 2012 | |

### B. Placement Agreement

22.     On or about March 15, 2012—just four days before Arcapita filed for

bankruptcy—Tadhamon and Arcapita entered into a Master *Wakala* Agreement for Investment

(previously defined as the "Placement Agreement").

23.     This marked the first time in the parties' relationship that they had ever

executed such a Placement Agreement.

24.     Pursuant to the Placement Agreement, Arcapita appointed Tadhamon to

serve as its agent with respect to the investment of Arcapita funds in certain treasury securities

(each such investment a "placement").  Upon maturity of each placement, Tadhamon would be

obligated to return to Arcapita the value of the investment, plus an agreed upon return, minus

Tadhamon's agency fee.

25.     Section 6 of the Placement Agreement states, in pertinent part, that,

"Each party represents and warrants for the benefit of the other party from the date of this

---

[1]     Approximately $5 million was invested by Tadhamon with Arcapita at various times between September 24, 2009 and January 9, 2012.  Upon information and belief, all such investments were continually rolled over for subsequent periods.

6

APP021

Agreement and on each Investment Date that . . . this Agreement and each [placement]

contemplated hereunder will be binding and enforceable upon it. . . ."

26.     Furthermore, section 8.2 of the Placement Agreement states: "[n]o

expiry or early termination . . . shall affect the rights and obligations of either party hereunder in

relation to any outstanding [placement] upon which the conditions of this Agreement shall

remain applicable until such [placement] is completed and each party has received all amounts

due to it pursuant to the [placement]."

### C.  Placements

27.     Upon executing the Placement Agreement, Arcapita entered into the two

Placements on March 15, 2012, each for $10 million.  The Placements had prescribed maturity

dates of March 30, 2012 and April 16, 2012, respectively.

28.     To execute the Placements, Arcapita transferred a total of $20 million in

funds from its account at JP Morgan Chase Bank in New York to an account designated by

Tadhamon at HSBC Bank in New York.  The funds were then transferred from the HSBC Bank

account to an account held by Tadhamon at Khaleeji Commercial Bank B.S.C.

29.     Upon maturity of the Placements, Tadhamon agreed to deposit the

Placement Proceeds into Arcapita's account at JP Morgan Chase Bank in New York.

30.     Arcapita was insolvent on March 15, 2012 when it transferred the $20

million in Placements to Tadhamon.

31.     Just four days later, on March 19, 2012, Arcapita filed petitions for relief

under chapter 11 of the Bankruptcy Code.

32.     On March 30, 2012, Tadhamon was required pursuant to the Placement

Agreement to return to Arcapita its Placement of $10 million, plus a profit at the rate of 1.25%

7

APP022

per annum, minus Tadhamon's agency fee, resulting in Placement Proceeds in the amount of $10,005,208.33.

33.     On April 16, 2012, Tadhamon was required pursuant to the Placement Agreement to return to Arcapita its other Placement of $10 million, plus a profit at the rate of 2.0% per annum, minus Tadhamon's agency fee, resulting in Placement Proceeds in the amount of $10,017,777.78.

34.     The Placements, and the resulting Placement Proceeds owed to Arcapita, can be summarized as follows:

| Placed Funds | Investment Date | Maturity Date | Expected Return | Total Placement Proceeds Due At Maturity |
|---|---|---|---|---|
| $10,000,000 | March 15, 2012 | March 30, 2012 | 1.25% per annum | $10,005,208.33 |
| $10,000,000 | March 15, 2012 | April 16, 2012 | 2% annum | $10,017,777.78 |

### D. **Tadhamon's Failure to Complete the Placements Upon Maturity**

35.     Notwithstanding its binding obligations under the Placement Agreement, Tadhamon failed to deliver any of the Placement Proceeds due to Arcapita upon maturity of the Placements.

36.     On March 28, 2012 and April 15, 2012, respectively, Arcapita and Tadhamon purported to reinvest or "roll-over" each of the $10 million Placements for an additional term.  The new maturity dates of the Placements were April 30, 2012 and May 16, 2012.  The Placement Proceeds were not remitted to Arcapita on such maturity dates.

37.     On or about April 30, 2012, Arcapita, through its counsel, Gibson, Dunn & Crutcher LLP, sent a letter addressed to Waleed Rashan, chief executive officer of Tadhamon. The letter demanded payment of the Placement Proceeds, noting that the funds "are property of

APP023

the bankruptcy estate of Arcapita and must immediately be remitted to Arcapita . . . pursuant to the provisions of section 542 of the Bankruptcy Code" and Tadhamon's "failure immediately to turnover these funds to Arcapita will force us to commence an action to compel turnover."

38.     On or about June 25, 2012, Tadhamon, through its counsel, K&L Gates LLP, sent a letter addressed to Arcapita's counsel refusing to turn over the Placement Proceeds. Tadhamon claimed to be taking a "setoff" on account of the Antecedent Debt.

39.     Tadhamon has neither sought nor obtained an order of the Court allowing it to set off the Antecedent Debt against the Placement Proceeds.

40.     In or about December 2012, Tadhamon returned to Arcapita that portion of the Placement Proceeds that exceeded Tadhamon's purported setoff.  The outstanding balance of Placement Proceeds due and owing from Tadhamon to the Arcapita Estate is at least $18,480,269.  Tadhamon has failed to turn over any portion of these funds to the Arcapita Estate.

41.     To the extent that Arcapita and Tadhamon entered into the Placements as a means of paying the Antecedent Debt, they allowed Tadhamon to recover more on its claim against Arcapita than it otherwise would have been able to recover had the claim been resolved through Arcapita's chapter 11 proceedings or through a chapter 7 liquidation.

## COUNT I
### (Breach of the Placements and the Placement Agreement)

42.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 41 as though fully set forth herein.

43.     The Placements are valid, enforceable, and legally binding contracts between Arcapita and Tadhamon.

44.     Tadhamon is in default under the Placements and the Placement Agreement for failing to transfer the Placement Proceeds as required.

9

APP024

45.     Notwithstanding the Debtors' bankruptcy, under section 8.2 of the Placement Agreement, "[n]o expiry or early termination . . . shall affect the rights and obligations of either party hereunder in relation to any outstanding [Placement] upon which the conditions of this Agreement shall remain applicable until such [Placement] is completed and each party has received all amounts due to it pursuant to the [Placement]."

46.     Thus, Tadhamon has breached its obligations to Arcapita under the Placements.

47.     The Court granted the Committee standing to prosecute claims relating to the Placements on behalf of the Arcapita Estate.  As such, the Committee, on behalf of the Arcapita Estate, is entitled to (i) an award of damages equal to $18,480,269, plus interest, and (ii) reimbursement of, among other things, fees and costs (including reasonable attorneys' fees) expended in effecting compliance with the Placements, as well as fees and costs expended in any proceeding to recover sums owed under the same.

## COUNT II
### (Turnover of Assets – 11 U.S.C. §§ 541, 542 and 550)

48.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 47 as though fully set forth herein.

49.     The Placements are valid, enforceable, and legally binding contracts between Arcapita and Tadhamon.

50.     The Placements are specific in their terms as to both the maturity dates of Tadhamon's obligations and the amounts of those obligations.  The Placements matured on March 30, 2012 and April 16, 2012, respectively.  At maturity, Tadhamon owed Arcapita $10,005,208.33 and $10,017,777.78, respectively, on account of each Placement.

APP025

51.     By virtue of the Placements, after accounting for amounts previously remitted, Tadhamon is wrongfully in possession of property of the Arcapita Estate in the amount of $18,480,269, plus accrued interest thereon from the Placement maturity dates.

52.     The amount owed by Tadhamon to the Arcapita Estate on account of the Placements is payable immediately without legitimate offset of any kind.

53.     As a result of the foregoing, the Committee, on behalf of the Arcapita Estate, is entitled to (i) an award of damages equal to $18,480,269, plus interest, and (ii) reimbursement of any and all fees and costs (including reasonable attorneys' fees) expended in effecting compliance with the Placements, as well as fees and costs expended in any proceeding to recover sums owed under the same.

## COUNT III
### (Preferential Transfer – 11 U.S.C. §§ 547 and 550)

54.      The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 53 as though fully set forth herein.

55.     Arcapita transferred $20 million to Tadhamon under the Placements (the "Placement Transfers") on March 15, 2012.

56.     At the time of the Placement Transfers, Tadhamon was a "creditor" of Arcapita within the meaning of section 101(10) of the Bankruptcy Code.

57.     Each of the Placement Transfers was to or for the benefit of Tadhamon.

58.     Each of the Placement Transfers was made on account of the Antecedent Debt owed by Arcapita to Tadhamon.

59.     Each of the Placement Transfers was made while Arcapita was insolvent and within 90 days before it filed petitions for relief under chapter 11 of the Bankruptcy Code.

11

APP026

60.     The Placement Transfers enabled Tadhamon to receive more than it would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) Tadhamon received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

61.     Each of the Placement Transfers constitutes a preferential transfer avoidable pursuant to section 547(b) of the Bankruptcy Code and recoverable from Tadhamon pursuant to section 550(a).

62.     As a result of the foregoing, the Committee, on behalf of the Arcapita Estate, is entitled to a judgment pursuant to sections 547(b) and 550 of the Bankruptcy Code: (i) avoiding the Placement Transfers; (ii) directing that the Placement Transfers be set aside; and (iii) recovering the amounts due and owing under the Placements for the benefit of the Arcapita Estate.

## COUNT IV
### (Violation of Automatic Stay – 11 U.S.C. §362)

63.     The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 as though fully set forth herein.

64.     Pursuant to section 362(a)(3) of the Bankruptcy Code, upon the commencement of a chapter 11 case, "any act to . . . exercise control over property of the estate" constitutes a violation of the automatic stay.

65.     Pursuant to section 362(a)(7) of the Bankruptcy Code, "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor" also constitutes a violation of the automatic stay.

66.     Tadhamon has and continues to exercise control over the Placement Proceeds, which are property of the Arcapita Estate.

APP027

67. On or about June 25, 2012, Tadhamon informed Arcapita by letter that it would not relinquish control over the Placement Proceeds. Tadhamon claimed to be taking a setoff on account of the Antecedent Debt.

68. Tadhamon has neither sought nor obtained an order of the Court allowing it to set off the Antecedent Debt against the Placement Proceeds.

69. Tadhamon's actions are in direct violation of the automatic stay.

70. As a result of the foregoing, the Committee, on behalf of the Arcapita Estate, is entitled to (i) an award of damages equal to $18,480,269, and (ii) reimbursement of any and all fees and costs (including reasonable attorneys' fees) associated with Tadhamon's violation of the automatic stay.

## COUNT V
### (Claim Objection – 11 U.S.C. § 502(d))

71. The Committee repeats, re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 70 as though fully set forth herein.

72. The Committee has asserted causes of action, enumerated above, against Tadhamon that seek turnover of the Placement Proceeds pursuant to sections 542 and 550 of the Bankruptcy Code or, alternatively, avoidance of the Placement Transfers and recovery of the Placement Proceeds pursuant to sections 547 and 550 of the Bankruptcy Code.

73. Arcapita included on its Schedule F aggregate liabilities in the amount of $18,497,734.48 owing to Tadhamon on account of the Antecedent Debt. Absent objection by a party in interest or an amendment to Schedule F, Tadhamon will have allowed claims against Arcapita in the amount of $18,497,734.48.

APP028

74.     The Committee is entitled to a judgment under section 502(d) of the Bankruptcy Code disallowing all claims held by Tadhamon, including claims on account of the Antecedent Debt, pending payment or turnover of the Placement Proceeds.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully prays that the Court award the following relief:

(i)      payment of $18,480,269 plus all interest that may be earned thereon from the March 30, 2012 and April 16, 2012 maturity dates of the Placements, as applicable;

(ii)     disallowance of any and all claims that Tadhamon holds against the Arcapita Estate;

(iii)    reimbursement of, among other things, fees and costs (including reasonable attorneys' fees) expended in effecting compliance with the Placements, as well as fees and costs expended in any proceeding to recover sums owed under the same; and

(iv)     such other and further relief as the Court deems just.


Dated:  August 26, 2013
New York, New York

By:  /s/  Evan R. Fleck
Dennis F. Dunne
Evan R. Fleck
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for the Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), *et al.*

APP029

Notice of Motion of Defendant Bahrain Islamic Bank to Dismiss the Complaint

APP030

Hearing Date: January 21, 2014 at 11:00 a.m. E.S.T.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                                    :
                                                          :
ARCAPITA BANK B.S.C.(c), et al.,                          :        Chapter 11
                                                          :        Case No. 12-11076 (SHL)
                    Debtors.                               :        (Jointly Administered)
                                                          :
------------------------------------------------------------:
OFFICIAL COMMITTEE OF UNSECURED                           :
CREDITORS OF ARCAPITA BANK B.S.C.(c),                     :
et al.,                                                   :
                                                          :
                    Plaintiff,                            :        Adv. Pro. No. 13-01434 (SHL)
                                                          :
          v.                                              :
                                                          :
BAHRAIN ISLAMIC BANK,                                     :
                                                          :
                    Defendant.                            :
------------------------------------------------------------X

## NOTICE OF MOTION OF DEFENDANT BAHRAIN ISLAMIC BANK
## TO DISMISS THE COMPLAINT

**PLEASE TAKE NOTICE** that, upon the annexed Declaration of Mohammed Ebrahim

Mohammed in Support of Motion to Dismiss of Defendant Bahrain Islamic Bank, dated

November 13, 2013, and the accompanying Memorandum of Law in Support of Motion to

Dismiss, defendant Bahrain Islamic Bank ("BisB") will move before the Honorable Sean H.

Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York, on January 21, 2014 at 11:00

a.m. E.S.T., or as soon thereafter as counsel may be heard, for entry of an order pursuant to

Rules 12(b)(1), 12(b)(2) and 12(b)(6), Fed. R. Civ. P., made applicable by Rule 7012, Fed. R.

Bankr. P., dismissing this action (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion shall be

served upon BisB's counsel, K&L Gates LLP, 599 Lexington Avenue, New York, New York

10022 (Attn: John A. Bicks, Esq. and Lani A. Adler, Esq.), and filed with the Bankruptcy Court

electronically, with a courtesy copy delivered to the chambers of the Honorable Sean H. Lane, so

as to be received no later than January 14, 2014.


Dated: New York, New York
      November 18, 2013

                                 K&L GATES LLP

                                 By: _____
                                    John A. Bicks
                                    Lani A. Adler
                                    Ryan M. Papir

                                 *Counsel for Defendant Bahrain Islamic Bank*
                                 599 Lexington Avenue
                                 New York, New York 10022
                                 (212) 536-3900

- 2 -

APP032

John A. Bicks
Lani A. Adler
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3900

*Counsel for Defendant Bahrain Islamic Bank*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

In re:                                                :
                                                      :
ARCAPITA BANK B.S.C.(c), etal.,                       :
                                                      :
                        Debtors.                      :
                                                      :
-----------------------------------------------------X
                                                      :
OFFICIAL COMMITTEE OF UNSECURED                       :
CREDITORS OF ARCAPITA BANK B.S.C.(C)                  :
ET AL.,                                               :
                                                      :
                        v.                            :
                                                      :
BAHRAIN ISLAMIC BANK,                                 :
                                                      :
                        Defendant.                    :
-----------------------------------------------------X

Chapter 11
Case No. 12-11076 (SHL)
(Jointly Administered)

Adv. Pro. No. 13-01434 (SHL)

## DECLARATION OF MOHAMMED EBRAIM MOHAMMED IN SUPPORT OF
## MOTION TO DISMISS OF DEFENDANT BAHRAIN ISLAMIC BANK

Pursuant to 28 U.S.C. Section 1746, I, Mohammed Ebraim Mohammed, declare as

follows:

1.      Since 2007 , I have been the Chief Executive Officer of defendant Bahrain Islamic

        Bank ("BisB"), and make this declaration on personal knowledge in support of

        BisB's motion to dismiss the adversary proceeding complaint (the "Complaint")

APP033

filed against it by the Plaintiff, the Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.

2.     BisB is a Bahraini bank, with its headquarters located in Manama, Bahrain. BisB does not have and never has had any offices, staff or telephone numbers in the United States. It does not do business in the United States, or solicit business or clients, or advertise in the United States.

3.     According to the Complaint, Plaintiff seeks the return of $10 million paid to BisB by the debtor Arcapita Bank B.S.C. ("Arcapita"), which is also a Bahraini bank and headquartered in Bahrain. On March 14, 2012. Compl.¶¶1, 12, 27, 42, 48, 57, 65.

4.     According to the Complaint, on March 14, 2012, Arcapita paid BisB this $10 million pursuant to an agreement (denominated as the "Placement Agreement" in the Complaint) entered into on or about July 10, 2003, between BisB and Arcapita. In 2003, Arcapita was known as the First Islamic Investment Bank. A true and accurate copy of this Placement Agreement is attached as Exhibit A hereto. The March 14, 2012 payment by Arcapita was negotiated between BisB and Arcapita in Bahrain, not in the United States, and was not directed at any residents of the United States.

5.     The Placement Agreement was negotiated in Bahrain, not in the United States, and did not contemplate performance by the parties in the United States. None of the actions undertaken under the Placement Agreement were directed at residents of the United States.

6.     As set forth in Paragraph 24 of the Complaint, under the Placement Agreement, BisB purchased commodities for Arcapita. See Ex. A ¶ 1, 2, 3, 5, 6.

2



APP034

7.    Paragraph 12 of the Placement Agreement, Ex. A hereto, specifies that it "shall be governed by and construed in accordance with the laws of the Kingdom of Bahrain to the extent that such laws do not conflict with the principles of Islamic Sharia'a, the latter of which shall prevail."

8.    Paragraph 10 of the Placement Agreement, Ex. A hereto, specifies that it "shall not be amended without the written consent of both parties." At no time did BisB consent in writing to have the Placement Agreement governed by or construed in accordance with the laws of the United States.

9.    The Placement Agreement is between, and was entered and performed by, two Bahraini entities, and it is governed by Bahraini law.

10.   On March 14, 2012, the same day that, under the Placement Agreement, Arcapita transferred $10 million to BisB for BisB to purchase commodities for Arcapita, BisB purchased commodities for Arcapita through a London broker. This transaction did not impact anyone in the United States, except that Arcapita's payment was made by a one-time transfer of $10 million from a bank account Arcapita maintained in New York to a BisB correspondent bank account at JP Morgan Chase in New York.

11.   Pursuant to Paragraph 4.4 of the Placement Agreement, title to the commodities BisB purchased for Arcapita on March 14, 2012 passed to Arcapita on March 14, 2012.

12.   Pursuant to the Placement Agreement, the parties contemplated that, on March 29, 2012, for a price of $10,002,291.67, BisB would purchase from Arcapita the same commodities that BisB had purchased for Arcapita on March 14, 2012. However,

3

APP035

Arcapita owed $9,774,096.15 to BisB which, according to the Complaint, was due

to be paid to BisB by March 23, 2012. Compl.¶22.

13.     Under Bahraini law, which governs the $10 million payment that Plaintiff seeks to

obtain from BisB, set-off is explicitly permitted, even when the debts set off are

different.  Specifically, Article 353(a) of the Bahraini Civil Law states:

> A debtor has a right to a set-off of that which he owes to his
> creditor against that which such creditor owes to him, even
> when the causes giving rise to the two debts are different,
> provided that they are both for a sum of money or fungibles
> of a like nature and quality, that they are not in dispute and
> that they are due and may be sued for.

A true and accurate copy of this law, in English, taken from the website of the

Kingdom of Bahrain, Ministry of Justice and Islamic Affairs, is attached as Exhibit

B hereto.

14.     Accordingly, in or about July 2012, from Bahrain, I wrote to to Arcapita's Chief

Executive Officer, Mr. Arif A. Abdulmalik, in Bahrain, informing him that BisB

had exercised its right to set off the $10 million over which Plaintiff has sued in the

instant action against the aggregate amount of $9,774,096.15 that the Complaint

alleges Arcapita was obligated to pay to BisB by March 23, 2012, pursuant to

Article 353(a) of the Bahraini Civil Law; and that, as a consequence of the setoff,

BisB had a balance due to Arcapita in the amount of $194,516.03, which we



APP036

proposed to remit to Arcapita upon Arcapita's confirmation of the setoff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13 day of November, 2013 in Manama, Bahrain

Mohammed Ebrahim Mohammed

5

APP037

# EXHIBIT A

APP038

# INVESTMENT AGREEMENT

## BETWEEN

### First Islamic Investment Bank, E.C.
P.O. Box 1406
Manama, Kingdom of Bahrain

(the "Bank")

## AND

### Bahrain Islamic Bank
P.O. Box 5240
Manama, Kingdom of Bahrain

(the "Agent")

صورة الى : ملف مساهمة وتوثيق استثمار F.I.I.B

This agreement is made on the day of .10th.,July..2003 by and between:

**First Islamic Investment Bank, E.C. (FIIB)**
P.O. Box 1406
Manama, Kingdom of Bahrain
(the "Bank")

And

**Bahrain Islamic Bank (BIB)**
P.O. Box 5240
Manama, Kingdom of Bahrain
(the "Agent")

Now the parties agree as follows:-

**1. APPOINTMENT**
FIIB appoints Bahrain Islamic Bank as Agent for the investment of FIIB's funds for the purchase of commodities from a third party and sale of the same commodities to Bahrain Islamic Bank.

**2. COMMODITIES**
The commodities in which FIIB's funds are to be invested are such commodities as the parties may agree from time to time and which are not prohibited by the Islamic Sharia'a.

**3. BASIC TRANSACTION**
Bahrain Islamic Bank will act as Agent on behalf of the Bank in buying commodities on cash basis for immediate delivery and in selling such commodities to Bahrain Islamic Bank, as principal, with immediate delivery on deferred payment terms.

**4. PURCHASING**
4.1 The Agent will send an Investment Offer to the Bank containing all details of the transaction in accordance with (Exhibit - A).
4.2 Upon accepting of the Investment Offer, the Bank will send an Investment Acceptance in accordance with (Exhibit - B).
4.3 On the value date, the Bank shall transfer to the Agent such funds to enable the Agent to purchase the commodities on behalf of the Bank.
4.4 Once such payment reaches the Agent's account, the Agent shall complete the purchase of the commodities and notify the Bank of such purchase whereupon title to the commodities shall pass to the Bank who shall thereupon become the owner of those commodities.

2

APP040

## 5. SALES

5.1 Every sale shall be made after the purchase of the same commodities and with immediate delivery for deferred payment terms.

5.2 Immediately after Bahrain Islamic Bank concludes the purchase of commodities for the account of FIIB and the title of the commodities has passed on to FIIB, Bahrain Islamic Bank, acting in such capacity as principal, will extend an offer to FIIB to buy the same commodities for its own account for immediate delivery on a deferred payment basis. This offer will be confirmed in accordance with (Exhibit - C).

5.3 FIIB shall accept the offer in accordance with (Exhibit - D).

## 6. DEFERRED PAYMENT

Commodities may be purchased and sold on deferred payment after 30 days, 60 days, 90 days or 180 days according to Bank's stipulation for each transaction.

## 7. LIMITED AGENCY

For each transaction the Agent shall be acting as Agent for FIIB on limited agency (i.e. Agent on a deal by deal basis)

## 8. RATE OF RETURN (PROFIT)

The rate of return (profit) advised by the Agent to FIIB shall be a net rate.

## 9. AUTHORITY OF AGENT

The Agent shall arrange payment and collection of funds on behalf of FIIB and is hereby authorized as such Agent to arrange the contracts and to receive and to deliver the goods and to execute and deliver any endorsements, assignments or any other instruments of transfer which it deems necessary in connection with any individual transaction in respect of which it is instructed to act.

## 10. AMENDMENT

The terms of this Agreement shall not be amended without the written consent of both parties.

## 11. TERMINATION

This Agreement may be terminated at any time by either party giving not less than 30 days written notice of termination to the other party.

## 12. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of Kingdom of Bahrain to the extent that such Laws do not conflict with the principles of Islamic Sharia'a, the latter of which shall prevail.

In witness whereof, the parties hereto have executed this Agreement on the day and year first above written.

3

APP041

For/ First Islamic Investment Bank, E.C.

.......................

Name       : ALAN BARSLEY

Position   : DIRECTOR

For/ Bahrain Islamic Bank

.......................

Name       ABDULREHMAN SHEHAB          MOHD. SALEH ALI

Position   A.G.M. (OPERATIONS)         A.G.M. (RETAIL BANKING)

Date: 10.7.2003

4

## Exhibit - A
## (Investment Offer)

Date        : ....................................

To          : First Islamic Investment Bank, E.C.

Attn.       : ....................................

From        : Bahrain Islamic Bank

We refer to the Investment Agreement dated ................., 2003 (the "Agreement") between Bahrain Islamic Bank and First Islamic Investment Bank, and we are pleased to offer the following Commodity Transaction:

Commodity and Quantity:
Location:
Title Documents:
Unit Price:
Purchase Price:
Purchase Date:
Deferred Payment Date:
No. of Days:
Return:

Kindly credit US Dollar ...................., value ....................., to our account with ...................................., .....................; Swift Code .............; Favour .............................., Bahrain; Account No. ...................; Further credit to Bahrain Islamic Bank; Account No. ...........................

Thanks and best regards

5

APP043

**Exhibit – D**
**(Purchase Acceptance)**

Date        : ..........................................

To           : Bahrain Islamic Bank

Attn.      : ..........................................

From      : First Islamic Investment Bank


Thank you for your fax (Exhibit – C) dated ..................., we hereby confirm our acceptance to the Purchase offer made by you to buy the same commodity as follows:

Commodity and Quantity:
Location:
Title Documents:
Unit Price:
Purchase Price:
Purchase Date:
Sale Price:
Deferred Payment Date:
No. of Days:
Return

This acceptance is sent under the Agreement, and we kindly request you to credit our account with Chase Manhattan Bank, New York; Swift Code CHASUS33; Favour Arab Banking Corporation, Bahrain/ Account No. 544-7-04575, Further credit to First Islamic Invetsment Bank; Account No. 226280120101of US Dollar ............................. on the Deferred Payment Date ......................

Thanks and best regards

APP044

# EXHIBIT B

APP045

Ministry of Justice and Islamic Affairs



☆ Home   📧 Contact Us   ⊹ Sitemap          Search

Home >> Law and Legislation >> Civil Law



**Civil Law**

### Chapter V
### The Law

#### Article 201

Obligations arising from the law on acts other than contract, unilateral undertaking, injury act and profitable act shall be governed by the provisions of the law giving rise to such obligations.

### Part II
### The Effects of Obligations

### Chapter I
### Enforceable Obligation

#### Article 202

An obligation is enforceable against the debtor if he does not perform it voluntarily. The performance of a natural obligation, however, cannot be enforced.

#### Article 203

The judge shall decide, in the absence of any provision of the law, whether a natural obligation exists.

There cannot ever be a natural obligation that is contrary to public order.

#### Article 204

A debtor cannot claim restitution of that which he has voluntarily given to another with the object of discharging a natural obligation.

#### Article 205

A natural obligation may constitute a valid cause for a civil obligation.

### First: Specific Performance:

#### Article 206

1. A debtor shall be compelled upon being summoned do so specifically to perform his obligation, if such performance is possible.

2. When, however, specific performance is too onerous for the debtor, the Court may according to his request, limit performance to payment of money as indemnity, provided that this method of performance does not seriously prejudice the creditor.

#### Article 207

Subject to the rules with regard to transcription, an obligation to transfer ownership or any other real right transfers ipso facto that right, if the object of the obligation is specifically identified and is owned by the debtor without prejudice to the rules related to registration.

#### Article 208

When an obligation to transfer a real right has for its object a thing which is described only as regards its species, the right is not transferred, unless the object is identified as regards its individuality.

If, however, the debtor does not perform his obligation, the creditor may, upon an order of the judge, or in case of urgency even without such an order, acquire, at the expense of the debtor, an article of the same kind. He may also claim the value of the article without prejudice to his rights to damages, in either case.

#### Fourth: Set off:

##### Article 353

(a) A debtor has a right to a set-off of that which he owes to his creditor against that which such creditor owes to him, even when the causes giving rise to the two debts are different, provided that they are both for a sum of money or fungibles of a like nature and quality, that they are not in dispute and that they are due and may be sued for.

(b) Postponement of payment by reason of delay granted by the Judge or by the creditor does not prevent a set -off.

##### Article 354

A debtor may avail himself of set-off even when the places of payment of the two debts are different, but he must, in such a case, make good any loss caused to the creditor by reason of the fact that the creditor was not able, as result of the compensation, to obtain or to perform the prestation at the place fixed for this purpose.

##### Article 355

A set-off takes place, whatever may be the sources of the debts, except in the following cases:

(a) where one of the two obligations consists of a thing of which the owner has been unjustly deprived, and is the object of a claim for restitution;

(b) where one of the two debts consists of a thing that has been deposited or lent for use or is the object of a claim for restitution;

(c) where one of the two debts is a right which is not liable to attachment.

(d) where one of the two debts is payable in respect of alimony.

##### Article 356

(a) Set-off only takes place when set up by the interested party. Set-off cannot be renounced before the right thereto has come into existence.

(b) Set-off extinguishes the two debts to the extent of the amount of the smaller debt, from the moment they become subject to set-off. Imputation of the amount discharged in set-off takes place in the same way as in ordinary payment.

(c) If the debtor owes several debts, determination of the set-off shall take place in the same manner as the determination upon the payment thereof.

##### Article 357

If the delay for prescription of a debt has expired when set-off is set up, set-off will nevertheless still take place if the delay for prescription has not expired when set-off became possible.

##### Article 358

(a) Set-off cannot take place to the detriment of rights acquired by third parties.

(b) If, after the seizure by a third party of the property held by the debtor for his creditor, such debtor becomes the creditor of his creditor, he cannot set up set-off to the prejudice of the attaching creditor.

##### Article 359

(a) When a creditor has assigned his debt to a third party, the debtor who has consented to the assignment without reserve, cannot set up set-off against the assignee, which he had the right to set up before he consented to the assignment; he can only enforce his claim against the assignor.

(b) But a debtor who has not accepted an assignment which has been notified to him, may, notwithstanding the assignment, set up compensation.

##### Article 360

A debtor who had the right to set up set-off but who nevertheless paid his debt, cannot avail himself, to the prejudice of third parties, of the securities guaranteeing his right unless he did not know of the existence of his right.

#### Fifth: Merger

##### Article 361

When the qualities of creditor and debtor in the same debt are united in the same person, the debt is extinguished to the extent of the merger.

When the cause which gave rise to the merger disappears and its disappearance is retroactive, the debt revives with its accessories as regards all interested parties and the merger is deemed never to have existed.

### Chapter III
### The Extinction of Obligations Without Payment

APP047

Notice of Motion of Defendant Tadhamon Capital Bank B.S.C. to Dismiss the Complaint

Hearing Date: January 21, 2014 at 11:00 a.m. E.S.T.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

|   |   |   |
|---|---|---|
| In re: | : |   |
|   | : |   |
| ARCAPITA BANK B.S.C.(c), et al., | : | Chapter 11 |
|   | : | Case No. 12-11076 (SHL) |
| Debtors. | : | (Jointly Administered) |
| ----------------------------------------------------------------: |   |   |
| OFFICIAL COMMITTEE OF UNSECURED | : |   |
| CREDITORS OF ARCAPITA BANK B.S.C.(c), | : |   |
| et al., | : |   |
|   | : |   |
| Plaintiff, | : | Adv. Pro. No. 13-01435 (SHL) |
|   | : |   |
| v. | : |   |
|   | : |   |
| TADHAMON CAPITAL B.S.C., | : |   |
|   | : |   |
| Defendant. | : |   |

------------------------------------------------------------------X

## NOTICE OF MOTION OF DEFENDANT TADHAMON CAPITAL B.S.C.
## TO DISMISS THE COMPLAINT

**PLEASE TAKE NOTICE** that, upon the annexed Declaration of Waleed Rashdan in

Support of Motion to Dismiss of Defendant Tadhamon Capital B.S.C., dated November 15,

2013, and the accompanying Memorandum of Law in Support of Motion to Dismiss, defendant

Tadhamon Capital B.S.C. ("Tadhamon") will move before the Honorable Sean H. Lane, United

States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, New York, on January 21, 2014 at 11:00 a.m. E.S.T., or

as soon thereafter as counsel may be heard, for entry of an order pursuant to Rules 12(b)(1),

12(b)(2) and 12(b)(6), Fed. R. Civ. P., made applicable by Rule 7012, Fed. R. Bankr. P.,

dismissing this action (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion shall be

served upon Tadhamon's counsel, K&L Gates LLP, 599 Lexington Avenue, New York, New

York 10022 (Attn: John A. Bicks, Esq. and Lani A. Adler, Esq.), and filed with the Bankruptcy

Court electronically, with a courtesy copy delivered to the chambers of the Honorable Sean H.

Lane, so as to be received no later than January 14, 2014.


Dated: New York, New York
      November 18, 2013

                        K&L GATES LLP

                        By:_____
                            John A. Bicks
                            Lani A. Adler
                            Ryan M. Papir

                        *Counsel for Defendant Tadhamon Capital B.S.C.*
                        599 Lexington Avenue
                        New York, New York 10022
                        (212) 536-3900

APP050

John A. Bicks
Lani A. Adler
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3900

*Counsel for Defendant Tadhamon Capital B.S.C.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                :

In re:                          :

                                :

ARCAPITA BANK B.S.C.(c), <u>etal.</u>,     :            Chapter 11
                                :            Case No. 12-11076
                 Debtors.      :            (Jointly Administered)
                                :
------------------------------------------------------------X
                                :

OFFICIAL COMMITTEE OF UNSECURED   :
CREDITORS OF ARCAPITA BANK B.S.C.(C) :
ET AL.,                            :

                                :

                 v.               :

                                :        Adv. Pro. No. 13-01435 (SHL)

TADHAMON CAPITAL B.S.C.,          :

                                :

                 Defendant.   :
------------------------------------------------------------X

### DECLARATION OF WALEED RASHDAN IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT TADHAMON CAPITAL B.S.C.

Pursuant to 28 U.S.C. § 1746, I, Waleed Rashdan, declare as follows:

1.      Since 2008, when the company began operating, I have been the Chief Executive

Officer of defendant Tadhamon Capital B.S.C. ("Tadhamon"), and make this

declaration on personal knowledge in support of Tadhamon's motion to dismiss the

adversary proceeding complaint (the "Complaint") filed against it by the Plaintiff,

the Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.

2. As alleged in the Complaint, Tadhamon is a Bahraini corporation, whose only office is in Manama, Kingdom of Bahrain. Tadhamon does not have and never has had offices, staff or telephone numbers in the United States, and does not own any property in the United States. It does not do business in the United States, or solicit business or clients or advertise in the United States.

3. As alleged in the Complaint, on March 15, 2012, Tadhamon entered into a "Master Wakala Agreement For Investment," dated 15th March 2012, with the debtor, Arcapita B.S.C.(c) ("Arcapita").

4. A true and accurate copy of this Agreement (denominated in the Complaint as the "Placement Agreement") is attached as Exhibit A hereto.

5. Paragraph 7.1 of this Placement Agreement provides that it is to be "governed in all respects" by Bahraini law. Specifically paragraph 7.1 provides:

> This Agreement and the Construction, performance and validity hereof shall be governed in all respects in accordance with the laws of Kingdom of Bahrain save to the extent these conflict with the rules and principles of the Islamic Shari'a, when the latter shall prevail. The parties hereto agree to be bound by exclusive determination of the Fatwa and Shari'a Supervisory Board of the Wakil (the "Board") as to whether any such conflict exists, and if it does the appropriate provision(s) of the Islamic Shari'a to be applied. The court(s) shall apply the applicable provision(s) of the Islamic Shari'a as advised b y the Board.

6. Paragraph 7.2 of this Placement Agreement states that "[t]he parties hereto hereby submit to the jurisdiction of Kingdom of Bahrain courts for the purpose of any proceedings arising out of or in connection with this Agreement."

7. On March 15, 2012, under the Placement Agreement, Arcapita transferred two payments, each in the amount of ten million U.S. dollars, an aggregate of $20 million, to Tadhamon for Tadhamon to make investments for Arcapita. Arcapita

APP052

made these transfers on March 15, 2012 by arranging, in Bahrain, to have the funds
transferred from a correspondent bank account it had at JP Morgan Chase Bank in
New York to an intermediary account at HSBC Bank in New York maintained by
Tadhamon's bank in Bahrain, Khaleeij Commercial Bank. As alleged in the
Complaint, HSBC then, immediately, transferred the funds to Tadhamon's Khaleeji
Commercial Bank account in Bahrain.

8.  In Paragraph 2.1, the Placement Agreement defines "Investment Date" as the date
    on which Arcapita was obligated to pay Tadhamon for the securities Tadhamon
    was to purchase for Arcapita.

9.  As set forth in the two Schedules dated March 15, 2012, annexed and made a part
    of the Placement Agreement, which set forth the terms of each of the two
    transactions as to which Plaintiff sues and which were each signed by both Arcapita
    and by Tadhamon, the "Investment Date" for each transaction was March 15, 2012.
    True and accurate copies of these two schedules are attached as Exhibits B and C
    hereto.

10. As set forth in the Placement Agreement and in the Complaint, in the Placement
    Agreement, the parties contemplated that, for each of the two investment
    transactions for which Arcapita paid Tadhamon, Tadhamon would return to
    Arcapita the amount of monies transferred, plus an agreed-upon return, on a
    specified future "Maturity Date."

11. As set forth in the Schedules the parties executed on March 15, 2012 with respect
    to the transactions at issue, Exhibits B and C hereto, one of Arcapita's $10 million
    investments had a Maturity Date of March 30, 2012, and the other had a Maturity
    Date of April 16, 2012.

3

12. As alleged in the Complaint, Arcapita owed Tadhamon an aggregate of approximately $18,000,000 -- $5,000,000 due on April 9, 2012; $12,000,000, due on May 17, 2012; and $1,000,000, also due to Tadhamon, on April 9, 2012.

13. The Placement Agreement was negotiated in Bahrain, not in the United States, and did not contemplate performance in the United States. None of the actions undertaken under the Placement Agreement were directed at residents of the United States, and Tadhamon never bought or invested in United States treasury or other United States securities or products of any kind under the Placement Agreement. All of the investments made by Tadhamon for Arcapita under the Placement Agreement were made in Bahraini investments.

14. According to the Complaint, Arcapita filed a bankruptcy petition in the U.S. on March 19, 2012.

15. On March 28, 2012, pursuant to the Placement Agreement, at Arcapita's request, Arcapita and Tadhamon each executed the agreement attached as Exhibit D hereto. In Exhibit D, Arcapita instructed Tahdamon, upon the scheduled March 30 maturity of the first of Tadhamon's $10 million investments described above, to invest the $10 million in a new investment, with an Investment Date of March 30, 2012 and a Maturity Date of April 30, 2012, rather than remit that amount to Arcapita on March 30, 2012.

16. Similarly, on April 15, 2012, pursuant to the Placement Agreement, at Arcapita's request, Arcapita and Tadhamon each executed the agreement attached as Exhibit E hereto. In Exhibit E, Arcapita instructed Tadhamon, upon the scheduled April 16, 2012 maturity of the second of Tahdamon's $10 million investments described

4

above, to invest the $10 million in a new investment, with an Investment Date of

April 16, 2012, and a Maturity Date of May 16, 2012, rather than remit that amount

to Arcapita on April 16, 2012.

17.     Under Bahraini law, which governs the Placement Agreement, set-off is explicitly

permitted, even when the debts set-off are different or based on different

transactions.  Specifically, Article 353(a) of the Bahraini Civil Law states:

> A debtor has a right to a set-off of that which he owes to his
> creditor against that which such creditor owes to him, even
> when the causes giving rise to the two debts are different,
> provided that they are both for a sum of money or fungibles
> of a like nature and quality, that they are not in dispute and
> that they are due and may be sued for.

A true and accurate copy of this law, in English, taken from the website of the

Kingdom of Bahrain, Ministry of Justice and Islamic Affairs, is attached as Exhibit

F hereto.

18.     As alleged in the Complaint, Arcapita did not timely pay Tadhamon the aggregate

amount of $18,497,734.48 that Arcapita owed Tadhamon.  Accordingly, as

authorized by the law of Bahrain, in or about June 2012, Tadhamon set off that

amount of $18,497,734.48 against the approximately $20 million Tadhamon owed

to Arcapita in connection with the Placement Agreement, and Tadhamon offered to

forward to Arcapita the difference of $1,412,050.63.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 15th of November, 2013
in Manama Bahrain

Waleed Rashdan

5

# EXHIBIT A

*In the Name of Allah, the Beneficent, the Merciful*

## MASTER WAKALA AGREEMENT
## FOR INVESTMENT

**Between**

**Arcapita B.S.C.(c)**

**(As the Muwakkil)**

**And**

**Tadhamon Capital BSC (c)**
**(as the Wakil)**

**Dated 15ᵗʰ March 2012**

**Arcapita B.S.C.(c)**
**Department of Legal & Shari'a Compliance**

APP057

## Contents

| Clause | Heading |
|---|---|
| 1 | Introduction |
| 2 | Interpretation |
| 3 | Conditions Precedent |
| 4 | Wakala Terms and Conditions |
| 5 | Implementation and Performance of each Investment Transaction |
| 6 | Representations and Warranties |
| 7 | Law and Jurisdiction |
| 8 | General Provisions |

**Schedule**

| First | Form of Wakil Offer and Muwakkil Acceptance |
|---|---|
| Second | Particulars of Communication |

2

APP058

This **Agreement** is executed as of the latest of the dates on the signature page

**BETWEEN:**

(1)  Arcapita B.S.C.(c) (the **"Muwakkil:"**) and;

(2)  Tadhamon Capital BSC (c) (the **"Wakil"**)

**IT IS HEREBY AGREED** as follows:

1.  **Introduction**

The Muwakkil (the principal) wishes to appoint the Wakil (the agent) to be the agent of the Muwakkil with respect to the investment of the Muwakkil's funds in Islamically acceptable transactions through and as part of the Wakil's pool of treasury funds pursuant to the terms and conditions set out in this Agreement and in compliance with the rules and principles of the Islamic Shari'a as determined by the Fatwa and Shari'a Supervisory Board of the Wakil and embodied in this Agreement.

2.  **Interpretation**

2.1  The following terms and expressions shall have the meanings assigned to them herein unless the context requires otherwise:

**Business Day**: A day on which the Muwakkil and the Wakil are open for business.

**Investment Amount**: The amount invested in relation to an Investment Transaction.

**Investment Date**: The due date for payment of the Investment Amount in relation to an Investment Transaction, which date shall be specified in the Wakil Offer.

**Investment Transaction**: An individual transaction between the Muwakkil and the Wakil made pursuant to Clause 5.

**Maturity Date**: The date on which the Maturity Proceeds are to be paid to the Muwakkil, as specified in the Wakil Offer.

**Maturity Proceeds**: The amount due to the Muwakkil on the Maturity Date, calculated in accordance with the Wakil Offer.

**Muwakkil Acceptance**: A notice to be sent by the Muwakkil to the Wakil substantially in the form set out in the First Schedule.

**Muwakkil Profit**: The profit due to the Muwakkil calculated in accordance with the Wakil Offer.

**Wakil Offer**: A notice to be sent by the Wakil to the Muwakkil substantially in the form set out in the First Schedule.

2.2  The Schedules to this Agreement form an integral part hereof.

3

APP059

2.3    References to Clauses and Schedules are references to clauses of and schedules to this Agreement.

2.4    The headings are inserted for convenience only and shall not affect the construction hereof.

3.    **Conditions Precedent**

Each Party shall provide the other with certified true original specimen signature(s) of the individual(s) authorized to sign on its behalf this Agreement and all other documents required in connection herewith.

4.    **Wakala Terms and Conditions**

4.1    The Muwakkil hereby appoints the Wakil to be the agent of the Muwakkil for the investment of the Muwakkil's funds through and as part of the Wakil's pool of treasury funds. The Wakil is hereby authorized to enter into Islamically acceptable transactions on behalf of the Muwakkil and for the Muwakkil's account and to do all acts as fully as the Muwakkil could do itself with respect to such transactions through purchase agreements, sales agreements or other agreements and to negotiate on behalf of the Muwakkil in relation thereto and to exercise on the Muwakkil's behalf all other related powers necessary to enable it to fulfill its obligations under this Agreement.

4.2    The Muwakkil as principal shall bear all the risks associated with the acts of the Wakil as agent for the Muwakkil except those risks resulting from the Wakil's willful misconduct or gross negligence.

4.3    Investment Transactions shall be carried out for and on behalf of the Muwakkil but in the name of the Wakil, or in the name of such agent as the Wakil selects.

4.4    The Wakil shall be entitled to the agency fees specified in the Wakil Offer in respect of each Investment Transaction.

5    **Implementation and Performance of each Investment Transaction**

5.1    On any Business Day during the business hours of both parties, either party may notify the other by telephone or any other media of its desire to enter into an Investment Transaction. The Wakil shall then send the Muwakkil a Wakil Offer.

5.2    If the Muwakkil is willing to enter into the proposed Investment Transaction, it shall send the Wakil a Muwakkil Acceptance.

5.3    The Muwakkil shall pay the Investment Amount to such account as the Wakil shall have notified the Muwakkil for value not later than the Investment Date.

5.4    The Wakil shall arrange for payment and collection of funds on behalf of the Muwakkil and is hereby authorized to execute and deliver any instruments or transfers which are necessary in connection therewith.

4

5.5    The Wakil undertakes to transfer the Maturity Proceeds on the Maturity Date to such account as the Muwakkil shall have notified the Wakil.

5.6    The currency of each Investment Transaction shall be as agreed by both parties.

5.7    The parties hereby notify each other that in accordance with their internal rules and procedures, all telephone calls made by or to the parties concerning any proposed Investment Transaction may be tape recorded by the parties. Accordingly, each party (a) consents to the recording of the telephone conversations of trading, marketing and/or other personnel of the parties and their officers, employees, agents and affiliates in connection with this Agreement or any potential Investment Transaction, (b) agrees to obtain any necessary consent of and give notice of such recording to such personnel (as aforesaid) and (c) agrees that recordings may be submitted in evidence in any proceedings relating to this Agreement or any Investment Transaction (accepted or otherwise).

## 6    Representations and Warranties

Each party represents and warrants for the benefit of the other party from the date of this Agreement and on each Investment Date that:

(i)    it has the legal capacity to enter into this Agreement and the Investment Transactions contemplated hereunder;

(ii)    the execution by it of this Agreement has been duly authorized;

(iii)    this Agreement and each Investment Transaction contemplated hereunder will be binding and enforceable upon it and will not violate the terms of any other agreement to which it is a party; and

(iv)    it has and will at all times maintain all authorizations, approvals, licenses and consents required to enable it lawfully to perform its obligations under this Agreement.

## 7    Law and Jurisdiction

7.1    This Agreement and the construction, performance and validity hereof shall be governed in all respects in accordance with the laws of Kingdom of Bahrain save to the extent these conflict with the rules and principles of the Islamic Shari'a, when the latter shall prevail. The parties hereto agree to be bound by exclusive determination of the Fatwa and Shari'a Supervisory Board of the Wakil (the "**Board**") as to whether any such conflict exists, and if it does the appropriate provision(s) of the Islamic Shari'a to be applied. The court(s) shall apply the applicable provision(s) of the Islamic Shari'a as advised by the Board.

7.2    The parties hereto hereby submit to the jurisdiction of Kingdom of Bahrain courts for the purpose of any proceedings arising out of or in connection with this Agreement.

## 8    General Provisions

8.1    Notices

5

8.1.1   A notice shall be deemed to have been given when received.

8.1.2   Any notice received on a day which is not a Business Day for the Addressee shall be deemed to have been given at its opening on the next succeeding Business Day.

8.1.3   Particulars of communication are set out in the Second schedule.

8.1.4   The Muwakkil hereby agrees to indemnify and hold the Wakil harmless against all liabilities, costs, claims, losses, damages or expenses which the Wakil may suffer or incur as a result of acting upon any instructions received by fax under the signature of the Muwakkil or a purportedly authorized officer or representative of the Muwakkil except for liabilities, loss, costs, claims, damages or expenses resulting from the Wakil's willful misconduct or gross negligence.

8.2     Termination

The expiry date of this Agreement shall be the date falling after one year from the date of effectiveness hereof and shall thereafter be automatically extended by a further period or periods of one year each unless either party notifies the other in writing not less than 30 days prior to any such expiry date of its wish not to extend the validity of this Agreement, in which case this Agreement shall expire upon the then forthcoming expiry date. No expiry or early termination (as the case may be) shall affect the rights and obligations of either party hereunder in relation to any outstanding Investment Transaction upon which the conditions of this Agreement shall remain applicable until such Investment Transaction is completed and each party has received all amounts due to it pursuant to the Investment Transaction.

**AS WITNESS** the duly authorized representatives of the parties hereto have executed this Agreement.

6

APP062

**THE FIRST SCHEDULE**
**Form of Wakil Offer and Muwakkil Acceptance**

**WAKIL OFFER**

Date:

To:      **Arcapita B.S.C.(c)**

From:    **Tadhamon Capital BSC (c)**

**Re: Master Wakala Agreement for Investment dated [       ] (the "Master Agreement")**
We refer to the Master Agreement (terms defined in which shall have the same meanings herein) and your instructions of today, in which you indicated your wish to deposit an amount with us for investment by us in Islamic transactions on your behalf:

1.  Investment Amount          : [       ]

2.  Investment Date            : [       ]

3.  Maturity Date              : [       ]

4.  Our agency fee will be     : [       ]

5.  We will invest the Investment Amount in transactions expected to generate for you a Muwakkil Profit of [       ]% per annum. Any profit exceeding this after the deduction of the agency fee will be ours as an incentive.

6.  In respect of the Investment Amount, please authorize us to debit your account with us or credit the amount to our following account: [       ].

7.  This offer is valid for acceptance only until [       ] am/pm today and conditional upon receipt by us of the Investment Amount in cleared funds no later than the Investment Date.

Signed: .......................................................
**Tadhamon Capital BSC (c)**
**MUWAKKIL ACCEPTANCE**

**To:    Tadhamon Capital BSC (c)**
1.  We accept the above terms.

2.  In respect of the Investment Amount, on the Investment Date (please tick one only):
    ☐ Please debit our following account with you: [       ].
    ☐ We will credit the amount to your specified account.

3.  On the Maturity Date, please credit the Maturity Proceeds to the following account:

Signed: .......................................................
**Arcapita B.S.C.(c)**

7

APP063

**THE SECOND SCHEDULE**
**Particulars of Communication**

**The Wakil:**

Attention:

Postal Address:

**The Muwakkil:**

Attention:        Sonia Baqer/Maria Mudara

Postal Address: P.O. Box 1406
                Manama
                Kingdom of Bahrain

Fax:             +973 218217

SWIFT:           FIIVBHBM

Fax:   17  104840

SWIFT: ———

Or in accordance with such other contact details as one party may from time to time notify in writing to the other.

8

**Signatures**

For and on behalf of
**Arcapita B.S.C.(c)**

Authorized Signature:
Name: Hisham Al Raee
Title: Executive Director
Date: 15/3/2012

Authorized Signature:
Name: Mohammed Chowdhury
Title: Executive Director
Date: 15/3/2012

For and on behalf of
**Tadhamon Capital BSC (c)**

Authorized Signature:
Name: Ahmed Darwish
Title: Director Financial Control
Date: March 15th 2012

Authorized Signature:
Name: Fatima Ba Ali
Title: Director - Operations
Date: March 15th, 2012

تضامن كابيتال
Tadhamon Capital

9

# EXHIBIT B

THE FIRST SCHEDULE

Form of Wakil Offer and Muwakkil Acceptance

**WAKIL OFFER**

| | |
|---|---|
| Date: | 15 March 2012 |
| To: | Arcapita B.S.C.(c) |
| From: | Tadhamon Capital BSC (c) |

Re: Master Wakala Agreement for Investment dated 15 March 2012 (the "Master Agreement")

We refer to the Master Agreement (terms defined in which shall have the same meanings herein) and your instructions of today, in which you indicated your wish to deposit an amount with us for investment by us in Islamic transactions on your behalf:

1. Investment Amount : USD 10,000,000
2. Investment Date : 15 March 2012
3. Maturity Date : 30 March 2012
4. Our agency fee will be :
5. We will invest the Investment Amount in transactions expected to generate for you a Muwakkil Profit of 1.25% per annum. Any profit exceeding this after the deduction of the agency fee will be ours as an incentive.
6. In respect of the Investment Amount, please authorize us to debit your account with us or credit the amount to our following account:

| | |
|---|---|
| Receiving bank | Khaleeji Commercial Bank – Bahrain |
| SWIFT | KHCBBHBM |
| Beneficiary's a/c | BH66KHCB00300032041003 |
| Beneficiary's name | Tadhamon Capital B.S.C. |
| Intermediary bank | HSBC Bank New York, USA SWIFT: MRMDUS33 |

7. This offer is valid for acceptance only until 05:00 pm today and conditional upon receipt by us of the Investment Amount in cleared funds no later than the Investment Date.

Signed: Takmac

**Tadhamon Capital BSC (c)**

**MUWAKKIL ACCEPTANCE**

To:  Tadhamon Capital BSC (c)
1.  We accept the above terms.

2.  In respect of the Investment Amount, on the Investment Date (please tick one only):
     ☐ Please debit our following account with you:
     ☑ We will credit the amount to your specified account.

3.  On the Maturity Date, please credit the Maturity Proceeds to the following account:

Signed:
Arcapita B.S.C.(c)

USD to be received in:

Pay to: JPMorgan Chase, NY
SWIFT Code: CHASUS33
ABA No.: 021000021
For account of: Arcapita Bank B.S.C
SWIFT Code: FIIVBHBM
Account No.: 000400806991

7

# EXHIBIT C

APP068

**THE FIRST SCHEDULE**
**Form of Wakil Offer and Muwakkil Acceptance**

WAKIL OFFER

| | |
|---|---|
| Date: | 15 March 2012 |
| To: | Arcapita B.S.C.(c) |
| From: | Tadhamon Capital BSC (c) |

Re: Master Wakala Agreement for Investment dated 15 March 2012 (the "Master Agreement")

We refer to the Master Agreement (terms defined in which shall have the same meanings herein) and your instructions of today, in which you indicated your wish to deposit an amount with us for investment by us in Islamic transactions on your behalf:

1. Investment Amount : USD 10,000,000 -
2. Investment Date : 15 March 2012
3. Maturity Date : 16 April 2012
4. Our agency fee will be :
5. We will invest the Investment Amount in transactions expected to generate for you a Muwakkil Profit of 2.0% per annum. Any profit exceeding this after the deduction of the agency fee will be ours as an incentive.
6. In respect of the Investment Amount, please authorize us to debit your account with us or credit the amount to our following account:

| | |
|---|---|
| Receiving bank | Khaleeji Commercial Bank    Bahrain |
| SWIFT | KHCBBHBM |
| Beneficiary's a/c | BH66KHCB00300032041003 |
| Beneficiary's name | Tadhamon Capital B.S.C. |
| Intermediary bank | HSBC Bank New York, USA SWIFT: MRMDUS33 |

7. This offer is valid for acceptance only until 05:00 pm today and conditional upon receipt by us of the Investment Amount in cleared funds no later than the Investment Date.

Signed: ......................................

Tadhamon Capital BSC (c)

MUWAKKIL ACCEPTANCE

To: Tadhamon Capital BSC (c)
1. We accept the above terms.

2. In respect of the Investment Amount, on the Investment Date (please tick one only):
   ☐ Please debit our following account with you:
   ☑ We will credit the amount to your specified account.

3. On the Maturity Date, please credit the Maturity Proceeds to the following account:

Signed: ......................................
Arcapita B.S.C.(c)

USD to be received in:

Pay to: JPMorgan Chase, NY
SWIFT Code: CHASUS33
ABA No.: 021000021
For account of: Arcapita Bank B.S.C
SWIFT Code: FIIVBHBM
Account No.: 000400806991

7

APP069

# EXHIBIT D

## THE FIRST SCHEDULE
### Form of Wakil Offer and Muwakkil Acceptance

**WAKIL OFFER**

| | |
|---|---|
| Date: | 28 March 2012 |
| To: | Arcapita B.S.C.(c) |
| From: | Tadhamon Capital BSC (c) |

**Re: Master Wakala Agreement for Investment dated 15 March 2012 (the "Master Agreement")**

We refer to the Master Agreement (terms defined in which shall have the same meanings herein) and your instructions of today, in which you indicated your wish to deposit an amount with us for investment by us in Islamic transactions on your behalf:

1. Investment Amount                  : USD 10,000,000
2. Investment Date                      : 30 March 2012
3. Maturity Date                         : 30 April 2012
4. Our agency fee will be
5. We will invest the Investment Amount in transactions expected to generate for you a Muwakkil Profit of 1.5% per annum. Any profit exceeding this after the deduction of the agency fee will be ours as an incentive.
6. In respect of the Investment Amount, please authorize us to debit your account with us or credit the amount to our following account:

7. This offer is valid for acceptance only until 05:00 pm today and conditional upon receipt by us of the Investment Amount in cleared funds no later than the Investment Date.

Signed: ............................................

Tadhamon Capital BSC (c)

**MUWAKKIL ACCEPTANCE**

To:   **Tadhamon Capital BSC (c)**

1.    We accept the above terms.

2.    In respect of the Investment Amount, on the Investment Date (please tick one only):
      ☐ Please debit our following account with you:
      ☐ We will credit the amount to your specified account.

3.    On the Maturity Date, please credit the Maturity Proceeds to the following account:

**USD to be received in:**

Signed: ............................................
Arcapita B.S.C.(c)

**Pay to:** JPMorgan Chase, NY
**SWIFT Code:** CHASUS33
**ABA No.:** 021000021
**For account of:** Arcapita Bank B.S.C
**SWIFT Code:** FIIVBHBM
**Account No.:** 000400806991

# EXHIBIT E

**THE FIRST SCHEDULE**

Form of Wakil Offer and Muwakkil Acceptance

**WAKIL OFFER**

| | |
|---|---|
| Date: | 15 April 2012 |
| To: | Arcapita B.S.C.(c) |
| From: | Tadhamon Capital BSC (c) |

**Re: Master Wakala Agreement for Investment dated 15 March 2012 (the "Master Agreement")**

We refer to the Master Agreement (terms defined in which shall have the same meanings herein) and your instructions of today, in which you indicated your wish to deposit an amount with us for investment by us in Islamic transactions on your behalf:

1. Investment Amount                 : USD 10,000,000
2. Investment Date                      : 16 April 2012
3. Maturity Date                          : 16 May 2012
4. Our agency fee will be              :
5. We will invest the Investment Amount in transactions expected to generate for you a Muwakkil Profit of 1.5% per annum. Any profit exceeding this after the deduction of the agency fee will be ours as an incentive.
6. In respect of the Investment Amount, please authorize us to debit your account with us or credit the amount to our following account:

7. This offer is valid for acceptance only until 12:pm pm today and conditional upon receipt by us of the Investment Amount in cleared funds no later than the Investment Date.

Signed: ...................................

Tadhamon Capital BSC (c)

**MUWAKKIL ACCEPTANCE**

To:     Tadhamon Capital BSC (c)
1.      We accept the above terms.

2.      In respect of the Investment Amount, on the Investment Date (please tick one only):
☐ Please debit our following account with you.
☐ We will credit the amount to your specified account.

This is reinvestment of USD 10,000,000.00 only. On value date please pay the profit of USD 17,777.78 to our account as per our instructions.

3.      On the Maturity Date, please credit the Maturity Proceeds to the following account:

Signed: ...................................
Arcapita B.S.C.(c)

Pay to: JPMorgan Chase, NY
SWIFT Code: CHASUS33
ABA No.: 021000021
For account of: Arcapita Bank B.S.C©
SWIFT Code: FIIVBHBM
Account No.: 000400806991

# EXHIBIT F

APP074

Ministry of Justice and Islamic Affairs



Home >> Law and Legislation >> Civil Law

Civil Law





Send this page to a friend

### Chapter V
### The Law
### Article 201

Obligations arising from the law on acts other than contract, unilateral undertaking, injury act and profitable act shall be governed by the provisions of the law giving rise to such obligations.

### Part II
### The Effects of Obligations

### Chapter I
### Enforceable Obligation

### Article 202

An obligation is enforceable against the debtor if he does not perform it voluntarily. The performance of a natural obligation, however, cannot be enforced.

### Article 203

The judge shall decide, in the absence of any provision of the law, whether a natural obligation exists.

There cannot ever be a natural obligation that is contrary to public order.

### Article 204

A debtor cannot claim restitution of that which he has voluntarily given to another with the object of discharging a natural obligation.

### Article 205

A natural obligation may constitute a valid cause for a civil obligation.

### First: Specific Performance:

### Article 206

1. A debtor shall be compelled upon being summoned do so specifically to perform his obligation, if such performance is possible.

2. When, however, specific performance is too onerous for the debtor, the Court may according to his request, limit performance to payment of money as indemnity, provided that this method of performance does not seriously prejudice the creditor.

### Article 207

Subject to the rules with regard to transcription, an obligation to transfer ownership or any other real right transfers ipso facto that right, if the object of the obligation is specifically identified and is owned by the debtor without prejudice to the rules related to registration.

### Article 208

When an obligation to transfer a real right has for its object a thing which is described only as regards its species, the right is not transferred, unless the object is identified as regards its individuality.

If, however, the debtor does not perform his obligation, the creditor may, upon an order of the judge, or in case of urgency even without such an order, acquire, at the expense of the debtor, an article of the same kind. He may also claim the value of the article without prejudice to his rights to damages, in either case.

APP075

Ministry of Justice and Islamic Affairs

**Fourth: Set off:**

**Article 353**

(a) A debtor has a right to a set-off of that which he owes to his creditor against that which such creditor owes to him, even when the causes giving rise to the two debts are different, provided that they are both for a sum of money or fungibles of a like nature and quality, that they are not in dispute and that they are due and may be sued for.

(b) Postponement of payment by reason of delay granted by the Judge or by the creditor does not prevent a set -off.

**Article 354**

A debtor may avail himself of set-off even when the places of payment of the two debts are different, but he must, in such a case, make good any loss caused to the creditor by reason of the fact that the creditor was not -able, as result of the compensation, to obtain or to perform the prestation at the place fixed for this purpose.

**Article 355**

A set-off takes place, whatever may be the sources of the debts, except in the following cases:

(a) where one of the two obligations consists of a thing of which the owner has been unjustly deprived, and is the object of a claim for restitution;

(b) where one of the two debts consists of a thing that has been deposited or lent for use or is the object of a claim for restitution;

(c) where one of the two debts is a right which is not liable to attachment.

(d) where one of the two debts is payable in respect of alimony.

**Article 356**

(a) Set-off only takes place when set up by the interested party. Set-off cannot be renounced before the right thereto has come into existence.

(b) Set-off extinguishes the two debts to the extent of the amount of the smaller debt, from the moment they become subject to set-off. Imputation of the amount discharged in set-off takes place in the same way as in ordinary payment.

(c) If the debtor owes several debts, determination of the set-off shall take place in the same manner as the determination upon the payment thereof.

**Article 357**

If the delay for prescription of a debt has expired when set-off is set up, set-off will nevertheless still take place if the delay for prescription has not expired when set-off became possible.

**Article 358**

(a) Set-off cannot take place to the detriment of rights acquired by third parties.

(b) If, after the seizure by a third party of the property held by the debtor for his creditor, such debtor becomes the creditor of his creditor, he cannot set up set-off to the prejudice of the attaching creditor.

**Article 359**

(a) When a creditor has assigned his debt to a third party, the debtor who has consented to the assignment without reserve, cannot set up set-off against the assignee, which he had the right to set up before he consented to the assignment; he can only enforce his claim against the assignor.

(b) But a debtor who has not accepted an assignment which has been notified to him, may, notwithstanding the assignment, set up compensation.

**Article 360**

A debtor who had the right to set up set-off but who nevertheless paid his debt, cannot avail himself, to the prejudice of third parties, of the securities guaranteeing his right unless he did not know of the existence of his right.

**Fifth: Merger**

**Article 361**

When the qualities of creditor and debtor in the same debt are united in the same person, the debt is extinguished to the extent of the merger.

When the cause which gave rise to the merger disappears and its disappearance is retroactive, the debt revives with its accessories as regards all interested parties and the merger is deemed never to have existed.

**Chapter III**
**The Extinction of Obligations Without Payment**

APP076

Declaration of Nicholas A. Bassett in Support of the Committee's Objection to
Bahrain Islamic Bank's Motion to Dismiss

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Official Committee of*
*Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re:                                    :
                                          :           Chapter 11
ARCAPITA BANK B.S.C.(c), et al.,          :           Case No. 12-11076 (SHL)
                                          :           Confirmed
              Reorganized Debtors.        :
                                          :
-------------------------------------------------------------x
                                          :
OFFICIAL COMMITTEE OF UNSECURED           :
CREDITORS OF ARCAPITA BANK B.S.C.(c),     :
et al.,                                   :
                                          :           Adv. Pro. No. 13-1434 (SHL)
              v.                          :
                                          :
BAHRAIN ISLAMIC BANK                      :
                                          :
-------------------------------------------------------------x
```

**DECLARATION OF NICHOLAS A. BASSETT IN SUPPORT OF THE OBJECTION OF**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO BAHRAIN**
**ISLAMIC BANK'S MOTION TO DISMISS THE COMPLAINT**

I, Nicholas A. Bassett, hereby declare, pursuant to 28 U.S.C. § 1746, under

penalty of perjury:

APP078

1.      I am an attorney duly licensed to practice in the State of New York and in the United States Bankruptcy Court for the Southern District of New York.  I am a member of the law firm Milbank, Tweed, Hadley & McCloy LLP, counsel to the Official Committee of Unsecured Creditors (the "Committee") of Arcapita Bank B.S.C.(c) ("Arcapita") and each of its affiliated debtors-in-possession in the above-captioned proceeding.

2.      I respectfully submit this Declaration in Support of the Committee's Objection to Defendant Bahrain Islamic Bank's ("BisB") Motion to Dismiss the Complaint.

3.      Attached hereto as Exhibit A is a true and correct copy of BisB's investment offer (the "Investment Offer") to Arcapita for a placement of $10 million, dated March 14, 2012.

4.      Attached hereto as Exhibit B is a true and correct copy of Arcapita's acceptance of BisB's Investment Offer (the "Investment Acceptance").

5.      Attached hereto as Exhibit C is a true and correct copy of the "Agent's Confirmation and purchase offer" (the "Purchase Offer") sent from BisB to Arcapita, dated March 14, 2012.

6.      Attached hereto as Exhibit D is a true and correct copy of Arcapita's acceptance of BisB's Purchase Offer, dated March 14, 2012 (the "Purchase Acceptance").

7.      Attached hereto as Exhibit E is a true and correct copy of email correspondence between Maria Mudara and Omar Alkawari of Arcapita confirming BisB's designation of an account at JP Morgan Chase Bank (New York/USA) for the placement transfer, and providing the account number and Swift code necessary for the transfer.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Dated: January 28, 2014
Washington, DC

By:   /s/  Nicholas A. Bassett
Nicholas A. Bassett
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for the Official Committee of Unsecured
Creditors of Arcapita Bank B.S.C.(c), *et al.*

# Exhibit A

APP081



## EXHIBIT - A
## (INVESTMENT OFFER )

DATE :   14-Mar-12

TO    :  ARCAPITA BANK - BAHRAIN
ATTN. TREASURY-OPERATION.
      FAX 17 218217
FROM  :  BAHRAIN ISLAMIC BANK - BAHRAIN .

We refer to the Investment Agreement dated 10th July, 2003 (the "Agreement")
between Bahrain Islamic Bank and Arcapita Bank, and we are pleased to
refer the following Commodity Transaction:

Commodities and Quantity : Palladium, 14,245 Troy Ounces
Purchase Price              : USD 10,000,000.00
Purchase Date               : 14 MAR 2012
Deferred Payment Date       : 29 MAR 2012
No. of Days                 : 15 DAYS
expected Return             :0.55%

Thanks and best regards

# Exhibit B



**ARCAPITA**

**(Investment Acceptance)**

| | | |
|---|---|---|
| Date | : | **March 14, 2012** |
| To | : | Bahrain Islamic Bank |
| Attn | : | Mr. Samir Abdulaziz |
| Fax | : | 17533486 |
| From | : | Arcapita Bank B.S.C (c) |

Our Ref::    **02/11**

Thank you for your fax (Exhibit – A) dated **March 14, 2012** we are pleased to confirm our acceptance:

| | |
|---|---|
| Commodity and Quantity: | **Palladium 14,245 Troy Ounces** |
| Purchase Price: | **USD 10,000,000.00** |
| Purchase Date: | **March 14, 2012** |
| Deferred Payment Date: | **March 29, 2012** |
| No. of Days: | 15 Days |

Thanks and best regards,

APP084

# Exhibit C



## EXHIBIT - C
### (Agent's Confirmation and purchase offer )

DATE  :  14-Mar-12

TO    :  ARCAPITA BANK - BAHRAIN

ATTN. TREASURY-OPERATION.
        FAX 17 218217.
FROM  :  BAHRAIN ISLAMIC BANK - BAHRAIN .

Thank you for your fax (exhibit - B) dated 26 Apr 2011. We hereby confirm our purchase of the commodities detailed in Exhibit - B in your name and for our account. We would now like to extend an offer to purchase the same commodities which we have originally bought for you in accordance with Exhibit - B for our own Account as follows:

| | |
|---|---|
| Commodity & QUANTITY | : Palladium, 14,245 Troy Ounces |
| Purchase Price | : USD 10,000,000.00 |
| Purchase Date | : 14 MAR 2012 |
| Sale Price | : USD 10,002,291.67 |
| Deferred Payment Date | : 29 MAR 2012 |
| No. of Days | : 15 DAYS |
| expected Return | :0.55% |

We confirm that we shall pay the Sale Price to you on the Deferred Payment Date.

Thanks and best regards

APP086

# Exhibit D

.



# ARCAPITA

**(Purchase Acceptance)**

| | | |
|---|---|---|
| Date | : | **March 14, 2012** |
| To | : | Bahrain Islamic Bank |
| Attn | : | Mr. Samir Abdulaziz |
| Fax | : | 17533486 |
| From | : | Arcapita Bank B.S.C (c) |

Our Ref:: **02/11**

Thank you for your fax ("Exhibit – C") dated **March 14, 2012** we hereby confirm our acceptance to the purchase offer made by you to buy the same commodity as follows:

| | |
|---|---|
| Commodity and Quantity: | **Palladium 14,245 Troy Ounces** |
| Purchase Price: | **USD 10,000,000.00** |
| Purchase Date: | **March 14, 2012** |
| Sale Price: | **USD 10,002,291.67** |
| Deferred Payment Date: | **March 29, 2012** |
| No. of Days: | **15 Days** |
| Return: | **USD 2,291.67** |

On value date **March 14, 2012** we will pay **USD 10,000,000.00** to your account as per your instructions.

Thanks and best regards,

APP088

# Exhibit E

APP089

## Maria Mudara

**To:** Omar Alkawari
**Subject:** RE: New Murabaha- Bahrain Islamic Bank (BIB)

**From:** Omar Alkawari
**Sent:** Wednesday, March 14, 2012 12:02 PM
**To:** Maria Mudara
**Subject:** RE: New Murabaha- Bahrain Islamic Bank (BIB)

pay USD to

## USD

JP Morgan chase Bank (New York/USA)
Swift (CHASUS33)
Account number: 885062968
Swift: BIBBBHBM

**From:** Maria Mudara
**Sent:** Wednesday, March 14, 2012 12:01 PM
**To:** Omar Alkawari
**Subject:** FW: New Murabaha- Bahrain Islamic Bank (BIB)

Kindly confirm with them where do they need the USD.

Thanks.

Best Regards,
Maria Mudara
Operations Department

Arcapita Bank B.S.C.(c) | Arcapita Building
Bahrain Bay | P.O. Box 1406
Manama | Kingdom of Bahrain

Tel: +973 17 218333 | Dir: +973 17 218869
Fax: +973 17 218217
mmudara@arcapita.com | www.arcapita.com

Licensed as an Islamic wholesale bank by the Central Bank of Bahrain

**From:** Omar Alkawari
**Sent:** Wednesday, March 14, 2012 10:42 AM
**To:** Abdul Kader Kazi; Farhaz Farouk; Ahmed Al-Doy; Ahmed Taqi; Amin Jawad; Alaa Shafie; Deena Hamad; Fatema Mansoor; Fowzia Aidok; Gana Balaratnam; Hasan Nowrooz; Maria Mudara; Mani Kuttickal; Marwa Al Awadhi; Mohammed Alammadi; Mohammed AlShaikh; Nawaf Mattar; Noora Khalfan; Sarah Ghayyath; Sharaah Abdulrahman; Sonia Baqer; Ady AlShaikh; Abdulrahman Alsowaidi
**Cc:** Rashid Khan; Yousif Al Sayed; Abdulrahman Aqeel
**Subject:** New Murabaha- Bahrain Islamic Bank (BIB)

1

APP090



PLACEMENT BY ARCAPITA

| Deal Ticket No. | Treasur | BIB | 489/11 |
| Ref No.: | Arcapita | | 02/11 |

| | | |
| Purchase Amount: | $ | 10,000,000.00 |
| Profit Rate: | 0.55000000% |
| Value Date: | 14-Mar-12 |
| Deferred Date | 29-Mar-12 |
| Number of Days | 15 |
| Profit | 2,291.67 |
| Sale Amount | 10,002,291.67 |
| Commodity | |
| Quantity | |
| Price | #DIV/0! |

| Agents Offer | 14/03/2012 | 10.00 AM |
| Investors Acceptance | 14/03/2012 | 10.05 AM |
| Agents (as Principal) Offer | 14/03/2012 | 10.20 AM |
| Investors Acceptance | 14/03/2012 | 10.35 AM |

Remarks
This is a new amount to be paid to their A/C

Done with     N/A

2

APP091