# 15-cv-03828 (GBD)

## United States District Court

*for the*

## Southern District of New York

_____

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ARCAPITA BANK B.S.C.(C), ET AL.,

*Appellant,*

—against—

BAHRAIN ISLAMIC BANK,

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (LANE, J.)

IN RE ARCAPITA BANK B.S.C.(C), *ET. AL.*, BANKR. CASE NO. 12-11076

**APPENDIX TO BRIEF FOR APPELLANT – VOLUME II**

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
DENNIS F. DUNNE
EVAN R. FLECK
ANDREW M. LEBLANC
28 Liberty Street
New York, New York 10005-1413
(212) 530-5000
aleblanc@milbank.com

*Attorneys for the Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

## TABLE OF CONTENTS

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| **VOLUME I** | | | |
| Complaint Against Bahrain Islamic Bank | August 26, 2013 | 13-1434: Dkt. No. 1 | APP001 |
| Complaint Against Tadhamon Capital | August 26, 2013 | 13-1435: Dkt. No. 1 | APP015 |
| Notice of Motion of Defendant Bahrain Islamic Bank to Dismiss the Complaint | November 18, 2013 | 13-1434: Dkt. No. 8 | APP030 |
| Notice of Motion of Defendant Tadhamon Capital to Dismiss the Complaint | November 18, 2013 | 13-1435: Dkt. No. 8 | APP048 |
| Declaration of Nicholas A. Bassett in Support of the Committee's Objection to Bahrain Islamic Bank's Motion to Dismiss | January 28, 2014 | 13-1434: Dkt. No. 15 | APP077 |
| **VOLUME II** | | | |
| Transcript Regarding Hearing Held on March 9, 2014 re: Motion to Dismiss Adversary Proceeding | March 28, 2014 | 13-1434: Dkt. No. 20; 13-1435: Dkt. No. 18 | APP092 |
| Bankruptcy Court's Memorandum of Decision | April 17, 2015 | 13-1434: Dkt. No. 23; 13-1435: Dkt. No. 21 | APP267 |
| Order Granting Motion to Dismiss the Complaint Against Bahrain Islamic Bank | April 28, 2015 | 13-1434: Dkt. No. 24 | APP291 |
| Order Granting Motion to Dismiss the Complaint Against Tadhamon Capital | April 28, 2015 | 13-1435: Dkt. No. 22 | APP294 |
| Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against Bahrain Islamic Bank | May 12, 2015 | 13-1434: Dkt. No. 25 | APP297 |
| Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against Tadhamon Capital | May 12, 2015 | 13-1435: Dkt. No. 23 | APP303 |

Transcript Regarding Hearing Held on March 9, 2014 re: Motion to Dismiss Adversary
Proceeding

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    CASE NO. 12-11076-shl

4    - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    ARCAPITA BANK B.S.C.(C), et al, and

8    ARCAPITA BANK B.S.C.(c), et al,

9

10            Debtors.

11    - - - - - - - - - - - - - - - - - - - x

12

13                        U.S. Bankruptcy Court

14                        One Bowling Green

15                        New York, New York

16

17                        March 19, 2014

18                        11:07 AM

19

20

21    B E F O R E :

22    HON. SEAN H. LANE

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO - KAREN

Page 2

1    HEARING Re Doc. #1766 Motion to Object to Claim No. 254

2

3    HEARING Re Doc. #1771 Motion to Approve/Motion for Order

4    Pursuant to Rule 9019 Approving Settlement Agreement With

5    Thronson Parties

6

7    HEARING Re Doc. #1707 Motion for Omnibus Objection to

8    Claim(s)/Ninth Omnibus Objection to Claims filed by Evan R.

9    Fleck on behalf of Reorganized Debtors and the New Holding

10   Companies (Claim 577)

11

12   HEARING Re Adversary Proceeding: 13-01434-shl Official

13   Committee of Unsecured Creditors of Arcap v Bahrain Islamic

14   Bank; pre-trial conference

15

16   HEARING Re Doc. #8 Motion to Dismiss Adversary Proceeding

17   Filed by Defendant: Bahrain Islamic Bank

18

19   HEARING Re Adversary Proceeding: 13-01435-shl Official

20   Committee of Unsecured Creditors of Arcap v. Tadhamon

21   Capital B.S.C., Pre-trial Conference

22

23

24

25

Page 3

1    HEARING Re Adversary Proceeding: 13-01435-shl Official

2    Committee of Unsecured Creditors of Arcap v Tadhamon Capital

3    B.S.C.; Doc #8 Motion to Dismiss Adversary Proceeding Filed

4    by Defendant Tadhamon Capital B.S.C.

5

6    HEARING Re Adversary Proceeding: 13-01677-shl Baeshen, et al

7    v Arcapita Bank B.S.C.(c) et al; Pre-trial Conference

8

9    HEARING Re Doc #4 Motion to Dismiss Adversary Proceeding

10   Filed by Defendant: Reorganized Debtors and the New Holding

11   Companies

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms

                                                          Page 4

1    A P P E A R A N C E S :

2

3    MILBANK, TWEED, HADLEY & MCCLOY LLP

4         Attorneys for the Reorganized Debtors

5         One Chase Manhattan Plaza

6         New York, NY 10005-1413

7

8    BY:  LENA MANDEL, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for the Official Creditors' Committee

12        International Square Building

13        1850 K Street, N.W.

14        Washington, D.C.  20006

15

16   BY:  ANDREW M. LEBLANC, ESQ.

17

18   K&L GATES

19        Attorneys for Bahrain Islamic Bank and Tadhamon Capital

20        599 Lexington Avenue

21        New York, NY  10022

22

23   BY:  LANI A. ADLER, ESQ.

24        JOHN A. BICKS, ESQ.

25

1   BAKER HOSTETLER

2        Attorneys for Baeshen

3        45 Rockefeller Plaza

4        New York, NY  10111

5

6   BY:  MARC SKAPOF, ESQ.

7        REGINA L. GRIFFIN, ESQ.

8        JAMES W. DAY, ESQ.

9

10   TELEPHONIC APPEARANCES:

11

12   ANDREW TSANG, ESQ., MILBANK, TWEED, HADLEY & MCCLOY, LLP,

13        FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   JOSEPH G. GIBBONS, WHITE & WILLIAMS LLP FOR WESTCHESTER

15        FIRE INSURANCE COMPANY

16   ADAM RAUCH, FTI CONSULTING, INC.

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning.  Please be seated.

 4          We're here this morning for a hearing in Arcapita

 5    Bank and so before we begin, let me get appearances from

 6    folks who expect to speak at the hearing this morning, in no

 7    particular order.

 8              MR. LEBLANC:  Good morning, Your Honor, Andrew

 9    Leblanc of Milbank Tweed Hadley & McCloy on behalf of the

10    reorganized Arcapita, joined by my colleagues, Nicholas

11    Bassett and Lena Mandel.

12              THE COURT:  All right.  Good morning.  And who's

13    going to be arguing the other side of the motions that we

14    have in front of us today?

15              MS. ADLER:  Your Honor, Lani Adler and John Bicks,

16    K&L Gates for the defendants in the adversary proceedings

17    against Bahrain Islamic Bank and Tadhamon Capital.

18              THE COURT:  All right.  Thank you.

19              MR. SKAPOF:  Good morning, Your Honor, Marc

20    Skapof, Baker Hostetler with my colleague Regina Griffin and

21    Jim Day, arguing for the Baeshen claimants.

22              THE COURT:  All right.  So before we get to those

23    motions, there were a few other things on the calendar, so

24    take it away.

25              MS. MANDEL:  Good morning, Your Honor.
```

1           THE COURT:  Good morning.

2           MS. MANDEL:  Lena Mandel, Milbank Tweed Hadley &

3     McCloy, on behalf of the reorganized debtors.

4           We do have a couple of claims related matters

5     today.  The first matters on the agenda have been adjourned,

6     and at the time we filed the agenda, Your Honor, we didn't

7     have the date for the April omnibus hearing, so we adjourned

8     them without a date certain.

9           But with respect to matter number one, omnibus

10    objection number two, with respect to claim 255, we would

11    like to adjourn it to April 30 at 11 a.m.

12          THE COURT:  All right.

13          MS. MANDEL:  And with respect to the third omnibus

14    objection, this is one handled by Gibson Dunn, so I don't

15    have a date for that.

16          THE COURT:  All right.  That's fair enough.

17          MS. MANDEL:  Thank you, Your Honor.

18          Then we have an uncontested objection to claim

19    number 254, filed by Joint Venture, Foreign Van Ness

20    Construction (ph) and Muhr and Roberts (ph).

21          There was a settlement agreement as we explained

22    in our objection that the debtors entered into post-petition

23    with the claimant.  They never got Court approval, so it's

24    not a binding settlement agreement, but based on the review

25    of its terms by FTI, our financial consultants, we believe

Page 8

1  that the terms of the settlement are reasonable, and we're

2  willing to abide by them.

3        So they filed a proof of claim based on the amount

4  set forth as the settlement amount in that agreement, which

5  was equivalent to slightly over $4 million.  However, there

6  was one point in the agreement that dealt with a provisional

7  amount, which was slightly over a million dollars that

8  related to work that had not been performed at the time, and

9  on information belief that it had never been performed.

10        So we believe that the settlement amount should be

11  reduced by that number.  And when we tried to contact the

12  claimant to resolve this consensually, but they -- we never

13  got any response.  So we were forced to file a formal

14  objection.

15        As Your Honor can see, we served the objection on

16  them, we did not receive any response.  And so we're asking

17  to have that claim reduced to $2,979,419 --

18        THE COURT:  All right.

19        MS. MANDEL:  -- and 10 cents.

20        THE COURT:  So let me make sure I understand this.

21  You want me to essentially approve the settlement agreement,

22  but then back out of the settlement agreement certain funds

23  that are the subject of the objection?

24        MS. MANDEL:  That is correct, Your Honor.  Well,

25  we're not formally asking to approve the settlement

Page 9

```
 1    agreement.  We're asking to reduce the proof of claim --

 2              THE COURT:  Claim.

 3              MS. MANDEL:  -- and allow it in the amount --

 4              THE COURT:  Consistent with a modified settlement

 5    agreement.

 6              MS. MANDEL:  That is correct, Your Honor.

 7              THE COURT:  I understand, all right.  And they

 8    were noticed, properly noticed with --

 9              MS. MANDEL:  That's right.  We filed affidavit of

10    service.

11              THE COURT:  All right.  Anybody wish to be heard

12    in connection with that claim objection?

13         (No response)

14              THE COURT:  All right.  I did take a look at it as

15    well as the settlement agreement to try to put the pieces

16    together, and I had understood the way you understood it

17    here this morning, but it's nice to confirm it, and I will

18    grant the claim objection.  And I think you're right, that I

19    don't need to address the settlement, as the claim objection

20    really sets the proper figure.

21              MS. MANDEL:  Thank you, Your Honor.

22              THE COURT:  And so if you'd submit an order on

23    that.

24              MS. MANDEL:  Thank you very much, we will.

25              THE COURT:  Thank you.
```

1          MS. MANDEL:   Okay.   The next matter is motion

2     under Rule 9019 seeking approval of the settlement with the

3     Thronson Parties.

4          As Your Honor may recall, there were a lot of

5     different litigation surrounding the sale by Falcon Gas

6     Search Company, debtor of the Nortex (ph) assets, that was

7     one of them, filed in Texas state court by former employees

8     who were holding stock options.

9          And they alleged that, you know, they were not --

10    they were deprived of the opportunity of exercising those

11    stock options in connection with the sale.  So they filed a

12    suit seeking damages close to $2 million.

13         We finally were able to consensually resolve those

14    claims, and we are seeking approval of the settlement, which

15    provides that Falcon will pay these parties $190,000 for

16    which there will be -- have the Texas lawsuit dismissed with

17    prejudice and grant debtor's wide release, very broad

18    release.

19         And we believe that this is a very good settlement

20    for Falcon's estate.  You know, we're settling $2 million of

21    a claim for $190,000, where the settlement allowed the plan

22    to be confirmed, as with respect to Falcon and the Falcon

23    creditors will now -- their coverage will be enhanced.  So

24    we're seeking approval of the settlement.

25         The only item in the settlement agreement that

1  we're asking to modify is the settlement -- there were --

2  Thronson Parties filed numerous proofs of claim, and they

3  were objected to on the fourth omnibus objection, which

4  obviously now resolved.  And the stipulation -- the

5  settlement agreement provides that once the payment is made,

6  a joint stipulation will be filed withdrawing those claims.

7          We believe that's unnecessarily cumbersome and

8  unnecessary, so we're asking Your Honor, and we included it

9  in the proposed order that once the payment is made under

10  the settlement agreement three days after that, all the

11  claims will be deemed automatically withdrawn, and we will

12  withdraw the pending fourth omnibus objection.

13          THE COURT:  Well, I agree with you it's probably

14  unnecessary, but I confess that I'm not anxious to start

15  approving settlement agreements, where you give you me a

16  settlement agreement and say we want you to approve it, but

17  we want you to change a part of it.

18          I can see -- again, this seems fairly

19  uncontroversial here, but I could see how that notion could

20  lead to some very unfortunate and confusing requests and

21  results, so I confess I'm not a big fan of that.

22          The other one I think is different, in that, you

23  noticed -- it's noticed in a way -- well, the two of them

24  together raise some concerns.  I think I'm willing to let

25  you go on the first one, but the second one, I think it's a

1    very administerial act that can be accomplished fairly

2    easily without much expense at all.

3              MS. MANDEL:  That's fine, Your Honor.  We will --

4              THE COURT:  If it's in the settlement agreement,

5    that's what the parties contemplated --

6              MS. MANDEL:  Well, my only concern was that there

7    are 36 of them, but that's okay, we'll figure it out.

8              THE COURT:  Well, you can tell them that in the

9    settlement agreement they agreed to do it so --

10             MS. MANDEL:  Right.

11             THE COURT:  -- the judge understands that they

12   will do it and if you have --

13             MS. MANDEL:  That's fine, Your Honor, that's not a

14   problem.  We'll modify the proposed order and we'll be then

15   seeking just approval of the settlement agreement as is.

16             THE COURT:  All right.  Anyone wish to be heard on

17   the request to approve this settlement?

18        (No response)

19             THE COURT:  All right.  Hearing no objection, I

20   will approve the settlement consistent with the settlement

21   agreement as we just discussed under Rule 9019 as satisfying

22   that requirement, and certainly within the -- more than the

23   lowest range of reasonableness and the factors identified by

24   the Court in Iridium.

25             MS. MANDEL:  Thank you, Your Honor.

1          The last claims related matter on the agenda was

2     listed as a contested matter, and was relating to claim

3     number 577 from the ninth omnibus objection to claims.

4     Since we filed the agenda, the claimant has withdrawn its

5     proof of claim, so there's no need to go forward on a

6     contested matter.

7          And I understand that the claimant is on the phone

8     and wishes to say something.

9          THE COURT:  All right.  Who's on the phone?

10        (No response)

11        THE COURT:  Maybe they're in listen only capacity.

12        MS. MANDEL:  Okay.  Maybe they're just listening.

13        THE COURT:  It's all right.

14        MS. MANDEL:  So that's --

15        THE COURT:  All right.  Well, I appreciate them

16    addressing it in a timely way so we can have the record

17    clear for the hearing.  And in light of that, it doesn't

18    look like we need to do anything as to that claim.

19        MS. MANDEL:  That's correct, thank you very much.

20        THE COURT:  Thank you very much.

21        MS. MANDEL:  Thank you, Your Honor.

22        THE COURT:  All right.  I believe that allows us

23    to move on to the motions part of the program.  I thought

24    that it'd probably made sense to do the Baeshen motion first

25    unless --

1           MR. LEBLANC:  Whichever the Court prefers, Your

2   Honor, it's -- I'm arguing all three of them so whatever the

3   Court's pleasure is.

4           THE COURT:  All right.  So you're stuck --

5           MR. LEBLANC:  So I'll --

6           THE COURT:  -- either way.

7           MR. LEBLANC:  I will now stand and argue.  Let me

8   just switch books if I could, Your Honor.

9           THE COURT:  Absolutely and we'll give a second for

10  the folks to come up on the other side on that motion.

11          All right, proceed.

12          MR. LEBLANC:  May it please the Court, Your Honor,

13  Andrew Leblanc of Milbank Tweed Hadley & McCloy on behalf of

14  the reorganized debtors.

15          I want to tell the Court at the outset that I'm

16  going to say this with respect to both motions that I'm

17  going to argue.  The motions are extraordinary we believe,

18  in the context of the bankruptcy case for different reasons,

19  but I don't want Your Honor to think that I saw that about

20  every motion that I argue.  It's just these two or the three

21  but two of them are really the same, are truly

22  extraordinary.

23          And I'm going to deal with this one obviously and

24  we'll deal with the other one when we get to that.  But this

25  motion, Your Honor, in its simplest terms, seeks to gut the

Page 15

1    confirmation order that the Court already entered.

2          Now, the confirmation order that the Court entered

3    dealt in relevant part with two critical elements.  The two

4    elements that are necessary for the complainant's claims.

5          The first is the plan in as clear terms as one

6    could possibly do, dictated what the assets of the estate

7    were, which were property of the estate.  The Court

8    determined that, and I have demonstratives here, Your Honor,

9    that show, and if the Court would like me to I'm happy to

10   walk through where those definitions are.

11         But the definition of property of the estate, as

12   reflected in the disclosure statement as confirmed by the

13   plan, includes all of the scheduled assets.  There's a

14   commingled amount of cash, constituting $147 million of cash

15   that are designated on the schedules.  The Court then found

16   that to be property of the estate.

17         The complainants seek a determination from the

18   Court that that was never property of the estate.  And

19   astonishingly, and what again I think is truly extraordinary

20   is at no point in time until they filed their complaint

21   after the plan had gone effective, did they raise their hand

22   and say, we contest, we dispute, we even want to reserve our

23   rights as to whether or not that particular piece of

24   property is property of the estate.

25         And what makes that particular element of their

1    claim even more astonishing, is that in the context of this

2    plan, someone else did exactly that.  Someone else raised

3    their hand, said I have a dispute as to whether or not my

4    particular piece of property is property of the estate.  And

5    what happened?  That particular creditor, Mr. Nazer (ph) got

6    a reservation of rights specific to him, allowing him to

7    preserve that argument.  Had the Baeshens done the same, one

8    of two things would've happened.

9          Either it would've been concluded that we could

10    include them in a reservation of rights, or alternatively,

11    the dispute would've been resolved.  But fundamentally,

12    because they didn't make themselves known at any point in

13    time prior to the filing of their complaint, nobody had any

14    reason to think that there was a contest to that.

15          And I think that Mr. Nazer came before the Court,

16    or came at least before the debtors filed an objection and

17    had the reservation, may explain it was in the contemplation

18    of somebody that that might be an argument that one could

19    make.  And that reservation of rights, it's reflected in the

20    plan as repeated in our papers is clear that it relates to

21    Mr. Nazer.

22          Now, that's -- that element alone, that's fatal to

23    their claim because --

24          THE COURT:  Well, let me ask whether -- there's a

25    res judicata aspect of this.

1          MR. LEBLANC:  Correct.

2          THE COURT:  But there's also what I hear in your

3    comments, also it's almost a laches kind of argument that by

4    waiting, and I guess that it's tied in with the res judicata

5    meaning that proceeding went forward and you didn't

6    challenge it.  Are you making any sort of separate laches

7    argument?

8          MR. LEBLANC:  No.  No, I don't think, Your Honor,

9    that there's -- well, let me be clear, in a motion to

10   dismiss we're not.  It's a declarable -- the constructive

11   trust is an equitable doctrine to the extent that they

12   wanted to assert a constructive trust.

13         We would argue a laches argument.  That's probably

14   a summary judgment argument.  The problem for them, Your

15   Honor, is they have to get past the motion to dismiss on the

16   basis of res judicata.

17         THE COURT:  Right.

18         MR. LEBLANC:  And the Court having determined this

19   in the confirmation order and in confirming the plan, they

20   don't get out of the starting gate, and we don't have to

21   raise affirmative defenses to inequitable relief like a

22   constructive trust that they seek, like affirmative defenses

23   like laches, because they simply don't get out of the

24   starting gate.

25         THE COURT:  You mentioned the $147 million in

Page 18

1    cash, how many other folks are in the same position as these

2    plaintiffs and the objecting party for purposes of the plan

3    are there?  I mean, how much of that cash are we talking?

4               MR. LEBLANC:  Your Honor, I think -- the number --

5    the dollar amount is $320 million, so even though there's

6    only 147 million because what's important for the Court to

7    remember is these are unrestricted investment accounts that

8    were deposited.

9               THE COURT:  Right.

10              MR. LEBLANC:  The company could do with them what

11   they chose.  The 147 million is simply what was available --

12              THE COURT:  At that time.

13              MR. LEBLANC:  -- what was in bank accounts at that

14   time.

15              THE COURT:  Was the balance but --

16              MR. LEBLANC:  It was the balance, because the

17   money was obviously commingled, which in and of itself would

18   defeat if they get past the summary judgment stage, would

19   defeat a constructive trust argument.  But again, we're not

20   at that point.

21              But it's 230 million, and I understand it's about

22   60 claimants who would be in exactly the same position.  In

23   other words, who have URIA or RIA accounts, deposited money,

24   and could come before the Court if there's no restriction,

25   if the confirmation order meant nothing, could come before

1    the Court and contest or contend that they could assert a

2    constructive trust.

3            Now, I talked about the designation by the Court

4    of the assets.  There's a second and independent fatal flaw

5    to their assertion, and that is that the Baeshens in the

6    plan, one of the things that occurs, is they are designated,

7    they're concluded to be creditors, based upon their URIA

8    accounts.

9            And separately with respect to their rights

10   offering account, there's a separately classified group of

11   claimants and the Baeshens fall into both of those

12   categories.

13           Now, the disclosure statement sets forth plainly

14   the classification of those claims.  The Court by its

15   determination concludes that all claimants within those

16   categories are similarly situated, and all claimants get the

17   treatment that's provided for in the plan.

18           Now, the treatment that's provided for in the plan

19   is demonstrably different than what the Baeshens are

20   contending they're entitled to now, which is just take their

21   money and go home.

22           Now, why is that so critical, Your Honor, because

23   that is a second independent decision that the Court makes

24   in the context of the confirmation of the plan.  That is,

25   that prohibits them from now asserting that their claims

1    against the estate are anything other than those that are

2    categorized as unsecured claims against Arcapita Bank

3    entitled to the distributions that are provided for in the

4    plan.

5            So, Your Honor, as to either of those issues, and

6    with respect to the claims themselves, they filed -- it's

7    not just that they were scheduled, they also filed proofs of

8    claim.  They filed proofs of claim, so they came to the

9    Court, and they came to the debtors and said, we believe

10   ourselves to be claimants.  It had a boilerplate reservation

11   of rights that didn't mention anything about constructive

12   trust.  But it has -- they came to the Court and said, we

13   are claimants.

14           The debtors then proceeded, and the debtors with

15   the help of the plan sponsors and the committee proceeded

16   with proposing a plan, having a disclosure statement

17   approved, months later having that plan approved, months

18   after that, having that plan go effective and be

19   consummated, all the while with the understanding that the

20   Baeshens just like they said they were, were claimants

21   properly categorized in the two claims -- in the two

22   categories of claims.

23           Now -- so, Your Honor, that's an independent

24   reason why the Court must dismiss their claims on the

25   doctrine -- under the doctrine of res judicata.

1           And it's clear, Your Honor, the doctrine of res

2      judicata has very powerful effect.  But it has even more

3      powerful effect in a bankruptcy case than it does in a

4      general commercial litigation.  The reason for that is the

5      importance of finality, and we talk about this in our

6      papers.

7           And I think we've just mentioned, Your Honor, the

8      importance of finality in this particular case is

9      extraordinary, given the fact that the Baeshens are in no

10     different position than anyone else.  Their claims are no

11     different than the other URIA, and for the reasons we talked

12     about, the -- just the sheer volume of money, it would

13     fundamentally alter the context of this case.

14          Were the Court now to say that they can contend

15     that they can just take their money out in full.  Well, the

16     plan that the Court confirmed just falls apart in that

17     context.  Not because of their 3 million, but because of all

18     of the money that can come out from the C people that are

19     identically situated.

20          So, Your Honor, we think that the basis to dismiss

21     this claim is just absolutely clear.  It's a blatant,

22     blatant collateral attack on this Court's order.  It doesn't

23     seek in any respect to comply with 1144, there's no

24     allegation that there was fraud, that they were misled, that

25     they didn't understand what was happening to them, no

Page 22

```
 1    allegation of that whatsoever.  Instead, they just ask the

 2    Court to ignore the orders that it enters.

 3              The Court should reject that and should dismiss

 4    these claims.

 5              THE COURT:  All right.

 6              MR. LEBLANC:  Unless the Court has any questions.

 7              THE COURT:  Yeah, my question is what do you make

 8    of, and I'll put this in a broad brush of the case that they

 9    cite dealing with property of the estate, and the idea that

10    that's separate and apart, is your answer one about sort of

11    the timing of raising those issues or the substance of it,

12    those cases being different than this circumstance?

13              MR. LEBLANC:  I would say it's both, Your Honor.

14    Certainly the timing has an enormous impact.  The second is

15    the substance of those.

16              The issue that was raised in those cases was an

17    argument that a particular piece of property couldn't become

18    property of the estate pursuant to the confirmation order,

19    when there was a dispute, a known dispute about that prior

20    to it.

21              In other words, the confirmation order isn't the

22    place to adjudicate disputes as to whether something is

23    property of the estate.  However, the confirmation order is

24    the place to determine what is property of the estate.

25              The schedules here have been out for more than a
```

Page 23

1    year.  The disclosure statement have been out for several

2    months before the confirmation hearing, and that was

3    February -- it was filed in February, confirmation hearing

4    in June.

5            And there wasn't a dispute about this being

6    property of the estate.  And just think about the floodgates

7    that open, Your Honor.  If somebody can -- if there can be

8    no dispute and the Court can say, this is all listed in the

9    disclosure statement as property of the estate, I find it to

10   be property of the estate, and then someone can come in and

11   say afterwards, all of the debtor's property, I now dispute

12   whether it's property of the estate.  And that's effectively

13   -- that is what they're doing.

14           And so, Your Honor, it's the absence of any

15   suggestion that there was a dispute.  And it's the fact of

16   the Court's conclusion that these -- this was, in fact,

17   property of the estate.  Something that as it relates to

18   this debtor, and Your Honor knows that this debtor

19   throughout much of its -- much of the course of this case,

20   it was not a debtor flush with cash.

21           And this plan, which is paying creditors pennies

22   on the dollar at the Arcapita Bank level, is not a plan

23   that's like a close to full play, where you could go -- get

24   away with giving away a few million bucks or even $300

25   million.  That is not the case.

```
 1            This is a debtor, upon reorganization, that has an

 2      estimated reorganization value of 1.3 billion.  And what

 3      they're suggesting is that $320 million of cash could be

 4      contended to be not property of the estate.

 5            And I think that's the distinction with those

 6      cases, Your Honor, is there was no dispute whatsoever in

 7      this case as to whether or not this was property of the

 8      state, when the Court ordered that to be the case.  And for

 9      that reason, it has res judicata effect.

10            THE COURT:  So if it was raised, I would imagine

11      the options would be at the confirmation hearing to do one

12      of two things.  One is to say, we can reserve that right, as

13      you did with the one party that raised it, because we can

14      afford to go ahead --

15            MR. LEBLANC:  Uh-huh.

16            THE COURT:  -- without that money.  Or two, this

17      is a game changer and we need to litigate it now so the

18      confirmation hearing now becomes a hearing, an evidentiary

19      hearing or whatever it is on what's in and what's out.

20            MR. LEBLANC:  Absolutely, and that's what I

21      mentioned at the outset.  Had they raised this, Your Honor,

22      we had those two choices.  We could've done effectively what

23      would be comparable to a quiet title action.  To get anybody

24      who claims they had a -- anyone who claims they have a

25      property interest in the debtor's assets come forward and
```

1     say that you do.

2              Nobody was making a claim except for one person,

3     and as to that person, and for exactly the reason Your Honor

4     said, the plan can go forward with a reservation with

5     respect to Mr. Nazer.  That's okay, we can do that.  We

6     can't do it with respect to everybody else.

7              And just think about the impossible position.

8     Your Honor, I know, just confirmed American Airlines.  If

9     somebody could come in today and say, well, six of those

10    planes, I have a property right in those, I'm asserting a

11    constructive trust over them, after the plan has been

12    confirmed upon which the ownership of those planes was just

13    part of it because nobody contested it, and presumably Your

14    Honor's orders, confirmation orders there say that the

15    planes that are listed on their schedules are property of

16    that estate.

17             If somebody could come in afterwards and just say,

18    well, now I'm going to assert that that is my property, it

19    just doesn't work.  And exactly what Your Honor said, had

20    they raised this at any time, any time prior to the res

21    judicata order in this case, the confirmation order, we

22    would've resolved it in one of two ways.

23             Either, we would've carved them out if it was

24    acceptable to do that for all the plan sponsors with the

25    recognition that there was the risk that $3 million would be

1    declared later not to be property of the estate, or we

2    would've said, we've got to figure this out.  And you could

3    figure it out in one of two ways.  You can either change the

4    plan to react to that, or you can litigate the question and

5    resolve it at that point.

6            We were never given that option, and the Court was

7    never given that option.  And instead what the Court did is

8    entered the order and that becomes -- that has res judicata

9    effect.

10           I think any conclusion to the contrary, Your

11   Honor, would be astonishing, and could wreak havoc in every

12   bankruptcy case.  Because then what you -- you put the onus

13   on debtors and the creditors who put plans together with

14   debtors, to quiet title to all the assets that are on the

15   debtor's schedule.  And there's been no suggestion

16   whatsoever that there's any dispute as to whether or not

17   they own it.

18           You also, you also put the onus on debtors to go

19   through what can be tens or hundreds or thousands of claims

20   to say, well, does anybody have some generic reservation of

21   rights, we have to go and litigate those claim objections to

22   resolve any generic reservations of right.  Because somebody

23   who filed a proof of claim, who was classified as a

24   particular creditor, who was provided for a plan treatment,

25   would be free to come out -- come in after the plan was

1    confirmed and consummated and say, I just don't agree with

2    the order that the Court entered, and I'm free to contest

3    the treatment of my claims, the claims that I've asserted in

4    the plan.

5            Your Honor, that is -- that would be an

6    extraordinary outcome from this Court, and it would turn

7    bankruptcy, you know, up on its head.

8            So, Your Honor, we would ask that the Court to

9    dismiss the claims of the Baeshens without -- with

10   prejudice --

11           THE COURT:  All right.

12           MR. LEBLANC:  -- and without any further action

13   from the debtors.  Thank you, Your Honor.

14           THE COURT:  Thank you.

15           MR. SKAPOF:  Good morning, Your Honor --

16           THE COURT:  Good morning.

17           MR. SKAPOF:  -- Marc Skapof from Baker Hostetler

18   on behalf of the Baeshens, and you'll excuse me because I'm

19   battling a cold, so if you have trouble hearing me --

20           THE COURT:  That's all right, you and many other

21   people.

22           MR. SKAPOF:  -- please let me know.

23           As a second indulgence, we're going to address the

24   arguments that Mr. Leblanc made, but I'd like to sort of

25   just take this one on to sort of frame what we think the

1    issue is.

2              THE COURT:  Certainly, however you'd like to

3    proceed.

4              MR. SKAPOF:  Right.  And just as a matter of sort

5    of procedure, we're not here on a motion.  We're here on a

6    complaint for declaratory relief, and we think that's

7    important because, you know, the debtors have raised one --

8    excuse me, reorganized debtors have raised one affirmative

9    defense to the claims that we've put at issue, the

10   allegations we put at issue, which we're all going to

11   assume, you know, are true for today.

12             And what we are talking about here is the Baeshens

13   invested a total of a little more than $12 million with the

14   debtors.  The Baeshens accept under governing Bahraini law

15   that 75 percent of that $12 million, the debtors had an

16   interest in that.  And we do not contest the treatment of

17   the debt Class 5 claims or the Class A claims as to the

18   money that we believe under Bahraini law title passed or the

19   debtors had an interest in.

20             So we're talking about $3 million and change

21   carved out of that 12 million.  So to begin with, with the

22   147 that the debtors are using as a number, one, I think

23   it's improper that on a motion to dismiss, they're

24   essentially talking about a bunch of claimants that are not

25   in our complaint.

1              Our complaint specifically --

2              THE COURT:  No, but it goes to the notion of what

3    this has to do with the plan, right?  And so the argument

4    has been made that it's res judicata because of the plan,

5    and I was just trying to get a sense of where these kinds of

6    funds fit into the plan.  And I certainly can get that

7    information by going back and looking at the plan.  I'm just

8    trying to get a -- sort of a short thumbnail --

9              MR. SKAPOF:  No, no.

10             THE COURT:  -- sketch from folks who have already

11   done that work --

12             MR. SKAPOF:  Sure.

13             THE COURT:  -- as to what the plan provides for

14   and what the claims would be and, you know, is it central to

15   the plan.

16             MR. SKAPOF:  Understood, Your Honor, and I think

17   the point I make to that, and then I'm going to sort of

18   circle back to the sort of bigger points that we want to

19   make is, the pot of assets available for distribution to

20   creditors is distinct from what the debtor holds that may or

21   may not be there.

22             So all that 147 --

23             THE COURT:  How -- I'm not following you on that.

24             MR. SKAPOF:  If I put down or disclose I've got

25   $147 million and we go back to Schedule B where that money's

Page 30

1    listed, it just lists a bunch of bank accounts.  There's no

2    way any particular person would know that their assets were

3    in those bank accounts or anything else.

4            So all the debtor is basically saying is, and

5    again, by the definitions in the plan, their definition is

6    assets, assets revested in the reorganized debtor.  The

7    definition of assets is property that's property of the

8    estate under 541, which we contest, the language does fall

9    or on the schedules, but the case we cite in our papers, In

10   Re Toni (ph) says, just because you put something down on a

11   schedule, if it's not yours, it doesn't make it yours.

12           THE COURT:  But let me just step back from the

13   sort of bankruptcy speak --

14           MR. SKAPOF:  Uh-huh.

15           THE COURT:  -- that we all engage in, and to a

16   more generalist perspective.

17           MR. SKAPOF:  Uh-huh.

18           THE COURT:  Your client, and I assume other folks

19   in similar circumstances, after all this was an investment

20   bank --

21           MR. SKAPOF:  Uh-huh.

22           THE COURT:  -- invested money with the debtors.

23   And the debtors had that money, that's why you filed a proof

24   of claim to say you owe us money, it's pretty clear that

25   whatever's left of that money, right, because they filed for

1    bankruptcy --

2              MR. SKAPOF:  Uh-huh.

3              THE COURT:  -- because they're in financial

4    distress, that the idea is to say, well, here's everything

5    we've got, all the assets we have, and we're going to

6    distribute them.

7              So I understand parsing needs to be done as to the

8    plan and the specifics, but how could your client not know

9    that the money that was invested by it and everybody else

10   would be part -- whatever is left is the assets that are

11   going to be divvied up?

12             MR. SKAPOF:  Certainly, Your Honor, and I can

13   answer that, and it's also based on the allegations in our

14   complaint.  Our client placed money under certain

15   agreements, there's two agreements at issue here, because

16   these are a family one -- one of the agreements that one of

17   the family members has and slightly different in terms of

18   the choice of law provision.  And our theory under our

19   complaint is, is that initial investment under the governing

20   Bahraini law, which governs here.  I don't think anyone

21   would disagree on a Buttner (ph) analysis, this is the law

22   that determines the property interest, that money until it

23   was deployed as we use in our complaint, that is used for

24   investment purposes, title remained with the claimant.

25             We filed a claim for the full amount --

1          THE COURT:  Yeah, but we're getting into the

2    merits though of your argument.

3          MR. SKAPOF:  No.  But I agree, but I think I'm

4    addressing your point is, is that the 147 just because some

5    -- the number is there, it doesn't -- you can't tell if it's

6    including money that under the governing law isn't property

7    of the estate.  And under the definitions in the plan of

8    assets non-property of the estate is already carved out of

9    that.

10          The definition in the plan, and it all talks about

11    assets is, property that's property under 541 or on the

12    schedule.

13          THE COURT:  But do you have anything specific that

14    you can point to in the plan that says that these kind of --

15    these kinds of funds -- I mean, they're an investment bank,

16    so people give them money to invest.

17          I mean, isn't this the heart --

18          MR. SKAPOF:  Yes, Your Honor.

19          THE COURT:  -- of what they were doing?

20          MR. SKAPOF:  Yeah, but what we're saying, Your

21    Honor --

22          THE COURT:  And so it's the heart of the creditor

23    body and the heart of the assets?

24          MR. SKAPOF:  Well, no, because we're -- what we're

25    saying, Your Honor, is we are a creditor for 75 percent of

1     the money we did, and we agree the plan binds that.

2           You keep on positing an example of, didn't you

3     deposit money with an investment bank, and I don't want to

4     go too much into the merits, but it does inform the answer

5     to your question, so you know, if you'll indulge me --

6           THE COURT:  When you say you deposited money but

7     you retained the -- some of that money, nonetheless, even

8     though you gave it to the debtors was still yours --

9           MR. SKAPOF:  Yes, right.

10          THE COURT:  -- under Bahraini law?

11          MR. SKAPOF:  What we're saying is, is we didn't

12    deposit money with an investment bank, like I would go and

13    give money to Goldman Sachs here.  We gave money to a

14    Mudarabah bank that's regulated under Islamic banking

15    statute and is governed by Bahraini law as informed by

16    Sharia law.

17          So we would never take the position that that

18    initial deposit of the money or whatever you want to call

19    it, placement, made that -- let the debtor own that money.

20          The debtor did make further --

21          THE COURT:  But is there anything in the plan --

22          MR. SKAPOF:  Yes, Your Honor.

23          THE COURT:  -- that carves -- I understand you've

24    cited the general --

25          MR. SKAPOF:  Uh-huh.

1          THE COURT:  -- notion that not -- this doesn't

2   address non-property, but is there anything in there that

3   addresses your -- these kinds of bank accounts?  I'm just --

4          MR. SKAPOF:  Yeah, I can --

5          THE COURT:  Because what you're asking, I mean,

6   it's pretty clear, you are asking to undo the plan.

7          MR. SKAPOF:  No, no, I would fundamentally

8   disagree with that, Your Honor, because, and let me explain,

9   and you know, people can respond to that.

10          We are making an argument based on our agreements,

11   which again, we have two different agreements, and the fact

12   that some portion of our money, about 25 percent was not

13   deployed, there is nothing in the plan, and there's no

14   evidence in the record here, because you know, they're just

15   saying what's in the plan but they're not introducing

16   evidence that the agreements were all these people are the

17   same, whether their money was deployed or not, or anything

18   else.

19          So it's completely speculative at this point, and

20   we're on a motion to dismiss.  If that's the case, let's

21   have discovery on it, and they can come back and make the

22   argument.

23          THE COURT:  Well, let me -- if the 147 million is

24   in a bank account for entities that are investment banks,

25   what else would the money be?

1              MR. SKAPOF:  But, Your Honor, as alleged in our

2     complaint, the money is in a specific type of account, and

3     then some of that money was then, under the agreements, we

4     acknowledge that the agreements say Arcapita had the

5     discretion to invest the money.

6              Again, if you go back to the complaint, our theory

7     is, under Bahraini law, the initial placement with the bank

8     in the first account title does not pass.  Once the debtor

9     invests that money --

10             THE COURT:  No, I understand.

11             MR. SKAPOF:  -- title did.  Right.  So -- but what

12    I'm saying is --

13             THE COURT:  I understand the theory --

14             MR. SKAPOF:  -- is that number, we can't tell what

15    it's referring to.  And if you ask me, I want to turn to the

16    plan provisions because you asked me about that.

17             The first thing we would do is look at the actual

18    definitions in the plan because it's not boilerplate to

19    define assets, because that's fundamentally part of what the

20    plan does.  And assets again include only property of the

21    estate, and there's a case that says, just because you put

22    it on the schedules it doesn't.

23             So while I acknowledge that the reorganized

24    debtors are saying we're claiming something extraordinary or

25    astonishing, because it has sort of fundamental impacts on

Page 36

1    bankruptcy, I'd argue on the opposite side that we've cited

2    cases, and the debtors haven't cited any to the contrary

3    that say when a piece of property is not property of the

4    estate, it can't be turned into property of the estate under

5    a plan.  The --

6              THE COURT:  I understand that --

7              MR. SKAPOF:  Right.

8              THE COURT:  -- but why wasn't this raised at the

9    -- sometime before the plan --

10             MR. SKAPOF:  Right.

11             THE COURT:  -- was confirmed so that a bankruptcy

12   court can do --

13             MR. SKAPOF:  Uh-huh.

14             THE COURT:  -- what it has to do?  There are all

15   sorts of cases that have issues, that say we can't confirm a

16   plan until --

17             MR. SKAPOF:  Uh-huh.

18             THE COURT:  -- we know X, and so, Judge, you're

19   not going to like this, but we need to take up two weeks in

20   June --

21             MR. SKAPOF:  Uh-huh.

22             THE COURT:  -- or whatever it is to have a hearing

23   on X because that is the fundamental issue that needs to be

24   resolved?

25             MR. SKAPOF:  And I'm -- yeah.  And I knew you were

1    going to ask this question, and I'm actually -- I thought it

2    would be the very first question you would ask me before I

3    even introduced myself, so now that we're dealing with it.

4           THE COURT:  All right.

5           MR. SKAPOF:  Now, clearly as a prudential matter,

6    our client would've been better served to raise this at the

7    time.  However, our argument is, that just because it was

8    prudent at one time it's not foreclosed now.

9           And Mr. Leblanc mentioned the Nazer carve-out and

10   how it's exclusive to him, and they cite for that

11   proposition, Justice Scalia's dissent in a case that has

12   nothing to do with bankruptcy and a secondary source using

13   sort of a cannon of catchatory (ph) construction.

14          THE COURT:  Well, but I'll tell you --

15          MR. SKAPOF:  Yeah.

16          THE COURT:  -- my take on that --

17          MR. SKAPOF:  Uh-huh.

18          THE COURT:  -- is how can I allow -- carve-outs

19   are a particular thing --

20          MR. SKAPOF:  Uh-huh.

21          THE COURT:  -- in bankruptcy.  And they are

22   different than, you know, district court --

23          MR. SKAPOF:  Uh-huh.

24          THE COURT:  -- litigation, it's a very different

25   world.  If I start saying one person's carve-out is a

```
 1    universal carve-out, then nobody knows what the plan is

 2    giving away or not.

 3              MR. SKAPOF:  Agreed, Your Honor.

 4              THE COURT:  I mean, how can I do that?

 5              MR. SKAPOF:  But in this case, the argument that

 6    was raised by Mr. Nazer said, I don't think this is property

 7    of the estate, I --

 8              THE COURT:  But that happens all the time.

 9              MR. SKAPOF:  No, no, no, I understand.  And he

10    said it was held in trust and the debtors in their briefs

11    initially said, look, this isn't even a confirmation issue,

12    and if it's not covered by the plan or the order, it's not

13    covered by the plan or the order, and then they negotiated a

14    carve-out.

15              Our clients, we're making or we're making similar

16    kind of arguments now, believed they could've reasonably

17    relied on that because this is essentially talking about the

18    same kind of claim.

19              Second --

20              THE COURT:  But let me -- before you move on --

21              MR. SKAPOF:  Uh-huh.

22              THE COURT:  -- to second, so what do you say to

23    Mr. Leblanc's hypothetical about aircraft ownership?  In

24    fact, in American, there are very, very complex

25    relationships that govern aircraft ownership --
```

```
 1              MR. SKAPOF:  Uh-huh.

 2              THE COURT:  -- the aircraft are in effect not

 3     owned by the airline.

 4              MR. SKAPOF:  Uh-huh.

 5              THE COURT:  They -- and people are getting ready

 6     to send me many, many briefs on many, many complicated

 7     issues --

 8              MR. SKAPOF:  Uh-huh.

 9              THE COURT:  -- relating to that.  And if somebody

10     wanted to reserve, and in fact, various people did reserve

11     various rights as to particular aircraft, particular

12     airports, particular amounts owing, if those carve-outs at

13     confirmation were construed as to everybody in a similar

14     situation, I think that the debtor's counsel would've had no

15     choice in American to say, nobody gets any carve-outs, we

16     can't do this because we can't confirm a plan.

17              So I don't know how I can -- I'm just trying --

18              MR. SKAPOF:  Yeah.

19              THE COURT:  -- to address that.  This is a very

20     narrow issue about --

21              MR. SKAPOF:  It is.  And --

22              THE COURT:  -- reliance on its -- someone else's

23     carve-out.

24              MR. SKAPOF:  And I would answer that, and I would

25     state the Maxwell case, which is in our briefs that says,
```

1    when you're dealing with a similar kind of issue in Maxwell,

2    it had to do with certain banks, and of whether the plan

3    administrator in the UK could bring preference actions, and

4    we acknowledge the actual holding of that case is based on

5    comity, but there is dicta in a section that discusses res

6    judicata, which specifically says Barkley's Bank came

7    forward and got a carve-out on this exact issue.

8              And that post-confirmation, the other two banks

9    who are subject to the potential avoidance action were

10   allowed to have reasonably relied on that carve-out because

11   they were talking about the same thing.

12             So to switch that back to your example of the

13   airplane, if Mr. Nazer had come in and said, Arcapita, I

14   think you own my airplane, that's different than saying, I

15   think you're holding my money in trust because title never

16   passed to it.

17             So it's reasonable reliance.  And so the question

18   becomes, was it reasonable to rely on that carve-out because

19   it effectively -- it looked like it covered your situation.

20             THE COURT:  Well, I think we've mixed our

21   metaphors there.

22             MR. SKAPOF:  Uh-huh.

23             THE COURT:  When Mr. Nazer is selling me an

24   airplane.

25             MR. SKAPOF:  Right.  Yes.

1            THE COURT:  I think I used that as an example to

2    say --

3            MR. SKAPOF:  Yes.

4            THE COURT:  -- some reservation that is central to

5    what's going on --

6            MR. SKAPOF:  Uh-huh.

7            THE COURT:  -- in the plan, and it can be all

8    sorts of things.  It can be an amount owed a -- the nature

9    of an asset, there are lots of things, and you can even have

10   -- it can even apply in things as far flung as the

11   government where somebody talks about the nature of a tax

12   owed and other taxing authorities could have the same

13   argument, and there you would -- you know, you could be

14   dealing with the IRS in 50 different states --

15           MR. SKAPOF:  Sure.

16           THE COURT:  -- and other taxing authorities

17   overseas.

18           So my point was that if you have something that is

19   an issue that's raised that's, for lack of a more technical

20   term, a big deal, and somebody raises -- asks for

21   reservation and gets it, I'm wondering what that -- if I

22   adopt your thinking, how that doesn't wreak havoc in plans

23   going forward.

24           MR. SKAPOF:  Well, I mean, it didn't wreak havoc

25   in Maxwell, and we would say that --

1            THE COURT:  But there wasn't a holding in Maxwell.

2            MR. SKAPOF:  There wasn't a holding, but it said

3    that even -- if it didn't decide in comity, they did say you

4    -- res judicata doesn't apply here, the carve-out did apply

5    because you wouldn't --

6            THE COURT:  Well --

7            MR. SKAPOF:  -- even get to the comity part.  But

8    my answer would be is, look, it has to be essentially on a

9    case-by-case basis.  Because to flip it around, and this is

10   our fundamental position is, regardless of a tactical

11   mistake, which you know, or the fact that it would've been

12   better timing, does not as a legal matter allow a plan to

13   transform an asset that's not part of the estate into an

14   asset of the estate.

15            And if it does, it's based on some other argument

16   than res judicata.  You asked the reorganized debtors if

17   they were making a laches argument, and they said no, but we

18   reserve it for later and that's fine.

19            But what it sounds like they're saying or you may

20   be eluding to is waiver.  But there's case law that says

21   waiver is a conscious decision that's not based on

22   negligence, mistake, or anything else to forego a right.

23            And I can give an example that's in their papers

24   about where you could see that situation is, in the

25   Northwest case --

```
 1              THE COURT:  Well, but that's why I used waiver

 2      rather than -- I'm sorry, laches rather than waiver.

 3              MR. SKAPOF:  Yeah, okay.

 4              THE COURT:  Because waiver is a particular thing,

 5      but laches basically say you didn't act promptly.

 6              MR. SKAPOF:  Yes, too little too late, I think

 7      Your Honor --

 8              THE COURT:  And I've got to say, I'm not

 9      prejudging it --

10              MR. SKAPOF:  Uh-huh.

11              THE COURT:  -- but there is a similar event that

12      occurred between the time when this could've been raised and

13      now that is a big problem.

14              MR. SKAPOF:  Uh-huh.

15              THE COURT:  So -- but I don't think we need to get

16      it into it here today.

17              MR. SKAPOF:  No, we don't need to get into it, and

18      I think, you know, the positions that we're arguing here, I

19      would just mention that, you know, to the extent, and I get

20      it from the debtor's point of view, and say this is

21      extraordinary, you're going to reopen the plan, you're going

22      to do all this.  But there are no cases that hold again

23      through the alchemy of a plan.  You can change an asset that

24      doesn't belong to you as a debtor to one that you do.

25              THE COURT:  But you're presuming is that
```

                                                      Page 44

1    (indiscernible) say a fact not in evidence.  You're

2    presuming that it belongs to you.

3              MR. SKAPOF:  Well --

4              THE COURT:  And so there certainly have presumed

5    all along --

6              MR. SKAPOF:  Right.

7              THE COURT:  -- it belongs to them.  The -- when

8    you talk about timing --

9              MR. SKAPOF:  Yeah.

10             THE COURT:  -- bad timing is raising on the day of

11   confirmation --

12             MR. SKAPOF:  Uh-huh.

13             THE COURT:  -- as opposed to a month before

14   confirmation.

15             MR. SKAPOF:  Uh-huh.

16             THE COURT:  That's bad timing.  This is beyond bad

17   timing, so.

18             MR. SKAPOF:  Well, there's a difference between

19   bad timing and being precluded timing, which is really what

20   we're on, and I would turn Your Honor to the Hollywell (ph)

21   case, the cite for that is 118 B.R. 876, Southern District

22   of Florida, 1990, and it's citing a Seventh Circuit case,

23   Pantel (ph), it's 777 F.2d 1281, 1985.

24             And the quote from the Hollywell case says, the

25   bankruptcy statutes do not give a bankruptcy court

Page 45

1     jurisdiction, and then it talks about the specific property

2     interests that's at dispute here, without first finding that

3     the property also constitutes a part of the bankrupt's

4     property.

5              THE COURT:  But didn't I make that finding by

6     having the debtors identify in the plan what the assets are?

7     I mean, I can't figure out how to distribute a pie unless I

8     know what the pie is, right?

9              MR. SKAPOF:  I agree, Your Honor, but the federal

10    rules also say, bankruptcy rules say, if you want to make a

11    determination as to what property of the estate is, you have

12    to bring it by an adversary proceeding.

13             So buried in the schedule --

14             THE COURT:  Well, yes and no.

15             MR. SKAPOF:  -- of a plan --

16             THE COURT:  I mean, are you saying that every plan

17    then has to have an adversary proceeding to ratify what's in

18    the plan?

19             MR. SKAPOF:  No, but I think --

20             THE COURT:  Because a plan --

21             MR. SKAPOF:  Yeah.

22             THE COURT:  -- has to -- I mean, you would have a

23    huge disclosure statement problem.

24             MR. SKAPOF:  I agree, Your Honor, but --

25             THE COURT:  Because that's what a liquidation

1    analysis is.  Here's what we have --

2         MR. SKAPOF:  Uh-huh.

3         THE COURT:  -- and therefore, here's how many of -

4    -

5         MR. SKAPOF:  Right.

6         THE COURT:  -- you people in terms of creditors

7    there are --

8         MR. SKAPOF:  Uh-huh.

9         THE COURT:  -- and the classes and how it's going

10    to -- and here's what things look like.

11         MR. SKAPOF:  Well, first of all, the liquidation

12    analysis and the projections when you look at it, have the

13    similar boilerplate as we're all throwing that around as we

14    don't really know, these are forward-looking, this is

15    subject to claim, it could come in after and whatever.

16         So that's what it says.  But more importantly, you

17    know, debtors, and we would -- it didn't happen in this

18    case, essentially asked for relief that needs to be brought

19    by motion or otherwise within a plan.

20         This particular plan, for example, on the plan

21    settlement basically says this is a motion under 9019, this

22    is what we're doing, this is why it's reasonable.  It

23    doesn't -- they knew people had come forward, Nazer and even

24    earlier in the case that was sort of like we think maybe

25    this is not your money, there's issue.

 1              There's like a line in the disclosure statement

 2      that says, we looked at it, we think it's ours.  It's not

 3      the same kind of robust discussion that you get.  And so --

 4              THE COURT:  But if it says that in the disclosure

 5      statement, we look -- people have raised this issue, we

 6      looked at it, we think it's ours --

 7              MR. SKAPOF:  Uh-huh.

 8              THE COURT:  -- it's -- I mean, doesn't that cut

 9      against you because the issue has been --

10              MR. SKAPOF:  Well, I don't think so, because again

11      when it says ours, we're making a distinction about what

12      we're asking for.  And again, we're not asking for all of

13      our 12 million.

14              So if we're not asking for all of our 12 million,

15      there has to be something different that differentiates the

16      three from the other nine.  And that projections in the plan

17      don't say anything about that.

18              THE COURT:  But at what point are you --

19              MR. SKAPOF:  Well, I would answer that.  I mean,

20      if you want to say at what point, I think if I can in here

21      two years from now, I wouldn't, because at some point,

22      laches and other equitable things would say, you know, this

23      has gone on too long.

24              THE COURT:  Well, I'm not going to get into it

25      today, I've got to tell you though, I -- if you're saying

1     that those kind of concerns don't kick in for two years

2     after a plan --

3                MR. SKAPOF:  Uh-huh.  Uh-huh.

4                THE COURT:  -- is confirmed, I categorically would

5     completely reject that.

6                MR. SKAPOF:  Yeah.

7                THE COURT:  I don't need a specific set of facts

8     to --

9                MR. SKAPOF:  No.

10               THE COURT:  -- go there.

11               So -- but my concern is this, you have to -- the

12    debtors identified the assets that were in the plan.  The

13    language that you keep mentioning about things that aren't

14    property of the estate aren't covered.  If I -- memory

15    serves, it's pretty boilerplate, I see it in every plan

16    everywhere.

17               MR. SKAPOF:  But --

18               THE COURT:  And you're so asking it to carry an

19    awful lot of water here.

20               MR. SKAPOF:  But just because something is

21    boilerplate doesn't say it has meaning.  And again, I would

22    just turn to the cases that we cited that said, the plan

23    can't deal with the property that's not property of the

24    estate.  And this plan says that.

25               And so our fundamental point and the cases that we

1    cited --

2            THE COURT:  I think that's right and that's why

3    there --

4            MR. SKAPOF:  Yeah.

5            THE COURT:  -- are objections to confirmation that

6    need to be made, to say, this isn't property of the estate

7    and cite those cases.  And I say, hold up, we have a

8    dispute, and that's what we do.  And --

9            MR. SKAPOF:  Okay.  So I guess my point is the --

10   if it wasn't raised, then does it take something which

11   conceivably for these purposes, or for the purposes of this

12   hypothetical, wasn't property and affect the transfer and

13   make it the debtors.  And if it does, is that law, res

14   judicata, is it waiver.  We all talk here it's not waiver.

15           THE COURT:  But you're -- for me to make anybody

16   to jump through that hoop, requires me to agree with you --

17           MR. SKAPOF:  Uh-huh.

18           THE COURT:  -- that, in fact, the property is not

19   property of the estate.  And I don't know that any more than

20   I know that it is property of the estate if we were thinking

21   about this prior to confirmation.

22           But let me -- I've certainly peppered you with

23   questions --

24           MR. SKAPOF:  Yeah.

25           THE COURT:  -- and I've done so, and I appreciate

1     you shifting gears to address them, because I want to make

2     sure that I covered certain things, but.

3              MR. SKAPOF:  Yeah.  No, I think the colloquy that

4     we had, you know, does address the concerns.  And, you know,

5     again I'll just return to this fundamental point is, is that

6     we're in agreement on a lot of particulars here.  And one of

7     the things that we agree on is, is that as we understand or

8     as we argue under Bahrain law, we did give up $9 million,

9     and we didn't object to the plan in terms of what that $9

10    million was classified as in terms of what its treatment is,

11    that -- whether the rights offering funds are subordinated.

12              We acknowledge.  We can't do anything about that.

13    The ship has sailed on that.  What we're arguing is, is that

14    25 percent of that never was in that bucket.

15              THE COURT:  I understand it, but --

16              MR. SKAPOF:  Yeah.

17              THE COURT:  -- it was in the debtor's bank account

18    is my concern.  But --

19              MR. SKAPOF:  We'll --

20              THE COURT:  -- I think we've plowed this ground

21    pretty well --

22              MR. SKAPOF:  Yeah.

23              THE COURT:  -- so I'm sure there may be some other

24    things that you want to mention --

25              MR. SKAPOF:  No, no, I --

1                THE COURT:  -- before you conclude.

2                MR. SKAPOF:  -- mean, otherwise, Your Honor, I

3       mean, we think the -- you know, the (indiscernible) legal

4       discussion in our brief and why we think, you know, we

5       thread the needle on this is in there, and you know, it's

6       there.  I don't -- unless you have any other questions --

7                THE COURT:  No, I don't.

8                MR. SKAPOF:  -- I don't.

9                THE COURT:  Thank you very much.

10               MR. SKAPOF:  Thank you very much, Your Honor.

11               MR. LEBLANC:  Your Honor, I will -- I'll be

12      relatively brief, but there are a few things that I think

13      have to be mentioned.

14               I think I will, with the Court's indulgence --

15               THE COURT:  Sure.

16               MR. LEBLANC:  -- I will just pull up the first

17      demonstrative we created.

18               THE COURT:  It's always a shame to make a nice

19      demonstrative and not use it, so.

20               MR. LEBLANC:  Should I take a picture of it, no,

21      no.

22          (Pause)

23               MR. LEBLANC:  Your Honor, the -- words matter, and

24      I think everybody will agree with that.  This is the

25      definition that Your Honor confirmed in the plan.  Assets in

Page 52

1    relevant part, and we have the blow-up there, assets mean

2    all property wherever located in which any of the debtors

3    holds a legal or equity interest.  Fair enough.  That's what

4    they argued.  The debtors don't hold an equitable interest

5    in this.  But it actually goes on from that.

6              Including, and then there's one clause, and -- so

7    including all property disclosed in the debtor's respective

8    schedules in the disclosure statement.  That ends this

9    analysis, Your Honor.  There was a disclosure of this, there

10   was no mention by them of any objection to that, none

11   whatsoever.

12             If I understand their --

13             THE COURT:  When you say disclosure of this, can

14   you be more precise?

15             MR. LEBLANC:  Sure.  Can I go to the demonstrative

16   because it's the next one?

17       (Pause)

18             MR. LEBLANC:  This is the full version.

19             MR. SKAPOF:  So this is just the schedule?

20             MR. LEBLANC:  That's the actual --

21             MR. SKAPOF:  Oh, it's Schedule B.

22             MR. LEBLANC:  So, Your Honor, the debtor's

23   schedule, Schedule B, disclosed all of the monies that were

24   in bank accounts all over the world, totaling $147 million.

25   That's what it disclosed.  It identifies -- there's a

Page 53

1   number, and it's Schedule B-1 lists the bank accounts to

2   Schedule B, Schedule B then Schedule B-1 lists the bank

3   accounts.  It has every dollar that Arcapita has listed on

4   it, disclosed to the Court, disclosed to all the parties,

5   and no mention was made by anybody other than Mr. Nazer of a

6   contest to the -- when you go back to the plan definition of

7   concluding -- of this Court concluding that that was the

8   property of the estate.

9            Now, it's important to contrast this.  They -- he

10  mentioned the Tooney (ph) case or the Toni case.  In the

11  Toni case, the secured creditor there had completed a

12  foreclosure action with respect to the debtor's residence,

13  prior to the bankruptcy filing, the debtor filed for

14  bankruptcy and listed on his schedules the house that had

15  been the subject of the foreclosure action.

16           Subsequent to that, the Court noted that it didn't

17  appear as though the secured creditor had gotten notice of

18  the fact that the debtor was claiming a property interest in

19  property that had been foreclosed upon.

20           That's the circumstance where I think it would be

21  fair to say that the debtor should reasonably expect to

22  commence an adversary proceeding to quiet title if they're

23  going to put on their schedule a piece of property that had

24  already been foreclosed upon at the time they filed their

25  petition.  That is not this case.

1          Because make no mistake about it, what they're

2     suggesting would, in fact, require, in every single case, an

3     actual adversary proceeding, to quiet title, because you

4     cannot do a plan if your schedules can't be ordered to be

5     said -- to be property of the estate.

6          If American can't say, we're going to dispose of

7     our assets, and our assets include all of these aircraft

8     with the comfort that that -- where there's no contest to

9     it, that that is, in fact, property of the estate, you

10    simply can't do it.

11         Yes, liquidation analyses include boilerplate

12    language because claims may go down and may go up, and

13    because assets, particularly if you think about this estate,

14    where their assets consist of portfolio investments in

15    companies that are of uncertain value, of course, the

16    disclosure statement values are going to go up and they're

17    going to go down.

18         But that doesn't mean that the debtor doesn't know

19    and the Court doesn't know, and the parties who vote on the

20    plan don't know what is and what is not property of the

21    estate.  It's about as fundamental as you can imagine in a

22    bankruptcy case.

23         Now, let me turn to a second topic, the carve-out,

24    the reservation.  I want to read for the Court the entirety

25    of the reservation, it's not long.  Paragraph 65 of the

```
 1    Court's confirmation order -- of the Court's findings of

 2    fact with respect to confirmation.  And it's actually --

 3    it's not just called reservation of rights, it's actually --

 4    the title, it's in bold, "Claims of Nazer" period in bold.

 5             "Nothing in the confirmation order, the plan, or

 6    the plan documents shall prejudice or impair the right of,

 7    Monzur Nazer (ph) or Beatrice Flecha Delima Nazer (ph)

 8    collectively the Nazers to argue that any property held by

 9    the debtors or the reorganized debtors is not property of

10    the debtor's estates, or has been or is being improperly or

11    wrongfully withheld from the Nazers," and that's defined as

12    the title disputes.

13             And two, "That the Nazers have timely preserved

14    their right to assert title disputes.  And for the Nazers to

15    be granted a remedy with respect thereto, nor shall anything

16    in the confirmation order," then it preserves the debtor's

17    right to contest the Nazers -- to contest that what's

18    defined as the title disputes.

19             The title disputes are defined as the Nazer

20    parties' title disputes.  That odd maxim of statutory

21    interpretation we cite from Justice Scalia's dissent is the

22    expression unius est exclusion alterius.  To state one thing

23    means the exclusion of others.

24             It's not -- I don't think we needed to cite to a

25    majority opinion from the Supreme Court to understand that
```

Page 56

1    that is a statutory -- that is a maxim of construction that

2    courts routinely apply.  We could've simply used the Latin.

3                Your Honor, two other things that I think -- I

4    don't -- I'm sure they're not suggesting, because they

5    weren't here, nor was I, but my colleagues certainly were

6    here at the confirmation order.  Your Honor was not a

7    rubberstamp with respect to confirmation.  I think Your

8    Honor did what a judge is supposed to do when faced with

9    findings, even in the absence of a contest to them.

10               The Court painstakingly went through the findings

11   to make sure that the Court could enter each of the findings

12   that were requested of it.  You gave credence to the fact

13   that there weren't people here objecting to the plan, that

14   it was a settlement.  But Your Honor went through in

15   painstaking detail, and I'm advised by my colleague that you

16   even apologized for the level of detail through which you

17   went, the findings of fact.  This was not a court acting as

18   a rubberstamp.  Even if that had anything to do with the

19   application of res judicata because Your Honor's signature

20   on a document is an order, however it came about.  And I

21   think that's the critical thing here, Your Honor.

22               Now, lastly, I just want to touch upon, because

23   there's mention after mention after mention of they're

24   giving up $9 million, giving up $9 million.  It's a little

25   bit to be judicious, it's a little misleading, Your Honor.

1          Your Honor is very familiar with this issue, as it

2     relates to many other claimants, including Mr. Osohabi (ph).

3     The Baeshens invested in certain things, they got shares in

4     portfolio investments.  Some of their money was not

5     invested, 25 percent of it apparently they allege.

6          But it's not as though they gave it up, they

7     traded that money for equity interest in other things.  They

8     didn't walk away from $9 million, they exchanged that in

9     return for investments, just might -- like Captain Osohabi

10    did, and Your Honor has already dealt with his claim with

11    respect to the really almost identical assertions that he's

12    entitled to get a return of his investments, even in those

13    equity interests.  That's what's going on here.

14          At the end of the day, Your Honor, this is truly

15    extraordinary.  They're asking you to fundamentally alter

16    the Chapter 11 process, to require a debtor to quiet title

17    to all of the property that they assert, they put on their

18    schedules, to say that is their property, and Your Honor

19    should reject the idea that that's an appropriate thing to

20    do and you should dismiss this case without any further

21    action by the debtors.

22          THE COURT:  All right.

23          MR. LEBLANC:  Thank you, Your Honor.

24          MR. SKAPOF:  One brief point, Your Honor, and

25    we're mostly going to rest on our papers here.  I just

1    really want to address the last point and Mr. Leblanc's

2    actually correct, and we said walk away, I mean, I'm using

3    that colloquially.

4           What I mean is, is we acknowledge that 75 percent

5    of our money was invested, it went to portfolio companies or

6    whatever it did, and whatever the treatment of that is under

7    the plan, is the treatment under the plan.  So that --

8           THE COURT:  Yeah, that's how I understood your

9    argument.

10          MR. SKAPOF:  We're not seeking that money, and so

11   it's a little different than people who are saying

12   everything I gave, I want back.

13          THE COURT:  You get your recovery under the plan.

14          MR. SKAPOF:  Exactly.

15          THE COURT:  Because there's a plan and a

16   confirmation order.  And on the carve-out, again, I would

17   just point, and Your Honor, you know, can look at it.  The

18   Maxwell one where one bank raised an issue as to a

19   particular action that the plan administrators wanted to

20   take, got its rights reserved, post-confirmation albeit in

21   dicta because it held in comity, the Court said, the one

22   covers the all.

23          THE COURT:  All right.

24          MR. SKAPOF:  And on that, we'll rest on our

25   papers, Your Honor, thank you very much.

Page 59

```
 1              THE COURT:  All right.  Thank you very much.  I
 2    appreciate the argument.  I will take the matter under
 3    advisement.  Thank you.
 4              The other two motions which really are essentially
 5    one motion in terms of legal issues raised.
 6              MS. ADLER:  Give us just a moment to get --
 7              THE COURT:  Absolutely, that's fine.
 8         (Pause)
 9              THE COURT:  All right.  Let me know when you're
10    ready.
11              MS. ADLER:  I am ready, Your Honor.
12              THE COURT:  All right.  So before we start, I know
13    there's a slightly, but only ever so slightly, from what I
14    can tell, difference between the two motions, the facts.
15    But it would seem that the legal arguments and everything
16    that everybody has to say are otherwise identical.  Am I
17    right in that?
18              MS. ADLER:  That is correct, Your Honor.  Most of
19    the facts -- there is an --
20              THE COURT:  I think it's one -- it's two versus
21    one.
22              MS. ADLER:  -- substantial overlap of facts, and
23    where they don't overlap and where I think it impacts the
24    argument, I'm going to address that with Your Honor --
25              THE COURT:  Okay.
```

1          MS. ADLER:  -- but counsel and I agreed that it

2    would be more efficient for the Court --

3          THE COURT:  I agree.

4          MS. ADLER:  -- hopefully if we made the arguments

5    one time, as opposed to the identical arguments twice.

6          THE COURT:  Thank you for that.

7          All right, proceed.

8          MS. ADLER:  Lani Adler for -- from K&L Gates for

9    Defendant Bahrain Islamic Bank which we call BISB and

10   Tadhamon, Defendant Tadhamon Capital B.S.C., which we call

11   Tadhamon.

12         Your Honor is aware that neither of these

13   defendants filed proofs of claim, and have not appeared

14   other than to object to the jurisdiction of this court.  And

15   the real issues here, Your Honor, I believe, are whether

16   this Court could constitutionally exercise personal

17   jurisdiction over these clients in the first instance.

18   Because if you determine that you cannot, we don't even get

19   to the subsequent arguments and the extraterritorial

20   application of the Bankruptcy Code on these particular

21   facts.

22         Now, the plaintiff has admitted in both instances,

23   let me just frame the facts for a moment.  In BISB, there

24   was a single transfer by Arcapita to BISB of $10 million

25   made on March 14th.  That investment was made by Arcapita

Page 61

1    pursuant to an agreement negotiated, performed, executed in

2    Bahrain for the purchase in that instance of commodities

3    outside of Bahrain, and subject to Bahraini law.

4          The agreements specified that everything that BISB

5    did, including with respect to the collection and the

6    movement of funds, it was undertaking as Arcapita's agent.

7          In the Tadhamon case similarly, there were two

8    transfers, each of $10 million on one day, the following day

9    March 15th.  In that agreement again, between two Bahrain

10   entities because let's not forget that the debtor is

11   Bahraini, and each of the banks is Bahraini and there is no

12   dispute on these facts.  I believe that all of the facts

13   we're going to be discussing this morning are undisputed as

14   between the parties.

15         In the Tadhamon case, there were two transfers on

16   March 15th of $10 million each made by the Bahraini debtor

17   Arcapita to the Bahraini Bank Tadhamon.  Each of those

18   called for -- was made pursuant again to an agreement

19   negotiated, performed, and executed in Bahrain, had nothing

20   to do with the United States, in that case, for the purpose

21   of treasury securities in Bahrain, outside of the United

22   States.

23         And that agreement not only specified that

24   Bahraini law would govern, but also that any disputes

25   arising out of that agreement would be adjudicated in

 1   Bahrain.

 2          THE COURT:  Can I ask, and maybe it's not proper

 3   for me to consider it, and you can feel free to tell me so,

 4   I didn't see anything in the record about why New York banks

 5   were involved at all in this particular transaction.

 6          MS. ADLER:  The two who --

 7          THE COURT:  And maybe nobody knows, I --

 8          MS. ADLER:  Well, apparently Arcapita, the way

 9   that these templates were set up, and you see the templates

10   in the papers because they were made part of the agreements

11   was Arcapita wanted to make the transfer in dollars, and it

12   wanted to make it from its -- Arcapita's JPMorgan Chase

13   corresponding bank accounts in New York.

14          So the recipients of the transfers, BISB on the

15   14th, and Tadhamon on the 15th, had to have an account that

16   could in the first instance accept the dollars.  In BISB's

17   case, it used a correspondent bank account also at Chase,

18   and the dollars were transferred the very same day to BISB's

19   bank account in Manama, Bahrain.  And in Tadhamon's case,

20   because it didn't even have a corresponding bank account in

21   the United States, it used an HSBC account for the, again,

22   one day transfer, transferred the same day to its Bahrain,

23   but the Tadhamon -- the account used by Tadhamon was not

24   even Tadhamon's, it was the account of Tadhamon's Bahraini

25   Bank, which is called Khaleeji Commercial Bank.

1        And you see that in the swift transfer documents

2    where they describe both of those intermediary banks, I'm

3    calling them intermediary in New York, as the intermediary

4    banks.  But your question raises an important point because

5    the dollars, or the funds, remained in New York for less

6    than 12 hours, according to the SWIFT documents, and there

7    really isn't a dispute.  They're pleaded that way, they go

8    both ways, I don't think that's in dispute.

9        And the SWIFT documents indicate that they were

10   ordered in the BISB case by First Islamic Bank, which is

11   Arcapita's either relative or its former name from Bahrain,

12   and in the second instance, Tadhamon's the same.

13       So these are Bahraini transactions that have this

14   intermediary slice where they're on one day in BISB's case

15   in one transaction, and in Tadhamon's two, briefly routed

16   for literally a matter of hours through New York.

17       And if you look at the Maxwell case, which I know

18   you were talking about at a different instance this morning,

19   but we discuss at length, and it speaks more to

20   extraterritoriality than jurisdiction, and I'll hook it into

21   jurisdiction in a moment.

22       But the transfers in Maxwell that are discussed at

23   great length in both the bankruptcy court case and the

24   district court case were made by Maxwell, the British debtor

25   in one instance to Barclay's another British debtor there,

1    and in another instance by Maxwell to NatWest, another

2    British bank.  And those transfers which originated in the

3    same fashion, they were ordered by the British debtor to be

4    made to these other British banks likewise passed through

5    momentarily New York, and they describe that in the facts.

6            In no way, and I've jumped to extraterritoriality

7    and in a moment, I'll jump back to jurisdiction, did any of

8    the courts that looked very hard and scrutinized those

9    transfers from top to bottom consider that tiny New York

10   intermediary piece to in any way constitute -- make those

11   domestic or U.S. transfers.  They did not overcome the

12   British-ness of the transactions, that's really important.

13   And they did not, for purposes of determining the

14   extraterritoriality analysis, whether there's -- those were

15   domestic transfers that therefore one did not have to go

16   through the calculation of whether the Bankruptcy Code could

17   be extraterritorially applied, or would it have to be.

18           Both courts concluded that those were foreign

19   transfers because they were made by one British entity to

20   other British entities.  They started in England, they ended

21   up in England, the funds ended up in England on behalf of

22   what was purported to be antecedent debt incurred abroad and

23   that little piece of it, that little New York moment did not

24   undo that in any sense.

25           And if we look at that, if I bring that back to

Page 65

1    the jurisdictional piece, I think we should start with that

2    because that's the most fundamental here, the plaintiffs

3    have conceded that they haven't been able to make out a

4    general jurisdiction case, meaning that there's a systematic

5    presence of either bank here.

6           They conceded, and they haven't put in anything

7    that refutes the moving affidavits by the CEOs of both BISB

8    and of Tadhamon that says, we don't do business here, we

9    don't have an office, we don't have a staff, we don't have a

10   phone number, we don't have property, we don't solicit

11   business here, we don't advertise business here, we don't

12   have any of the indicia of being present here because we are

13   not.

14          So let's just put general jurisdiction to the

15   side, and I believe that the defendants can concede it.  And

16   just on that one point, Your Honor, defendants threw in in

17   their opposition papers what I believed was kind of a

18   desperate fall-back argument, which was, well, yeah, we

19   can't make out general jurisdiction, but maybe, Judge, you

20   should give us an opportunity to take discovery on it,

21   because maybe we could somehow come up with it.

22          And the cases are really clear that you do not get

23   discovery for jurisdictional purposes if you can't come up

24   with any facts whatsoever, if you haven't made out a prima

25   facie case, or you can't say something specific.  So in that

1    case, they haven't done anything to refute the general

2    jurisdiction.

3            Now, specific jurisdiction, which I'm sure Your

4    Honor knows, requires that the -- there be some purposeful

5    availment by the defendant in this case with the United

6    States that is tied in some meaningful substantive way to

7    the claims at issue.

8            Here the only allegation that speaks to specific

9    jurisdiction at all is that -- it started as Arcapita

10   determined to make this transfer in -- from its New York

11   correspondent bank to another one.  But then I think

12   defendants realized, gee, that was Arcapita's action, not

13   the defendants.  So they changed it to defendant's

14   designated a bank account.

15           Well, to get this deal, defendants had to come up

16   with a bank account, an intermediary bank account.  And the

17   question really becomes is that good enough under the Leachy

18   (ph) cases, when is a -- the use -- the one day single time

19   only use of a correspondent bank account good enough to

20   predicate specific jurisdiction.  And there is not a single

21   case that the plaintiff can point to where it does.

22           In the Leachy case, which is the leading case on

23   this, in which Your Honor may know that the Second Circuit

24   certified the question to the Court of Appeals, and then it

25   went back to the Second Circuit, the Court of Appeals and

1    the Second Circuit determined that the defendant there,

2    which was called Lebanese Canadian Bank had the -- its use

3    of a correspondent bank account in connection with tort

4    claims involving the tourist financing of Middle Eastern

5    terrorist organizations which the American/Canadian, and

6    there may have been one other nationality of plaintiffs, had

7    claimed they'd been injured by, they've lost family or

8    family members as a result.

9              In that case, the Leachy case said, for a

10   correspondent bank account to predicate specific

11   jurisdiction, it needs to be recurring, it needs to be

12   deliberate, and it needs to be the tort itself.  It needs to

13   be actionable in itself.

14             So in that case, the terrorist financing was

15   literally occasioned by the dozens and dozens, and that

16   dozens I'm quoting, of the wire transfers made through that

17   account.  And it was Lebanese.

18             In this case, by contrast, we do not have anything

19   remotely recurring.  And, in fact, the Second Circuit when

20   they're discussing the recurringness, says you've got to

21   have enough recurring deliberate, so that it is quote, in

22   effect a course of dealing between the parties, to use this

23   correspondent bank account.

24             Here, not only do we not have a course of dealing,

25   but the complaints in both the BISB and Tadhamon actions

Page 68

1   allege that there is no course of dealing.  These were kind

2   of one off singular transactions, thing one.

3           Thing two, it's not deliberate, it's ministerial,

4   it's not like they're using it again.  And most importantly,

5   thing three, or as importantly of thing three, it is not the

6   use of the correspondent bank account that is actionable or

7   the tort here.

8           No one is claiming that the transfer by itself

9   violated any statute, it is only by virtue of Arcapita

10  filing bankruptcy and/or here, so that isn't an activity

11  undertaken by the defendants and/or BISB and Tadhamon who

12  each set off amounts, and I think you're familiar with that,

13  but I'll loop that back in, which occurred in Bahrain or

14  failing as plaintiff's claim, to pay certain proceeds to the

15  -- to Arcapita, which also occurred in Bahrain that that

16  happened.

17          Again, for specific jurisdiction, the critical

18  concept regardless of the correspondent bank account we've

19  just covered that, but its purposeful availment.

20          THE COURT:  Does it make any difference in your

21  analysis, or had -- would you like me to construe the fact

22  that at one point some funds were reinvested?  Does it

23  matter at all?

24          MS. ADLER:  The funds were reinvested in Tadhamon,

25  and it could -- it made the argument in Tadhamon because we

Page 69

1     believe that if there were jurisdiction, it would show that

2     there were, you know, that Arcapita had access to these

3     funds in order to instruct us to reinvest them, and that's

4     handwritten in timing.  So that would defeat -- that would

5     be sort of a 12(b)(6) that would effectively preclude those

6     claims.

7              But from a jurisdictional point of view, which is

8     what I'm focusing on that --

9              THE COURT:  Right.

10             MS. ADLER:  -- I can put that to the side.

11             THE COURT:  All right.

12             MS. ADLER:  But I do want to make the point, Your

13    Honor, the purposeful availment in all of the Supreme Court

14    and everybody else's articulation of it, requires that a

15    defendant purposefully direct activities toward residence of

16    the forum, residence of the United States.

17             So if you look at the one activity that plaintiff

18    claim, which is the use of this correspondent bank account,

19    that activity wasn't directed at residence of the forum, it

20    was directed at Arcapita, designating the bank account was

21    directed at Arcapita in Bahrain because you needed to do it

22    to effectuate this agreement.

23             And the one piece of paper that plaintiffs have

24    submitted in their opposition papers, it's Exhibit DRA (ph)

25    to Mr. Bassett's (ph) affidavit is basically a hearsay

1    exchange of e-mails between one person at Arcapita and

2    another person at Arcapita, and it's intended to show that

3    BISB instructed Arcapita to send the dollars to this

4    particular account in New York.

5             And aside from the fact that it's hearsay, and

6    aside from the fact that it's between two Arcapita people,

7    so query its credibility in the first instance, but it makes

8    the point that it's directed at Bahrain.  It's not directed

9    at any residence of the United States.  It has nothing to do

10   with that.

11            So the other point that flows from that is that

12   purposeful availment has to be an independent action

13   undertaken by the defendant to avail itself of the forum,

14   the benefits of the forum, the United States in this

15   instance.  But the use of the correspondent bank account was

16   undertaken by both BISB and Tadhamon expressly as the agent

17   of Arcapita.  That doesn't get you to that independent

18   purposeful availment stuff.

19            And the fact that it was undertaken is actually

20   explicit in the contractual language in both.  And I can

21   point you out -- point that out to you, it's in our brief.

22   So I don't think you really need it.

23            So again, the only question that we're really

24   dealing with here, is whether this truly ministerial,

25   momentary, internal, intermediary exchange of the dollars in

Page 71

1    a Bahraini transaction between Bahraini entities where the

2    money started in Bahrain and ended up in Bahrain under an

3    agreement, that we all agree was Bahrain, governed by

4    Bahraini law, and in one case, to be adjudicated in Bahrain

5    is good enough on a one time basis.

6            And don't think it's close question, Your Honor, I

7    don't think it is, especially when they -- those activities

8    were undertaken as the agent of the plaintiff, and the agent

9    of the Bahraini plaintiff.

10           THE COURT:  I saw that your reply addressed the

11   cases that the plaintiffs rely upon --

12           MS. ADLER:  Right.

13           THE COURT:  -- and I didn't know -- and those

14   include I guess Bank Brussels Lambert and Correspondent

15   Services in the Dell case, and I certainly have looked at

16   that.  I don't know if you have anything else that you want

17   to say in the context of your argument --

18           MS. ADLER:  On those -- sure.

19           THE COURT:  -- on those cases, and how to

20   understand them.

21           MS. ADLER:  I think those cases are easily

22   distinguishable.  All of them were cases brought under

23   302(a).  In Bank Brussels Lambert you may recall that the

24   question was whether a Puerto Rico law firm had enough

25   systematic presence so that its other actions in New York

1    considered tort actions, could get it within the rubric of

2    302(a).  302(a) which I happen to have in front of me, the

3    New York Long Arm, will enable someone who commits a tort

4    without the state, causing injury to person or property

5    within the state.  So that's the first piece.  We didn't

6    cause any injury or any property to anybody within the

7    state.

8            But you have to, if you want to be in 302(a),

9    either regularly do or solicit business, or engage in a

10   persistent course of conduct, that's 302(a)(1) which was the

11   provision at issue in Bank Brussels Lambert.  And there, in

12   Bank Brussels Lambert, that Puerto Rico law firm had an

13   apartment in New York that it used on -- or that the Court

14   found that it used on a regular basis, and that got it to

15   the piece about regularly engaging in a persistent court of

16   conduct.

17           And the Court also found that the Puerto Rico law

18   firm engaged in advertising and PR because it was trying to

19   get more work in the New York market from New York clients.

20   Obviously that's a distinguishable case.

21           The other cases were similarly much closer and

22   though the plaintiff periodically says, yes, but one

23   instance is good enough because that's its way to get around

24   the Leachy correspondent bank requirement of recurring and

25   deliberateness; a) it has to be deliberate which it wasn't;

1    and b) in those cases, again, the use of the bank account

2    was itself the tort.

3             In one of the cases it -- the defendant is accused

4    of making unauthorized securities trades, generally by the

5    way for New York plaintiffs, and in that instance, they used

6    the -- it was the bank account through which they made the

7    trades.  So much closer to the account being the instrument

8    of action, being actionable on its own without anything

9    else, and similarly so were the other cases.

10            I think again it's important to know the

11   plaintiffs beef as it were, it's not the use of the

12   correspondent bank account, that was just a, in my opinion,

13   contrived construct to try to generate jurisdiction.

14            The beef, and it's pleaded this way, is that the

15   defendants either did not repurchase the investments post-

16   petition as initially planned, and/or that they set off the

17   amounts which they were permitted to do under Bahraini law,

18   and which plaintiff has not challenged by the way -- I mean,

19   challenged the propriety of the Bahraini law.  They

20   challenge that they don't like the set off, but they haven't

21   challenged that Bahraini law permits it.

22            With respect -- oh, now there's one more piece of

23   the jurisdictional analysis that I should get to.

24            If there -- and again, we're in constitutionally

25   -- we're in Fifth Amendment due process because the

Page 74

1    bankruptcy and United States.

2          If you get to -- if you find the minimum contacts,

3    then there is a second question that the Court is obligated

4    to engage in, which is whether it is constitutionally

5    reasonable to exert -- to -- for the Court to exercise

6    jurisdiction.  And that reasonableness is articulated as is,

7    does it -- would it comport with substantial justice and

8    fair play for the Court to exercise jurisdiction.

9          I don't think there is -- you don't get to that

10   question in the first instance, if you don't get through

11   minimal contacts.  And so our argument is that, you don't

12   have minimal contacts here, so you don't need to get to that

13   question.

14          But even if you did get to that question, Your

15   Honor, the metric is could the defendant -- is it fair that

16   the defendant could reasonably foresee being hailed, and

17   they spell it h-a-l-e-d, into court, and the answer is, I

18   don't see how that's possible.  Again, because were Bahraini

19   transactions for performance that took place in Bahrain or

20   outside the United States under Bahraini law with no

21   connection to the United States to be adjudicated and to be

22   governed by Bahraini law.  There's just no way a defendant

23   could imagine being hailed into court here.  I don't see

24   that.

25          The analogy is to the Supreme Court Assai (ph)

1    case, and Your Honor may know that the Court found that it's

2    inappropriate often where you have claims that have

3    basically little, if anything, to do with the United States.

4    In Osohahi (ph), there was a third party claim because there

5    had been a tort action between I think a bicycle tire

6    manufacturer in Taiwan and the tire manufacturer which had

7    blown out in Japan.  The Court found it was wholly

8    inappropriate to -- and that the California state court in

9    that instance did not have jurisdiction.

10            And in connection with that, I want to point out

11   that this plaintiff is not without a remedy.  If this

12   plaintiff thinks that set off was inappropriate, this

13   plaintiff which has among its members, the committee

14   members, a number of Bahraini entities itself, can go to

15   Bahrain and challenge the legitimacy of the set-off, if it

16   so chooses.

17            Now -- nor -- so again, just to reiterate on the

18   discovery piece, I've told Your Honor why I don't think

19   discovery is warranted on general jurisdiction, but the

20   cases are very clear that this is different than other

21   bankruptcy examinations that one is not entitled to a

22   fishing expedition to put a defendant to the trouble and

23   expense of discovery, if there's just nothing there, even on

24   a specific jurisdiction basis.

25            In this case, the defendants -- the plaintiff's

```
1    opposition papers said well, we should get discovery to get
2    more information about the transfers because again, specific
3    jurisdiction, you have to link up the specifics to the
4    claim.  And the answer is, they have access to Arcapita.
5    They know as much about the transfers as anybody, and it
6    wasn't able to generate for them any basis for jurisdiction
7    other than this one time correspondent bank use.  That is
8    not good enough, and the cases are quite clear on that.
9              And there's kind of a due process to it one could
10   understand, which is if you really don't have a case, and
11   you've dragged someone in to the expense and a burden of
12   having to show up in court to make that point, you surely
13   shouldn't be able to keep it going, if you don't have any
14   good reason to do it, and the cases are very clear, that
15   hope and conjuncture, and they use those words, hope and
16   speculation I think, are not a sufficient basis to warrant
17   discovery for jurisdictional purposes.
18             Now, on extraterritoriality, the plaintiff makes
19   two arguments that have been squarely rejected in courts in
20   this district.  The first is that as Your Honor probably
21   knows for a statute to be applied extraterritorial under
22   Morrison and the recent Supreme Court and Second Circuit
23   cases like Norags (ph) the statute has to extremely clearly
24   provide for extraterritorial application.  Statutes that
25   speak to foreign commerce like the RICO statute are not good
```

```
 1    enough.  Almost no statute has been found good enough that

 2    I'm aware of.

 3              The plaintiff's argument is that the wherever

 4    located in the definition of property of the estate in

 5    Section 541 of the Code is good enough, that argument was

 6    expressly rejected in both the Maxwell bankruptcy case and

 7    district court case.  And interestingly, I'd like to point

 8    out that in the second amended disclosure statement filed by

 9    the debtor, not by the committee, but of course, the

10    committee stands in the shoes of the debtor, the debtors

11    conceded that those cases are currently good law, and they

12    remain good law, their words.

13              So that's not good enough, and that gets you

14    there.  The second argument, and I point out that in, you

15    know, generic words are not good enough, the Keyable (ph)

16    Supreme Court says any and every are not sufficient, that's

17    at 133 S.Court at 1665, and in Morrison, the -- Judge Scalia

18    went even farther and said, "possible interpretations of

19    statutory language."

20              So language that one could not arguably

21    unreasonably engraft something on to Allah wherever located,

22    again are not good enough, 130 S.Court at 2883.

23              So that's the first piece, we don't have the

24    language.  The second piece is you then -- you also

25    scrutinize the transfer itself, and you scrutinize according
```

1    to Maxwell, the totality of the transfer, not just the teeny

2    momentary hours long piece of it that occurs in New York.

3           To determine if the transfer is domestic, in which

4    case, you don't need to worry about extraterritorial

5    application, or if the transfer is itself foreign, and

6    therefore, you have to consider whether the statute can be

7    extraterritorially applied.

8           I don't think that there is any substantive real

9    question that on these facts, which are very close to the

10   maximal facts, that these transfers began and ended in

11   Bahrain.  Again, I don't want to keep repeating myself,

12   between Bahraini entities.

13          THE COURT:  Well, the debtors cited the use of the

14   correspondent bank, you responded by saying that that was

15   essentially Arcapita's direction, and in other words,

16   Arcapita required this.

17          MS. ADLER:  I said that --

18          THE COURT:  And --

19          MS. ADLER:  -- I said anything we did was

20   undertaken, and I said that even if you put that -- as

21   Arcapita's agent, and even if you put that aside, it's

22   ministerial, it's not critical to the transaction.

23          THE COURT:  No, I understand, but what do you say

24   to the notion that if that's what the agreement said and

25   Arcapita said, well, in order to sign this agreement and do

1    this, we want it done this way, that that's a decision to

2    avail yourself from the forum, it may be done at the

3    direction of somebody else, but it's still a decision to

4    avail yourself of the forum.

5            MS. ADLER:  I don't think it's availing yourself

6    of the forum.  I think it's really ministerial.  So I think

7    you make a good point, Judge, you have to focus on two

8    things.  You have to focus on a) is there independent action

9    by the defendant, which I think there is not, but b) you

10   look at that action itself, and if it's too, I'll use the

11   legal phrase, namby-pamby, if it's too ministerial or

12   adventitious is a word I had known before I started reading

13   these cases, that's not good enough.

14           And again, in Maxwell, you know, the monies that

15   get transferred, get transferred in the first instance from

16   Maxwell through a New York account to the debtor's New York

17   accounts and immediately transferred to the debtors in

18   Britain.

19           And in Maxwell, the case, certainly the

20   extraterritoriality, that the connection to the U.S. was

21   even stronger, because the funds that were transferred, were

22   those that indisputably were the proceeds of the sale of

23   U.S. assets.  We don't even have that connection here.

24           But I don't think that if you -- the agreements do

25   not say New York -- that there is no agreement and there is

Page 80

1   no piece of paper that says either BISB or Tadhamon has to

2   use a New York account to do it.  The agreements leave open,

3   in the BISB case, and we can look -- I can take you through

4   those documents.  In the BISB case, you know, the way these

5   work is there's an overlapping agreement, and then there are

6   a series of templates because you want to make it -- it

7   needs to -- it is structured to be Sharia compliant, so that

8   there won't be interests by both parties.

9            THE COURT:  Right.

10           MS. ADLER:  So the way that it works in BISB, is

11   that either party can propose a transaction by which the

12   agent, in this case, BISB and Tadhamon would purchase, in

13   the BISB case, commodities, in the Tadhamon case, treasury

14   securities for Arcapita.  Arcapita wants to do those deals

15   out of the dollars that none of them say -- the template in

16   the BISB says, it leaves blank which bank account BISB will

17   use, and it says it will be an account in favor, in f-a-v-o-

18   u-r, of BISB and Tadhamon does something similar.  And then

19   when they do the specifics, they do it -- they put in the

20   accounts.

21           So I don't think -- I don't know of any case where

22   receipt of funds, and there are cases and we've cited them

23   in our brief, Your Honor, receipt of funds on a one time

24   transitory basis in New York, whether whoever designated the

25   account, is sufficient to predicate personal jurisdiction.

Page 81

1              THE COURT:  All right.  Okay.

2              MS. ADLER:  There just is simply zero authority

3      for that.

4              I think we were talking about extraterritoriality,

5      and I think I made the point that there is no basis,

6      especially when you look at Maxwell, that these transfers

7      when scrutinized in their totality, could be considered

8      domestic rather than Bahraini in nature, and therefore, they

9      would require extraterritorial application.

10             Finally, we argued that international comity would

11     more of this Court's deference to Bahraini law and set off,

12     you've got two Bahraini parties, Bahraini transaction who

13     agree that Bahraini law is going to cover, and Tadhamon, who

14     also agree that stuff is going to be adjudicated, you know,

15     disputes are going to be adjudicated in Bahrain.

16             The plaintiff seems to think that there is a

17     requirement that there be a pending parallel insolvency

18     proceeding.  There is no case that says that.  And the

19     Hilton v Guyo (ph) language, which is what's always cited

20     says the Court is to pay deference to judicial legislative

21     proceedings.  I don't think that's required.

22             Again, you know, the parties understood that they

23     were going to be doing a transaction under Bahraini law.

24     Bahraini law, and it's important to note this, provides for

25     set off, and it's different than the U.S. set off law.  The

1    Bahraini law it's quoted to you, we've given you as good --

2    does not require for mutuality, and Bahraini law specifies

3    in its set off provision, that a creditor can set off

4    obligations even from a different agreement that is

5    different or than the U.S. law is required of mutuality and

6    would call for, I think, different results here.

7            And again if the plaintiff thinks that's

8    problematic, the plaintiff easily can go to Bahrain and

9    address it.

10           I don't think we get to any of the equities of

11   bankruptcy law or creditors being treated differently if the

12   Court does not have jurisdiction or the Bankruptcy Code

13   cannot be applied on these facts, Your Honor.  Thank you.

14           THE COURT:  All right.  Thank you.  It is a

15   quarter to 1.  I'll give you the option of whether you want

16   to proceed straight through, or take a break for lunch.

17           MR. LEBLANC:  Your Honor, I'm certainly at the

18   pleasure of the Court, so I'm prepared to proceed.  I

19   actually am currently in a trial downstairs, one floor down,

20   so I'd love to get back to that, but if Your Honor wants to

21   take a break --

22           THE COURT:  No, that's fine.

23           MR. LEBLANC:  -- I don't have any witnesses today,

24   so I'm --

25           MS. ADLER:  So to be so long-winded, Your Honor.

1           THE COURT:  No, no, not at all.

2           MR. LEBLANC:  I'm going to be going down there and

3    sitting.

4           THE COURT:  You --

5           MR. LEBLANC:  So -- but I --

6           MS. ADLER:  It was the guys before us.

7           THE COURT:  All right.  No, I think --

8           MR. LEBLANC:  Your Honor, whatever Your Honor

9    wants to do.

10          THE COURT:  -- that's fine.  I'm fine.  I just

11   figured I'd always ask because I do my -- when I did the

12   Chapter 13 cases, I went from 10 in the morning till when

13   they were done, and often at 4 o'clock, and when I told my

14   wife that, she accused me of being inhumane.  So I decided I

15   should ask rather than barreling ahead in circumstances.

16          MR. LEBLANC:  At least in those cases, you're only

17   being inhumane to yourself, Your Honor, not because you've

18   got, I assume, people flowing through.

19          THE COURT:  No, there are a couple of lawyers that

20   are in there for the long haul usually, but anyway, yeah,

21   let's -- I'm fine, let's go ahead.

22          MR. LEBLANC:  Your Honor, let me begin by -- I've

23   never actually had somebody correct our spelling in a brief

24   standing at the podium, so I apologize sincerely, Your

25   Honor, for the typographical error when we misspelled hailed

1   apparently in our brief.  I thought that was just odd.

2              MS. ADLER:  It's counter intuitive.

3              MR. LEBLANC:  Your Honor, so let me -- I think it

4   is --

5              THE COURT:  It's a nice quaint spelling.

6              MR. LEBLANC:  Sure.  Your Honor, I think it's a

7   little bit -- it's important to step back, and obviously I

8   don't think there's any fair dispute.  This is what's

9   alleged in the complaint.

10             The actions that were taken here deprive the

11  estate of $30 million worth of assets.  They were

12  transferred a few days before the bankruptcy, they were

13  transferred in amounts that were almost the same as amounts

14  that were owed by Arcapita, and then subsequent to that they

15  were -- you know, they exercised what they claimed to be a

16  right of set off.  And as a result of that, the Arcapita

17  estate was deprived of $30 million, which would have

18  otherwise been available to distribute to creditors when

19  these banks would've like everyone else had a claim against

20  these estates and recovered on a pro rata basis.

21             THE COURT:  No, I understand that, but -- and

22  certainly I know that's a good fact to get out there, but I

23  don't know that it's relevant for what I have to decide in

24  the motions.

25             MR. LEBLANC:  Well, I think it is relevant, Your

1    Honor, for a couple of reasons.  Because you actually have

2    to look at the claims that are asserted in the motion,

3    because there are five of them.  And their motion just

4    mushes everything together.

5           And, Your Honor, I said at the outset, when I was

6    talking about the other motion that you're hearing some

7    extraordinary things argued today, and let me tell you why

8    that is.  No court in the history of the Bankruptcy Code, so

9    far as I can tell, has ever said that the automatic stay is

10   not extraterritorial.  None.

11          Maxwell doesn't do it, and Your Honor, I'm sorry,

12   I'm getting responses to my argument as I'm standing here.

13          MS. ADLER:  Sorry, I apologize.

14          THE COURT:  All right.  Well, let's -- I mean, I

15   want to address personal jurisdiction first anyway.

16          MR. LEBLANC:  Sure.

17          THE COURT:  And as I understand it, I think people

18   are unanimous in how to look at the case and what the issues

19   are, and that personal jurisdiction is one issue that's been

20   raised, and extraterritoriality is another.

21          MR. LEBLANC:  Sure.

22          THE COURT:  So let's sort of take it, personal

23   jurisdiction first.  I think the -- if the case arises or

24   falls on the extraterritoriality, thank you, of the

25   automatic stay, I'd be very surprised.

1          MR. LEBLANC:  Fair enough, Your Honor.  Let's --

2     so let me deal with personal jurisdiction.

3          Your Honor, there is -- we've not found a single

4     case that has said, and this is where we dispute that the

5     facts are the facts, but there's one critical distinction.

6     The parties here actually performed the contract in the

7     United States.  The only exchange of consideration that

8     occurred, occurred between two New York banks.  They

9     purposely availed themselves of the New York banking system

10    to exchange the only piece of consideration that was to be

11    exchanged to commence the contract.  That is undisputable.

12         And, Your Honor, there is no case, none, that says

13    that the use of a bank account in the U.S. to consummate a

14    transaction, and a suit about that transaction, that that

15    does not constitute personal jurisdiction.  That is not what

16    the Listy (ph) case says.

17         And it's important to recognize, the Listy court

18    had the facts before that it had.  It had a year of

19    discovery in which it was determined that there were dozens

20    of transactions.  Those were the facts.  But the New York

21    Court of Appeals on the certification of that question, Your

22    Honor, the facts were that there were dozens of

23    transactions.  But that's not what the New York Court of

24    Appeals held was necessary.

25         And quite to the contrary, Your Honor, the

```
 1    Correspondent Services case that we cite, the Correspondent

 2    Services, and I will quote from that decision says, "the

 3    single purposeful act of transferring JVW's funds to New

 4    York constituted the transacting of business from which the

 5    cause of action directly arose."  That's Correspondent

 6    Services.

 7            THE COURT:  Well, that raises a good point.  So --

 8    where the parties disagree.  I understand that what the

 9    debtors are seeking is -- well, exactly what are the debtors

10    seeking?  That's why I asked about the reinvesting of some

11    of the money after the bankruptcy so because -- to sort of

12    dumb this down, think about it as a practical matter,

13    doesn't it make -- doesn't that make it less about those

14    transfers and more about then what happened later, which is,

15    you decide to set off the amount of money and not give it

16    back to us, and you refused to honor your agreement to, on

17    the maturity date, pay us.

18            So it's not the -- at least they say, it's not the

19    investment of the money, it's rather what happened at the

20    end.

21            MR. LEBLANC:  Well, Your Honor, then that's why I

22    started to go through the claims, and I think it's important

23    to think about what claims we assert.  We assert a breach of

24    contract because they had an obligation to return the funds

25    upon the conclusion of the contract.  That's true, whether
```

Page 88

1    there's reinvestment or not.  And to be clear, there's only

2    reinvestment with respect to one of the two institutions,

3    there's not with respect to the other.

4              THE COURT:  Right.

5              MR. LEBLANC:  So there's a breach of contract

6    claim.  The consummation of the contract; i.e., the exchange

7    of consideration occurs in New York.  And, in fact, in the

8    case of Tadhamon, documents that they submitted make clear

9    that when Tadhamon is supposed to return the money to

10   Arcapita with the profit, it's identified on those documents

11   and there's four of them that they submitted, Exhibits -- I

12   think it's B, C, D and E to their motions, all four of those

13   identified Arcapita's New York bank account as the place to

14   which they were to remit the funds.  That was the direction.

15             So there's a breach of contract claim, unrelated

16   to whether or not there was reinvestment.  The second claim

17   is a claim for turnover under Section 541 -- 542 of the

18   Bankruptcy Code.

19             The turnover claim, Your Honor, there is no

20   dispute as to whether or not this is property of the estate.

21   They don't contest that, that it's property of the estate,

22   because this is a matured debt.

23             So the second claim, turnover, doesn't, in our

24   view, Your Honor, turn on whether or not there is

25   reinvestment of the proceeds.  It's Arcapita's money.  The

```
 1   debt matured, they're obligated to turn the money over.

 2   It's Arcapita's property.

 3            The third claim is an automatic -- a claim for

 4   violation of the automatic stay under Section 362.  That

 5   relates to the contention that they've made that without

 6   coming to Court, that they simply unilaterally set it off.

 7            The fourth claim, and this is the only claim as to

 8   which you could even potentially claim it was a later acting

 9   event.  That claim is a preference claim.

10            Now, just let me be clear about that.  That's pled

11   in the alternative, Your Honor, because to the extent that

12   they contend that instead of being a contract that called

13   for them to return the money, it was designed to repay an

14   antecedent obligation, then we would assert that was a

15   preference.  Or alternatively, to the extent that they

16   contend that there was a set-off, we would say that set-off

17   was a preference, because it was made five days before the

18   bankruptcy filing at a point in time that the other elements

19   of Section 547 are met.

20            And then the fifth claim, one as to which there

21   really isn't any defense, as far as we can tell if -- it's

22   only a claim if we lose, that isn't a claim objection

23   because the debt that we don't believe has been set off,

24   which we believe we owe to them if they return the money,

25   the debt is scheduled, and therefore, needs to be objected
```

1    to.

2          And so as to that claim, there can't be a personal

3    jurisdiction argument.  They would -- I assume, if there's a

4    dismissal, they would simply default on that question and we

5    could expunge that record from the schedules and no claim

6    would be made.

7          But it's important for those reasons, Your Honor,

8    to talk about each and every one of those claims, because

9    the two primary arguments are just fundamentally different

10   as they relate to them.  Because when you think about the --

11   the first three claims all relate to the transaction and the

12   consummation of that transaction incurred entirely in New

13   York.  You would be, I submit, Your Honor, the first judge

14   to look at a case in which the transaction that is being

15   sued upon was consummated in New York, and you would

16   conclude -- between two banks in New York, and you would

17   conclude that you did not have jurisdiction over that.

18         Now, I want to be clear, because there was I think

19   some effort to muddle this.  Your Honor has, under the

20   Constitution, the full reach of the jurisdiction that the

21   Court has.  Now, you have as expansive of a reach as the

22   Constitution provides.

23         To the extent that something is covered by the New

24   York Long Arm Statute, you have that reach as well.  Because

25   it's been said many times that the New York Long Arm Statute

1    is less extensive than the reach of Article 5 of the Fifth

2    Amendment to the Constitution.

3            So to the extent that it's covered, now the Lessy

4    (ph) case I think is quite instructive on this issue.  The

5    facts were that there were dozens of transactions, but what

6    was the relevant part?  What did the Court use the fact that

7    there were dozens of transactions?  And I think it's

8    important because from time to time we stand here and we say

9    cases what mean, I think it's important to read the words

10   that they actually use.

11           The Court begins by -- there's two elements to the

12   302, because that was a 302(a) case.  The Court begins by

13   saying, "In its response to our certified questions," and

14   this is at page 168 of the Second Circuit decision, "the

15   Court of Appeals confirmed that Amego Foods v Marine Midland

16   Bank (ph)," and I won't give the cite there, "stands for the

17   proposition that the use of a New York correspondent bank

18   account standing alone may be considered a transaction of

19   business under the Long Arm Statute, if the defendant's use

20   of the correspondent bank account was purposeful."

21           And then they go through a discussion, and make

22   note of the fact that there were dozens and dozens of

23   transfers.  And what do they say about that?

24           "The Court focused on the allegations that LCB

25   used its New York correspondent account, 'dozens' of times

Page 92

1    'to affect its support of Shadid (ph) and Shared Terraskulls

2    (ph), not 'once or twice by mistake'."

3         Next line, "The Court confirmed that this conduct

4    indicates the desirability and a lack of coincidence."

5    That's the relevance of the number of transactions.

6         Now, the Court -- the Second Circuit then again,

7    quoting for the Court of Appeals goes on to say, "Because

8    the defendant's allegedly culpable conduct stems from this

9    use of the New York correspondent account, the Court of

10   Appeals concluded the plaintiff's claims are sufficiently

11   related to LCB's New York business activity to satisfy the

12   second prong of 302(a)(1)."

13        Now, Your Honor, the issue that they were faced

14   with there, the injury that was complained of in the Listy

15   case occurred in Lebanon and Israel, when there is injuries

16   to individuals living in Israel from attacks by Hezbollah,

17   that did not have -- didn't happen in New York.

18        Here, by contrast, we have without question, the

19   purposeful availment of New York, and let me just step back

20   and just as a digression.

21        I -- it's a little silly to say that Arcapita

22   could've dictated where those funds went.  They had to

23   identify a bank account, Your Honor, they had to, meaning

24   the defendants had to.  Our complaint in paragraph 6 alleges

25   that at BISB's direction, the funds were transferred to

Page 93

1    accounts in New York.  It's not something made up in our

2    reply.

3              THE COURT:  Before we get into that, though, I

4    just want to ask you about your reading of the Lissy (ph)

5    case.  In Lissy, I read that, and again, I know it's under

6    302, but let's put that aside for a second.  I read that to

7    say that a one -- this one time use, with this use that's at

8    issue can satisfy if there's some other depth to the

9    relationship.  And so there, they looked at these other

10   transactions and said, okay, it's not an accident, it's not

11   essentially just coincidental.

12             And so the cases that seem to talk about a one-

13   time availment seem to focus on one of two things.  That

14   they are really part and parcel of the actual injury, so a

15   fraud case, here's where the money goes, that's -- it's

16   going into this bank account, so it's really, it's part and

17   parcel of the injury.

18             Or that there's some other depth to it, that is,

19   that this party has availed itself of the forum in -- on

20   other instances, in terms of this one account, and it begins

21   to blur frankly from my point of view, specific and general

22   jurisdiction.

23             MR. LEBLANC:  I agree with you, and I had the same

24   question reading Lissy.

25             THE COURT:  So I'm trying to figure out since the

1    Second Circuit is binding precedent, but sometimes the

2    binding precedent is not always very clear, how the parties

3    construe that, because it does seem to have an element,

4    Lissy does seem to have an element and the Second Circuit's

5    decision in that has an element of the specific in general.

6            So what do you take from that reference to the

7    many bank accounts -- I'm sorry, the many transfers, and how

8    that essentially proves up the specific jurisdiction?

9            MR. LEBLANC:  Well, I take two things, Your Honor.

10   I take first of all that those were the facts at the time,

11   that's one.  It's just what it is.

12           THE COURT:  Right.

13           MR. LEBLANC:  What it -- what you cannot conclude

14   from that is that if you only had one, that the Second

15   Circuit or the New York Court of Appeals more appropriately

16   on certification would've come out differently.  It didn't

17   rest its holding on the fact that there were many -- there

18   were dozens and dozens.  Those were the facts.

19           But the important question I think is what we just

20   walked through which is, what was the relevance of the

21   dozens and dozens of transactions?  It was because the

22   relevance was that it was purposeful.  It was not

23   coincidental.  It was knowing on their part.

24           Because under Lissy when you actually look at the

25   facts of Lissy, it was a client or a customer of the banks

1    who was transacting business in the U.S. through Lissy's

2    accounts.  So it wasn't Lissy itself conducting the

3    business, it was one of its customers.

4           And so I think the numerosity of the transactions

5    there gave comfort to the Court, and those were the facts

6    they had, but gave comfort to the Court of the

7    purposefulness of the bank's use of a New York account.

8           And importantly, I think their -- and the cases

9    recognize this, Your Honor, that there's a continuum, that

10   the more directly connected the transaction is, the injury

11   is to the transaction, the less frequency of contact you

12   have to have.  That's why if I drive through New York one

13   time in my life, and I get into a car accident, I am subject

14   to the jurisdiction of New York, because the injury alleged

15   is -- it doesn't matter that I've come through here time and

16   time again or never before, that's the best analogy I think

17   you can give to that.

18          But here, the very depletion of the estate's

19   assets, of which we complain, the very contract of which we

20   seek remedy for breach was consummated pursuant to the

21   transfer of consideration in New York.

22          THE COURT:  I understand that, but that's sort of

23   a but for view which is a little different than it being the

24   actual injury.

25          So if, for example, the set off was accomplished

1    by a transfer of funds that went through New York, and you

2    say, well, the set off is the -- and this gets muddled by

3    the fact that there are many different claims --

4              MR. LEBLANC:  Correct.

5              THE COURT:  -- and we begin to sort of put on

6    different hats, but if you say well that set off is the

7    problem, that's the injury, that's the improper conduct, for

8    lack of a more precise term, then would you have a better

9    argument if that -- if there was some transfer that went

10   through New York for that, as opposed to this transfer seems

11   to be setting the stage for the ultimate problems to come,

12   but doesn't seem to the actual injury, in the way that I

13   understand the cases.

14             So it's one thing to say, hey, I gave money to

15   you, you were supposed to do X, Y, and Z with it, and you

16   said you would transfer it to Switzerland, went through a

17   New York account, well, that's part of the injury, that's

18   part of the actual tort in that case or breach of contract

19   or whatever it is.  And here, it seems to be a little

20   further afield, wouldn't you agree?

21             MR. LEBLANC:  I would not, Your Honor.  The set

22   off is their defense to our claims.  We don't plead --

23             THE COURT:  But there was nothing --

24             MR. LEBLANC:  -- the set off.

25             THE COURT:  But there was nothing -- no one would

1    complain that there was something improper about the -- what

2    happened with the funds initially.

3              MR. LEBLANC:  Well --

4              THE COURT:  It was later when the funds were

5    either supposed to be -- the investment was supposed to

6    mature and be paid, and it wasn't paid.

7              MR. LEBLANC:  It's --

8              THE COURT:  So it's not the initial transfer

9    that's the problem, it's the failure to make another

10   transfer back to the debtors.

11             MR. LEBLANC:  Well, Your Honor, it's -- the

12   problem and our first two claims are breach of contract and

13   turnover.  They defend -- we expect when they answer the

14   complaint, that they will defend on the basis of set off,

15   but that's their defense.

16             The fact that they did a transaction which we

17   believe to be in violation of the automatic stay and Bahrain

18   can't change whether or not they're subject to jurisdiction

19   here, the conduct of which we complain is the depletion of

20   -- is the contract and the fact that they didn't turn over

21   into the United States where they were required to under the

22   terms of the contract, the funds owed to Arcapita.

23             That's -- and the transaction that we're seeking,

24   we're not seeking to unwind the transaction, we're seeking

25   to have it completed.  The first step in the consideration

Page 98

1    of that transaction, Your Honor, and there's two steps as it

2    relates as between the parties, there are two steps;

3    Arcapita gives money to them, they give money back to

4    Arcapita.  Only one of those steps occurred because they

5    breached the contract and therefore cut it off.

6              THE COURT:  Right, but --

7              MR. LEBLANC:  The first of that happened in New

8    York entirely.

9              THE COURT:  I agree, but I don't think that's the

10   harm, but I think in isolation -- you still have an

11   argument.  You still have an argument to say it's part of --

12   you can't have the second part of the transaction without

13   the first part of the transaction, but I think it does

14   remove it a little bit from those cases where it's the

15   transfer is the harm.  And the transfer is, you took my

16   money and should've made that transfer, and somebody said

17   that transfer was improper.

18             The transfer, this transfer is improper, it's --

19   it is the consideration for the transaction that you say

20   wasn't handled appropriately on the back end, which was a

21   fairly short period of time.

22             MR. LEBLANC:  But it's not handled appropriately

23   on the back end, it wasn't -- the contract -- it has --

24   again, exchange of consideration, we can think of it as a

25   loan, we give them money, they give it back to us with a

```
 1   profit.

 2             We gave it to them in New York, they were supposed

 3   to give it back to us in New York and they didn't.  They

 4   just didn't do it.  So I -- to suggest that this is somehow

 5   in Bahrain, it's just not.

 6             And I would submit, Your Honor, you couldn't find,

 7   and when we're suing for a breach of contract, a contract

 8   that they purposely availed themselves, they chose to

 9   consummate and that's our allegation, and I don't know how

10   they could even contest that they chose which bank account

11   we would send money to them in, we couldn't dictate that for

12   them, they had to open it or talk to somebody to do so, that

13   they chose to send it there.  I think you would be the --

14   and I actually know, you would be the first court ever to

15   say that in that circumstance there isn't personal

16   jurisdiction.

17             And if you look at the Second Circuit I think one

18   thing that -- I actually wondered this question because Your

19   Honor asked why did this happen in New York, and I had

20   thought the same thing.  But if you read the Lissy case, I

21   think it tells you that the decision to do it in New York is

22   of quite some moment because this is what the Court says.

23   And they're noting the fact that the banks here, or that the

24   customer in that instance in the Lissy case didn't have to

25   use New York, even though it was a U.S. dollar denominated
```

```
 1    transaction.

 2             In light of the widespread, and this is a quote,

 3    in light of the widespread acceptance and availability of

 4    U.S. currency LCB could have, as it acknowledges, processed

 5    U.S. dollar denominated wire transfers for the Shaheed (ph)

 6    account through corresponding accounts anywhere in the

 7    world.  And then they cite a case which cites a number of

 8    places they could've done this, including Saudi Arabia.

 9             So they could've done it anywhere they wanted to

10    including in a neighboring country in the Middle East.  And

11    still done it as a U.S. dollar denominated transaction.

12             But when the money was to be sent from Arcapita to

13    them, and Arcapita had to ask and our complaint alleges they

14    did, they were directed by BISB and by Tadhamon to say where

15    should we put the money, they said, put it in these accounts

16    in New York.

17             Under those facts, Your Honor, I don't think any

18    court in New York has ever said that's not sufficient.

19             Now, the other point --

20             THE COURT:  Well, let me ask whether or what

21    significance, if any, is it to you that Arcapita essentially

22    -- it seems to be undisputed that they designated a

23    particular account from which the funds were to go, that is

24    that account in New York, and so you had to find another

25    bank, that is the recipient had to find a bank.  You're
```

Page 101

 1    saying it didn't have to be a New York bank.

 2              MR. LEBLANC:  It didn't have to be in New York.

 3              THE COURT:  But -- so what am I supposed to take

 4    from the fact that Arcapita designated this New York account

 5    to be the last bank that Arcapita had control of funds and

 6    would transfer the funds somewhere to?  Does it matter at

 7    all?

 8              MR. LEBLANC:  Well, I think it makes a huge

 9    difference to this case, because in the absence of that

10    designation, presumably that money would have been here five

11    days later when the company filed for bankruptcy.  It would

12    have been part of -- not just part of the estate, but would

13    have been physically present in New York.

14              But the simple fact, Your Honor, is that the fact

15    that Arcapita was using a bank here, this is a completely

16    different case.  If they said, okay, you're using JPMorgan

17    Chase here, wire it to us to our account in Saudi Arabia,

18    our U.S. dollar denominated account in Saudi Arabia.  They

19    could have done that.  That's what the Lissy court says.

20              THE COURT:  Well, I guess what I'm asking is, does

21    the use of one New York corresponding bank account have

22    anything to do with the other and you're saying no.

23              MR. LEBLANC:  No.

24              THE COURT:  Because, for example, say Arcapita

25    didn't designate its New York -- this New York bank to be

1    involved.  And say they, through whatever -- it went through

2    various financial institutions, but it never went through a

3    bank in New York.  And so when the funds finally left the

4    Arcapita side, it left from a bank in Saudi Arabia and it

5    was the defendants who said, send it to us in New York.  So

6    you're saying that essentially is factual indistinguishable

7    from your case?  It doesn't matter that Arcapita --

8              MR. LEBLANC:  I am, Your Honor.  Because there's

9    no indication -- and the Lissy court says exactly the

10   opposite of that, that you can do U.S. dollar denominated

11   transactions outside of the U.S.

12             So I don't know of any reason why the defendants

13   couldn't have identified in response to Arcapita saying,

14   it's coming from our JPMorgan Chase account and we want it

15   to go back to our JPMorgan Chase account, they couldn't have

16   said sent it to our account in London.

17             There's no suggestion -- and we're here on a

18   motion to dismiss, so you have to accept the facts pled in

19   the complaint.  There's no suggestion that that couldn't

20   have happened.  And that's a very different case than the

21   one that's facing us here.

22             Because in that instance, if the money is just

23   coming out of the U.S. then there's a real question as to

24   purposeful availment, I think that's a very fair question.

25   But the banks -- the only BISB and Tadhamon could have said

1    where they would receive the money.  And they said, when

2    asked that question, here it is in New York.  That, I think,

3    is dispositive of it.  And Your Honor would be cutting the

4    legs out of personal jurisdiction if you said something

5    other than that.

6              And let me respond to the Maxwell suggestion

7    because Maxwell doesn't deal in the least bit with personal

8    jurisdiction.  It was Sochan (ph) and Barclays that were

9    defendants in that who are the subject of jurisdiction in

10   the United States.  But the facts actually matter there as

11   well.  Because in that instance, the reason that the Second

12   Circuit found that comity should have the case proceed in

13   the parallel proceeding that was pending in the UK is

14   because the debtor rather, transferred funds out of a UK

15   account into a U.S. account.

16             So when you're talking about the extraterritorial

17   reach of U.S. law, the fact that the debtor's estate in the

18   UK was depleted is the relevant inquiry when you're talking

19   about the extraterritoriality -- extraterritorial reach of

20   -- and just to be clear, it's only the preferenced statute

21   there.

22             But here, that's -- the destination -- if it was a

23   personal jurisdiction question, the destination of the money

24   would be the relevant question.  And so Maxwell doesn't have

25   -- nobody suggests that it does deal with personal

1    jurisdiction but -- and I don't know why it was raised in

2    that context, but just to be clear, the facts are that if

3    the plaintiff or the defendant here designated a New York

4    bank account, that's the relevant question.

5              Now, one other point to make about Lissy, Your

6    Honor is, the allegations in Lissy were about a number of

7    transactions that constituted violations of the anti-terror

8    -- anti-money laundering and anti-terror act.  There was --

9    so the allegations turned on the number of transactions

10   here.  We have a single transaction, a onetime use of a bank

11   account that is the subject of the lawsuit.

12             So, inevitably, our facts are going to be

13   different than those that were present in Lissy.  Our facts,

14   frankly, are going to be more like what was present in the

15   Correspondent Services case that I read to Your Honor from

16   before where one account -- one transaction was found to be

17   sufficient.

18             Now, let me turn -- let me talk about

19   extraterritoriality, Your Honor, unless the Court doesn't

20   want me to.

21             THE COURT:  One question about -- before we leave

22   personal jurisdiction --

23             MR. LEBLANC:  Yes.

24             THE COURT:  -- is what do you want me to make of

25   your mention of discovery and --

1          MR. LEBLANC:  Sure.

2          THE COURT:  -- and how this would work?

3          MR. LEBLANC:  Your Honor, I don't think -- we

4     don't think you need to give -- grant us discovery, because

5     we think Your Honor must comply -- must conclude that

6     there's jurisdiction on the basis of the transaction.

7          However, there is -- it is the -- if you can have

8     an elephant in the room in a declaration, in each of the

9     declarations there's an elephant in the room.  What they

10    ignore.  They give you all sorts of facts that they contend

11    are helpful for them, but what they completely ignore is

12    what throughout their brief they contend to be the relevant

13    question.  They don't tell the Court or us how frequently

14    these institutions use the U.S. banking system.  Yet they

15    contend that the relevant inquiry is how frequently do they

16    use the U.S. banking system.

17         They tell you, they don't have employees here,

18    they don't have branches here.  They don't solicit business.

19    All of that's fine and well, but when they turn to the

20    question of what it actually matters for the Court, they

21    ignore that.

22         Your Honor, in the Lissy case, there was -- I

23    think it was a year of discovery on the jurisdictional

24    question.  What we would suggest, if the Court disagrees

25    with us on the application of New York law to this question

1   and we think the Court shouldn't, but if it did, we should

2   be permitted to take discovery to understand the use of

3   correspondent bank accounts in the United States, because to

4   the extent that it's dozens and dozens of times, the Court

5   has no evidence before it whatsoever.

6          And that's not a fishing expedition here, Your

7   Honor.  Because we know, as a matter of fact, that they used

8   it one time.  That they directed it be used in this

9   instance.  Now, it happens to be in our view sufficient,

10  that alone is sufficient.  But to the extent that they think

11  or the Court thinks that the relevant question is, do they

12  use it frequently, has it been used dozens and dozens of

13  times?  Well, let us take that discovery.  And that's what

14  we suggest with respect to discovery, although, again, Your

15  Honor, I think Your Honor should dispose of it without the

16  need to resort to discovery.

17          THE COURT:  But I guess what you are -- and your

18  requests I should understand as being consistent with the

19  Lissy case, in other words, that's what Lissy talked about,

20  which is these other -- the other uses of this account?

21          MR. LEBLANC:  If that's -- if the Court were to

22  conclude that on this -- on the record before it, on the

23  complaint, and the specific transaction that we're

24  challenging and its connection to New York, that that was

25  insufficient and that what would have to be shown is what

1    was shown in Lissy that as a matter of fact, there were

2    dozens and dozens of transactions, then yes we should be

3    permitted to take discovery.

4            To understand -- and that's not -- we're not

5    talking about burdensome onerous discovery.  I suspect it

6    was a conscious decision when you're submitting an affidavit

7    on personal jurisdiction where the issue is how many --

8    their argument is the frequency with which they use it and

9    they don't say anything about it, I can leap to what that

10   might mean.  But if the Court thinks that's necessary then

11   we should be entitled to understand that.

12           THE COURT:  All right.  And just to circle back on

13   the one other issue that we discussed, the notion about what

14   Lissy talks about in this sort of melding of specific and

15   personal jurisdiction, I don't know if you have any views

16   about how to understand that.

17           My own view, which I don't know if it's correct,

18   was the best I could come up with, is that it's a function

19   of the fact that they're applying a particular New York Long

20   Arm Statute, which is what it is and therefore you don't get

21   into, sort of, the constitutional question as Pacific versus

22   General (ph) you apply the Long Arm Statute, which in fact

23   might have elements of both.  I don't know, but I'd be

24   interested in the parties' view on that.

25           MR. LEBLANC:  I'll tell you my view, Your Honor,

1    and it's what I suggested before is that it is a continuum

2    between the two.  You have the very clear -- the car

3    accident in New York, that's the most direct specific, the

4    furthest, you know, at the other end of the spectrum is

5    somebody who travels to New York twice a week, but doesn't

6    live here and commits a tort in Connecticut, but is subject

7    to personal jurisdiction here because they're always in New

8    York.  That's the classic general jurisdictional argument.

9              I think it's a spectrum as between the two.

10   That's how I would read Lissy because I actually asked the

11   same question.  I said, is this -- because Lissy is -- it is

12   under the New York specific jurisdiction prong.  But they

13   note the relationship between the transactions and the tort

14   that's alleged.  And the tort, of course is, occurred

15   entirely elsewhere.  The physical -- we're talking about

16   physical injuries here.

17             Here, this is a transaction that we're seeking

18   recovery with respect to that occurred entirely in New York.

19   The fact that it's a onetime transaction doesn't change

20   anything.  It just means that the only relevant data point

21   is when the parties did the one thing that they had to do

22   under the contract, which is transfer the money, what did --

23   where did they do it?  They did it in New York.  That's the

24   relevant inquiry.  The fact that it was negotiated

25   elsewhere, other laws applied, none of that, in our view,

1     matters, Your Honor.  Because the consummation of the

2     transaction, it's not like they met in the airport lounge

3     and talked about the contract.  When they decided where to

4     send the money, they -- Arcapita sent it from New York and

5     they received it, at their request, in New York.

6             So I don't know how much Your Honor wants me to

7     talk about the extraterritoriality because it is beyond

8     belief to me that anyone would suggest that turnover actions

9     or the automatic stay do not apply extraterritorially.  That

10    is not front page news.

11            Just in the American Bankruptcy -- the ABI

12    Journal, that's front page news is the Wall Street Journal.

13    If the Court were to say the automatic stay doesn't apply

14    extraterritorially, that would be extraordinary.

15            In other words, what that means, let's just be

16    clear about what that means.  If a debtor before the Court

17    -- if American Airlines has gates in London and somebody

18    goes to London to try to seize them, this Court would be

19    without power to prevent that from happening, that's what

20    they argue.

21            Now, it is critical, I think, Your Honor, to look

22    very carefully at Maxwell, all of the various decisions,

23    except for the Second Circuit's, because that doesn't deal

24    at all with the question of extraterritoriality.  The only

25    decision, which is not binding on this Court that deals with

 1    that question of extraterritoriality is the district court's

 2    decision not binding on this Court.

 3            When you look at those decisions, the only

 4    question presented is whether 547 of the Bankruptcy Code,

 5    the preference statute applies extraterritorially.  That is

 6    the only question presented.  And I think, Your Honor, I

 7    think just to read, page 11 of their reply brief I think

 8    reflects just an astonishing misstatement of the law.  And

 9    it's worth going through almost every paragraph.  I don't

10    know if the Court has it there.  I have copies.

11            THE COURT:  I do.  No, I have it.  Thank you.

12    Give me two seconds to find it.

13            MR. LEBLANC:  Of course.

14            THE COURT:  Page 11?

15            MR. LEBLANC:  Yes.  And it's the paragraph that

16    begins, plaintiff asserts.

17            THE COURT:  I'm there.

18            MR. LEBLANC:  Okay.  So the first sentence just

19    states what we assert.  I think it's a fair recitation.  The

20    second sentence says plaintiff is wrong, I disagree.  Third

21    sentence, it is quote, well established that generic terms

22    like any and every do not rebut the presumption against

23    extraterritoriality.

24            Your Honor, that sentence -- that quote literally

25    refers to a statute that says any civil action.  That's what

1    the statute says.

2            By contrast, Section 541 of the Bankruptcy Code

3    says property wherever located, wherever located.  There is

4    simply no comparison between generic terms like any or

5    every, like any civil action and property wherever located.

6            The next sentence -- and this one we have to break

7    into two clauses because they're completely different

8    arguments.  Plaintiff's argument was squarely rejected in

9    Maxwell, which held the wherever located language did not

10   meet the stringent Morrison standard for clear intent.  And

11   I'll stop there.

12           That is, first of all, the Morrison decision was

13   issued 17 years after Judge Brozman's decision in Maxwell

14   and 16 years after Judge Scheindlin's decision in the

15   district court.  So they obviously weren't opining on the

16   Morrison decision.

17           Moreover, no one of those decisions says in any

18   respect that the wherever located language was not -- did

19   not express a clear intent.  That is simply untrue.

20   Instead, what is correct is the second clause of that

21   sentence.

22           The Maxwell decision, both one and two, the

23   district court and the bankruptcy court does in fact say

24   that because of the Second Circuit's Colonial Realty

25   decision, which deals with the question of whether avoidance

1    actions become property of the estate upon the filing of the

2    case, whether those are property of the estate could not

3    apply to claims for preferential transfer, since property

4    which has been preferentially transferred does not become

5    property of the estate until recovered.

6              That's just -- that's correct, Your Honor.  That's

7    what Maxwell says and I'll turn to that in a second.  But

8    the first half of that sentence is demonstrably wrong.

9              The next sentence -- in the next sentence is just

10   a quotation from Maxwell so that is what it is.  The last

11   sentence, "As the Maxwell Court recognized, the same

12   reasoning precludes using the wherever located language in

13   the Code's definition of property of the estate as a basis

14   for extraterritorial application of claims made pursuant to

15   Section 362 for violation of the automatic stay and they

16   quote to Maxwell, 170 B.R. at 812.  And Your Honor, that's

17   just wrong.  Let me read to you from the decision.

18             And again just to step back from this, we can use

19   these words, but this is their contention that the automatic

20   stay does not extend outside the continental United States

21   and the two external states we have.

22             Judge Brozman says -- and this is presumably on

23   page 812 what they're suggesting.  It says, "And for that

24   same reason the extraterritorial application of Section 362,

25   which serves to protect the property of the estate wherever

1     located does not help the joint administrators either."  And

2     she cites to the In Re McLean Industries (ph) decision.

3             So, Your Honor, what she's saying is that the

4     extraterritorial -- that Section 362 applies

5     extraterritorially, but it doesn't help the joint

6     administrators who are asserting a preference claim only in

7     that instance.  And there's no real dispute.  One of the

8     more recent Madoff decisions cited in our papers, Your

9     Honor, goes through a long discussion of whether Section 362

10    applies extraterritorially.

11            And then the last part of this sentence, "And

12    likewise would prevent extraterritorial application with

13    respect to plaintiff's turnover in other code claims,"

14    demonstrably wrong, Your Honor.  The very same part of the

15    sentence, footnote 16 of Judge Brozman's decision.

16            Since the transferred property was property of the

17    estate and since our bankruptcy laws permit recovery of

18    estate property wherever located, there was a rationale for

19    the extraterritorial application of the statute.  In other

20    words, turnover is not subject to the same analysis with

21    respect to extraterritoriality as is a preference claim.

22            And if this wasn't clear, Your Honor, the analysis

23    that I just walked through is exactly the analysis that is

24    done in the Madoff decision and most importantly, the

25    decision that inexplicably they completely ignore in their

Page 114

1     reply brief, which is Judge Lifland's most recent decision

2     in the Picard v. Madoff cases.

3            Judge Lifland spends the last four pages of that

4     decision, pages 25 to 29 on the Lexis printed version,

5     discussing why Maxwell doesn't apply to preference actions

6     in circumstances that are indistinguishable from the

7     circumstances we have here.

8            Now, here's the only area that there's area for

9     fair debate even, Your Honor.  Not with respect to whether a

10    541 applies extraterritoriality.  In other words, whether

11    the Court could order a debtor to bring property from

12    outside the U.S. into the U.S., or whether 362 applies

13    extraterritoriality so the Court could order somebody

14    hurting a debtor's property outside the United States.

15    There's room for fair debate whether 547 applies.

16           And the reason there's room for fair debate there,

17    and again, that's our pleading in the alternative, is

18    because of the -- because there's questions as to whether a

19    preference action is property of the estate for the purposes

20    of extraterritoriality.

21           Now, Judge Lifland in the most recent decision,

22    that's again cited in our papers, goes through an extensive

23    analysis as to why -- how he distinguishes Judge Brozman and

24    Judge Scheindlin's decision in Maxwell.

25           And here's the key element and I mentioned this

1    before, Your Honor.  The key distinction, because he notes

2    that the transfer that was at issue in the Madoff case was

3    between, as it turns out the very same two New York banks

4    that are at issue here, JPMorgan transferred to HSBC just by

5    coincidence.

6          But he walks through it and he notes the

7    fundamental difference between the Madoff case and the

8    Maxwell case is that the depletion of the assets occurred

9    from the United States.  That's the distinction.

10          So -- and Judge Lifland says he's not disagreeing

11    with Judge Brozman's decision in the Madoff decision, but

12    reaches a different conclusion based on that fundamentally

13    different fact, Your Honor.

14          And here's -- the bottom line is, I don't know how

15    you could read our opposition and not even mention this

16    recent decision in response to it.  And I don't know how one

17    could even contend that the automatic stay and that the

18    turnover actions are even questionably within the reach of

19    this Court, that this Court's orders don't apply

20    extraterritorially in those two respects.

21          And even without even mentioning the fact that the

22    breach of contract claim doesn't have anything to do with

23    extraterritorial application.  This Court couldn't say, I

24    can't do a breach of contract case because it involves a

25    contract from Bahrain.  That's not even part of the

1    analysis.

2              It's -- the question is whether there's a

3    statutory reach to extend statutory provisions

4    extraterritoriality.  So it doesn't apply at all to the

5    contract case and they're simply wrong and about as wrong as

6    one could stand before a bankruptcy court and be in

7    suggesting that your automatic stay doesn't work outside

8    these waters.

9              Now, I can talk, if Your Honor wants me to about

10   comity, but it's just -- it's a flawed premise, the notion

11   of comity.  There's no reason -- Judge Lifland in the Madoff

12   decision, in the Picard v. Madoff decision notes that there

13   was a request for comity there.  There actually were

14   proceedings elsewhere, but there were no proceedings with

15   respect to that debtor.  So a similar situation to what we

16   have here there were proceedings in the Cayman Islands.  But

17   Judge Lifland simply dismisses it because he says that's an

18   affirmative defense, we'll deal with that later.

19             So it's not an issue for this Court today, but

20   fundamentally Your Honor would be -- I don't know of an

21   instance where a court would defer on the basis of comity to

22   something that doesn't exist.

23             I can understand the argument under a for non-

24   convenes to be sure, but on the basis of comity.  And even

25   if that applied at all, even if the principle applied, under

1    no circumstance does it -- have has it ever been applied to

2    a breach of contract case.

3              That's an argument if they want to make it under

4    for non-convenes, they could make it with respect to the

5    breach of contract, but the principle doesn't even apply to

6    a breach of contract.

7              Now, unless the Court has any other questions, I

8    think the Court --

9              THE COURT:  I don't.

10             MR. LEBLANC:  -- should reject the motion to

11   dismiss.  They're clearly within Your Honor's personal

12   jurisdiction, and Your Honor's reach, the reach of the

13   Bankruptcy Code certainly touches these actions.  Thank you,

14   Your Honor.

15             THE COURT:  Thank you.

16             MS. ADLER:  Your Honor, I would like to respond

17   briefly.

18             THE COURT:  Sure.

19             MS. ADLER:  Thank you.  Unless you need a lunch

20   break.

21             THE COURT:  No, let's go ahead.

22             MS. ADLER:  The first point is to call this a New

23   York transaction on the jurisdictional point is simply

24   assuming a conclusion.  It is clearly not looking at the

25   totality of the transaction.  It is not looking at the

1    document which reflect that the monies were ordered through

2    Bahraini things and ended up in Bahrain the same day.

3            So the point is that those monies probably spent

4    more time -- less time in New York than we have just devoted

5    thus far this morning and early afternoon to talking about

6    it.  That's thing one.

7            The beef again, and I think counsel appeared to

8    fudge it, was it wasn't the set-off of antecedent debt, it

9    was the fact that we didn't pay them back, and then set off

10   the amounts down the road.

11           Had we paid them back, they wouldn't contend -- we

12   would've done so from Bahrain, and they wouldn't contended

13   that anything happened in New York.

14           Again, when you look at the cases, the mere

15   receipt of funds in New York without anything more on a one

16   time basis is simply not good enough, and you've misstated

17   Leechy.  For one thing Leechy, the district court which

18   granted the motion to dismiss denied discovery.

19           The Court -- the case then -- there was no

20   discovery in Leechy.  The case then was appealed to the

21   Second Circuit.  The Second Circuit certified it to the New

22   York Court of Appeals, and then thereafter, it went back to

23   the Second Circuit.  There was no basis for discovery there,

24   for the same reasons that we've already discussed.

25           And in the discussion of discovery, counsel was

1    conflating personal -- specific jurisdiction and general

2    jurisdiction.  How many times the defendants may or may not

3    have used a New York correspondent bank account would speak

4    only to systematic general jurisdiction.

5              THE COURT:  Right.  Well, that gets back to my

6    question about how you read Leechy, and why does Leechy talk

7    about that in what seems to be a specific jurisdiction

8    context.

9              MS. ADLER:  Leechy is a specific jurisdictional

10   case.  And the cases that -- the 2000 case Correspondent

11   Bank way pre-Leechy, was a 302(a) case.

12             THE COURT:  Right.

13             MS. ADLER:  It was about were they doing business

14   here.  And again, as Your Honor correctly perceived, the

15   issue was not only the multitude of times they used the

16   securities account, the defendant, you know, but also the

17   fact that they were doing unauthorized securities trades in

18   it.  There is always something more.

19             And in Leechy --

20             THE COURT:  Well, but let me -- when the case law

21   contemplates jurisdictional discovery, it doesn't cabin it

22   off to say you can only have this, you can only have that.

23   It, like all discovery is tied to what's going on in the

24   case.  And while it's more limited, so you have to

25   essentially have some sort of an offering or a proffer as to

Page 120

1    why discovery is appropriate, what I understand here, the

2    request is to the extent I disagree with plaintiff's view

3    about personal jurisdiction to allow them some discovery on

4    the use of correspondent bank accounts in New York.

5            Now, that may lead to a claim that there's

6    specific jurisdiction, it might lead to a claim there's

7    general jurisdiction, might lead to some claim that there's

8    Leechy jurisdiction, which seems to be straddling --

9            MS. ADLER:  I think --

10           THE COURT:  -- the line.  So what's your response

11   to that?

12           MS. ADLER:  I think that that is one desperate,

13   and two, in this specific instance it would be misplaced.

14   Because counsel keeps misrepresenting that the basis for

15   this jurisdiction is that the payments that the defendants

16   did not make were to be made to New York accounts.  But, in

17   fact, those were New York accounts again designated by

18   Arcapita.

19           And if you look at --

20           THE COURT:  Well, but I understand the argument

21   there --

22           MS. ADLER:  But literally Arcapita says, pay us

23   back to this account.

24           THE COURT:  I know, I understand that.

25           MS. ADLER:  Okay.

1            THE COURT:  But there's a New York encounter on

2       Arcapita's side, but the argument is, and I'm not saying I

3       agree with it or disagree with it, but I understand the

4       argument to be that put that aside, what's really relevant

5       is what's on the defendant's side for the receipt of the

6       funds.

7            MS. ADLER:  I understand, but look at the Tadhamon

8       case, for example, Tadhamon doesn't have a New York

9       correspondent bank account, didn't have any correspondent

10      bank account.  It had to use the HSBC bank account of its

11      bank in Bahrain.

12            And you look at the use of it in Leechy, the

13      defendant bank was alleged to have used the New York

14      correspondent bank many, many times to disseminate funds to

15      terrorists, to do something bad.

16            Here, the use of the account wasn't again anything

17      bad.  So Tadhamon doesn't even have a correspondent bank

18      account.  Leechy -- I mean, in BISB which used it the one

19      time, but obviously that wouldn't get you to specific

20      jurisdiction, and in general jurisdiction, that's just

21      irrelevant.  You don't have anything that overcomes -- we

22      don't solicit business in the United States.  We don't do

23      business with people in the United States, we don't avail

24      ourselves of -- BISB does not avail itself of the United

25      States.  You don't have the something more.

1          So to just kind of pull something out of thin air

2     to keep a case alive, basically out of hope or conjuncture,

3     literally the cases say that is not good enough, that's

4     really, really important.  And you can't just presume your

5     conclusion by citing to depletion of the estate in New York,

6     when the defendants reasonably, I don't think anybody

7     disagrees with that, have no basis to assume that they will

8     be hailed into court, and have every basis to believe that

9     under Bahraini law they can after the petition was filed,

10    set off amounts due to them.

11         I mean, those are -- that's just wrong.  So I want

12    to point out again the misstatements about Leechy.  Because

13    Leechy really does turn on the recurriness and

14    deliberateness, and it says that minimum contacts again, you

15    know, have to exist where the defendant purposely avails

16    itself.  And you have to look at the jurisdictional inquiry

17    focused on the affiliation between the forum and the

18    underlying controversy.  We don't have that affiliation

19    here.

20         These were not consummated transactions in New

21    York.  They were -- there was a tiny New York piece that was

22    a predicate to the rest of the transaction.  And if the real

23    bit of the transaction was the purchase of investments by

24    BISB and Tadhamon as agents, again as agents for Arcapita,

25    those purchases, the value exchanged happened outside of the

1    United States.  They happened in Bahrain, they happened

2    where the things were made.

3              And if you look at the BISB -- just to make it

4    really plain, if you look at the agreement, that is the

5    agreement under which plaintiffs sued BISB, and it's

6    attached as Exhibit A to BISB's moving papers, it's the

7    agreement.

8              And you look at paragraph 4.4, it says, "Once

9    payment --"

10             THE COURT:  Hold on one minute, let me get there.

11             MS. ADLER:  I -- Exhibit 82, BISB's notice of

12    motion.

13             THE COURT:  All right.  Okay.

14             MS. ADLER:  The fact, and I'm showing you this,

15    Your Honor, to make the point that these were not

16    transactions that were completed in any remote sense in New

17    York.

18             If you look at 4.4 the parties agreed that once

19    such payment reaches the agent's account, and here, that was

20    the agent's account in Bahrain, the agent being BISB, the

21    agent shall complete the purchase of commodities, that

22    happened outside the United States and notified the bank

23    that was Arcapita of such purpose, whereupon title to the

24    commodities shall pass to the bank, who shall thereupon

25    become the owner of the commodities.

Page 124

1          The point is that this was just the facilitation,

2     and it could've happened anywhere.  You don't give the

3     purposeful availment, and the monies, and this is not in

4     dispute, get immediately transferred to Bahrain, which again

5     distinguishes it from Leechy.

6          In Leechy, the monies go through New York, and

7     then they go to the purported terrorist organizations

8     supposedly to shield them from view, that's not the case

9     here.

10          Arcapita wants to do them in dollars, they ask for

11     the -- they asked for us to do it.  And if you would look at

12     likewise the Arcapita notice of motion, Your Honor, Exhibit

13     B, which is the schedule that speaks to these transfers with

14     respect to the transfer from Arcapita to Tadhamon.  You tell

15     me when you're ready.

16               THE COURT:  So you're asking me to look at --

17               MS. ADLER:  It's Tadhamon --

18               THE COURT:  Tadhamon's motion, okay.

19               MS. ADLER:  -- motion, Exhibit B, please.

20               THE COURT:  Okay.  All right.

21               MS. ADLER:  It says the first schedule at the top.

22               THE COURT:  Got you.

23               MS. ADLER:  Page -- and it says page 7 at the

24     bottom.

25               You'll see that Tadhamon is writing at the top in

1    this offer to Arcapita, and it says we refer to the master

2    agreement, we know that was, and your instructions of today,

3    you, Arcapita's instructions of today, in which you

4    indicated your wish to deposit an amount with us for

5    investment by us and Islamic transactions on your behalf.

6              And then it says, please authorize -- paragraph 6,

7    please authorize in respect of the investment amount, the 10

8    million to be transferred by Arcapita, please authorize us

9    to debit your account with us or credit the amount to our

10   following account, receiving bank, the bank that was getting

11   the money, Khaleeji Commercial Bank, Bahrain.  And then it

12   gives its SWIFT number.

13             The beneficiary is Tadhamon.  The intermediary,

14   the one-time intermediary is HSBC, not even Tadhamon's

15   correspondent bank.

16             And then in Arcapita's acceptance, which is the

17   form at the bottom, Arcapita writes -- asks that on maturity

18   date, when the monies were to be repurchased by Tadhamon, we

19   want to receive the dollars at our account at JPMorgan

20   Chase, and again, in New York, and again it gives the SWIFT

21   code information.

22             These are instructions coming from Arcapita, you

23   cannot bootstrap the actions of the Bahraini debtor Arcapita

24   to become, to morph into the purposeful availment

25   independent availment by its agent in these transactions

1   which were BISB and Tadhamon.

2          Now, also you have to understand the policy

3   reasons.  If anybody, any time, anyone ever used a

4   correspondent bank account on a single -- a foreign entity

5   in a foreign transaction between foreign entities, a

6   correspondent bank account in New York for a single

7   transaction, there would never not be jurisdiction.  There

8   are no floodgates here, and it's really important to

9   understand that.  It seems to me that some of plaintiff's

10  arguments are overbroad like that.

11         So, for example, if depletion of the estate in

12  itself could overcome objections to jurisdiction or

13  territoriality, that would mean that any time a foreign

14  entity determined to file bankruptcy there would never --

15  you would automatically have jurisdiction, and there would

16  never be any extra-territoriality inquiry.  That is really

17  not the law.  Maxwell makes that really clear.

18         I think that's the case.  Maxwell says clear,

19  Judge Scheindlin, that augmentation of the estate is not by

20  itself a reason to do it.  These cases are easily

21  distinguished from the Madoff cases that plaintiff cited

22  toward the end.

23         In that case, you had a U.S. debtor, you had

24  overseas sometimes transferees who had done business in the

25  Chase case through her father-in-law, a U.S. agent who had

1    used New York bank accounts to receive monies, and make

2    investments.  They were wholly distinguishable in terms and

3    often had signed and Judge Lifland made a big deal about

4    this, often had signed agreements with Madoff Securities

5    which provided for a New York choice of law, and sometimes a

6    New York forum.  So those are obviously entirely

7    distinguishable cases.

8            The exchange of consideration as I've just shown

9    was really the monies after they were received in Bahrain

10   and the title passing to the investments in commodities in

11   BISB's case, and in treasury securities into Tadhamon's that

12   also -- Tadhamon received in -- that also, forgive me,

13   Arcapita received in Bahrain.

14           We do contest that the wherever located in

15   property of the estate has been presumed to be okay, and you

16   know, to be presumed, should always be acceptable.  And I

17   also want to --

18           THE COURT:  Well, let me ask you about that.  I

19   understand your 547 argument, and I think the parties while

20   they vehemently disagree with each other, sort of agree what

21   they're arguing, which is you rely on Maxwell and some

22   statements from the Second Circuit, and the other side

23   relies on distinguishing those cases as Judge Rakoff has

24   recently done.  So I think I just need to look at that.

25           But I think everyone agrees what it says.  But for

1    property of the estate, and the automatic stay, again, I

2    think maybe you could argue that it's not property of the

3    estate and that's a separate argument.  But accepting

4    something as true, if you accept it as property of the

5    estate, you accept that proffer, well, I -- and the

6    Bankruptcy Code says property wherever located, you're not

7    trying to augment the estate, you're just trying to deal

8    with the property.

9              And again, you may have beef with that whole

10   concept --

11             MS. ADLER:  I do, Your Honor --

12             THE COURT:  -- I understand that.

13             MS. ADLER:  -- yeah, I do.

14             THE COURT:  But I don't know that that beef -- why

15   is that beef something that isn't addressed here, if I have

16   to take those allegations as true, and the Code talks about

17   property wherever located.  I understand your beef to be

18   it's not property.  Are you --

19             MS. ADLER:  I'm saying something further than

20   that.

21             THE COURT:  All right.

22             MS. ADLER:  I'm saying that wherever located does

23   not pass Morrison muster at least as applied on these facts.

24             THE COURT:  But if I do that, haven't I thrown the

25   baby with the bath water on large Chapter 11 cases?

```
 1              MS. ADLER:  No, I don't think so.  I think that --
 2    I think the Supreme Court is ultimately going to have to
 3    decide this, and I think that when you look at the use of
 4    foreign commerce and everything else in the RICO statues and
 5    in the alien tort statutes, and the language that was held
 6    insufficient to have -- insufficient to indicate Congress'
 7    intent that a statute extraterritorial apply, you have that.
 8              But I think on this case, Your Honor, just so you
 9    don't get worried about -- get worried unnecessarily, I
10    think that these transfers under Maxwell are so clearly non-
11    domestic, that you don't get there in any event.  I don't
12    think --
13              THE COURT:  Well, that's an extraterritoriality
14    argument, right?
15              MS. ADLER:  It is.
16              THE COURT:  Well, I mean, here's my problem, much
17    like the argument earlier that someone said and usually this
18    is how this goes, right, someone says, this is a very narrow
19    request I'm making in this case under these specific set of
20    facts, and somebody else, the consequences for this decision
21    are horrible.
22              And in that earlier case, the argument was about
23    what a plan means or doesn't mean.  And here if parties are
24    -- if the idea that there's a dispute about whose funds,
25    they are somehow undoes the ability to address the property
```

1    of the estate, either turnover or automatic stay, I --

2            MS. ADLER:  Let me say it a different way and I

3    think that this is what Judge Scheindlin said in the

4    district court Maxwell decision.  If you have a case -- and

5    she was quoting Judge Brozman, if you have transfers between

6    foreign debtors and foreign entities where the center of

7    gravity of that transfer is clearly foreign as I think is

8    indisputable in the case here, notwithstanding other

9    opinions.

10            It is not -- the bankruptcy law doesn't give you

11   and the wherever located doesn't give you carte blanche to

12   go get all property all over the world.

13            THE COURT:  But that's in the preference context,

14   isn't it?

15            MS. ADLER:  No, I think it's in all contexts.  I

16   think it would be --

17            THE COURT:  But that case was in the preference

18   context, wasn't it?

19            MS. ADLER:  No, there were also avoidance claims,

20   they're not directly addressed, but they actually are

21   addressed at some point.  Hold on just one minute.  There

22   were avoidance claims raised as well, and they're kind of

23   subsumed in that discussion.

24            But she talks about --

25            THE COURT:  I thought your response was going to

1    be that under the facts and circumstances, if there's no

2    dispute, based on the allegations, and a Court is able to

3    make a determination something is or isn't property, that

4    that's -- you can decide whether the turnover and you can

5    look at the territoriality at that point, but I'm just --

6    I'd be interested in what you're pointing to tell me that

7    that.  I understand that rationale and the context of

8    preference, and I would just --

9                MS. ADLER:  No, I would point Your Honor to again

10   some of the same language that we looked at a moment ago

11   when counsel was up here.  But if you look at footnote 16

12   and some of the language that follows it in Judge

13   Scheindlin's decision, and I so I'm at 170 B.R. at 812, note

14   16.

15               She talks about 362 is dinged because of property

16   of the estate wherever located, and she uses the word

17   relocated.  In that footnote, she distinguishes a case

18   that's In Re Bevel, and she says that since the transferred

19   property was property of the estate and our bankruptcy laws

20   permit recovery of estate property wherever located, there

21   was rationale.

22               But she says that that case is distinguishable,

23   and that was in a securities setting.  And we now know that

24   the securities laws 10(b)(5) are not extraterritorial, may

25   not -- do not have a sufficient indication of Congress'

1    intent.  So I think that, you know, you get there.

2              THE COURT:  I'm not following that last part.  Why

3    her statement basically saying is -- seems to be supporting

4    the notion that if it's property of the estate, 362 gives --

5              MS. ADLER:  Let me say --

6              THE COURT:  -- the ability to do this --

7              MS. ADLER:  Let me even give --

8              THE COURT:  -- and I don't --

9              MS. ADLER:  Let me even give you a better quote

10   that's perhaps clearer, Your Honor.

11             THE COURT:  All right.

12             MS. ADLER:  Further down on the same page, so I'm

13   at 170 B.R. -- but now I'm in the text, 812, this is Judge

14   Brozman, I'm sorry, says, "I do not agree however that in

15   permitting foreign debtors to avail themselves of our law

16   Congress unquestionably must have meant to imbue those

17   debtors with the right to apply our avoidance laws

18   extraterritorially.  To embrace the reigning of those making

19   that argument," in that case, the joint administrators and

20   the examiner, "would be to ignore Ramco (ph)," which you may

21   remember was a predicate, "which requires an unambiguous

22   expression of Congressional intent gleamed from the language

23   of the statute or other guides to its interpretation."

24             Here, there is no such unmistakable evidence of

25   Congressional intent.

1          THE COURT:  But you're referring to avoidance

2     actions, right?

3          MS. ADLER:  I am.  I thought that's what you were

4     asking me.

5          THE COURT:  No, I was asking about 362, the

6     automatic stay --

7          MS. ADLER:  Well, 362 again we get back to the

8     property of the estate, if you don't buy into it being

9     property of the estate.

10         THE COURT:  Yeah, but that's what I'm saying.  But

11    how do I --

12         MS. ADLER:  That property of the estate has the

13    same wherever located language.  And that language --

14         THE COURT:  Let me back up.  Let me see if I can

15    frame the -- my understanding is that there's a body of law

16    about preferences that says, can it be extraterritorial

17    because you're bringing something into the estate, it's not

18    property of the estate, Congress did not make clear that

19    that applied extraterritorially, and therefore, I've been

20    here long enough, I know that word rolls off my tongue

21    unlike earlier, so that's something that's -- the plaintiffs

22    disagree with that, but that's one way certainly to read

23    those cases.  All right.

24         But 362 and turnover are all about they're defined

25    as property of the estate.  So my question for you is how do

1      you get there?  I --

2                 MS. ADLER:  But you need again --

3                 THE COURT:  -- can see that you are essentially

4      saying it's not property of the estate, but is that a motion

5      to dismiss inquiry?

6                 MS. ADLER:  No, that is a challenge to whether

7      wherever located is good enough to meet the Morrison

8      standard for clear Congressional intent.

9                 THE COURT:  Yeah.  And I'm -- but I'm -- I mean, I

10     see you frame --

11                MS. ADLER:  And I don't think there's any case, by

12     the way, that says it is.

13                THE COURT:  I've got to say I have a real problem

14     with that.

15                MS. ADLER:  And --

16                THE COURT:  I understand augmentation of the

17     estate, and I understand your argument to say this isn't

18     property of the estate, let's get to Bahraini law.  Bahraini

19     law, that's the substance law.  But if you open -- there is

20     a floodgates argument to make that would say that people

21     then, for any dispute --

22                MS. ADLER:  Agreed.

23                THE COURT:  -- in any large 11 will say, we say

24     it's not property of the estate for whatever reason, you

25     have no jurisdiction, you have no ability to look at this

 1    extraterritorially.

 2              MS. ADLER:  I hear you, Your Honor, but I think in

 3    this case, and I don't know if this would be a floodgate

 4    thinner downer as it were, because you've got these foreign

 5    things without jurisdiction in the first instance, you

 6    probably never get to that question.

 7              THE COURT:  But isn't that a --

 8              MS. ADLER:  No, because you --

 9              THE COURT:  Wait, say that --

10              MS. ADLER:  Someone --

11              THE COURT:  -- again.

12              MS. ADLER:  A debtor could not be asserting 362

13    claims in setting or the Court could not be hearing them,

14    determining them, if the Court did not have personal

15    jurisdiction over those defendants.

16              THE COURT:  Yeah, but those are two separate

17    things.

18              MS. ADLER:  Agreed.

19              THE COURT:  You've done them in the alternative.

20              MS. ADLER:  I agree.

21              THE COURT:  My problem is taking them individually

22    as an independent basis.  We may have gone as far as we can

23    with this.

24              MS. ADLER:  But again, and I guess the other point

25    is one I made earlier --

```
 1              THE COURT:  I --

 2              MS. ADLER:  -- which is if you've got a debtor

 3    with foreign parties in foreign transactions were foreign

 4    law is going to govern, then the remedy is over there.  It's

 5    in the foreign states.

 6              THE COURT:  Well, that's a comity argument.

 7              MS. ADLER:  No, but it also speaks --

 8              THE COURT:  But --

 9              MS. ADLER:  -- to your concern that a bankruptcy

10    court or a debtor might not have a remedy, that's where I'm

11    going with it.

12              THE COURT:  No, that's not my concern.

13              MS. ADLER:  Okay.

14              THE COURT:  No.  My concern is taking each one of

15    these arguments in isolation as an independent basis that

16    has been asserted for dismissal, that I have concerns

17    looking independently at your argument that 362 and turnover

18    should be dismissed because of lack of -- because of

19    extraterritoriality.

20              MS. ADLER:  But --

21              THE COURT:  And I understand you've raised --

22              MS. ADLER:  I am.

23              THE COURT:  -- you've now talked about it when I

24    respond -- when I've raised that, you mention personal

25    jurisdiction, you've mentioned sort of comity concerns.
```

1    You've mentioned -- I'm not asking you to agree --

2            MS. ADLER:  And I --

3            THE COURT:  -- with me on the results here.  I'm

4    just trying to isolate something and there are times when

5    counsel doesn't want to answer a question because it's not a

6    wonderful way to --

7            MS. ADLER:  No, no, no, no.

8            THE COURT:  -- debate the issue.

9            MS. ADLER:  And again, and again, 362 is dealt

10   with in, you know, Judge Brozman's decision on --

11           THE COURT:  I think we've gone as far as we'll go

12   on that.

13           MS. ADLER:  Okay.  Let me just see if there's

14   anything else that work making you stay any longer for.

15   We've discussed the exchange of -- I think the real point is

16   that the jurisdictional stuff is all of that bootstrapped

17   onto defendant's by Arcapita.  And that's not good enough,

18   it has to be independent.  I don't see the purposeful

19   availment.  I don't believe you -- we have facts that

20   warrant what would indeed be a fishing expedition here.

21           I don't -- Leechy provides no authority for it.

22   In Leechy, there was no discovery contrary to counsel's

23   suggestion, and I think you can wholly distinguish as we've

24   just discussed the Madoff cases.  Thank you.

25           THE COURT:  All right.  Thank you very much.

1    Briefly.

2           MR. LEBLANC:  Sure.  Thank you, Your Honor, I

3    greatly appreciate it.

4           Less than two minutes I suspect, Your Honor.

5           THE COURT:  All right.

6           MR. LEBLANC:  Let me -- I just want to make I

7    think three points.  The first, Your Honor, I think Your

8    Honor is correctly thinking about the jurisdictional

9    question as to whether or not -- what is the relevant

10   transaction.  The point in the Leechy discussion is there

11   were dozens and dozens of transactions, of which they were

12   all complained.  They complained about the transfer of

13   dozens and dozens of things.  Here, we complain about one

14   transfer.

15          Now, with respect to our preference claims, the

16   question in the preference claim is whether the transfer is

17   wrongful.  That's the question.  That's the very transfer.

18   So the connection between the wrongful act and the

19   purposeful availment is entirely direct.

20          With respect to the set off argument, under

21   553(a)(3) the question that we're -- if they defend on the

22   basis of a set-off, we will respond by saying that the

23   transfer was done for the purpose of creating set off, which

24   means they can't set off against that debt.  And again,

25   that's the transfer that was done entirely in New York.

1          Two other points, Your Honor, I think.  We cite

2     these in our papers, but I'm not sure that there's any

3     confusion left about the question of extraterritoriality

4     reach, but if there is, we cite in our papers the

5     legislative history where Congress expressly stated its

6     addition to add wherever located, those very words, made

7     clear that a trustee in bankruptcy is vested with the title

8     of the bankrupt in property which is located without, as

9     well as within, the United States.  And that's cited in our

10    brief at page 24.

11          The last point, I don't -- there seemed to be a

12    suggestion, and I thought it was odd for two Bahraini banks

13    to be making the suggestion, but that these contracts --

14    Your Honor knows what these contracts are.  They are a

15    Sharia compliant way of lending money.  There's a series of

16    transactions, a commodities transactions to generate a

17    profit, predetermined profit amount for the purpose of

18    substituting for what otherwise would be interest.

19          Now, if the suggestion is that the consequence --

20    the consequential acts with respect to a lending transaction

21    like that structured in a Sharia compliant way is really the

22    commodities transactions that occur outside, and it's not

23    simply a lending arrangement between parties, where the loan

24    was made in the United States, and where the very document

25    signed by them calls for the loan to be repaid in the United

1   States, that the consequential acts with respect to that

2   transaction are the underlying commodities trades, that

3   would be an extraordinary decision with respect to a Sharia

4   compliant facility.

5           Because I think it would blow the thing out of the

6   water, because Sharia -- the purpose of this is to avoid

7   having a contract that pays interest.  And instead, they

8   substitute a series of transactions that are not

9   meaningfully at risk for the purpose of creating a profit

10  margin, so that they can pay the equivalent of interest.

11          And I think it's astonishing to say that the

12  nexus, the corpus, the substance of this transaction is

13  anything other than the lending and the repaying with

14  interest or profit because it's Sharia compliant.  That's

15  just wrong.

16          And I think Your Honor -- Your Honor knows that

17  from the history of this case, that the functional events in

18  this transaction were the lending of money and the repayment

19  of money, both of which were called for to occur in New

20  York, the first of which occurred in New York, the second of

21  which didn't occur because of their breach.

22          There's no question on those facts, Your Honor,

23  that there's -- on those allegations, which are assumed to

24  be true, that there is jurisdiction here.  So we'd ask the

25  Court to dismiss -- to deny the motion to dismiss.  Thank

1    you very much for all of your time today.

2              THE COURT:  Thank you.

3              MR. LEBLANC:  I've spent a lot of time talking to

4    you and I apologize.

5              THE COURT:  That's all right.

6              MS. ADLER:  Your Honor, I just want to point out

7    that the legislative history argument was made and rejected

8    in Maxwell, and that I believe on a motion to dismiss, with

9    undisputed facts it is wholly inappropriate for counsel to

10   be testifying about the nature of the transaction, much

11   less, you know, has he been qualified as an expert.

12             THE COURT:  Well, the record is what it is.  I'll

13   consider what I'm supposed to consider, and take it from

14   there.

15             MS. ADLER:  Thank you, Your Honor.

16             THE COURT:  All right.  I'd like to thank the

17   parties for their excellent arguments and very good

18   briefing, even though you disagree on many, many things.  I

19   will take it under advisement and I can't promise that I

20   won't have a follow-up question, I won't let pride stand in

21   the way of trying to get it right, to the extent I do,

22   rather than whistle in the dark and issue something that has

23   both sides scratching their heads, I reserve the right to

24   call you up and ask a follow-up question or two in an

25   appropriate setting.  But hopefully it won't come to that,

Page 142

1    and thank you again for your efforts.

2              MS. ADLER:   Thank you very much, Your Honor.

3              MR. LEBLANC:   Thank you, Your Honor.

4    (Proceedings concluded at 2:01 PM)

5                        * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 143

1                    I N D E X

2

3                  R U L I N G S

4    IDENTIFICATION                                PAGE

5    Doc. #1766 Motion to Object to Claim No. 254        9

6

7    Doc. #1771 Motion to Approve/Motion for Order      12

8    Pursuant to Rule 9019 Approving Settlement

9    Agreement With Thronson Parties

10

11   Doc. #1707 Motion for Omnibus Objection to        13

12   Claim(s)/Ninth Omnibus Objection to Claims filed

13   by Evan R. Fleck on behalf of Reorganized

14   Debtors and the New Holding Companies (Claim 577)

15

16

17

18

19

20

21

22

23

24

25

Page 144

1                    C E R T I F I C A T I O N

2

        I, Sheila G. Orms, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter.

5

6    Dated:  March 20, 2014

7

8

9

10     Signature of Approved Transcriber

11

12

     Veritext

13

     330 Old Country Road

14

     Suite 300

15

     Mineola, NY 11501

16

17

18

19

20

21

22

23

24

25

| **&** |
| --- |
| **&**  4:3,10 5:12,14 |
| 6:9 7:2 14:13 |

| **1** |
| --- |
| **1**  53:1,2 72:10 82:15 |
| 92:12 |
| **1.3**  24:2 |
| **10**  8:19 60:24 61:8 |
| 61:16 83:12 125:7 |
| 131:24 |
| **10005-1413**  4:6 |
| **10022**  4:21 |
| **10111**  5:4 |
| **11**  7:11 57:16 110:7 |
| 110:14 128:25 |
| 134:23 |
| **1144**  21:23 |
| **11501**  144:15 |
| **118**  44:21 |
| **11:07**  1:18 |
| **12**  28:13,15,21 |
| 47:13,14 63:6 69:5 |
| 143:7 |
| **12-11076**  1:3 |
| **1281**  44:23 |
| **13**  83:12 143:11 |
| **13-01434**  2:12 |
| **13-01435**  2:19 3:1 |
| **13-01677**  3:6 |
| **130**  77:22 |
| **133**  77:17 |
| **147**  15:14 17:25 |
| 18:6,11 28:22 29:22 |
| 29:25 32:4 34:23 |
| 52:24 |
| **14th**  60:25 62:15 |
| **15th**  61:9,16 62:15 |
| **16**  111:14 113:15 |
| 131:11,14 |
| **1665**  77:17 |
| **168**  91:14 |
| **17**  111:13 |
| **170**  112:16 131:13 |
| 132:13 |
| **1707**  2:7 143:11 |

| **1766**  2:1 143:5 |
| --- |
| **1771**  2:3 143:7 |
| **1850**  4:13 |
| **19**  1:17 |
| **190,000**  10:15,21 |
| **1985**  44:23 |
| **1990**  44:22 |

| **2** |
| --- |
| **2**  10:12,20 |
| **2,979,419**  8:17 |
| **20**  144:6 |
| **2000**  119:10 |
| **20006**  4:14 |
| **2014**  1:17 144:6 |
| **230**  18:21 |
| **24**  139:10 |
| **25**  34:12 50:14 57:5 |
| 114:4 |
| **254**  2:1 7:19 143:5 |
| **255**  7:10 |
| **2883**  77:22 |
| **29**  114:4 |
| **2:01**  142:4 |

| **3** |
| --- |
| **3**  21:17 25:25 28:20 |
| 138:21 |
| **30**  7:11 84:11,17 |
| **300**  23:24 144:14 |
| **302**  71:23 72:2,2,8 |
| 72:10 91:12,12 |
| 92:12 93:6 119:11 |
| **320**  18:5 24:3 |
| **330**  144:13 |
| **36**  12:7 |
| **362**  89:4 112:15,24 |
| 113:4,9 114:12 |
| 131:15 132:4 133:5 |
| 133:7,24 135:12 |
| 136:17 137:9 |

| **4** |
| --- |
| **4**  3:9 8:5 83:13 |
| **4.4**  123:8,18 |
| **45**  5:3 |

| **5** |
| --- |
| **5**  28:17 91:1 131:24 |
| **50**  41:14 |
| **541**  30:8 32:11 77:5 |
| 88:17 111:2 114:10 |
| **542**  88:17 |
| **547**  89:19 110:4 |
| 114:15 127:19 |
| **553**  138:21 |
| **577**  2:10 13:3 |
| 143:14 |
| **599**  4:20 |

| **6** |
| --- |
| **6**  69:5 92:24 125:6 |
| **60**  18:22 |
| **65**  54:25 |

| **7** |
| --- |
| **7**  124:23 |
| **75**  28:15 32:25 58:4 |
| **777**  44:23 |

| **8** |
| --- |
| **8**  2:16 3:3 |
| **812**  112:16,23 |
| 131:13 132:13 |
| **82**  123:11 |
| **876**  44:21 |

| **9** |
| --- |
| **9**  50:8,9 56:24,24 |
| 57:8 143:5 |
| **9019**  2:4 10:2 12:21 |
| 46:21 143:8 |

| **a** |
| --- |
| **a.m.**  7:11 |
| **abi**  109:11 |
| **abide**  8:2 |
| **ability**  129:25 132:6 |
| 134:25 |
| **able**  10:13 65:3 |
| 76:6,13 131:2 |
| **abroad**  64:22 |
| **absence**  23:14 56:9 |
| 101:9 |
| **absolutely**  14:9 |
| 21:21 24:20 59:7 |

| **accept**  28:14 62:16 |
| --- |
| 102:18 128:4,5 |
| 127:16 |
| **acceptable**  25:24 |
| 127:16 |
| **acceptance**  100:3 |
| 125:16 |
| **accepting**  128:3 |
| **access**  69:2 76:4 |
| **accident**  93:10 |
| 95:13 108:3 |
| **accomplished**  12:1 |
| 95:25 |
| **account**  19:10 |
| 34:24 35:2,8 50:17 |
| 62:15,17,19,20,21 |
| 62:23,24 66:14,16 |
| 66:16,19 67:3,10,17 |
| 67:23 68:6,18 69:18 |
| 69:20 70:4,15 73:1 |
| 73:6,7,12 79:16 |
| 80:2,16,17,25 86:13 |
| 88:13 91:18,20,25 |
| 92:9,23 93:16,20 |
| 95:7 96:17 99:10 |
| 100:6,23,24 101:4 |
| 101:17,18,21 |
| 102:14,15,16 |
| 103:15,15 104:4,11 |
| 104:16 106:20 |
| 119:3,16 120:23 |
| 121:9,10,10,16,23 |
| 123:19,20 125:9,10 |
| 125:19 126:4,6 |
| **accounts**  18:7,13,23 |
| 19:8 30:1,3 34:3 |
| 52:24 53:1,3 62:13 |
| 79:17 80:20 93:1 |
| 94:7 95:2 100:6,15 |
| 106:3 120:4,16,17 |
| 127:1 |
| **accused**  73:3 83:14 |
| **acknowledge**  35:4 |
| 35:23 40:4 50:12 |
| 58:4 |
| **acknowledges**  |
| 100:4 |

**act**   12:1 43:5 87:3
  104:8 138:18
**acting**   56:17 89:8
**action**   24:23 27:12
  40:9 53:12,15 57:21
  58:19 66:12 70:12
  73:8 75:5 79:8,10
  87:5 110:25 111:5
  114:19
**actionable**   67:13
  68:6 73:8
**actions**   40:3 67:25
  71:25 72:1 84:10
  109:8 112:1 114:5
  115:18 117:13
  125:23 133:2
**activities**   69:15 71:7
**activity**   68:10 69:17
  69:19 92:11
**acts**   139:20 140:1
**actual**   35:17 40:4
  52:20 54:3 93:14
  95:24 96:12,18
**adam**   5:16
**add**   139:6
**addition**   139:6
**address**   9:19 27:23
  34:2 39:19 50:1,4
  58:1 59:24 82:9
  85:15 129:25
**addressed**   71:10
  128:15 130:20,21
**addresses**   34:3
**addressing**   13:16
  32:4
**adjourn**   7:11
**adjourned**   7:5,7
**adjudicate**   22:22
**adjudicated**   61:25
  71:4 74:21 81:14,15
**adler**   4:23 6:15,15
  59:6,11,18,22 60:1
  60:4,8,8 62:6,8
  68:24 69:10,12
  71:12,18,21 78:17
  78:19 79:5 80:10
  81:2 82:25 83:6

84:2 85:13 117:16
  117:19,22 119:9,13
  120:9,12,22,25
  121:7 123:11,14
  124:17,19,21,23
  128:11,13,19,22
  129:1,15 130:2,15
  130:19 131:9 132:5
  132:7,9,12 133:3,7
  133:12 134:2,6,11
  134:15,22 135:2,8
  135:10,12,18,20,24
  136:2,7,9,13,20,22
  137:2,7,9,13 141:6
  141:15 142:2
**administerial**   12:1
**administrator**   40:3
**administrators**
  58:19 113:1,6
  132:19
**admitted**   60:22
**adopt**   41:22
**adventitious**   79:12
**adversary**   2:12,16
  2:19 3:1,3,6,9 6:16
  45:12,17 53:22 54:3
**advertise**   65:11
**advertising**   72:18
**advised**   56:15
**advisement**   59:3
  141:19
**affect**   49:12 92:1
**affidavit**   9:9 69:25
  107:6
**affidavits**   65:7
**affiliation**   122:17
  122:18
**affirmative**   17:21
  17:22 28:8 116:18
**afford**   24:14
**afield**   96:20
**afternoon**   118:5
**agenda**   7:5,6 13:1,4
**agent**   61:10 70:16
  71:8,8 78:21 80:12
  123:20,21 125:25
  126:25

**agents**   122:24,24
**agent's**   123:19,20
**ago**   131:10
**agree**   11:13 27:1
  32:3 33:1 45:9,24
  49:16 50:7 51:24
  60:3 71:3 81:13,14
  93:23 96:20 98:9
  121:3 127:20
  132:14 135:20
  137:1
**agreed**   12:9 38:3
  60:1 123:18 134:22
  135:18
**agreement**   2:4 7:21
  7:24 8:4,6,21,22 9:1
  9:5,15 10:25 11:5
  11:10,16 12:4,9,15
  12:21 50:6 61:1,9
  61:18,23,25 69:22
  71:3 78:24,25 79:25
  80:5 82:4 87:16
  123:4,5,7 125:2
  143:9
**agreements**   11:15
  31:15,15,16 34:10
  34:11,16 35:3,4
  61:4 62:10 79:24
  80:2 127:4
**agrees**   127:25
**ahead**   24:14 83:15
  83:21 117:21
**air**   122:1
**aircraft**   38:23,25
  39:2,11 54:7
**airline**   39:3
**airlines**   25:8 109:17
**airplane**   40:13,14
  40:24
**airport**   109:2
**airports**   39:12
**al**   1:7,8 3:6,7
**albeit**   58:20
**alchemy**   43:23
**alien**   129:5
**alive**   122:2

**allah**   77:21
**allegation**   21:24
  22:1 66:8 99:9
**allegations**   28:10
  31:13 91:24 104:6,9
  128:16 131:2
  140:23
**allege**   57:5 68:1
**alleged**   10:9 35:1
  84:9 95:14 108:14
  121:13
**allegedly**   92:8
**alleges**   92:24
  100:13
**allow**   9:3 37:18
  42:12 120:3
**allowed**   10:21 40:10
**allowing**   16:6
**allows**   13:22
**alter**   21:13 57:15
**alterius**   55:22
**alternative**   89:11
  114:17 135:19
**alternatively**   16:10
  89:15
**amego**   91:15
**amended**   77:8
**amendment**   73:25
  91:2
**american**   25:8
  38:24 39:15 54:6
  67:5 109:11,17
**amount**   8:3,4,7,10
  9:3 15:14 18:5
  31:25 41:8 87:15
  125:4,7,9 139:17
**amounts**   39:12
  68:12 73:17 84:13
  84:13 118:10
  122:10
**analogy**   74:25
  95:16
**analyses**   54:11
**analysis**   31:21 46:1
  46:12 52:9 64:14
  68:21 73:23 113:20
  113:22,23 114:23

116:1
**andrew** 4:16 5:12
  6:8 14:13
**answer** 22:10 31:13
  33:4 39:24 42:8
  47:19 74:17 76:4
  97:13 137:5
**antecedent** 64:22
  89:14 118:8
**anti** 104:7,8,8
**anxious** 11:14
**anybody** 9:11 24:23
  26:20 49:15 53:5
  72:6 76:5 122:6
  126:3
**anyway** 83:20 85:15
**apart** 21:16 22:10
**apartment** 72:13
**apologize** 83:24
  85:13 141:4
**apologized** 56:16
**apparently** 57:5
  62:8 84:1
**appealed** 118:20
**appeals** 66:24,25
  86:21,24 91:15 92:7
  92:10 94:15 118:22
**appear** 53:17
**appearances** 5:10
  6:5
**appeared** 60:13
  118:7
**application** 56:19
  60:20 76:24 78:5
  81:9 105:25 112:14
  112:24 113:12,19
  115:23
**applied** 64:17 76:21
  78:7 82:13 108:25
  116:25,25 117:1
  128:23 133:19
**applies** 110:5 113:4
  113:10 114:10,12
  114:15
**apply** 41:10 42:4,4
  56:2 107:22 109:9
  109:13 112:3 114:5

115:19 116:4 117:5
  129:7 132:17
**applying** 107:19
**appreciate** 13:15
  49:25 59:2 138:3
**appropriate** 57:19
  120:1 141:25
**appropriately**
  94:15 98:20,22
**approval** 7:23 10:2
  10:14,24 12:15
**approve** 2:3 8:21,25
  11:16 12:17,20
  143:7
**approved** 20:17,17
  144:10
**approving** 2:4
  11:15 143:8
**april** 7:7,11
**arabia** 100:8 101:17
  101:18 102:4
**arcap** 2:13,20 3:2
**arcapita** 1:7,8 3:7
  6:4,10 20:2 23:22
  35:4 40:13 53:3
  60:24,25 61:17 62:8
  62:11 66:9 68:9,15
  69:2,20,21 70:1,2,3
  70:6,17 76:4 78:16
  78:25 80:14,14
  84:14,16 88:10
  92:21 97:22 98:3,4
  100:12,13,21 101:4
  101:5,15,24 102:4,7
  102:13 109:4
  120:18,22 122:24
  123:23 124:10,12
  124:14 125:1,8,17
  125:22,23 127:13
  137:17
**arcapita's** 61:6
  62:12 63:11 66:12
  78:15,21 88:13,25
  89:2 121:2 125:3,16
**area** 114:8,8
**aren't** 48:13,14

**arguably** 77:20
**argue** 14:7,17,20
  17:13 36:1 50:8
  55:8 109:20 128:2
**argued** 52:4 81:10
  85:7
**arguing** 6:13,21
  14:2 43:18 50:13
  127:21
**argument** 16:7,18
  17:3,7,13,14 18:19
  22:17 29:3 32:2
  34:10,22 37:7 38:5
  41:13 42:15,17 58:9
  59:2,24 65:18 68:25
  71:17 74:11 77:3,5
  77:14 85:12 90:3
  96:9 98:11,11 107:8
  108:8 111:8 116:23
  117:3 120:20 121:2
  121:4 127:19 128:3
  129:14,17,22
  132:19 134:17,20
  136:6,17 138:20
  141:7
**arguments** 27:24
  38:16 59:15 60:4,5
  60:19 76:19 90:9
  111:8 126:10
  136:15 141:17
**arises** 85:23
**arising** 61:25
**arm** 72:3 90:24,25
  91:19 107:20,22
**arose** 87:5
**arrangement**
  139:23
**article** 91:1
**articulated** 74:6
**articulation** 69:14
**aside** 70:5,6 78:21
  93:6 121:4
**asked** 35:16 42:16
  46:18 87:10 99:19
  103:2 108:10
  124:11

**asking** 8:16,25 9:1
  11:1,8 34:5,6 47:12
  47:12,14 48:18
  57:15 101:20
  124:16 133:4,5
  137:1
**asks** 41:20 125:17
**aspect** 16:25
**assai** 74:25
**assert** 17:12 19:1
  25:18 55:14 57:17
  87:23,23 89:14
  110:19
**asserted** 27:3 85:2
  136:16
**asserting** 19:25
  25:10 113:6 135:12
**assertion** 19:5
**assertions** 57:11
**asserts** 110:16
**asset** 41:9 42:13,14
  43:23
**assets** 10:6 15:6,13
  19:4 24:25 26:14
  29:19 30:2,6,6,7
  31:5,10 32:8,11,23
  35:19,20 45:6 48:12
  51:25 52:1 54:7,7
  54:13,14 79:23
  84:11 95:19 115:8
**assume** 28:11 30:18
  83:18 90:3 122:7
**assumed** 140:23
**assuming** 117:24
**astonishing** 16:1
  26:11 35:25 110:8
  140:11
**astonishingly** 15:19
**attached** 123:6
**attack** 21:22
**attacks** 92:16
**attorneys** 4:4,11,19
  5:2
**augment** 128:7
**augmentation**
  126:19 134:16

**authorities**  41:12
41:16
**authority**  81:2
137:21
**authorize**  125:6,7,8
**automatic**  85:9,25
89:3,4 97:17 109:9
109:13 112:15,19
115:17 116:7 128:1
130:1 133:6
**automatically**  11:11
126:15
**avail**  70:13 79:2,4
121:23,24 132:15
**availability**  100:3
**available**  18:11
29:19 84:18
**availed**  86:9 93:19
99:8
**availing**  79:5
**availment**  66:5
68:19 69:13 70:12
70:18 92:19 93:13
102:24 124:3
125:24,25 137:19
138:19
**avails**  122:15
**avenue**  4:20
**avoid**  140:6
**avoidance**  40:9
111:25 130:19,22
132:17 133:1
**aware**  60:12 77:2
**awful**  48:19

**b**

**b**  1:21 29:25 52:21
52:23 53:1,2,2,2
69:5 73:1 79:9
88:12 124:13,19
131:24
**b.r.**  44:21 112:16
131:13 132:13
**b.s.c.**  1:7,8 2:21 3:3
3:4,7 60:10
**baby**  128:25
**back**  8:22 29:7,18
29:25 30:12 34:21

35:6 40:12 53:6
58:12 64:7,25 65:18
66:25 68:13 82:20
84:7 87:16 92:19
97:10 98:3,20,23,25
99:3 102:15 107:12
112:18 118:9,11,22
119:5 120:23 133:7
133:14
**bad**  44:10,16,16,19
121:15,17
**baeshen**  3:6 5:2
6:21 13:24
**baeshens**  16:7 19:5
19:11,19 20:20 21:9
27:9,18 28:12,14
57:3
**bahrain**  2:13,17
4:19 6:17 50:8 60:9
61:2,3,9,19,21 62:1
62:19,22 63:11
68:13,15 69:21 70:8
71:2,2,3,4 74:19
75:15 78:11 81:15
82:8 97:17 99:5
115:25 118:2,12
121:11 123:1,20
124:4 125:11 127:9
127:13
**bahraini**  28:14,18
31:20 33:10,15 35:7
61:3,11,11,16,17,24
62:24 63:13 71:1,1
71:4,9 73:17,19,21
74:18,20,22 75:14
78:12 81:8,11,12,12
81:13,23,24 82:1,2
118:2 122:9 125:23
134:18,18 139:12
**baker**  5:1 6:20
27:17
**balance**  18:15,16
**bank**  1:7,8 2:14,17
3:7 4:19 6:5,17
18:13 20:2 23:22
30:1,3,20 32:15
33:3,12,14 34:3,24

35:7 40:6 50:17
52:24 53:1,2 58:18
60:9 61:17 62:13,17
62:19,20,25,25
63:10 64:2 65:5
66:11,14,16,16,19
67:2,3,10,23 68:6
68:18 69:18,20
70:15 71:14,23
72:11,12,24 73:1,6
73:12 76:7 78:14
80:16 86:13 88:13
91:16,17,20 92:23
93:16 94:7 99:10
100:25,25 101:1,5
101:15,21,25 102:3
102:4 104:4,10
106:3 119:3,11
120:4 121:9,10,10
121:11,13,14,17
123:22,24 125:10
125:10,11,15 126:4
126:6 127:1
**banking**  33:14 86:9
105:14,16
**bankrupt**  139:8
**bankruptcy**  1:1,13
1:23 14:18 21:3
26:12 27:7 30:13
31:1 36:1,11 37:12
37:21 44:25,25
45:10 53:13,14
54:22 60:20 63:23
64:16 68:10 74:1
75:21 77:6 82:11,12
84:12 85:8 87:11
88:18 89:18 101:11
109:11 110:4 111:2
111:23 113:17
116:6 117:13
126:14 128:6
130:10 131:19
136:9 139:7
**bankrupt's**  45:3
**banks**  34:24 40:2,8
61:11 62:4 63:2,4
64:4 84:19 86:8

90:16 94:25 99:23
102:25 115:3
139:12
**bank's**  95:7
**barclays**  103:8
**barclay's**  63:25
**barkley's**  40:6
**barreling**  83:15
**based**  7:24 8:3 19:7
31:13 34:10 40:4
42:15,21 115:12
131:2
**basically**  30:4 43:5
46:21 69:25 75:3
122:2 132:3
**basis**  17:16 21:20
42:9 71:5 72:14
75:24 76:6,16 80:24
81:5 84:20 97:14
105:6 112:13
116:21,24 118:16
118:23 120:14
122:7,8 135:22
136:15 138:22
**bassett**  6:11
**bassett's**  69:25
**bath**  128:25
**battling**  27:19
**beatrice**  55:7
**beef**  73:11,14 118:7
128:9,14,15,17
**began**  78:10
**begins**  91:11,12
93:20 110:16
**behalf**  2:9 6:9 7:3
14:13 27:18 64:21
125:5 143:13
**belief**  8:9 109:8
**believe**  7:25 8:10
10:19 11:7 13:22
14:17 20:9 28:18
60:15 61:12 65:15
69:1 89:23,24 97:17
122:8 137:19 141:8
**believed**  38:16
65:17

**belong** 43:24
**belongs** 44:2,7
**beneficiary** 125:13
**benefits** 70:14
**best** 95:16 107:18
**better** 37:6 42:12
  96:8 132:9
**bevel** 131:18
**beyond** 44:16 109:7
**bicks** 4:24 6:15
**bicycle** 75:5
**big** 11:21 41:20
  43:13 127:3
**bigger** 29:18
**billion** 24:2
**binding** 7:24 94:1,2
  109:25 110:2
**binds** 33:1
**bisb** 60:9,23,24
  61:4 62:14 63:10
  65:7 67:25 68:11
  70:3,16 80:1,3,4,10
  80:12,13,16,16,18
  100:14 102:25
  121:18,24 122:24
  123:3,5,20 126:1
**bisb's** 62:16,18
  63:14 92:25 123:6
  123:11 127:11
**bit** 56:25 84:7 98:14
  103:7 122:23
**blanche** 130:11
**blank** 80:16
**blatant** 21:21,22
**blow** 52:1 140:5
**blown** 75:7
**blur** 93:21
**body** 32:23 133:15
**boilerplate** 20:10
  35:18 46:13 48:15
  48:21 54:11
**bold** 55:4,4
**books** 14:8
**bootstrap** 125:23
**bootstrapped**
  137:16

**bottom** 64:9 115:14
  124:24 125:17
**bowling** 1:14
**branches** 105:18
**breach** 87:23 88:5
  88:15 95:20 96:18
  97:12 99:7 115:22
  115:24 117:2,5,6
  140:21
**breached** 98:5
**break** 82:16,21
  111:6 117:20
**brief** 51:4,12 57:24
  70:21 80:23 83:23
  84:1 105:12 110:7
  114:1 139:10
**briefing** 141:18
**briefly** 63:15
  117:17 138:1
**briefs** 38:10 39:6,25
**bring** 40:3 45:12
  64:25 114:11
**bringing** 133:17
**britain** 79:18
**british** 63:24,25
  64:2,3,4,12,19,20
**broad** 10:17 22:8
**brought** 46:18
  71:22
**brozman** 112:22
  114:23 130:5
  132:14
**brozman's** 111:13
  113:15 115:11
  137:10
**brush** 22:8
**brussels** 71:14,23
  72:11,12
**bucket** 50:14
**bucks** 23:24
**building** 4:12
**bunch** 28:24 30:1
**burden** 76:11
**burdensome** 107:5
**buried** 45:13
**business** 65:8,11,11
  72:9 87:4 91:19

92:11 95:1,3 105:18
  119:13 121:22,23
  126:24
**buttner** 31:21
**buy** 133:8

**c**

**c** 1:7,8 3:7 4:1 6:1
  21:18 88:12 144:1,1
**cabin** 119:21
**calculation** 64:16
**calendar** 6:23
**california** 75:8
**call** 33:18 60:9,10
  82:6 117:22 141:24
**called** 55:3 61:18
  62:25 67:2 89:12
  140:19
**calling** 63:3
**calls** 139:25
**canadian** 67:2,5
**cannon** 37:13
**can't** 25:6 32:5
  35:14 36:4,15 39:16
  39:16 45:7 48:23
  50:12 54:4,6,10
  65:19,23,25 90:2
  97:18 98:12 115:24
  122:4 138:24
  141:19
**capacity** 13:11
**capital** 2:21 3:2,4
  4:19 6:17 60:10
**captain** 57:9
**car** 95:13 108:2
**carefully** 109:22
**carry** 48:18
**carte** 130:11
**carve** 37:9,18,25
  38:1,14 39:12,15,23
  40:7,10,18 42:4
  54:23 58:16
**carved** 25:23 28:21
  32:8
**carves** 33:23
**case** 1:3 14:18 21:3
  21:8,13 22:8 23:19
  23:25 24:7,8 25:21

26:12 30:9 34:20
  35:21 37:11 38:5
  39:25 40:4 42:9,9
  42:20,25 44:21,22
  44:24 46:18,24
  53:10,10,11,25 54:2
  54:22 57:20 61:7,15
  61:20 62:17,19
  63:10,14,17,23,24
  65:4,25 66:1,5,21
  66:22,22 67:9,9,14
  67:18 71:4,15 72:20
  75:1,25 76:10 77:6
  77:7 78:4 79:19
  80:3,4,12,13,13,21
  81:18 85:18,23 86:4
  86:12,16 87:1 88:8
  90:14 91:4,12 92:15
  93:5,15 96:18 99:20
  99:24 100:7 101:9
  101:16 102:7,20
  103:12 104:15
  105:22 106:19
  112:2 115:2,7,8,24
  116:5 117:2 118:19
  118:20 119:10,10
  119:11,20,24 121:8
  122:2 124:8 126:18
  126:23,25 127:11
  129:8,19,22 130:4,8
  130:17 131:17,22
  132:19 134:11
  135:3 140:17
**cases** 22:12,16 24:6
  36:2,15 43:22 48:22
  48:25 49:7 65:22
  66:18 71:11,19,21
  71:22 72:21 73:1,3
  73:9 75:20 76:8,14
  76:23 77:11 79:13
  80:22 83:12,16 91:9
  93:12 95:8 96:13
  98:14 114:2 118:14
  119:10 122:3
  126:20,21 127:7,23
  128:25 133:23
  137:24

**cash** 15:14,14 18:1
18:3 23:20 24:3
**catchatory** 37:13
**categorically** 48:4
**categories** 19:12,16
20:22
**categorized** 20:2,21
**cause** 72:6 87:5
**causing** 72:4
**cayman** 116:16
**center** 130:6
**central** 29:14 41:4
**cents** 8:19
**ceos** 65:7
**certain** 7:8 8:22
31:14 40:2 50:2
57:3 68:14
**certainly** 12:22
22:14 28:2 29:6
31:12 44:4 49:22
56:5 71:15 79:19
82:17 84:22 117:13
133:22
**certification** 86:21
94:16
**certified** 66:24
91:13 118:21
**certify** 144:2
**challenge** 17:6
73:20 75:15 134:6
**challenged** 73:18,19
73:21
**challenging** 106:24
**change** 11:17 26:3
28:20 43:23 97:18
108:19
**changed** 66:13
**changer** 24:17
**chapter** 57:16 83:12
128:25
**chase** 4:5 62:12,17
101:17 102:14,15
125:20 126:25
**choice** 31:18 39:15
127:5
**choices** 24:22

**chooses** 75:16
**chose** 18:11 99:8,10
99:13
**circle** 29:18 107:12
**circuit** 44:22 66:23
66:25 67:1,19 76:22
91:14 92:6 94:1,15
99:17 103:12
118:21,21,23
127:22
**circuit's** 94:4
109:23 111:24
**circumstance** 22:12
53:20 99:15 117:1
**circumstances**
30:19 83:15 114:6,7
131:1
**cite** 22:9 30:9 37:10
44:21 49:7 55:21,24
87:1 91:16 100:7
139:1,4
**cited** 33:24 36:1,2
48:22 49:1 78:13
80:22 81:19 113:8
114:22 126:21
139:9
**cites** 100:7 113:2
**citing** 44:22 122:5
**civil** 110:25 111:5
**claim** 2:1,8,10 7:10
7:18 8:3,17 9:1,2,12
9:18,19 10:21 11:2
13:2,5,18 16:1,23
20:8,8 21:21 25:2
26:21,23 30:24
31:25 38:18 46:15
57:10 60:13 68:14
69:18 75:4 76:4
84:19 88:6,15,16,17
88:19,23 89:3,3,7,7
89:8,9,9,20,22,22
90:2,5 113:6,21
115:22 120:5,6,7
138:16 143:5,12,14
**claimant** 7:23 8:12
13:4,7 31:24

**claimants** 6:21
18:22 19:11,15,16
20:10,13,20 28:24
57:2
**claimed** 67:7 84:15
**claiming** 35:24
53:18 68:8
**claims** 2:8 7:4 10:14
11:6,11 13:1,3 15:4
19:14,25 20:2,6,21
20:22,24 21:10 22:4
24:24,24 26:19 27:3
27:3,9 28:9,17,17
29:14 54:12 55:4
66:7 67:4 69:6 75:2
85:2 87:22,23 90:8
90:11 92:10 96:3,22
97:12 112:3,14
113:13 130:19,22
135:13 138:15
143:12
**class** 28:17,17
**classes** 46:9
**classic** 108:8
**classification** 19:14
**classified** 19:10
26:23 50:10
**clause** 52:6 111:20
**clauses** 111:7
**clear** 13:17 15:5
16:20 17:9 21:1,21
30:24 34:6 65:22
75:20 76:8,14 88:1
88:8 89:10 90:18
94:2 103:20 104:2
108:2 109:16
111:10,19 113:22
126:17,18 133:18
134:8 139:7
**clearer** 132:10
**clearly** 37:5 76:23
117:11,24 129:10
130:7
**clerk** 6:2
**client** 30:18 31:8,14
37:6 94:25

**clients** 38:15 60:17
72:19
**close** 10:12 23:23
71:6 78:9
**closer** 72:21 73:7
**code** 60:20 64:16
77:5 82:12 85:8
88:18 110:4 111:2
113:13 117:13
125:21 128:6,16
**code's** 112:13
**coincidence** 92:4
115:5
**coincidental** 93:11
94:23
**cold** 27:19
**collateral** 21:22
**colleague** 6:20
56:15
**colleagues** 6:10
56:5
**collection** 61:5
**collectively** 55:8
**colloquially** 58:3
**colloquy** 50:3
**colonial** 111:24
**come** 14:10 18:24
18:25 21:18 23:10
24:25 25:9,17 26:25
26:25 34:21 40:13
46:15,23 65:21,23
66:15 94:16 95:15
96:11 107:18
141:25
**comfort** 54:8 95:5,6
**coming** 89:6 102:14
102:23 125:22
**comity** 40:5 42:3,7
58:21 81:10 103:12
116:10,11,13,21,24
136:6,25
**commence** 53:22
86:11
**comments** 17:3
**commerce** 76:25
129:4

commercial 21:4
  62:25 125:11
commingled 15:14
  18:17
commits 72:3 108:6
committee 2:13,20
  3:2 4:11 5:13 20:15
  75:13 77:9,10
commodities 61:2
  80:13 123:21,24,25
  127:10 139:16,22
  140:2
companies 2:10
  3:11 54:15 58:5
  143:14
company 5:15 10:6
  18:10 101:11
comparable 24:23
comparison 111:4
complain 95:19
  97:1,19 138:13
complainants 15:17
complainant's 15:4
complained 92:14
  138:12,12
complaint 15:20
  16:13 28:6,25 29:1
  31:14,19,23 35:2,6
  84:9 92:24 97:14
  100:13 102:19
  106:23
complaints 67:25
complete 123:21
completed 53:11
  97:25 123:16
completely 34:19
  48:5 101:15 105:11
  111:7 113:25
complex 38:24
compliant 80:7
  139:15,21 140:4,14
complicated 39:6
comply 21:23 105:5
comport 74:7
concede 65:15
conceded 65:3,6
  77:11

conceivably 49:11
concept 68:18
  128:10
concern 12:6 48:11
  50:18 136:9,12,14
concerns 11:24 48:1
  50:4 136:16,25
conclude 51:1 90:16
  90:17 94:13 105:5
  106:22
concluded 16:9
  19:7 64:18 92:10
  142:4
concludes 19:15
concluding 53:7,7
conclusion 23:16
  26:10 87:25 115:12
  117:24 122:5
conduct 72:10,16
  92:3,8 96:7 97:19
conducting 95:2
conference 2:14,21
  3:7
confess 11:14,21
confirm 9:17 36:15
  39:16
confirmation 15:1,2
  17:19 18:25 19:24
  22:18,21,23 23:2,3
  24:11,18 25:14,21
  38:11 39:13 40:8
  44:11,14 49:5,21
  55:1,2,5,16 56:6,7
  58:16,20
confirmed 10:22
  15:12 21:16 25:8,12
  27:1 36:11 48:4
  51:25 91:15 92:3
confirming 17:19
conflating 119:1
confusing 11:20
confusion 139:3
congress 132:16
  133:18 139:5
congressional
  132:22,25 134:8

congress' 129:6
  131:25
conjuncture 76:15
  122:2
connected 95:10
connecticut 108:6
connection 9:12
  10:11 67:3 74:21
  75:10 79:20,23
  106:24 138:18
conscious 42:21
  107:6
consensually 8:12
  10:13
consequence
  139:19
consequences
  129:20
consequential
  139:20 140:1
consider 62:3 64:9
  78:6 141:13,13
consideration 86:7
  86:10 88:7 95:21
  97:25 98:19,24
  127:8
considered 72:1
  81:7 91:18
consist 54:14
consistent 9:4 12:20
  106:18
constitute 64:10
  86:15
constituted 87:4
  104:7
constitutes 45:3
constituting 15:14
constitution 90:20
  90:22 91:2
constitutional
  107:21
constitutionally
  60:16 73:24 74:4
construct 73:13
construction 7:20
  37:13 56:1

constructive 17:10
  17:12,22 18:19 19:2
  20:11 25:11
construe 68:21 94:3
construed 39:13
consultants 7:25
consulting 5:16
consummate 86:13
  99:9
consummated
  20:19 27:1 90:15
  95:20 122:20
consummation 88:6
  90:12 109:1
contact 8:11 95:11
contacts 74:2,11,12
  122:14
contemplated 12:5
contemplates
  119:21
contemplation
  16:17
contend 19:1 21:14
  89:12,16 105:10,12
  105:15 115:17
  118:11
contended 24:4
  118:12
contending 19:20
contention 89:5
  112:19
contest 15:22 16:14
  19:1 27:2 28:16
  30:8 53:6 54:8
  55:17,17 56:9 88:21
  99:10 127:14
contested 13:2,6
  25:13
context 14:18 16:1
  19:24 21:13,17
  71:17 104:2 119:8
  130:13,18 131:7
contexts 130:15
continental 112:20
continuum 95:9
  108:1

**contract** 86:6,11
87:24,25 88:5,6,15
89:12 95:19 96:18
97:12,20,22 98:5,23
99:7,7 108:22 109:3
115:22,24,25 116:5
117:2,5,6 140:7
**contracts** 139:13,14
**contractual** 70:20
**contrary** 26:10 36:2
86:25 137:22
**contrast** 53:9 67:18
92:18 111:2
**contrived** 73:13
**control** 101:5
**controversy** 122:18
**convenes** 116:24
117:4
**copies** 110:10
**corpus** 140:12
**correct** 8:24 9:6
13:19 17:1 58:2
59:18 83:23 96:4
107:17 111:20
112:6 144:3
**correctly** 119:14
138:8
**correspondent**
62:17 66:11,19 67:3
67:10,23 68:6,18
69:18 70:15 71:14
72:24 73:12 76:7
78:14 87:1,1,5
91:17,20,25 92:9
104:15 106:3 119:3
119:10 120:4 121:9
121:9,14,17 125:15
126:4,6
**corresponding**
62:13,20 100:6
101:21
**couldn't** 22:17 99:6
99:11 102:13,15,19
115:23
**could've** 24:22
38:16 43:12 56:2
92:22 100:8,9 124:2

**counsel** 39:14 60:1
118:7,25 120:14
131:11 137:5 141:9
**counsel's** 137:22
**counter** 84:2
**country** 100:10
144:13
**couple** 7:4 83:19
85:1
**course** 23:19 54:15
67:22,24 68:1 72:10
77:9 108:14 110:13
**court** 1:1,13 6:3,12
6:18,22 7:1,12,16
7:23 8:18,20 9:2,4,7
9:11,14,22,25 10:7
11:13 12:4,8,11,16
12:19,24 13:9,11,13
13:15,20,22 14:1,4
14:6,9,12,15 15:1,2
15:7,9,15,18 16:15
16:24 17:2,17,18,25
18:6,9,12,15,24
19:1,3,14,23 20:9
20:12,24 21:14,16
22:2,3,5,6,7 23:8
24:8,10,16 26:6,7
27:2,6,8,11,14,16
27:20 28:2 29:2,10
29:13,23 30:12,15
30:18,22 31:3 32:1
32:13,19,22 33:6,10
33:21,23 34:1,5,23
35:10,13 36:6,8,11
36:12,14,18,22 37:4
37:14,16,18,21,22
37:24 38:4,8,20,22
39:2,5,9,19,22
40:20,23 41:1,4,7
41:16 42:1,6 43:1,4
43:8,11,15,25 44:4
44:7,10,13,16,25
45:5,14,16,20,22,25
46:3,6,9 47:4,8,18
47:24 48:4,7,10,18
49:2,5,15,18,25
50:15,17,20,23 51:1

51:7,9,15,18 52:13
53:4,7,16 54:19,24
55:25 56:10,11,17
57:22 58:8,13,15,21
58:23 59:1,7,9,12
59:20,25 60:2,3,6
60:14,16 62:2,7
63:23,24 66:24,25
68:20 69:9,11,13
71:10,13,19 72:13
72:15,17 74:3,5,8
74:17,23,25 75:1,7
75:8 76:12,22 77:7
77:16 78:13,18,23
80:9 81:1,20 82:12
82:14,18,22 83:1,4
83:7,10,19 84:5,21
85:8,14,17,22 86:17
86:21,23 87:7 88:4
89:6 90:21 91:6,11
91:12,15,24 92:3,6
92:7,9 93:3,25
94:12,15 95:5,6,22
96:5,23,25 97:4,8
98:6,9 99:14,22
100:18,20 101:3,19
101:20,24 102:9
104:19,21,24 105:2
105:13,20,24 106:1
106:4,11,17,21
107:10,12 109:13
109:16,18,25 110:2
110:10,11,14,17
111:15,23,23
112:11 114:11,13
115:19,23 116:6,19
116:21 117:7,8,9,15
117:18,21 118:17
118:19,22 119:5,12
119:20 120:10,20
120:24 121:1 122:8
123:10,13 124:16
124:18,20,22
127:18 128:12,14
128:21,24 129:2,13
129:16 130:4,13,17
130:25 131:2 132:2

132:6,8,11 133:1,5
133:10,14 134:3,9
134:13,16,23 135:7
135:9,11,13,14,16
135:19,21 136:1,6,8
136:10,12,14,21,23
137:3,8,11,25 138:5
140:25 141:2,5,12
141:16
**courts** 56:2 64:8,18
76:19
**court's** 14:3 21:22
23:16 51:14 55:1,1
81:11 110:1 115:19
**cover** 81:13
**coverage** 10:23
**covered** 38:12,13
40:19 48:14 50:2
68:19 90:23 91:3
**covers** 58:22
**created** 51:17
**creating** 138:23
140:9
**credence** 56:12
**credibility** 70:7
**credit** 125:9
**creditor** 16:5 26:24
32:22,25 53:11,21
82:3
**creditors** 2:13,20
3:2 5:13 10:23 19:7
23:21 26:13 29:20
46:6 82:11 84:18
**creditors'** 4:11
**critical** 15:3 19:22
56:21 68:17 78:22
86:5 109:21
**culpable** 92:8
**cumbersome** 11:7
**currency** 100:4
**currently** 77:11
82:19
**customer** 94:25
99:24
**customers** 95:3
**cut** 47:8 98:5

**cutting** 103:3

**d**

**d** 6:1 74:17 88:12
143:1
**d.c.** 4:14
**damages** 10:12
**dark** 141:22
**data** 108:20
**date** 7:7,8,15 87:17
125:18
**dated** 144:6
**day** 5:8 6:21 44:10
57:14 61:8,8 62:18
62:22,22 63:14
66:18 118:2
**days** 11:10 84:12
89:17 101:11
**deal** 14:23,24 41:20
48:23 66:15 86:2
103:7,25 109:23
116:18 127:3 128:7
**dealing** 22:9 37:3
40:1 41:14 67:22,24
68:1 70:24
**deals** 80:14 109:25
111:25
**dealt** 8:6 15:3 57:10
137:9
**debate** 114:9,15,16
137:8
**debit** 125:9
**debt** 28:17 64:22
88:22 89:1,23,25
118:8 138:24
**debtor** 10:6 23:18
23:18,20 24:1 29:20
30:4,6 33:19,20
35:8 43:24 53:13,18
53:21 54:18 57:16
61:10,16 63:24,25
64:3 77:9,10 103:14
109:16 114:11
116:15 125:23
126:23 135:12
136:2,10
**debtors** 1:10 2:9
3:10 4:4 7:3,22

14:14 16:16 20:9,14
20:14 26:13,14,18
27:13 28:7,8,14,15
28:19,22 30:22,23
33:8 35:24 36:2
38:10 42:16 45:6
46:17 48:12 49:13
52:2,4 55:9,9 57:21
77:10 78:13 79:17
87:9,9 97:10 130:6
132:15,17 143:14
**debtor's** 10:17
23:11 24:25 26:15
39:14 43:20 50:17
52:7,22 53:12 55:10
55:16 79:16 103:17
114:14
**decide** 42:3 84:23
87:15 129:3 131:4
**decided** 83:14 109:3
**decision** 19:23
42:21 79:1,3 87:2
91:14 94:5 99:21
107:6 109:25 110:2
111:12,13,14,16,22
111:25 112:17
113:2,15,24,25
114:1,4,21,24
115:11,11,16
116:12,12 129:20
130:4 131:13
137:10 140:3
**decisions** 109:22
110:3 111:17 113:8
**declarable** 17:10
**declaration** 105:8
**declarations** 105:9
**declaratory** 28:6
**declared** 26:1
**deemed** 11:11
**default** 90:4
**defeat** 18:18,19
69:4
**defend** 97:13,14
138:21
**defendant** 2:17 3:4
3:10 60:9,10 66:5

67:1 69:15 70:13
73:3 74:15,16,22
75:22 79:9 104:3
119:16 121:13
122:15
**defendants** 6:16
60:13 65:15,16
66:12,13,15 68:11
73:15 75:25 92:24
102:5,12 103:9
119:2 120:15 122:6
135:15
**defendant's** 66:13
91:19 92:8 121:5
137:17
**defense** 28:9 89:21
96:22 97:15 116:18
**defenses** 17:21,22
**defer** 116:21
**deference** 81:11,20
**define** 35:19
**defined** 55:11,18,19
133:24
**definition** 15:11
30:5,7 32:10 51:25
53:6 77:4 112:13
**definitions** 15:10
30:5 32:7 35:18
**deliberate** 67:12,21
68:3 72:25
**deliberateness**
72:25 122:14
**delima** 55:7
**dell** 71:15
**demonstrably**
19:19 112:8 113:14
**demonstrative**
51:17,19 52:15
**demonstratives**
15:8
**denied** 118:18
**denominated** 99:25
100:5,11 101:18
102:10
**deny** 140:25
**depleted** 103:18

**depletion** 95:18
97:19 115:8 122:5
126:11
**deployed** 31:23
34:13,17
**deposit** 33:3,12,18
125:4
**deposited** 18:8,23
33:6
**deprive** 84:10
**deprived** 10:10
84:17
**depth** 93:8,18
**describe** 63:2 64:5
**designate** 101:25
**designated** 15:15
19:6 66:14 80:24
100:22 101:4 104:3
120:17
**designating** 69:20
**designation** 19:3
101:10
**designed** 89:13
**desirability** 92:4
**desperate** 65:18
120:12
**destination** 103:22
103:23
**detail** 56:15,16
**determination**
15:17 19:15 45:11
131:3
**determine** 22:24
60:18 78:3
**determined** 15:8
17:18 66:10 67:1
86:19 126:14
**determines** 31:22
**determining** 64:13
135:14
**devoted** 118:4
**dicta** 40:5 58:21
**dictate** 99:11
**dictated** 15:6 92:22
**didn't** 7:6 16:12
17:5 20:11 21:25
33:2,11 41:24 42:3

43:5 45:5 46:17
50:9 53:16 57:8
62:4,20 71:13 72:5
92:17 94:16 97:20
99:3,4,24 101:1,2
118:9 121:9 140:21
**difference**  44:18
59:14 68:20 101:9
115:7
**different**  10:5 11:22
14:18 19:19 21:10
21:11 22:12 31:17
34:11 37:22,24
40:14 41:14 47:15
58:11 63:18 75:20
81:25 82:4,5,6 90:9
95:23 96:3,6 101:16
102:20 104:13
111:7 115:12,13
130:2
**differentiates**  47:15
**differently**  82:11
94:16
**digression**  92:20
**dinged**  131:15
**direct**  69:15 108:3
138:19
**directed**  69:19,20
69:21 70:8,8 100:14
106:8
**direction**  78:15
79:3 88:14 92:25
**directly**  87:5 95:10
130:20
**disagree**  31:21 34:8
87:8 110:20 120:2
121:3 127:20
133:22 141:18
**disagreeing**  115:10
**disagrees**  105:24
122:7
**disclose**  29:24
**disclosed**  52:7,23
52:25 53:4,4
**disclosure**  15:12
19:13 20:16 23:1,9
45:23 47:1,4 52:8,9

52:13 54:16 77:8
**discovery**  34:21
65:20,23 75:18,19
75:23 76:1,17 86:19
104:25 105:4,23
106:2,13,14,16
107:3,5 118:18,20
118:23,25 119:21
119:23 120:1,3
137:22
**discretion**  35:5
**discuss**  63:19
**discussed**  12:21
63:22 107:13
118:24 137:15,24
**discusses**  40:5
**discussing**  61:13
67:20 114:5
**discussion**  47:3
51:4 91:21 113:9
118:25 130:23
138:10
**dismiss**  2:16 3:3,9
17:10,15 20:24
21:20 22:3 27:9
28:23 34:20 57:20
102:18 117:11
118:18 134:5
140:25,25 141:8
**dismissal**  90:4
136:16
**dismissed**  10:16
136:18
**dismisses**  116:17
**dispose**  54:6 106:15
**dispositive**  103:3
**dispute**  15:22 16:3
16:11 22:19,19 23:5
23:8,11,15 24:6
26:16 45:2 49:8
61:12 63:7,8 84:8
86:4 88:20 113:7
124:4 129:24 131:2
134:21
**disputes**  22:22
55:12,14,18,19,20
61:24 81:15

**disseminate**  121:14
**dissent**  37:11 55:21
**distinct**  29:20
**distinction**  24:5
47:11 86:5 115:1,9
**distinguish**  137:23
**distinguishable**
71:22 72:20 127:2,7
131:22
**distinguished**
126:21
**distinguishes**
114:23 124:5
131:17
**distinguishing**
127:23
**distress**  31:4
**distribute**  31:6 45:7
84:18
**distribution**  29:19
**distributions**  20:3
**district**  1:2 37:22
44:21 63:24 76:20
77:7 110:1 111:15
111:23 118:17
130:4
**divvied**  31:11
**doc**  2:1,3,7,16 3:3,9
143:5,7,11
**doctrine**  17:11
20:25,25 21:1
**document**  56:20
118:1 139:24
**documents**  55:6
63:1,6,9 80:4 88:8
88:10
**doesn't**  13:17 21:22
25:19 30:11 32:5
34:1 35:22 41:22
42:4 43:24 46:23
47:8 48:21 54:18,18
54:19 70:17 85:11
87:13,13 88:23
95:15 96:12 102:7
103:7,24 104:19
108:5,19 109:13,23
113:5 114:5 115:22

116:4,7,22 117:5
119:21 121:8,17
129:23 130:10,11
137:5
**doing**  23:13 32:19
46:22 81:23 119:13
119:17
**dollar**  18:5 23:22
53:3 99:25 100:5,11
101:18 102:10
**dollars**  8:7 62:11,16
62:18 63:5 70:3,25
80:15 124:10
125:19
**domestic**  64:11,15
78:3 81:8 129:11
**don't**  7:14 9:19
14:19 17:8,20,20,23
27:1 31:20 33:3
38:6 39:17 43:15,17
46:14 47:10,17 48:1
48:7 49:19 51:6,7,8
52:4 54:20 55:24
56:4 59:23 60:18
63:8 65:8,9,9,9,10
65:10,11,11 70:22
71:6,7,16 73:20
74:9,9,10,11,12,18
74:23 75:18 76:10
76:13 77:23 78:4,8
78:11 79:5,23,24
80:21,21 81:21
82:10,23 84:8,23
88:21 89:23 96:22
98:9 99:9 100:17
102:12 105:3,4,13
105:17,18,18 107:9
107:15,17,20,23
109:6 110:9 115:14
115:16,19 116:20
117:9 121:21,22,22
121:23,25 122:6,18
124:2 128:14 129:1
129:9,11,11 132:8
133:8 134:11 135:3
137:18,19,21
139:11

**downer** 135:4
**downstairs** 82:19
**dozens** 67:15,15,16
86:19,22 91:5,7,22
91:22 94:18,18,21
94:21 106:4,4,12,12
107:2,2 138:11,11
138:13,13
**dozens'** 91:25
**dra** 69:24
**dragged** 76:11
**drive** 95:12
**due** 73:25 76:9
122:10
**dumb** 87:12
**dunn** 7:14

**e**

**e** 1:21,21 4:1,1 6:1,1
70:1 74:17 88:12
143:1 144:1
**earlier** 46:24
129:17,22 133:21
135:25
**early** 118:5
**easily** 12:2 71:21
82:8 126:20
**east** 100:10
**eastern** 67:4
**ecro** 1:25
**effect** 21:2,3 24:9
26:9 39:2 67:22
**effective** 15:21
20:18
**effectively** 23:12
24:22 40:19 69:5
**effectuate** 69:22
**efficient** 60:2
**effort** 90:19
**efforts** 142:1
**either** 14:6 16:9
20:5 25:23 26:3
63:11 65:5 72:9
73:15 80:1,11 97:5
113:1 130:1
**electronic** 144:3
**element** 15:25
16:22 94:3,4,5

114:25
**elements** 15:3,4
89:18 91:11 107:23
**elephant** 105:8,9
**else's** 39:22 69:14
**eluding** 42:20
**embrace** 132:18
**employees** 10:7
105:17
**enable** 72:3
**encounter** 121:1
**ended** 64:20,21
71:2 78:10 118:2
**ends** 52:8
**engage** 30:15 72:9
74:4
**engaged** 72:18
**engaging** 72:15
**england** 64:20,21
64:21
**engraft** 77:21
**enhanced** 10:23
**enormous** 22:14
**enter** 56:11
**entered** 7:22 15:1,2
26:8 27:2
**enters** 22:2
**entirely** 90:12 98:8
108:15,18 127:6
138:19,25
**entirety** 54:24
**entities** 34:24 61:10
64:20 71:1 75:14
78:12 126:5 130:6
**entitled** 19:20 20:3
57:12 75:21 107:11
144:4
**entity** 64:19 126:4
126:14
**equitable** 17:11
47:22 52:4
**equities** 82:10
**equity** 52:3 57:7,13
**equivalent** 8:5
140:10
**error** 83:25

**especially** 71:7 81:6
**esq** 4:8,16,23,24 5:6
5:7,8,12
**essentially** 8:21
28:24 38:17 42:8
46:18 59:4 78:15
93:11 94:8 100:21
102:6 119:25 134:3
**est** 55:22
**established** 110:21
**estate** 10:20 15:6,7
15:11,16,18,24 16:4
20:1 22:9,18,23,24
23:6,9,10,12,17
24:4 25:16 26:1
30:8 32:7,8 35:21
36:4,4 38:7 42:13
42:14 45:11 48:14
48:24 49:6,19,20
53:8 54:5,9,13,21
77:4 84:11,17 88:20
88:21 101:12
103:17 112:1,2,5,13
112:25 113:17,18
114:19 122:5
126:11,19 127:15
128:1,3,5,7 130:1
131:16,19,20 132:4
133:8,9,12,17,18,25
134:4,17,18,24
**estates** 55:10 84:20
**estate's** 95:18
**estimated** 24:2
**et** 1:7,8 3:6,7
**evan** 2:8 143:13
**event** 43:11 89:9
129:11
**events** 140:17
**everybody** 25:6
31:9 39:13 51:24
59:16 69:14
**evidence** 34:14,16
44:1 106:5 132:24
**evidentiary** 24:18
**exact** 40:7
**exactly** 16:2 18:22
25:3,19 58:14 87:9

102:9 113:23
**examinations** 75:21
**examiner** 132:20
**example** 33:2 40:12
41:1 42:23 46:20
95:25 101:24 121:8
126:11
**excellent** 141:17
**exchange** 70:1,25
86:7,10 88:6 98:24
127:8 137:15
**exchanged** 57:8
86:11 122:25
**exclusion** 55:22,23
**exclusive** 37:10
**excuse** 27:18 28:8
**executed** 61:1,19
**exercise** 60:16 74:5
74:8
**exercised** 84:15
**exercising** 10:10
**exert** 74:5
**exhibit** 69:24 123:6
123:11 124:12,19
**exhibits** 88:11
**exist** 116:22 122:15
**expansive** 90:21
**expect** 6:6 53:21
97:13
**expedition** 75:22
106:6 137:20
**expense** 12:2 75:23
76:11
**expert** 141:11
**explain** 16:17 34:8
**explained** 7:21
**explicit** 70:20
**express** 111:19
**expression** 55:22
132:22
**expressly** 70:16
77:6 139:5
**expunge** 90:5
**extend** 112:20
116:3
**extensive** 91:1
114:22

**extent** 17:11 43:19 89:11,15 90:23 91:3 106:4,10 120:2 141:21
**external** 112:21
**extra** 126:16
**extraordinary** 14:17,22 15:19 21:9 27:6 35:24 43:21 57:15 85:7 109:14 140:3
**extraterritorial** 60:19 76:21,24 78:4 81:9 85:10 103:16 103:19 112:14,24 113:4,12,19 115:23 129:7 131:24 133:16
**extraterritoriality** 63:20 64:6,14 76:18 79:20 81:4 85:20,24 103:19 104:19 109:7,24 110:1,23 113:21 114:10,13 114:20 116:4 129:13 136:19 139:3
**extraterritorially** 64:17 78:7 109:9,14 110:5 113:5,10 115:20 132:18 133:19 135:1
**extremely** 76:23

**f**

**f** 1:21 80:17 144:1
**f.2d** 44:23
**faced** 56:8 92:13
**facie** 65:25
**facilitation** 124:1
**facility** 140:4
**facing** 102:21
**fact** 21:9 23:15,16 34:11 38:24 39:10 42:11 44:1 49:18 53:18 54:2,9 55:2 56:12,17 67:19 68:21 70:5,6,19

84:22 88:7 91:6,22 94:17 96:3 97:16,20 99:23 101:4,14,14 103:17 106:7 107:1 107:19,22 108:19 108:24 111:23 115:13,21 118:9 119:17 120:17 123:14
**factors** 12:23
**facts** 48:7 59:14,19 59:22 60:21,23 61:12,12 64:5 65:24 78:9,10 82:13 86:5 86:5,18,20,22 91:5 94:10,18,25 95:5 100:17 102:18 103:10 104:2,12,13 105:10 128:23 129:20 131:1 137:19 140:22 141:9
**factual** 102:6
**failing** 68:14
**failure** 97:9
**fair** 7:16 52:3 53:21 74:8,15 84:8 86:1 102:24 110:19 114:9,15,16
**fairly** 11:18 12:1 98:21
**falcon** 10:5,15,22 10:22
**falcon's** 10:20
**fall** 19:11 30:8 65:18
**falls** 21:16 85:24
**familiar** 57:1 68:12
**family** 31:16,17 67:7,8
**fan** 11:21
**far** 41:10 85:9 89:21 118:5 135:22 137:11
**farther** 77:18
**fashion** 64:3

**fatal** 16:22 19:4
**father** 126:25
**favor** 80:17
**february** 23:3,3
**federal** 45:9
**feel** 62:3
**fifth** 73:25 89:20 91:1
**figure** 9:20 12:7 26:2,3 45:7 93:25
**figured** 83:11
**file** 8:13 126:14
**filed** 2:8,17 3:3,10 7:6,19 8:3 9:9 10:7 10:11 11:2,6 13:4 15:20 16:16 20:6,7 20:8 23:3 26:23 30:23,25 31:25 53:13,24 60:13 77:8 101:11 122:9 143:12
**filing** 16:13 53:13 68:10 89:18 112:1
**finality** 21:5,8
**finally** 10:13 81:10 102:3
**financial** 7:25 31:3 102:2
**financing** 67:4,14
**find** 23:9 74:2 99:6 100:24,25 110:12
**finding** 45:2,5
**findings** 55:1 56:9 56:10,11,17
**fine** 12:3,13 42:18 59:7 82:22 83:10,10 83:21 105:19
**fire** 5:15
**firm** 71:24 72:12,18
**first** 7:5 11:25 13:24 15:5 35:8,17 37:2 45:2 46:11 51:16 60:17 62:16 63:10 70:7 72:5 74:10 76:20 77:23 79:15 85:15,23 90:11,13 94:10

97:12,25 98:7,13 99:14 110:18 111:12 112:8 117:22 124:21 135:5 138:7 140:20
**fishing** 75:22 106:6 137:20
**fit** 29:6
**five** 85:3 89:17 101:10
**flaw** 19:4
**flawed** 116:10
**flecha** 55:7
**fleck** 2:9 143:13
**flip** 42:9
**floodgate** 135:3
**floodgates** 23:6 126:8 134:20
**floor** 82:19
**florida** 44:22
**flowing** 83:18
**flows** 70:11
**flung** 41:10
**flush** 23:20
**focus** 79:7,8 93:13
**focused** 91:24 122:17
**focusing** 69:8
**folks** 6:6 14:10 18:1 29:10 30:18
**follow** 141:20,24
**following** 29:23 61:8 125:10 132:2
**follows** 131:12
**foods** 91:15
**footnote** 113:15 131:11,17
**forced** 8:13
**foreclosed** 37:8 53:19,24
**foreclosure** 53:12 53:15
**forego** 42:22
**foregoing** 142:2
**foreign** 7:19 64:18 76:25 78:5 126:4,5 126:5,13 129:4

130:6,6,7 132:15
135:4 136:3,3,3,5
**foresee** 74:16
**forget** 61:10
**forgive** 127:12
**form** 125:17
**formal** 8:13
**formally** 8:25
**former** 10:7 63:11
**forth** 8:4 19:13
**forum** 69:16,19
70:13,14 79:2,4,6
93:19 122:17 127:6
**forward** 13:5 17:5
24:25 25:4 40:7
41:23 46:14,23
**found** 15:15 72:14
72:17 75:1,7 77:1
86:3 103:12 104:16
**four** 88:11,12 114:3
**fourth** 11:3,12 89:7
**frame** 27:25 60:23
133:15 134:10
**frankly** 93:21
104:14
**fraud** 21:24 93:15
**free** 26:25 27:2 62:3
**frequency** 95:11
107:8
**frequently** 105:13
105:15 106:12
**front** 6:14 72:2
109:10,12
**fti** 5:16 7:25
**fudge** 118:8
**full** 21:15 23:23
31:25 52:18 90:20
**function** 107:18
**functional** 140:17
**fundamental** 35:25
36:23 42:10 48:25
50:5 54:21 65:2
115:7
**fundamentally**
16:11 21:13 34:7
35:19 57:15 90:9
115:12 116:20

**funds** 8:22 29:6
32:15 50:11 61:6
63:5 64:21 68:22,24
69:3 79:21 80:22,23
87:3,24 88:14 92:22
92:25 96:1 97:2,4
97:22 100:23 101:5
101:6 102:3 103:14
118:15 121:6,14
129:24
**further** 27:12 33:20
57:20 96:20 128:19
132:12
**furthest** 108:4

**g**

**g** 5:14 6:1 143:3
144:2
**game** 24:17
**gas** 10:5
**gate** 17:20,24
**gates** 4:18 6:16 60:8
109:17
**gears** 50:1
**gee** 66:12
**general** 21:4 33:24
65:4,14,19 66:1
75:19 93:21 94:5
107:22 108:8 119:1
119:4 120:7 121:20
**generalist** 30:16
**generally** 73:4
**generate** 73:13 76:6
139:16
**generic** 26:20,22
77:15 110:21 111:4
**getting** 32:1 39:5
85:12 125:10
**gibbons** 5:14
**gibson** 7:14
**give** 11:15 14:9
32:16 33:13 42:23
44:25 50:8 59:6
65:20 82:15 87:15
91:16 95:17 98:3,25
98:25 99:3 105:4,10
110:12 124:2
130:10,11 132:7,9

**given** 21:9 26:6,7
82:1
**gives** 98:3 125:12
125:20 132:4
**giving** 23:24 38:2
56:24,24
**gleamed** 132:22
**go** 11:25 13:5 19:21
20:18 23:23 24:14
25:4 26:18,21 29:25
33:4,12 35:6 48:10
52:15 53:6 54:12,12
54:16,17 63:7 64:15
75:14 82:8 83:21
87:22 91:21 100:23
102:15 117:21
124:6,7 130:12
137:11
**goes** 29:2 52:5 92:7
93:15 109:18 113:9
114:22 129:18
**going** 6:13 14:16,17
14:23 25:18 27:23
28:10 29:7,17 31:5
31:11 36:19 37:1
41:5,23 43:21,21
46:9 47:24 53:23
54:6,16,17 57:13,25
59:24 61:13 76:13
81:13,14,15,23 83:2
83:2 93:16 104:12
104:14 110:9
119:23 129:2
130:25 136:4,11
**goldman** 33:13
**good** 6:3,8,12,19,25
7:1 10:19 27:15,16
66:17,19 71:5 72:23
76:8,14,25 77:1,5
77:11,12,13,15,22
79:7,13 82:1 84:22
87:7 118:16 122:3
134:7 137:17
141:17
**gotten** 53:17
**govern** 38:25 61:24
136:4

**governed** 33:15
71:3 74:22
**governing** 28:14
31:19 32:6
**government** 41:11
**governs** 31:20
**grant** 9:18 10:17
105:4
**granted** 55:15
118:18
**gravity** 130:7
**great** 63:23
**greatly** 138:3
**green** 1:14
**griffin** 5:7 6:20
**ground** 50:20
**group** 19:10
**guess** 17:4 49:9
71:14 101:20
106:17 135:24
**guides** 132:23
**gut** 14:25
**guyo** 81:19
**guys** 83:6

**h**

**h** 1:22 74:17
**hadley** 4:3,10 5:12
6:9 7:2 14:13
**hailed** 74:16,23
83:25 122:8
**half** 112:8
**hand** 15:21 16:3
**handled** 7:14 98:20
98:22
**handwritten** 69:4
**happen** 46:17 72:2
92:17 99:19
**happened** 16:5,8
68:16 87:14,19 97:2
98:7 102:20 118:13
122:25 123:1,1,22
124:2
**happening** 21:25
109:19
**happens** 38:8 106:9
**happy** 15:9

hard 64:8
harm 98:10,15
hats 96:6
haul 83:20
haven't 36:2 65:3,6
65:24 66:1 73:20
128:24
havoc 26:11 41:22
41:24
head 27:7
heads 141:23
hear 17:2 135:2
heard 9:11 12:16
hearing 2:1,3,7,12
2:16,19 3:1,6,9 6:4
6:6 7:7 12:19 13:17
23:2,3 24:11,18,18
24:19 27:19 36:22
85:6 135:13
hearsay 69:25 70:5
heart 32:17,22,23
held 38:10 55:8
58:21 86:24 111:9
129:5
help 20:15 113:1,5
helpful 105:11
here's 31:4 46:1,3
46:10 93:15 114:8
114:25 115:14
129:16
hey 96:14
hezbollah 92:16
he's 57:11 115:10
hilton 81:19
history 85:8 139:5
140:17 141:7
hold 43:22 49:7
52:4 123:10 130:21
holding 2:9 3:10
10:8 40:4,15 42:1,2
94:17 143:14
holds 29:20 52:3
hollywell 44:20,24
home 19:21
hon 1:22
honor 6:8,15,19,25
7:6,17 8:15,24 9:6

9:21 10:4 11:8 12:3
12:13,25 13:21 14:2
14:8,12,19,25 15:8
17:8,15 18:4 19:22
20:5,23 21:1,7,20
22:13 23:7,14,18
24:6,21 25:3,8,19
26:11 27:5,8,13,15
29:16 31:12 32:18
32:21,25 33:22 34:8
35:1 38:3 43:7
44:20 45:9,24 51:2
51:10,11,23,25 52:9
52:22 56:3,6,8,14
56:21,25 57:1,10,14
57:18,23,24 58:17
58:25 59:11,18,24
60:12,15 65:16 66:4
66:23 69:13 71:6
74:15 75:1,18 76:20
80:23 82:13,17,20
82:25 83:8,8,17,22
83:25 84:3,6 85:1,5
85:11 86:1,3,12,22
86:25 87:16,21
88:19,24 89:11 90:7
90:13,19 92:13,23
94:9 95:9 96:21
97:11 98:1 99:6,19
100:17 101:14
102:8 103:3 104:6
104:15,19 105:3,5
105:22 106:7,15,15
107:25 109:1,6,21
110:6,24 112:6,16
113:3,9,14,22 114:9
115:1,13 116:9,20
117:14,16 119:14
123:15 124:12
128:11 129:8 131:9
132:10 135:2 138:2
138:4,7,8 139:1,14
140:16,16,22 141:6
141:15 142:2,3
honor's 25:14 56:19
117:11,12

hook 63:20
hoop 49:16
hope 76:15,15
122:2
hopefully 60:4
141:25
horrible 129:21
hostetler 5:1 6:20
27:17
hours 63:6,16 78:2
house 53:14
hsbc 62:21 115:4
121:10 125:14
huge 45:23 101:8
huh 24:15 30:14,17
30:21 31:2 33:25
36:13,17,21 37:17
37:20,23 38:21 39:1
39:4,8 40:22 41:6
43:10,14 44:12,15
46:2,8 47:7 48:3,3
49:17
hundreds 26:19
hurting 114:14
hypothetical 38:23
49:12

**i**

i.e. 88:6
idea 22:9 31:4
57:19 129:24
identical 57:11
59:16 60:5
identically 21:19
identification 143:4
identified 12:23
48:12 88:10,13
102:13
identifies 52:25
identify 45:6 92:23
ignore 22:2 105:10
105:11,21 113:25
132:20
imagine 24:10
54:21 74:23
imbue 132:16
immediately 79:17
124:4

impact 22:14
impacts 35:25
59:23
impair 55:6
importance 21:5,8
important 18:6
28:7 53:9 63:4
64:12 73:10 81:24
84:7 86:17 87:22
90:7 91:8,9 94:19
122:4 126:8
importantly 46:16
68:4,5 95:8 113:24
impossible 25:7
improper 28:23
96:7 97:1 98:17,18
improperly 55:10
inappropriate 75:2
75:8,12 141:9
include 16:10 35:20
54:7,11 71:14
included 11:8
includes 15:13
including 32:6 52:6
52:7 57:2 61:5
100:8,10
incurred 64:22
90:12
independent 19:4
19:23 20:23 70:12
70:17 79:8 125:25
135:22 136:15
137:18
independently
136:17
indicate 63:9 129:6
indicated 125:4
indicates 92:4
indication 102:9
131:25
indicia 65:12
indiscernible 44:1
51:3
indisputable 130:8
indisputably 79:22
indistinguishable
102:6 114:6

**individually** 135:21
**individuals** 92:16
**indulge** 33:5
**indulgence** 27:23
  51:14
**industries** 113:2
**inequitable** 17:21
**inevitably** 104:12
**inexplicably** 113:25
**inform** 33:4
**information** 8:9
  29:7 76:2 125:21
**informed** 33:15
**inhumane** 83:14,17
**initial** 31:19 33:18
  35:7 97:8
**initially** 38:11 73:16
  97:2
**injured** 67:7
**injuries** 92:15
  108:16
**injury** 72:4,6 92:14
  93:14,17 95:10,14
  95:24 96:7,12,17
**inquiry** 103:18
  105:15 108:24
  122:16 126:16
  134:5
**insolvency** 81:17
**instance** 60:17 61:2
  62:16 63:12,18,25
  64:1 70:7,15 72:23
  73:5 74:10 75:9
  79:15 99:24 102:22
  103:11 106:9 113:7
  116:21 120:13
  135:5
**instances** 60:22
  93:20
**institutions** 88:2
  102:2 105:14
**instruct** 69:3
**instructed** 70:3
**instructions** 125:2,3
  125:22
**instructive** 91:4

**instrument** 73:7
**insufficient** 106:25
  129:6,6
**insurance** 5:15
**intended** 70:2
**intent** 111:10,19
  129:7 132:1,22,25
  134:8
**interest** 24:25 28:16
  28:19 31:22 52:3,4
  53:18 57:7 139:18
  140:7,10,14
**interested** 107:24
  131:6
**interestingly** 77:7
**interests** 45:2 57:13
  80:8
**intermediary** 63:2
  63:3,3,14 64:10
  66:16 70:25 125:13
  125:14
**internal** 70:25
**international** 4:12
  81:10
**interpretation**
  55:21 132:23
**interpretations**
  77:18
**introduced** 37:3
**introducing** 34:15
**intuitive** 84:2
**invest** 32:16 35:5
**invested** 28:13
  30:22 31:9 57:3,5
  58:5
**investment** 18:7
  30:19 31:19,24
  32:15 33:3,12 34:24
  60:25 87:19 97:5
  125:5,7
**investments** 54:14
  57:4,9,12 73:15
  122:23 127:2,10
**invests** 35:9
**involved** 62:5 102:1
**involves** 115:24

**involving** 67:4
**iridium** 12:24
**irrelevant** 121:21
**irs** 41:14
**islamic** 2:13,17 4:19
  6:17 33:14 60:9
  63:10 125:5
**islands** 116:16
**isn't** 22:21 32:6,17
  38:11 49:6 63:7
  68:10 89:21,22
  99:15 128:15
  130:14 131:3
  134:17 135:7
**isolate** 137:4
**isolation** 98:10
  136:15
**israel** 92:15,16
**issue** 22:16 28:1,9
  28:10 31:15 36:23
  38:11 39:20 40:1,7
  41:19 46:25 47:5,9
  57:1 58:18 66:7
  72:11 85:19 91:4
  92:13 93:8 107:7,13
  115:2,4 116:19
  119:15 137:8
  141:22
**issued** 111:13
**issues** 20:5 22:11
  36:15 39:7 59:5
  60:15 85:18
**item** 10:25
**it'd** 13:24
**it's** 7:23 9:17 11:13
  11:23,25 12:4 13:13
  14:2,20 16:19 17:3
  17:4,10 18:21,21
  20:6 21:1,21 22:13
  23:12,14,15 28:23
  29:4 30:11,24 31:13
  32:5,22 34:6,19
  35:15,18 37:8,10,24
  38:12,12 40:17
  42:15 44:22,23 46:9
  46:22 47:2,2,6,8
  48:15 49:14 51:5,18

  52:16,21 53:1,9
  54:21,25 55:2,3,3,4
  55:24 56:24,25 57:6
  58:11 59:20,20 62:2
  68:3,3,4 69:24 70:2
  70:5,6,8,8,21 71:6
  73:10,11,14 75:1
  78:21,22 79:3,5,6
  79:10,11 81:24,25
  82:1 84:2,5,6,7,23
  86:17 87:18,18,19
  87:22 88:10,12,21
  88:25 89:2,21 90:7
  90:25 91:3,7,9
  92:21 93:1,5,10,10
  93:15,16,16 94:11
  96:14 97:7,8,9,11
  98:11,14,18,22 99:5
  102:14 103:20
  106:4 107:17,18
  108:1,9,19 109:2
  110:9,15,19 116:2
  116:10,10,19
  119:24 123:5,6
  124:17 126:8 128:2
  128:18 130:15
  132:4 133:17 134:4
  134:24 136:4 137:5
  139:22 140:11,14
**i'd** 27:24 36:1 77:7
  82:20 83:11 85:25
  107:23 131:6
  141:16
**i'll** 14:5 22:8 37:14
  50:5 51:11 63:20
  64:7 68:13 79:10
  82:15 107:25
  111:11 112:7
  141:12
**i'm** 11:14,21,24
  14:2,15,16,23 15:9
  25:10,18 27:2,18
  29:7,17,23 32:3
  34:3 35:12 36:25
  37:1 39:17 41:21
  43:2,8 47:24 50:23
  56:4,15 58:2 59:24

63:2 66:3 67:16
69:8 77:2 82:17,18
82:24 83:2,10,21
85:11,12,12 93:25
94:7 101:20 110:17
121:2 123:14
128:19,22 129:19
131:5,13 132:2,12
132:13,14 133:10
134:9,9 136:10
137:1,3 139:2
141:13
**i've** 27:3 29:24 43:8
47:25 49:22,25 64:6
75:18 83:22 95:15
127:8 133:19
134:13 136:24
141:3

**j**

**james** 5:8
**japan** 75:7
**jim** 6:21
**john** 4:24 6:15
**joined** 6:10
**joint** 7:19 11:6
113:1,5 132:19
**joseph** 5:14
**journal** 109:12,12
**jpmorgan** 62:12
101:16 102:14,15
115:4 125:19
**judge** 1:23 12:11
36:18 56:8 65:19
77:17 79:7 90:13
111:13,14 112:22
113:15 114:1,3,21
114:23,24 115:10
115:11 116:11,17
126:19 127:3,23
130:3,5 131:12
132:13 137:10
**judgment** 17:14
18:18
**judicata** 16:25 17:4
17:16 20:25 21:2
24:9 25:21 26:8
29:4 40:6 42:4,16

49:14 56:19
**judicial** 81:20
**judicious** 56:25
**jump** 49:16 64:7
**jumped** 64:6
**june** 23:4 36:20
**jurisdiction** 45:1
60:14,17 63:20,21
64:7 65:4,14,19
66:2,3,9,20 67:11
68:17 69:1 73:13
74:6,8 75:9,19,24
76:3,6 80:25 82:12
85:15,19,23 86:2,15
90:3,17,20 93:22
94:8 95:14 97:18
99:16 103:4,8,9,23
104:1,22 105:6
107:7,15 108:7,12
117:12 119:1,2,4,7
120:3,6,7,8,15
121:20,20 126:7,12
126:15 134:25
135:5,15 136:25
140:24
**jurisdictional** 65:1
65:23 69:7 73:23
76:17 105:23 108:8
117:23 119:9,21
122:16 137:16
138:8
**justice** 37:11 55:21
74:7
**jvw's** 87:3

**k**

**k** 4:13
**k&l** 4:18 6:16 60:8
**karen** 1:25
**keep** 33:2 48:13
76:13 78:11 122:2
**keeps** 120:14
**key** 114:25 115:1
**keyable** 77:15
**khaleeji** 62:25
125:11
**kick** 48:1

**kind** 17:3 32:14
38:16,18 40:1 47:3
48:1 65:17 68:1
76:9 122:1 130:22
**kinds** 29:5 32:15
34:3
**knew** 36:25 46:23
**know** 10:9,20 25:8
27:7,22 28:7,11
29:14 30:2 31:8
33:5 34:9,14 36:18
37:22 39:17 41:13
42:11 43:18,19 45:8
46:14,17 47:22
49:19,20 50:4,4
51:3,4,5 54:18,19
54:20 58:17 59:9,12
63:17 66:23 69:2
71:13,16 73:10 75:1
76:5 77:15 79:14
80:4,21 81:14,22
84:15,22,23 93:5
99:9,14 102:12
104:1 106:7 107:15
107:17,23 108:4
109:6 110:10
115:14,16 116:20
119:16 120:24
122:15 125:2
127:16 128:14
131:23 132:1
133:20 135:3
137:10 141:11
**knowing** 94:23
**known** 16:12 22:19
79:12
**knows** 23:18 38:1
62:7 66:4 76:21
139:14 140:16

**l**

**l** 5:7 74:17 143:3
**laches** 17:3,6,13,23
42:17 43:2,5 47:22
**lack** 41:19 92:4
96:8 136:18
**lambert** 71:14,23
72:11,12

**lane** 1:22
**language** 30:8
48:13 54:12 70:20
77:19,20,24 81:19
111:9,18 112:12
129:5 131:10,12
132:22 133:13,13
**lani** 4:23 6:15 60:8
**large** 128:25 134:23
**lastly** 56:22
**late** 43:6
**latin** 56:2
**laundering** 104:8
**law** 28:14,18 31:18
31:20,21 32:6 33:10
33:15,16 35:7 42:20
49:13 50:8 61:3,24
71:4,24 72:12,17
73:17,19,21 74:20
74:22 77:11,12
81:11,13,23,24,25
82:1,2,5,11 103:17
105:25 110:8
119:20 122:9
126:17,25 127:5
130:10 132:15
133:15 134:18,19
134:19 136:4
**laws** 108:25 113:17
131:19,24 132:17
**lawsuit** 10:16
104:11
**lawyers** 83:19
**lcb** 91:24 100:4
**lcb's** 92:11
**leachy** 66:17,22
67:9 72:24
**lead** 11:20 120:5,6,7
**leading** 66:22
**leap** 107:9
**leave** 80:2 104:21
**leaves** 80:16
**lebanese** 67:2,17
**lebanon** 92:15
**leblanc** 4:16 6:8,9
14:1,5,7,12,13 17:1
17:8,18 18:4,10,13

18:16 22:6,13 24:15
24:20 27:12,24 37:9
51:11,16,20,23
52:15,18,20,22
57:23 82:17,23 83:2
83:5,8,16,22 84:3,6
84:25 85:16,21 86:1
87:21 88:5 93:23
94:9,13 96:4,21,24
97:3,7,11 98:7,22
101:2,8,23 102:8
104:23 105:1,3
106:21 107:25
110:13,15,18
117:10 138:2,6
141:3 142:3
**leblanc's** 38:23 58:1
**leechy** 118:17,17,20
119:6,6,9,11,19
120:8 121:12,18
122:12,13 124:5,6
137:21,22 138:10
**left** 30:25 31:10
102:3,4 139:3
**legal** 42:12 51:3
52:3 59:5,15 79:11
**legislative** 81:20
139:5 141:7
**legitimacy** 75:15
**legs** 103:4
**lena** 4:8 6:11 7:2
**lending** 139:15,20
139:23 140:13,18
**length** 63:19,23
**lessy** 91:3
**let's** 34:20 61:10
65:14 83:21,21
85:14,22 86:1 93:6
109:15 117:21
134:18
**level** 23:22 56:16
**lexington** 4:20
**lexis** 114:4
**life** 95:13
**lifland** 114:3,21
115:10 116:11,17
127:3

**lifland's** 114:1
**light** 13:17 100:2,3
**likewise** 64:4
113:12 124:12
**limited** 119:24
**line** 47:1 92:3
115:14 120:10
**link** 76:3
**liquidation** 45:25
46:11 54:11
**lissy** 93:4,5,24 94:4
94:24,25 95:2 99:20
99:24 101:19 102:9
104:5,6,13 105:22
106:19,19 107:1,14
108:10,11
**lissy's** 95:1
**listed** 13:2 23:8
25:15 30:1 53:3,14
**listen** 13:11
**listening** 13:12
**lists** 30:1 53:1,2
**listy** 86:16,17 92:14
**literally** 63:16
67:15 110:24
120:22 122:3
**litigate** 24:17 26:4
26:21
**litigation** 10:5 21:4
37:24
**little** 28:13 43:6
56:24,25 58:11
64:23,23 75:3 84:7
92:21 95:23 96:19
98:14
**live** 108:6
**living** 92:16
**llp** 4:3,10 5:12,14
**loan** 98:25 139:23
139:25
**located** 52:2 77:4
77:21 111:3,3,5,9
111:18 112:12
113:1,18 127:14
128:6,17,22 130:11
131:16,20 133:13
134:7 139:6,8

**london** 102:16
109:17,18
**long** 47:23 54:25
72:3 78:2 82:25
83:20 90:24,25
91:19 107:19,22
113:9 133:20
**longer** 137:14
**look** 9:14 13:18
35:17 38:11 42:8
46:10,12 47:5 58:17
63:17 64:25 69:17
79:10 80:3 81:6
85:2,18 90:14 94:24
99:17 109:21 110:3
118:14 120:19
121:7,12 122:16
123:3,4,8,18 124:11
124:16 127:24
129:3 131:5,11
134:25
**looked** 40:19 47:2,6
64:8 71:15 93:9
131:10
**looking** 29:7 46:14
117:24,25 136:17
**loop** 68:13
**lose** 89:22
**lost** 67:7
**lot** 10:4 48:19 50:6
141:3
**lots** 41:9
**lounge** 109:2
**love** 82:20
**lowest** 12:23
**lunch** 82:16 117:19

**m**

**m** 4:16
**madoff** 113:8,24
114:2 115:2,7,11
116:11,12 126:21
127:4 137:24
**mails** 70:1
**majority** 55:25
**making** 17:6 25:2
34:10 38:15,15
42:17 47:11 73:4

129:19 132:18
137:14 139:13
**manama** 62:19
**mandel** 4:8 6:11,25
7:2,2,13,17 8:19,24
9:3,6,9,21,24 10:1
12:3,6,10,13,25
13:12,14,19,21
**manhattan** 4:5
**manufacturer** 75:6
75:6
**marc** 5:6 6:19 27:17
**march** 1:17 60:25
61:9,16 144:6
**margin** 140:10
**marine** 91:15
**market** 72:19
**master** 125:1
**matter** 1:5 7:9 10:1
13:1,2,6 28:4 37:5
42:12 51:23 59:2
63:16 68:23 87:12
95:15 101:6 102:7
103:10 106:7 107:1
144:4
**matters** 7:4,5
105:20 109:1
**mature** 97:6
**matured** 88:22 89:1
**maturity** 87:17
125:17
**maxim** 55:20 56:1
**maximal** 78:10
**maxwell** 39:25 40:1
41:25 42:1 58:18
63:17,22,24 64:1
77:6 78:1 79:14,16
79:19 81:6 85:11
103:6,7,24 109:22
111:9,13,22 112:7
112:10,11,16 114:5
114:24 115:8
126:17,18 127:21
129:10 130:4 141:8
**mccloy** 4:3,10 5:12
6:9 7:3 14:13

**mclean**  113:2
**mean**  18:3 32:15,17
  34:5 38:4 41:24
  45:7,16,22 47:8,19
  51:2,3 52:1 54:18
  58:2,4 73:18 85:14
  91:9 107:10 121:18
  122:11 126:13
  129:16,23 134:9
**meaning**  17:5 48:21
  65:4 92:23
**meaningful**  66:6
**meaningfully**  140:9
**means**  55:23 108:20
  109:15,16 129:23
  138:24
**meant**  18:25 132:16
**meet**  111:10 134:7
**melding**  107:14
**members**  31:17
  67:8 75:13,14
**memory**  48:14
**mention**  20:11
  43:19 50:24 52:10
  53:5 56:23,23,23
  104:25 115:15
  136:24
**mentioned**  17:25
  21:7 24:21 37:9
  51:13 53:10 114:25
  136:25 137:1
**mentioning**  48:13
  115:21
**mere**  118:14
**merits**  32:2 33:4
**met**  89:19 109:2
**metaphors**  40:21
**metric**  74:15
**middle**  67:4 100:10
**midland**  91:15
**milbank**  4:3,10
  5:12 6:9 7:2 14:13
**million**  8:5,7 10:12
  10:20 15:14 17:25
  18:5,6,11,21 21:17
  23:24,25 24:3 25:25
  28:13,15,20,21

**mineola**  144:15
**minimal**  74:11,12
**minimum**  74:2
  122:14
**ministerial**  68:3
  70:24 78:22 79:6,11
**minute**  123:10
  130:21
**minutes**  138:4
**misleading**  56:25
**misled**  21:24
**misplaced**  120:13
**misrepresenting**
  120:14
**misspelled**  83:25
**misstated**  118:16
**misstatement**  110:8
**misstatements**
  122:12
**mistake**  42:11,22
  54:1
**mistake'**  92:2
**mixed**  40:20
**modified**  9:4
**modify**  11:1 12:14
**moment**  59:6 60:23
  63:21 64:7,23 99:22
  131:10
**momentarily**  64:5
**momentary**  70:25
  78:2
**money**  18:17,23
  19:21 21:12,15,18
  24:16 28:18 30:22
  30:23,24,25 31:9,14
  31:22 32:6,16 33:1
  33:3,6,7,12,13,13
  33:18,19 34:12,17
  34:25 35:2,3,5,9
  40:15 46:25 57:4,7
  58:5,10 71:2 87:11
  87:15,19 88:9,25

**money's**  29:25
**monies**  52:23 79:14
  118:1,3 124:3,6
  125:18 127:1,9
**month**  44:13
**months**  20:17,17
  23:2
**monzur**  55:7
**morning**  6:3,4,6,8
  6:12,19,25 7:1 9:17
  27:15,16 61:13
  63:18 83:12 118:5
**morph**  125:24
**morrison**  76:22
  77:17 111:10,12,16
  128:23 134:7
**motion**  2:1,3,3,7,16
  3:3,9 10:1 13:24
  14:10,20,25 17:9,15
  28:5,23 34:20 46:19
  46:21 59:5 85:2,3,6
  102:18 117:10
  118:18 123:12
  124:12,18,19 134:4
  140:25 141:8 143:5
  143:7,7,11
**motions**  6:13,23
  13:23 14:16,17 59:4
  59:14 84:24 88:12
**move**  13:23 38:20
**movement**  61:6
**moving**  65:7 123:6
**mudarabah**  33:14
**muddle**  90:19
**muddled**  96:2
**muhr**  7:20
**multitude**  119:15
**mushes**  85:4

**muster**  128:23
**mutuality**  82:2,5

**n**

**n**  4:1 6:1 143:1,3
  144:1
**n.w.**  4:13
**namby**  79:11
**name**  63:11
**narrow**  39:20
  129:18
**nationality**  67:6
**nature**  41:8,11 81:8
  141:10
**natwest**  64:1
**nazer**  16:5,15,21
  25:5 37:9 38:6
  40:13,23 46:23 53:5
  55:4,7,7,19
**nazers**  55:8,11,13
  55:14,17
**necessary**  15:4
  86:24 107:10
**need**  9:19 13:5,18
  24:17 36:19 43:15
  43:17 48:7 49:6
  70:22 74:12 78:4
  105:4 106:16
  117:19 127:24
  134:2
**needed**  55:24 69:21
**needle**  51:5
**needs**  31:7 36:23
  46:18 67:11,11,12
  67:12 80:7 89:25
**negligence**  42:22
**negotiated**  38:13
  61:1,19 108:24
**neighboring**  100:10
**neither**  60:12
**ness**  7:19 64:12
**never**  7:23 8:9,12
  15:18 26:6,7 33:17
  40:15 50:14 83:23
  95:16 102:2 126:7
  126:14,16 135:6
**new**  1:2,15,15 2:9
  3:10 4:6,21 5:4

62:4,13 63:3,5,16
64:5,9,23 66:10
70:4 71:25 72:3,13
72:19,19 73:5 78:2
79:16,16,25 80:2,24
86:8,9,20,23 87:3
88:7,13 90:12,15,16
90:23,25 91:17,25
92:9,11,17,19 93:1
94:15 95:7,12,14,21
96:1,10,17 98:7
99:2,3,19,21,25
100:16,18,24 101:1
101:2,4,13,21,25,25
102:3,5 103:2 104:3
105:25 106:24
107:19 108:3,5,7,12
108:18,23 109:4,5
115:3 117:22 118:4
118:13,15,21 119:3
120:4,16,17 121:1,8
121:13 122:5,20,21
123:16 124:6
125:20 126:6 127:1
127:5,6 138:25
140:19,20 143:14

**news** 109:10,12

**nexus** 140:12

**nice** 9:17 51:18 84:5

**nicholas** 6:10

**nine** 47:16

**ninth** 2:8 13:3
143:12

**non** 32:8 34:2
116:23 117:4
129:10

**norags** 76:23

**nortex** 10:6

**northwest** 42:25

**note** 81:24 91:22
108:13 131:13

**noted** 53:16

**notes** 115:1,6
116:12

**notice** 53:17 123:11
124:12

**noticed** 9:8,8 11:23
11:23

**notified** 123:22

**noting** 99:23

**notion** 11:19 29:2
34:1 78:24 107:13
116:10 132:4

**notwithstanding**
130:8

**number** 7:9,10,19
8:11 13:3 18:4
28:22 32:5 35:14
53:1 65:10 75:14
92:5 100:7 104:6,9
125:12

**numerosity** 95:4

**numerous** 11:2

**ny** 4:6,21 5:4
144:15

## o

**o** 1:21 6:1 80:17
144:1

**object** 2:1 50:9
60:14 143:5

**objected** 11:3 89:25

**objecting** 18:2
56:13

**objection** 2:7,8 7:10
7:14,18,22 8:14,15
8:23 9:12,18,19
11:3,12 12:19 13:3
16:16 52:10 89:22
143:11,12

**objections** 26:21
49:5 126:12

**obligated** 74:3 89:1

**obligation** 87:24
89:14

**obligations** 82:4

**obviously** 11:4
14:23 18:17 72:20
84:7 111:15 121:19
127:6

**occasioned** 67:15

**occur** 139:22
140:19,21

**occurred** 43:12
68:13,15 86:8,8
92:15 98:4 108:14
108:18 115:8
140:20

**occurs** 19:6 78:2
88:7

**odd** 55:20 84:1
139:12

**offer** 125:1

**offering** 19:10
50:11 119:25

**office** 65:9

**official** 2:12,19 3:1
4:11 5:13 144:3

**oh** 52:21 73:22

**okay** 10:1 12:7
13:12 25:5 43:3
49:9 59:25 81:1
93:10 101:16
110:18 120:25
123:13 124:18,20
127:15 136:13
137:13

**old** 144:13

**omnibus** 2:7,8 7:7,9
7:13 11:3,12 13:3
143:11,12

**once** 11:5,9 35:8
92:2 123:8,18

**onerous** 107:5

**onetime** 104:10
108:19

**onus** 26:12,18

**open** 23:7 80:2
99:12 134:19

**opining** 111:15

**opinion** 55:25 73:12

**opinions** 130:9

**opportunity** 10:10
65:20

**opposed** 44:13 60:5
96:10

**opposite** 36:1
102:10

**opposition** 65:17
69:24 76:1 115:15

**option** 26:6,7 82:15

**options** 10:8,11
24:11

**order** 2:3 6:7 9:22
11:9 12:14 15:1,2
17:19 18:25 21:22
22:18,21,23 25:21
25:21 26:8 27:2
38:12,13 55:1,5,16
56:6,20 58:16 69:3
78:25 114:11,13
143:7

**ordered** 24:8 54:4
63:10 64:3 118:1

**orders** 22:2 25:14
25:14 115:19

**organizations** 67:5
124:7

**originated** 64:2

**orms** 3:25 144:2

**osohabi** 57:2,9

**osohahi** 75:4

**outcome** 27:6

**outs** 37:18 39:12,15

**outset** 14:15 24:21
85:5

**outside** 61:3,21
74:20 102:11
112:20 114:12,14
116:7 122:25
123:22 139:22

**overbroad** 126:10

**overcome** 64:11
126:12

**overcomes** 121:21

**overlap** 59:22,23

**overlapping** 80:5

**overseas** 41:17
126:24

**owe** 30:24 89:24

**owed** 41:8,12 84:14
97:22

**owing** 39:12

**owned** 39:3

**owner** 123:25

**ownership** 25:12
38:23,25

| | | | |
|---|---|---|---|
| **o'clock** 83:13 | **particulars** 50:6 | **period** 55:4 98:21 | **pieces** 9:15 |

**p**

**p** 4:1,1 6:1
**pacific** 107:21
**page** 91:14 109:10
   109:12 110:7,14
   112:23 124:23,23
   132:12 139:10
   143:4
**pages** 114:3,4
**paid** 97:6,6 118:11
**painstaking** 56:15
**painstakingly** 56:10
**pamby** 79:11
**pantel** 44:23
**paper** 69:23 80:1
**papers** 16:20 21:6
   30:9 42:23 57:25
   58:25 62:10 65:17
   69:24 76:1 113:8
   114:22 123:6 139:2
   139:4
**paragraph** 54:25
   92:24 110:9,15
   123:8 125:6
**parallel** 81:17
   103:13
**parcel** 93:14,17
**parsing** 31:7
**part** 11:17 13:23
   15:3 25:13 31:10
   35:19 42:7,13 45:3
   52:1 62:10 91:6
   93:14,16 94:23
   96:17,18 98:11,12
   98:13 101:12,12
   113:11,14 115:25
   132:2
**particular** 6:7
   15:23,25 16:4,5
   21:8 22:17 26:24
   30:2 37:19 39:11,11
   39:12 43:4 46:20
   58:19 60:20 62:5
   70:4 100:23 107:19
**particularly** 54:13

**particulars** 50:6
**parties** 2:5 10:3,15
   11:2 12:5 53:4
   54:19 61:14 67:22
   80:8 81:12,22 86:6
   87:8 94:2 98:2
   108:21 123:18
   127:19 129:23
   136:3 139:23
   141:17 143:9
**parties'** 55:20
   107:24
**party** 18:2 24:13
   75:4 80:11 93:19
**pass** 35:8 123:24
   128:23
**passed** 28:18 40:16
   64:4
**passing** 127:10
**pause** 51:22 52:17
   59:8
**pay** 10:15 68:14
   81:20 87:17 118:9
   120:22 140:10
**paying** 23:21
**payment** 11:5,9
   123:9,19
**payments** 120:15
**pays** 140:7
**pending** 11:12
   81:17 103:13
**pennies** 23:21
**people** 21:18 27:21
   32:16 34:9,16 39:5
   39:10 46:6,23 47:5
   56:13 58:11 70:6
   83:18 85:17 121:23
   134:20
**peppered** 49:22
**perceived** 119:14
**percent** 28:15 32:25
   34:12 50:14 57:5
   58:4
**performance** 74:19
**performed** 8:8,9
   61:1,19 86:6

**period** 55:4 98:21
**periodically** 72:22
**permit** 113:17
   131:20
**permits** 73:21
**permitted** 73:17
   106:2 107:3
**permitting** 132:15
**persistent** 72:10,15
**person** 25:2,3 30:2
   70:1,2 72:4
**personal** 60:16
   80:25 85:15,19,22
   86:2,15 90:2 99:15
   103:4,7,23,25
   104:22 107:7,15
   108:7 117:11 119:1
   120:3 135:14
   136:24
**person's** 37:25
**perspective** 30:16
**petition** 7:22 53:25
   73:16 122:9
**ph** 7:20,20 10:6
   16:5 30:10 31:21
   37:13 44:20,23
   53:10 55:7,7 57:2
   66:18 69:24,25
   74:25 75:4 76:23
   77:15 81:19 86:16
   91:4,16 92:1,2 93:4
   100:5 103:8 107:22
   113:2 132:20
**phone** 13:7,9 65:10
**phrase** 79:11
**physical** 108:15,16
**physically** 101:13
**picard** 114:2 116:12
**picture** 51:20
**pie** 45:7,8
**piece** 15:23 16:4
   22:17 36:3 53:23
   64:10,23 65:1 69:23
   72:5,15 73:22 75:18
   77:23,24 78:2 80:1
   86:10 122:21

**pieces** 9:15
**place** 22:22,24
   74:19 88:13
**placed** 31:14
**placement** 33:19
   35:7
**places** 100:8
**plain** 123:4
**plainly** 19:13
**plaintiff** 60:22
   66:21 69:17 71:8,9
   72:22 73:18 75:11
   75:12,13 76:18
   81:16 82:7,8 104:3
   110:16,20 126:21
**plaintiffs** 18:2 65:2
   67:6 69:23 71:11
   73:5,11 123:5
   133:21
**plaintiff's** 68:14
   75:25 77:3 92:10
   111:8 113:13 120:2
   126:9
**plan** 10:21 15:5,13
   15:21 16:2,20 17:19
   18:2 19:6,17,18,24
   20:4,15,16,17,18
   21:16 23:21,22 25:4
   25:11,24 26:4,24,25
   27:4 29:3,4,6,7,13
   29:15 30:5 31:8
   32:7,10,14 33:1,21
   34:6,13,15 35:16,18
   35:20 36:5,9,16
   38:1,12,13 39:16
   40:2 41:7 42:12
   43:21,23 45:6,15,16
   45:18,20 46:19,20
   46:20 47:16 48:2,12
   48:15,22,24 50:9
   51:25 53:6 54:4,20
   55:5,6 56:13 58:7,7
   58:13,15,19 129:23
**planes** 25:10,12,15
**planned** 73:16
**plans** 26:13 41:22

play 23:23 74:8
plaza 4:5 5:3
plead 96:22
pleaded 63:7 73:14
pleading 114:17
please 6:3 14:12
  27:22 124:19 125:6
  125:7,8
pleasure 14:3 82:18
pled 89:10 102:18
plowed 50:20
pm 142:4
podium 83:24
point 8:6 15:20
  16:12 18:20 26:5
  29:17 32:4,14 34:19
  41:18 43:20 47:18
  47:20,21 48:25 49:9
  50:5 57:24 58:1,17
  63:4 65:16 66:21
  68:22 69:7,12 70:8
  70:11,21,21 75:10
  76:12 77:7,14 79:7
  81:5 87:7 89:18
  93:21 100:19 104:5
  108:20 117:22,23
  118:3 122:12
  123:15 124:1
  130:21 131:5,9
  135:24 137:15
  138:10 139:11
  141:6
pointing 131:6
points 29:18 138:7
  139:1
policy 126:2
portfolio 54:14 57:4
  58:5
portion 34:12
positing 33:2
position 18:1,22
  21:10 25:7 33:17
  42:10
positions 43:18
possible 74:18
  77:18

possibly 15:6
post 7:22 40:8
  58:20 73:15
pot 29:19
potential 40:9
potentially 89:8
power 109:19
powerful 21:2,3
pr 72:18
practical 87:12
pre 2:14,21 3:7
  119:11
precedent 94:1,2
precise 52:14 96:8
preclude 69:5
precluded 44:19
precludes 112:12
predetermined
  139:17
predicate 66:20
  67:10 80:25 122:22
  132:21
preference 40:3
  89:9,15,17 110:5
  113:6,21 114:5,19
  130:13,17 131:8
  138:15,16
preferenced 103:20
preferences 133:16
preferential 112:3
preferentially
  112:4
prefers 14:1
prejudging 43:9
prejudice 10:17
  27:10 55:6
premise 116:10
prepared 82:18
presence 65:5 71:25
present 65:12
  101:13 104:13,14
presented 110:4,6
preserve 16:7
preserved 55:13
preserves 55:16
presumably 25:13
  101:10 112:22

presume 122:4
presumed 44:4
  127:15,16
presuming 43:25
  44:2
presumption
  110:22
pretty 30:24 34:6
  48:15 50:21
prevent 109:19
  113:12
pride 141:20
prima 65:24
primary 90:9
principle 116:25
  117:5
printed 114:4
prior 16:13 22:19
  25:20 49:21 53:13
pro 84:20
probably 11:13
  13:24 17:13 76:20
  118:3 135:6
problem 12:14
  17:14 43:13 45:23
  96:7 97:9,12 129:16
  134:13 135:21
problematic 82:8
problems 96:11
procedure 28:5
proceed 14:11 28:3
  60:7 82:16,18
  103:12
proceeded 20:14,15
proceeding 2:12,16
  2:19 3:1,3,6,9 17:5
  45:12,17 53:22 54:3
  81:18 103:13
proceedings 6:16
  81:21 116:14,14,16
  142:4 144:4
proceeds 68:14
  79:22 88:25
process 57:16 73:25
  76:9
processed 100:4

proffer 119:25
  128:5
profit 88:10 99:1
  139:17,17 140:9,14
program 13:23
prohibits 19:25
projections 46:12
  47:16
promise 141:19
promptly 43:5
prong 92:12 108:12
proof 8:3 9:1 13:5
  26:23 30:23
proofs 11:2 20:7,8
  60:13
proper 9:20 62:2
properly 9:8 20:21
property 15:7,11,16
  15:18,24,24 16:4,4
  22:9,17,18,23,24
  23:6,9,10,11,12,17
  24:4,7,25 25:10,15
  25:18 26:1 30:7,7
  31:22 32:6,8,11,11
  34:2 35:20 36:3,3,4
  38:6 45:1,3,4,11
  48:14,23,23 49:6,12
  49:18,19,20 52:2,7
  53:8,18,19,23 54:5
  54:9,20 55:8,9
  57:17,18 65:10 72:4
  72:6 77:4 88:20,21
  89:2 111:3,5 112:1
  112:2,3,5,13,25
  113:16,16,18
  114:11,14,19
  127:15 128:1,2,4,6
  128:8,17,18 129:25
  130:12 131:3,15,19
  131:19,20 132:4
  133:8,9,12,18,25
  134:4,18,24 139:8
propose 80:11
proposed 11:9
  12:14
proposing 20:16

proposition  37:11
91:17
propriety  73:19
protect  112:25
proves  94:8
provide  76:24
provided  19:17,18
20:3 26:24 127:5
provides  10:15 11:5
29:13 81:24 90:22
137:21
provision  31:18
72:11 82:3
provisional  8:6
provisions  35:16
116:3
prudent  37:8
prudential  37:5
puerto  71:24 72:12
72:17
pull  51:16 122:1
purchase  61:2
80:12 122:23
123:21
purchases  122:25
purported  64:22
124:7
purpose  61:20
123:23 138:23
139:17 140:6,9
purposeful  66:4
68:19 69:13 70:12
70:18 87:3 91:20
92:19 94:22 102:24
124:3 125:24
137:18 138:19
purposefully  69:15
purposefulness
95:7
purposely  86:9 99:8
122:15
purposes  18:2
31:24 49:11,11
64:13 65:23 76:17
114:19
pursuant  2:4 22:18
61:1,18 95:20

112:14 143:8
put  9:15 22:8 26:12
26:13,18 28:9,10
29:24 30:10 35:21
53:23 57:17 65:6,14
69:10 75:22 78:20
78:21 80:19 93:6
96:5 100:15,15
121:4

**q**

quaint  84:5
qualified  141:11
quarter  82:15
query  70:7
question  22:7 26:4
33:5 37:1,2 40:17
63:4 66:17,24 70:23
71:6,24 74:3,10,13
74:14 78:9 86:21
90:4 92:18 93:24
94:19 99:18 102:23
102:24 103:2,23,24
104:4,21 105:13,20
105:24,25 106:11
107:21 108:11
109:24 110:1,4,6
111:25 116:2 119:6
133:25 135:6 137:5
138:9,16,17,21
139:3 140:22
141:20,24
questionably
115:18
questions  22:6
49:23 51:6 91:13
114:18 117:7
quiet  24:23 26:14
53:22 54:3 57:16
quite  76:8 86:25
91:4 99:22
quotation  112:10
quote  44:24 67:21
87:2 100:2 110:21
110:24 112:16
132:9
quoted  82:1

quoting  67:16 92:7
130:5

**r**

r  1:21 2:8 4:1 6:1
80:18 143:3,13
144:1
raise  11:24 15:21
17:21 37:6
raised  16:2 22:16
24:10,13,21 25:20
28:7,8 36:8 38:6
41:19 43:12 47:5
49:10 58:18 59:5
85:20 104:1 130:22
136:21,24
raises  41:20 63:4
87:7
raising  22:11 44:10
rakoff  127:23
ramco  132:20
range  12:23
rata  84:20
ratify  45:17
rationale  113:18
131:7,21
rauch  5:16
reach  90:20,21,24
91:1 103:17,19
115:18 116:3
117:12,12 139:4
reaches  115:12
123:19
react  26:4
read  54:24 91:9
93:5,6 99:20 104:15
108:10 110:7
112:17 115:15
119:6 133:22
reading  79:12 93:4
93:24
ready  39:5 59:10,11
124:15
real  60:15 78:8
102:23 113:7
122:22 134:13
137:15

realized  66:12
really  9:20 14:21
44:19 46:14 57:11
58:1 59:4 63:7
64:12 65:22 66:17
70:22,23 76:10 79:6
89:21 93:14,16
121:4 122:4,4,13
123:4 126:8,16,17
127:9 139:21
realty  111:24
reason  16:14 20:24
21:4 24:9 25:3
76:14 102:12
103:11 112:24
114:16 116:11
126:20 134:24
reasonable  8:1
40:17,18 46:22 74:5
reasonableness
12:23 74:6
reasonably  38:16
40:10 53:21 74:16
122:6
reasoning  112:12
reasons  14:18 21:11
85:1 90:7 118:24
126:3
rebut  110:22
recall  10:4 71:23
receipt  80:22,23
118:15 121:5
receive  8:16 103:1
125:19 127:1
received  109:5
127:9,12,13
receiving  125:10
recipient  100:25
recipients  62:14
recitation  110:19
recognition  25:25
recognize  86:17
95:9
recognized  112:11
record  13:16 34:14
62:4 90:5 106:22
141:12

**recording** 144:4
**recovered** 84:20
  112:5
**recovery** 58:13
  108:18 113:17
  131:20
**recurriness** 122:13
**recurring** 67:11,19
  67:21 72:24
**recurringness**
  67:20
**reduce** 9:1
**reduced** 8:11,17
**refer** 125:1
**reference** 94:6
**referring** 35:15
  133:1
**refers** 110:25
**reflect** 118:1
**reflected** 15:12
  16:19
**reflects** 110:8
**refused** 87:16
**refute** 66:1
**refutes** 65:7
**regardless** 42:10
  68:18
**regina** 5:7 6:20
**regular** 72:14
**regularly** 72:9,15
**regulated** 33:14
**reigning** 132:18
**reinvest** 69:3
**reinvested** 68:22,24
**reinvesting** 87:10
**reinvestment** 88:1,2
  88:16,25
**reiterate** 75:17
**reject** 22:3 48:5
  57:19 117:10
**rejected** 76:19 77:6
  111:8 141:7
**relate** 90:10,11
**related** 7:4 8:8 13:1
  92:11
**relates** 16:20 23:17
  57:2 89:5 98:2

**relating** 13:2 39:9
**relationship** 93:9
  108:13
**relationships** 38:25
**relative** 63:11
**relatively** 51:12
**release** 10:17,18
**relevance** 92:5
  94:20,22
**relevant** 15:3 52:1
  84:23,25 91:6
  103:18,24 104:4
  105:12,15 106:11
  108:20,24 121:4
  138:9
**reliance** 39:22
  40:17
**relied** 38:17 40:10
**relief** 17:21 28:6
  46:18
**relies** 127:23
**relocated** 131:17
**rely** 40:18 71:11
  127:21
**remain** 77:12
**remained** 31:24
  63:5
**remedy** 55:15 75:11
  95:20 136:4,10
**remember** 18:7
  132:21
**remit** 88:14
**remote** 123:16
**remotely** 67:19
**remove** 98:14
**reopen** 43:21
**reorganization** 24:1
  24:2
**reorganized** 2:9
  3:10 4:4 6:10 7:3
  14:14 28:8 30:6
  35:23 42:16 55:9
  143:13
**repaid** 139:25
**repay** 89:13
**repaying** 140:13

**repayment** 140:18
**repeated** 16:20
**repeating** 78:11
**reply** 71:10 93:2
  110:7 114:1
**repurchase** 73:15
**repurchased**
  125:18
**request** 12:17 109:5
  116:13 120:2
  129:19
**requested** 56:12
**requests** 11:20
  106:18
**require** 54:2 57:16
  81:9 82:2
**required** 78:16
  81:21 82:5 97:21
**requirement** 12:22
  72:24 81:17
**requires** 49:16 66:4
  69:14 132:21
**res** 16:25 17:4,16
  20:25 21:1 24:9
  25:20 26:8 29:4
  40:5 42:4,16 49:13
  56:19
**reservation** 16:6,10
  16:17,19 20:10 25:4
  26:20 41:4,21 54:24
  54:25 55:3
**reservations** 26:22
**reserve** 15:22 24:12
  39:10,10 42:18
  141:23
**reserved** 58:20
**residence** 53:12
  69:15,16,19 70:9
**resolve** 8:12 10:13
  26:5,22
**resolved** 11:4 16:11
  25:22 36:24
**resort** 106:16
**respect** 7:9,10,13
  10:22 14:16 19:9
  20:6 21:23 25:5,6
  53:12 55:2,15 56:7

57:11 61:5 73:22
  88:2,3 106:14
  108:18 111:18
  113:13,21 114:9
  116:15 117:4
  124:14 125:7
  138:15,20 139:20
  140:1,3
**respective** 52:7
**respects** 115:20
**respond** 34:9 103:6
  117:16 136:24
  138:22
**responded** 78:14
**response** 8:13,16
  9:13 12:18 13:10
  91:13 102:13
  115:16 120:10
  130:25
**responses** 85:12
**rest** 57:25 58:24
  94:17 122:22
**restriction** 18:24
**result** 67:8 84:16
**results** 11:21 82:6
  137:3
**retained** 33:7
**return** 50:5 57:9,12
  87:24 88:9 89:13,24
**revested** 30:6
**review** 7:24
**ria** 18:23
**rico** 71:24 72:12,17
  76:25 129:4
**right** 6:12,18,22
  7:12,16 8:18 9:7,9
  9:11,14,18 12:10,16
  12:19 13:9,13,15,22
  14:4,11 17:17 18:9
  22:5 24:12 25:10
  26:22 27:11,20 28:4
  29:3 30:25 33:9
  35:11 36:7,10 37:4
  40:25 42:22 44:6
  45:8 46:5 49:2 55:6
  55:14,17 57:22
  58:23 59:1,9,12,17

60:7 69:9,11 71:12
80:9 81:1 82:14
83:7 84:16 85:14
88:4 94:12 98:6
107:12 119:5,12
123:13 124:20
128:21 129:14,18
132:11,17 133:2,23
137:25 138:5 141:5
141:16,21,23
**rights** 15:23 16:6,10
16:19 19:9 20:11
26:21 39:11 50:11
55:3 58:20
**rise** 6:2
**risk** 25:25 140:9
**road** 118:10 144:13
**roberts** 7:20
**robust** 47:3
**rockefeller** 5:3
**rolls** 133:20
**room** 105:8,9
114:15,16
**routed** 63:15
**routinely** 56:2
**rubberstamp** 56:7
56:18
**rubric** 72:1
**rule** 2:4 10:2 12:21
143:8
**rules** 45:10,10

**s**

**s** 2:8 4:1 6:1 143:3
143:12
**s.court** 77:17,22
**sachs** 33:13
**sailed** 50:13
**sale** 10:5,11 79:22
**satisfy** 92:11 93:8
**satisfying** 12:21
**saudi** 100:8 101:17
101:18 102:4
**saw** 14:19 71:10
**saying** 30:4 32:20
32:25 33:11 34:15
35:12,24 37:25
40:14 42:19 45:16

47:25 58:11 78:14
91:13 101:1,22
102:6,13 113:3
121:2 128:19,22
132:3 133:10 134:4
138:22
**says** 30:10 32:14
35:21 39:25 40:6
42:20 44:24 46:16
46:21 47:2,4,11
48:24 65:8 67:20
72:22 77:16 80:1,16
80:17 81:18,20
86:12,16 87:2 99:22
101:19 102:9
110:20,25 111:1,3
111:17 112:7,22,23
115:10 116:17
120:22 122:14
123:8 124:21,23
125:1,6 126:18
127:25 128:6
129:18 131:18,22
132:14 133:16
134:12
**scalia** 77:17
**scalia's** 37:11 55:21
**schedule** 26:15
29:25 30:11 32:12
45:13 52:19,21,23
52:23 53:1,2,2,23
124:13,21
**scheduled** 15:13
20:7 89:25
**schedules** 15:15
22:25 25:15 30:9
35:22 52:8 53:14
54:4 57:18 90:5
**scheindlin** 126:19
130:3
**scheindlin's** 111:14
114:24 131:13
**scratching** 141:23
**scrutinize** 77:25,25
**scrutinized** 64:8
81:7

**sean** 1:22
**search** 10:6
**seated** 6:3
**second** 11:25 14:9
19:4,23 22:14 27:23
38:19,22 54:23
63:12 66:23,25 67:1
67:19 74:3 76:22
77:8,14,24 88:16,23
91:14 92:6,12 93:6
94:1,4,14 98:12
99:17 103:11
109:23 110:20
111:20,24 112:7
118:21,21,23
127:22 140:20
**secondary** 37:12
**seconds** 110:12
**section** 40:5 77:5
88:17 89:4,19 111:2
112:15,24 113:4,9
**secured** 53:11,17
**securities** 61:21
73:4 80:14 119:16
119:17 127:4,11
131:23,24
**see** 8:15 11:18,19
42:24 48:15 62:4,9
63:1 74:18,23
124:25 133:14
134:3,10 137:13,18
**seek** 15:17 17:22
21:23 95:20
**seeking** 10:2,12,14
10:24 12:15 58:10
87:9,10 97:23,24,24
108:17
**seeks** 14:25
**seize** 109:18
**selling** 40:23
**send** 39:6 70:3
99:11,13 102:5
109:4
**sense** 13:24 29:5
64:24 123:16
**sent** 100:12 102:16
109:4

**sentence** 110:18,20
110:21,24 111:6,21
112:8,9,9,11 113:11
113:15
**separate** 17:6 22:10
128:3 135:16
**separately** 19:9,10
**series** 80:6 139:15
140:8
**served** 8:15 37:6
**serves** 48:15 112:25
**service** 9:10
**services** 71:15 87:1
87:2,6 104:15
**set** 8:4 48:7 62:9
68:12 73:16,20
75:12,15 81:11,25
81:25 82:3,3 84:16
87:15 89:6,16,16,23
95:25 96:2,6,21,24
97:14 118:8,9
122:10 129:19
138:20,22,23,24
**sets** 9:20 19:13
**setting** 96:11
131:23 135:13
141:25
**settlement** 2:4 7:21
7:24 8:1,4,10,21,24
8:25 9:4,15,19 10:2
10:14,19,21,24,25
11:1,5,10,15,16
12:4,9,15,17,20,20
46:21 56:14 143:8
**settling** 10:20
**seventh** 44:22
**shadid** 92:1
**shaheed** 100:5
**shame** 51:18
**shared** 92:1
**shares** 57:3
**sharia** 33:16 80:7
139:15,21 140:3,6
140:14
**sheer** 21:12
**sheila** 3:25 144:2

**she's** 113:3
**shield** 124:8
**shifting** 50:1
**ship** 50:13
**shl** 1:3 2:12,19 3:1,6
**shoes** 77:10
**short** 29:8 98:21
**shouldn't** 76:13
  106:1
**should've** 98:16
**show** 15:9 69:1 70:2
  76:12
**showing** 123:14
**shown** 106:25 107:1
  127:8
**side** 6:13 14:10 36:1
  65:15 69:10 102:4
  121:2,5 127:22
**sides** 141:23
**sign** 78:25
**signature** 56:19
  144:10
**signed** 127:3,4
  139:25
**significance** 100:21
**silly** 92:21
**similar** 30:19 38:15
  39:13 40:1 43:11
  46:13 80:18 116:15
**similarly** 19:16 61:7
  72:21 73:9
**simple** 101:14
**simplest** 14:25
**simply** 17:23 18:11
  54:10 56:2 81:2
  89:6 90:4 111:4,19
  116:5,17 117:23
  118:16 139:23
**sincerely** 83:24
**single** 54:2 60:24
  66:18,20 86:3 87:3
  104:10 126:4,6
**singular** 68:2
**sitting** 83:3
**situated** 19:16
  21:19

**situation** 39:14
  40:19 42:24 116:15
**six** 25:9
**skapof** 5:6 6:19,20
  27:15,17,17,22 28:4
  29:9,12,16,24 30:14
  30:17,21 31:2,12
  32:3,18,20,24 33:9
  33:11,22,25 34:4,7
  35:1,11,14 36:7,10
  36:13,17,21,25 37:5
  37:15,17,20,23 38:3
  38:5,9,21 39:1,4,8
  39:18,21,24 40:22
  40:25 41:3,6,15,24
  42:2,7 43:3,6,10,14
  43:17 44:3,6,9,12
  44:15,18 45:9,15,19
  45:21,24 46:2,5,8
  46:11 47:7,10,19
  48:3,6,9,17,20 49:4
  49:9,17,24 50:3,16
  50:19,22,25 51:2,8
  51:10 52:19,21
  57:24 58:10,14,24
**sketch** 29:10
**slice** 63:14
**slightly** 8:5,7 31:17
  59:13,13
**sochan** 103:8
**solicit** 65:10 72:9
  105:18 121:22
**somebody** 16:18
  23:7 25:9,17 26:22
  39:9 41:11,20 79:3
  83:23 98:16 99:12
  108:5 109:17
  114:13 129:20
**sorry** 43:2 85:11,13
  94:7 132:14
**sort** 17:6 22:10
  27:24,25 28:4 29:8
  29:17,18 30:13
  35:25 37:13 46:24
  69:5 85:22 87:11
  95:22 96:5 107:14
  107:21 119:25

127:20 136:25
**sorts** 36:15 41:8
  105:10
**sound** 144:3
**sounds** 42:19
**source** 37:12
**southern** 1:2 44:21
**speak** 6:6 30:13
  76:25 119:3
**speaks** 63:19 66:8
  124:13 136:7
**specific** 16:6 32:13
  35:2 45:1 48:7
  65:25 66:3,8,20
  67:10 68:17 75:24
  76:2 93:21 94:5,8
  106:23 107:14
  108:3,12 119:1,7,9
  120:6,13 121:19
  129:19
**specifically** 29:1
  40:6
**specifics** 31:8 76:3
  80:19
**specified** 61:4,23
**specifies** 82:2
**spectrum** 108:4,9
**speculation** 76:16
**speculative** 34:19
**spell** 74:17
**spelling** 83:23 84:5
**spends** 114:3
**spent** 118:3 141:3
**sponsors** 20:15
  25:24
**square** 4:12
**squarely** 76:19
  111:8
**staff** 65:9
**stage** 18:18 96:11
**stand** 14:7 91:8
  116:6 141:20
**standard** 111:10
  134:8
**standing** 83:24
  85:12 91:18

**stands** 77:10 91:16
**start** 11:14 37:25
  59:12 65:1
**started** 64:20 66:9
  71:2 79:12 87:22
**starting** 17:20,24
**state** 10:7 24:8
  39:25 55:22 72:4,5
  72:7 75:8
**stated** 139:5
**statement** 15:12
  19:13 20:16 23:1,9
  45:23 47:1,5 52:8
  54:16 77:8 132:3
**statements** 127:22
**states** 1:1 41:14
  61:20,22 62:21 66:6
  69:16 70:9,14 74:1
  74:20,21 75:3 86:7
  97:21 103:10 106:3
  110:19 112:20,21
  114:14 115:9
  121:22,23,25 123:1
  123:22 136:5 139:9
  139:24 140:1
**statues** 129:4
**statute** 33:15 68:9
  76:21,23,25 77:1
  78:6 90:24,25 91:19
  103:20 107:20,22
  110:5,25 111:1
  113:19 129:7
  132:23
**statutes** 44:25 76:24
  129:5
**statutory** 55:20
  56:1 77:19 116:3,3
**stay** 85:9,25 89:4
  97:17 109:9,13
  112:15,20 115:17
  116:7 128:1 130:1
  133:6 137:14
**stems** 92:8
**step** 30:12 84:7
  92:19 97:25 112:18
**steps** 98:1,2,4

stipulation 11:4,6
stock 10:8,11
stop 111:11
straddling 120:8
straight 82:16
street 4:13 109:12
stringent 111:10
stronger 79:21
structured 80:7
139:21
stuck 14:4
stuff 70:18 81:14
137:16
subject 8:23 40:9
46:15 53:15 61:3
95:13 97:18 103:9
104:11 108:6
113:20
submit 9:22 90:13
99:6
submitted 69:24
88:8,11
submitting 107:6
subordinated 50:11
subsequent 53:16
60:19 84:14
substance 22:11,15
134:19 140:12
substantial 59:22
74:7
substantive 66:6
78:8
substitute 140:8
substituting 139:18
subsumed 130:23
sued 90:15 123:5
sufficient 76:16
77:16 80:25 100:18
104:17 106:9,10
131:25
sufficiently 92:10
suggest 99:4 105:24
106:14 109:8
suggested 108:1
suggesting 24:3
54:2 56:4 112:23
116:7

suggestion 23:15
26:15 102:17,19
103:6 137:23
139:12,13,19
suggests 103:25
suing 99:7
suit 10:12 86:14
suite 144:14
summary 17:14
18:18
support 92:1
supporting 132:3
supposed 56:8 88:9
96:15 97:5,5 99:2
101:3 141:13
supposedly 124:8
supreme 55:25
69:13 74:25 76:22
77:16 129:2
sure 8:20 29:12
41:15 50:2,23 51:15
52:15 56:4,11 66:3
71:18 84:6 85:16,21
105:1 116:24
117:18 138:2 139:2
surely 76:12
surprised 85:25
surrounding 10:5
suspect 107:5 138:4
swift 63:1,6,9
125:12,20
switch 14:8 40:12
switzerland 96:16
system 86:9 105:14
105:16
systematic 65:4
71:25 119:4

**t**

t 144:1,1
tactical 42:10
tadhamon 2:20 3:2
3:4 4:19 6:17 60:10
60:10,11 61:7,15,17
62:15,23,23 65:8
67:25 68:11,24,25
70:16 80:1,12,13,18
81:13 88:8,9 100:14

102:25 121:7,8,17
122:24 124:14,17
124:25 125:13,18
126:1 127:12
tadhamon's 62:19
62:24,24 63:12,15
124:18 125:14
127:11
taiwan 75:6
take 6:24 9:14
19:20 21:15 27:25
33:17 36:19 37:16
49:10 51:20 58:20
59:2 65:20 80:3
82:16,21 85:22 94:6
94:9,10 101:3 106:2
106:13 107:3
128:16 141:13,19
taken 84:10
talk 21:5 44:8 49:14
90:8 93:12 99:12
104:18 109:7 116:9
119:6
talked 19:3 21:11
106:19 109:3
136:23
talking 18:3 28:12
28:20,24 38:17
40:11 63:18 81:4
85:6 103:16,18
107:5 108:15 118:5
141:3
talks 32:10 41:11
45:1 107:14 128:16
130:24 131:15
tax 41:11
taxing 41:12,16
technical 41:19
teeny 78:1
telephonic 5:10
tell 12:8 14:15 32:5
35:14 37:14 47:25
59:14 62:3 85:7,9
89:21 105:13,17
107:25 124:14
131:6

tells 99:21
template 80:15
templates 62:9,9
80:6
tens 26:19
term 41:20 96:8
terms 7:25 8:1
14:25 15:5 31:17
46:6 50:9,10 59:5
93:20 97:22 110:21
111:4 127:2
terraskulls 92:1
territoriality
126:13,16 131:5
terror 104:7,8
terrorist 67:5,14
124:7
terrorists 121:15
testifying 141:10
texas 10:7,16
text 132:13
thank 6:18 7:17
9:21,24,25 12:25
13:19,20,21 27:13
27:14 51:9,10 57:23
58:25 59:1,3 60:6
82:13,14 85:24
110:11 117:13,15
117:19 137:24,25
138:2 140:25 141:2
141:15,16 142:1,2,3
that's 7:16 9:9 11:7
12:3,5,7,13,13
13:14,19 16:22,22
17:13 19:17,18
20:23 22:10 23:12
23:23 24:5,20 25:5
27:20 28:6 30:7,23
32:11 33:14 34:20
35:19 40:14 41:19
41:19 42:13,18,21
42:23 43:1 44:16
45:2,25 46:16 48:23
49:2,2,8 52:3,20,25
53:20 55:11 56:21
57:13,19 58:8 59:7
63:8 64:12 65:2

69:3 72:5,10,20,23
74:18 77:13,16,23
78:24 79:1,13 81:21
82:7,22 83:10 84:22
85:19 86:23 87:5,10
87:21,25 89:10 92:5
93:7,15 94:11 95:12
95:16,22 96:7,7,17
96:17 97:9,15,23
98:9 99:9 100:18
101:19 102:20,21
102:24 103:22
104:4 105:19 106:6
106:13,19,21 107:4
107:10 108:3,8,10
108:14,23 109:12
109:19 110:25
112:6,6,6,16 114:17
114:22 115:9,25
116:17 117:3 118:6
121:20 122:3,11
124:8 126:18 128:3
129:13 130:13
131:4,18 132:10
133:3,10,21,21,22
134:19 136:6,10,12
137:17 138:17,17
138:25 139:9
140:14 141:5
**theory** 31:18 35:6
35:13
**thereto** 55:15
**there's** 13:5 15:13
16:24 17:2,9 18:5
18:24 19:4,10 21:23
26:15,16 30:1 31:15
34:13 35:21 42:20
44:18 46:25 47:1
52:6,25 54:8 56:23
58:15 59:13 64:14
65:4 73:22 74:22
75:23 76:9 80:5
84:8 86:5 88:1,1,3,5
88:11,15 90:3 91:11
93:8,18 95:9 98:1
102:8,17,19,23
105:6,9 113:7 114:8

114:15,16,18 116:2
116:11 120:5,6,7
121:1 129:24 131:1
133:15 134:11
137:13 139:2,15
140:22,23
**they'd** 67:7
**they're** 13:11,12
19:7,20 23:13 24:3
28:23 31:3 32:15
34:14,15 42:19
53:22 54:1,16 56:4
56:23 57:15 63:7,14
67:20 68:4 89:1
97:18 99:23 107:19
108:7 111:7 112:23
116:5 117:11
127:21 130:20,22
133:24
**they've** 67:7 89:5
**thin** 122:1
**thing** 35:17 37:19
40:11 43:4 55:22
56:21 57:19 68:2,3
68:5,5 96:14 99:18
99:20 108:21 118:6
118:17 140:5
**things** 6:23 16:8
19:6 24:12 41:8,9
41:10 46:10 47:22
48:13 50:2,7,24
51:12 56:3 57:3,7
79:8 85:7 93:13
94:9 118:2 123:2
135:5,17 138:13
141:18
**think** 9:18 11:22,24
11:25 14:19 15:19
16:14,15 17:8 18:4
21:7,20 23:6 24:5
25:7 26:10 27:25
28:6,22 29:16 31:20
32:3 38:6 39:14
40:14,15,20 41:1
43:6,15,18 45:19
46:24 47:2,6,10,20
49:2 50:3,20 51:3,4

51:12,14,24 53:20
54:13 55:24 56:3,7
56:21 59:20,23 63:8
65:1 66:11 68:12
70:22 71:6,7,21
73:10 74:9 75:5,18
76:16 78:8 79:5,6,6
79:9,24 80:21 81:4
81:5,16,21 82:6,10
83:7 84:3,6,8,25
85:17,23 87:12,22
87:23 88:12 90:10
90:18 91:4,7,9
94:19 95:4,8,16
98:9,10,13,24 99:13
99:17,21 100:17
101:8 102:24 103:2
105:3,4,5,23 106:1
106:10,15 108:9
109:21 110:6,7,7,19
117:8 118:7 120:9
120:12 122:6
126:18 127:19,24
127:25 128:2 129:1
129:1,2,3,8,10,12
130:3,7,15,16 132:1
134:11 135:2
137:11,15,23 138:7
138:7 139:1 140:5
140:11,16
**thinking** 41:22
49:20 138:8
**thinks** 75:12 82:7
106:11 107:10
**thinner** 135:4
**third** 7:13 75:4 89:3
110:20
**thought** 13:23 37:1
84:1 99:20 130:25
133:3 139:12
**thousands** 26:19
**thread** 51:5
**three** 11:10 14:2,20
47:16 68:5,5 90:11
138:7
**threw** 65:16

**thronson** 2:5 10:3
11:2 143:9
**throwing** 46:13
**thrown** 128:24
**thumbnail** 29:8
**tied** 17:4 66:6
119:23
**till** 83:12
**time** 7:6 8:8 15:20
16:13 18:12,14
25:20,20 37:7,8
38:8 43:12 53:24
60:5 66:18 71:5
76:7 80:23 89:18
91:8,8 93:7,13
94:10 95:13,15,16
98:21 106:8 118:4,4
118:16 121:19
125:14 126:3,13
141:1,3
**timely** 13:16 55:13
**times** 90:25 91:25
106:4,13 119:2,15
121:14 137:4
**timing** 22:11,14
42:12 44:8,10,16,17
44:19,19 69:4
**tiny** 64:9 122:21
**tire** 75:5,6
**title** 24:23 26:14
28:18 31:24 35:8,11
40:15 53:22 54:3
55:4,12,14,18,19,20
57:16 123:23
127:10 139:7
**today** 6:14 7:5 25:9
28:11 43:16 47:25
82:23 85:7 116:19
125:2,3 141:1
**told** 75:18 83:13
**tongue** 133:20
**toni** 30:10 53:10,11
**tooney** 53:10
**top** 64:9 124:21,25
**topic** 54:23
**tort** 67:3,12 68:7
72:1,3 73:2 75:5

**total** 28:13
**totaling** 52:24
**totality** 78:1 81:7
  117:25
**touch** 56:22
**touches** 117:13
**tourist** 67:4
**traded** 57:7
**trades** 73:4,7
  119:17 140:2
**transacting** 87:4
  95:1
**transaction** 62:5
  63:15 71:1 78:22
  80:11 81:12,23
  86:14,14 90:11,12
  90:14 91:18 95:10
  95:11 97:16,23,24
  98:1,12,13,19 100:1
  100:11 104:10,16
  105:6 106:23
  108:17,19 109:2
  117:23,25 122:22
  122:23 126:5,7
  138:10 139:20
  140:2,12,18 141:10
**transactions** 63:13
  64:12 68:2 74:19
  86:20,23 91:5,7
  92:5 93:10 94:21
  95:4 102:11 104:7,9
  107:2 108:13
  122:20 123:16
  125:5,25 136:3
  138:11 139:16,16
  139:22 140:8
**transcribed** 3:25
**transcriber** 144:10
**transcript** 144:3
**transfer** 49:12
  60:24 62:11,22 63:1
  66:10 68:8 77:25
  78:1,3,5 95:21 96:1
  96:9,10,16 97:8,10
  98:15,15,16,17,18

96:18 108:6,13,14
  129:5

**transferees** 126:24
**transferred** 62:18
  62:22 79:15,15,17
  79:21 84:12,13
  92:25 103:14 112:4
  113:16 115:4 124:4
  125:8 131:18
**transferring** 87:3
**transfers** 61:8,15
  62:14 63:22 64:2,9
  64:11,15,19 67:16
  76:2,5 78:10 81:6
  87:14 91:23 94:7
  100:5 124:13
  129:10 130:5
**transform** 42:13
**transitory** 80:24
**travels** 108:5
**treasury** 61:21
  80:13 127:11
**treated** 82:11
**treatment** 19:17,18
  26:24 27:3 28:16
  50:10 58:6,7
**trial** 2:14,21 3:7
  82:19
**tried** 8:11
**trouble** 27:19 75:22
**true** 28:11 87:25
  128:4,16 140:24
**truly** 14:21 15:19
  57:14 70:24
**trust** 17:11,12,22
  18:19 19:2 20:12
  25:11 38:10 40:15
**trustee** 139:7
**try** 9:15 73:13
  109:18
**trying** 29:5,8 39:17
  72:18 93:25 128:7,7
  137:4 141:21
**tsang** 5:12

98:18 101:6 108:22
  112:3 115:2 124:14
  130:7 138:12,14,16
  138:17,23,25

**turn** 27:6 35:15
  44:20 48:22 54:23
  88:24 89:1 97:20
  104:18 105:19
  112:7 122:13
**turned** 36:4 104:9
**turnover** 88:17,19
  88:23 97:13 109:8
  113:13,20 115:18
  130:1 131:4 133:24
  136:17
**turns** 115:3
**tweed** 4:3,10 5:12
  6:9 7:2 14:13
**twice** 60:5 92:2
  108:5
**two** 7:10 11:23
  14:20,21 15:3,3
  16:8 20:21,21 24:12
  24:16,22 25:22 26:3
  31:15 34:11 36:19
  40:8 47:21 48:1
  55:13 56:3 59:4,14
  59:20 61:7,9,15
  62:6 63:15 68:3
  70:6 76:19 79:7
  81:12 86:8 88:2
  90:9,16 91:11 93:13
  94:9 97:12 98:1,2
  108:2,9 110:12
  111:7,22 112:21
  115:3,20 120:13
  135:16 138:4 139:1
  139:12 141:24
**type** 35:2
**typographical**
  83:25

**u**

**u** 80:18 143:3
**u.s.** 1:13,23 64:11
  79:20,23 81:25 82:5
  86:13 95:1 99:25
  100:4,5,11 101:18
  102:10,11,23
  103:15,17 105:14
  105:16 114:12,12
  126:23,25

**uh** 24:15 30:14,17
  30:21 31:2 33:25
  36:13,17,21 37:17
  37:20,23 38:21 39:1
  39:4,8 40:22 41:6
  43:10,14 44:12,15
  46:2,8 47:7 48:3,3
  49:17
**uk** 40:3 103:13,14
  103:18
**ultimate** 96:11
**ultimately** 129:2
**unambiguous**
  132:21
**unanimous** 85:18
**unauthorized** 73:4
  119:17
**uncertain** 54:15
**uncontested** 7:18
**uncontroversial**
  11:19
**underlying** 122:18
  140:2
**understand** 8:20
  9:7 13:7 18:21
  21:25 31:7 33:23
  35:10,13 36:6 38:9
  50:7,15 52:12 55:25
  71:20 76:10 78:23
  84:21 85:17 87:8
  95:22 96:13 106:2
  106:18 107:4,11,16
  116:23 120:1,20,24
  121:3,7 126:2,9
  127:19 128:12,17
  131:7 134:16,17
  136:21
**understanding**
  20:19 133:15
**understands** 12:11
**understood** 9:16,16
  29:16 58:8 81:22
**undertaken** 68:11
  70:13,16,19 71:8
  78:20
**undertaking** 61:6

undisputable  86:11
undisputed  61:13
  100:22 141:9
undo  34:6 64:24
undoes  129:25
unfortunate  11:20
unilaterally  89:6
united  1:1 61:20,21
  62:21 66:5 69:16
  70:9,14 74:1,20,21
  75:3 86:7 97:21
  103:10 106:3
  112:20 114:14
  115:9 121:22,23,24
  123:1,22 139:9,24
  139:25
unius  55:22
universal  38:1
unmistakable
  132:24
unnecessarily  11:7
  129:9
unnecessary  11:8
  11:14
unquestionably
  132:16
unreasonably  77:21
unrelated  88:15
unrestricted  18:7
unsecured  2:13,20
  3:2 5:13 20:2
untrue  111:19
unwind  97:24
uria  18:23 19:7
  21:11
use  31:23 51:19
  66:18,19 67:2,22
  68:6 69:18 70:15
  73:1,11 76:7,15
  78:13 79:10 80:2,17
  86:13 91:6,10,17,19
  92:9 93:7,7 95:7
  99:25 101:21
  104:10 105:14,16
  106:2,12 107:8
  112:18 120:4
  121:10,12,16 129:3

uses  106:20 131:16
usually  83:20
  129:17

**v**

v  2:13,20 3:2,7
  80:17 81:19 91:15
  114:2 116:12
value  24:2 54:15
  122:25
values  54:16
van  7:19
various  39:10,11
  102:2 109:22
vehemently  127:20
venture  7:19
veritext  144:12
version  52:18 114:4
versus  59:20 107:21
vested  139:7
view  43:20 69:7
  88:24 93:21 95:23
  106:9 107:17,24,25
  108:25 120:2 124:8
views  107:15
violated  68:9
violation  89:4 97:17
  112:15
violations  104:7
virtue  68:9
volume  21:12
vote  54:19

**w**

w  5:8
wait  135:9
waiting  17:4
waiver  42:20,21
  43:1,2,4 49:14,14
walk  15:10 57:8
  58:2
walked  94:20
  113:23
walks  115:6
wall  109:12
want  8:21 11:16,17
  14:15,19 15:22
  29:18 33:3,18 35:15

45:10 47:20 50:1,24
  54:24 56:22 58:1,12
  69:12 71:16 72:8
  75:10 78:11 79:1
  80:6 82:15 85:15
  90:18 93:4 102:14
  104:20,24 117:3
  122:11 125:19
  127:17 137:5 138:6
  141:6
wanted  17:12 39:10
  58:19 62:11,12
  100:9
wants  80:14 82:20
  83:9 109:6 116:9
  124:10
warrant  76:16
  137:20
warranted  75:19
washington  4:14
wasn't  23:5 36:8
  42:1,2 49:10,12
  69:19 72:25 76:6
  95:2 97:6 98:20,23
  113:22 118:8
  121:16 130:18
water  48:19 128:25
  140:6
waters  116:8
way  9:16 11:23
  13:16 14:6 30:2
  62:8 63:7 64:6,10
  66:6 72:23 73:5,14
  73:18 74:22 79:1
  80:4,10 96:12
  119:11 130:2
  133:22 134:12
  137:6 139:15,21
  141:21
ways  25:22 26:3
  63:8
week  108:5
weeks  36:19
went  17:5 56:10,14
  56:17 58:5 66:25
  77:18 83:12 92:22
  96:1,9,16 102:1,2

118:22
weren't  56:5,13
  111:15
westchester  5:14
we'd  140:24
we'll  12:7,14,14
  14:9,24 50:19 58:24
  116:18 137:11
we're  6:4 8:1,16,25
  9:1 10:20,24 11:1,8
  17:10 18:19 27:23
  28:5,5,10,20 31:5
  32:1,20,24,24 33:11
  34:20 35:24 37:3
  38:15,15 43:18
  44:20 46:13,22
  47:11,12,12,14 50:6
  50:13 54:6 57:25
  58:10 61:13 70:23
  73:24,25 97:23,24
  97:24 99:7 102:17
  106:23 107:4
  108:15,17 138:21
we've  21:7 26:2
  28:9 31:5 36:1
  40:20 50:20 68:18
  80:22 82:1 86:3
  118:24 137:11,15
  137:23
whatever's  30:25
whatsoever  22:1
  24:6 26:16 52:11
  65:24 106:5
what's  18:6 24:19
  24:19 34:15 41:5
  45:17 55:17 57:13
  81:19 84:8 119:23
  120:10 121:4,5
whichever  14:1
whistle  141:22
white  5:14
wholly  75:7 127:2
  137:23 141:9
who's  6:12 13:9
wide  10:17
widespread  100:2,3

**wife** 83:14
**williams** 5:14
**willing** 8:2 11:24
**winded** 82:25
**wire** 67:16 100:5
  101:17
**wish** 9:11 12:16
  125:4
**wishes** 13:8
**withdraw** 11:12
**withdrawing** 11:6
**withdrawn** 11:11
  13:4
**withheld** 55:11
**witnesses** 82:23
**wondered** 99:18
**wonderful** 137:6
**wondering** 41:21
**won't** 80:8 91:16
  141:20,20,25
**word** 79:12 131:16
  133:20
**words** 18:23 22:21
  51:23 76:15 77:12
  77:15 78:15 91:9
  106:19 109:15
  112:19 113:20
  114:10 139:6
**work** 8:8 25:19
  29:11 72:19 80:5
  105:2 116:7 137:14
**works** 80:10
**world** 37:25 52:24
  100:7 130:12
**worried** 129:9,9
**worry** 78:4
**worth** 84:11 110:9
**wouldn't** 42:5
  47:21 96:20 118:11
  118:12 121:19
**would've** 16:8,9,11
  25:22,23 26:2 37:6
  39:14 42:11 84:19
  94:16 118:12
**wreak** 26:11 41:22
  41:24

**writes** 125:17
**writing** 124:25
**wrong** 110:20 112:8
  112:17 113:14
  116:5,5 122:11
  140:15
**wrongful** 138:17,18
**wrongfully** 55:11

**x**

**x** 1:4,11 36:18,23
  96:15 143:1

**y**

**y** 96:15
**yeah** 22:7 32:1,20
  34:4 36:25 37:15
  39:18 43:3 44:9
  45:21 48:6 49:4,24
  50:3,16,22 58:8
  65:18 83:20 128:13
  133:10 134:9
  135:16
**year** 23:1 86:18
  105:23
**years** 47:21 48:1
  111:13,14
**york** 1:2,15,15 4:6
  4:21 5:4 62:4,13
  63:3,5,16 64:5,9,23
  66:10 70:4 71:25
  72:3,13,19,19 73:5
  78:2 79:16,16,25
  80:2,24 86:8,9,20
  86:23 87:4 88:7,13
  90:13,15,16,24,25
  91:17,25 92:9,11,17
  92:19 93:1 94:15
  95:7,12,14,21 96:1
  96:10,17 98:8 99:2
  99:3,19,21,25
  100:16,18,24 101:1
  101:2,4,13,21,25,25
  102:3,5 103:2 104:3
  105:25 106:24
  107:19 108:3,5,8,12
  108:18,23 109:4,5
  115:3 117:23 118:4

118:13,15,22 119:3
120:4,16,17 121:1,8
121:13 122:5,21,21
123:17 124:6
125:20 126:6 127:1
127:5,6 138:25
140:20,20
**you'd** 9:22 28:2
**you'll** 27:18 33:5
  124:25
**you're** 9:18 14:4
  34:5 36:18 40:1,15
  43:21,21,25 44:1
  47:25 48:18 49:15
  59:9 68:12 83:16
  85:6 100:25 101:16
  101:22 102:6
  103:16,18 107:6
  124:15,16 128:6,7
  131:6 133:1,17
**you've** 33:23 67:20
  76:11 81:12 83:17
  118:16 135:4,19
  136:2,21,23,25
  137:1

**z**

**z** 96:15
**zero** 81:2

Bankruptcy Court's Memorandum of Decision

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>**FOR PUBLICATION**</u>

-------------------------------------------------------------x

In re

Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*

Case No. 12-11076 (SHL)

                    Reorganized Debtors.

(Jointly Administered)

-------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                    Plaintiff,

        vs.

Adv. No. 13-01434 (SHL)

BAHRAIN ISLAMIC BANK,

                  Defendant.

-------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA BANK B.S.C.(c),
*et al.*,

                    Plaintiff,

        vs.

Adv. No. 13-01435 (SHL)

TADHAMON CAPITAL B.S.C.,

                  Defendant.

-------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

MILBANK, TWEED, HADLEY & McCLOY LLP
*Counsel for Official Committee of Unsecured Creditors*
*of Arcapita Bank B.S.C.(c), et al.*
  By:  Dennis F. Dunne, Esq.
       Evan R. Fleck, Esq.
1 Chase Manhattan Plaza
New York, New York 10005
    -and-

APP268

By:  Andrew M. Leblanc, Esq.
1850 K Street, NW, Suite 1100
Washington, D.C. 20006

K&L GATES LLP
*Counsel for Bahrain Islamic Bank and Tadhamon Capital B.S.C.*
  By:  John A. Bicks, Esq.
       Lani A. Adler, Esq.
599 Lexington Avenue
New York, New York 10022

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions to dismiss filed by Bahrain Islamic Bank ("BisB") and

Tadhamon Capital B.S.C. ("Tadhamon," and together with BisB, the "Defendants"),

respectively, in the above-captioned adversary proceedings.  The adversary proceedings were

brought by the official committee of unsecured creditors for the above-captioned chapter 11

cases (the "Committee").  The cases seek the turnover of funds invested by the Debtor Arcapita

Bank—a Bahraini investment bank—with the Defendants—two Bahraini entities—just before

the bankruptcy filing.  Because the motions in the two cases raise the same issues, the Court will

address them together.  The Defendants make several arguments for dismissal, including that the

Court lacks personal jurisdiction over the Defendants.  For the reasons set forth below, the

motions are granted for lack of personal jurisdiction.

## BACKGROUND

Arcapita Bank B.S.C.(c) ("Arcapita"), one of the above-captioned reorganized debtors, is

licensed as an Islamic wholesale bank by the Central Bank of Bahrain.  BisB Compl. ¶ 12;

Tadhamon Compl. ¶ 12.  Headquartered in Bahrain, Arcapita is operated as an investment bank

and is a global manager of Shari'ah compliant alternative investments.  BisB Compl. ¶ 12;

Tadhamon Compl. ¶ 12.  Prior to its bankruptcy filing, Arcapita and its affiliates employed 268

2

APP269

people and, together with the debtors and their non-debtor subsidiaries, maintained offices in Bahrain, Atlanta, London, Hong Kong and Singapore. BisB Compl. ¶ 12; Tadhamon Compl. ¶ 12.

Defendant BisB is an Islamic commercial bank headquartered in Bahrain. BisB Compl. ¶ 13. BisB maintains correspondent bank accounts in the United States with Deutsche Bank, Standard Chartered Bank and JP Morgan Chase Bank. BisB Compl. ¶ 14. As required by the Patriot Act, BisB has designated an agent for service of process in the United States in connection with these accounts. BisB Compl. ¶14. BisB also participates in the Clearing House Interbank Payments System, located in New York. BisB Compl. ¶14.

Defendant Tadhamon is a Bahraini corporation and a subsidiary of Tadhamon International Islamic Bank ("TIIB"), a Yemeni bank that offers Islamic banking and investment services to customers in Yemen and abroad. Tadhamon Compl. ¶ 13. Tadhamon serves as the investment arm of TIIB. Tadhamon Compl. ¶ 13. While Tadhamon does not maintain any correspondent accounts in the United States, *see* Hr'g Tr. 62:19-21 (March 19, 2014), TIIB has correspondent bank accounts in the United States with Mashreq Bank and the Bank of New York Mellon. Tadhamon Compl. ¶14. As required by the Patriot Act, TIIB has designated an agent for service of process in the United States in connection with each of these accounts and also participates in the Clearing House Interbank Payments System in New York. Tadhamon Compl. ¶14.

According to the Defendants, they do not and have never maintained offices, staff or telephone numbers in the United States. Decl. of Waleed Rashdan ¶ 2 [Tadhamon ECF No. 8]; Decl. of Mohammed Ebraim Mohammed ¶ 2 [BisB ECF No. 8]. The Defendants maintain that they do not do business in the United States, do not solicit business or clients in the United States

3

and do not advertise in the United States.  Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2.  Neither

Defendant has filed a proof of claim in the debtors' cases.

A.  **The Placements**

A few days prior to its bankruptcy filing, Arcapita made several discrete short-term debt

investments through the Defendants (the "Placements").  BisB Compl. ¶¶ 27, 30; Tadhamon

Compl. ¶¶ 27, 31.  The Placements were made under two separate investment agreements

between Arcapita and each of the Defendants (the "Placement Agreements").  *Id*.[1]  Both of the

Placement Agreements were negotiated and signed in Bahrain and provided that the laws of the

Kingdom of Bahrain govern, except to the extent that such laws conflicted with the principles of

Islamic Shari'ah, in which case Shari'ah law would prevail.   Rashdan Decl. ¶ 13 & Ex. A, § 7.1;

Mohammed Decl. ¶ 5 & Ex. A § 12.

Under the terms of the Placement Agreements, Arcapita appointed the Defendants to

serve as its agent in the purchase of the Placement investments on Arcapita's behalf.  BisB

Compl. ¶¶ 23-24; Tadhamon Compl. ¶¶ 22, 24.  The Defendants were subsequently obligated to

repurchase the Placements from Arcapita on a deferred payment basis for an amount equal to the

original investment, plus an agreed-upon return (the "Placement Proceeds").  BisB Compl. ¶¶ 2,

24; Tadhamon Compl. ¶ 2, 24.  The Defendants were to transfer the Placement Proceeds to

---

[1] Arcapita and BisB entered into their Placement Agreement on July 10, 2003.  BisB Compl. ¶ 23.  Arcapita made at least five previous investments with BisB under the terms of the Placement Agreement in the two years before the investments here were made.  BisB Compl. ¶ 26.  These previous transfers are not relied on by the Committee as a basis for personal jurisdiction.  Indeed, the Committee states that "Arcapita did not enter into placement transactions with [BisB] as part of the ordinary course of business."  BisB Compl. ¶ 25.  Accordingly, the Court does not address these previous transfers as part of its jurisdictional analysis.

 Arcapita and Tadhamon entered into their Placement Agreement on March 15, 2012.  Tadhamon Compl. ¶¶ 22-23.  The Committee does not allege that Arcapita had placed any investments with Tadhamon prior to the transactions in question.  Tadhamon Compl. ¶¶ 22-23.

4

APP271

Arcapita on the designated maturity date of the Placement.  BisB Compl. ¶¶ 2, 24; Tadhamon Compl. ¶ 2, 24.

Consistent with these Placement Agreements, Arcapita entered into a Placement with BisB in the amount of $10 million on March 14, 2012 (the "BisB Placement").  BisB Compl. ¶ 27.  To execute the BisB Placement, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to the correspondent bank account maintained by BisB at JP Morgan Chase Bank in New York.  BisB Compl. ¶ 15.  The Committee alleges that this transfer took place at the direction of BisB.  BisB Compl. ¶¶ 15, 28.  On the same day as the transfer, BisB purchased the commodities for Arcapita through a London broker.  Mohammed Decl. ¶ 10.

 Arcapita entered into two Placements with Tadhamon on March 15, 2012, each for $10 million (the "Tadhamon Placements").  Tadhamon Compl. ¶ 27.  To execute the Tadhamon Placements, Arcapita transferred funds from its account at JP Morgan Chase Bank in New York to an account at HSBC Bank in New York.  Tadhamon Compl. ¶ 28.  The HSBC account was a correspondent bank account maintained by Khaleeji Commercial Bank B.S.C., Tadhamon's bank in Bahrain.  Rashdan Decl. ¶ 7.  The funds were then immediately transferred from the HSBC account to an account held by Tadhamon at Khaleeji Commercial Bank in Bahrain.  Tadhamon Compl. ¶ 28; Rashdan Decl. ¶ 7.  The Committee asserts that the HSBC account was designated by Tadhamon as the account to which the funds were to be transferred.  Tadhamon Compl. ¶ 28.

### B.  Bankruptcy Case

Less than a month after these Placements, Arcapita filed for protection under Chapter 11 of the Bankruptcy Code.  On April 5, 2012, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to Section 1102(a) of the Bankruptcy Code (the "Committee" or the

APP272

"Plaintiff") . All of the Placements matured within a month after Arcapita's bankruptcy filing.[2]

Both Defendants, however, failed to deliver the Placement Proceeds to Arcapita. BisB Compl.

¶¶ 32, 34; Tadhamon Compl. ¶¶ 35, 38. Instead, the Defendants informed Arcapita that, under

Bahraini law, they were setting off the Placement Proceeds against amounts owed to them by

Arcapita. BisB Compl. ¶ 34; Tadhamon Compl. ¶ 38.[3] In December 2012, Tadhamon returned

to Arcapita the portion of the Placement Proceeds that exceeded its purported setoff. Tadhamon

Compl. ¶40. The Committee alleges that the current outstanding balance of Placement Proceeds

due and owing to Arcapita is $10,002,292.00 from BisB and $18,480,269.00 from Tadhamon.

BisB Compl. ¶ 36; Tadhamon Compl. ¶ 40.

In June 2013, the Court confirmed the proposed plan of reorganization in Arcapita's

bankruptcy. *See Findings of Fact, Conclusions of Law, and Order Confirming the Second

Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors With

Respect to Each Debtor Other Than Falcon Gas Storage Company, Inc. Under Chapter 11 of the

Bankruptcy Code* [ECF No. 1262]. Later that summer, the Court entered the *Order Granting

Committee's Motion for Leave, Standing and Authority to Prosecute Avoidance Claims* [ECF

No. 1411], which granted the Committee the authority to pursue the claims asserted here against

the Defendants. The Committee subsequently brought these cases against the Defendants for

breach of contract, turnover, the avoidance of a preferential transfer, violation of the automatic

---

[2]     The BisB Placement matured on March 29, 2012, and the Tadhamon Placements matured on March 30, 2012 and April 16, 2012, respectively. BisB Compl. ¶ 31; Tadhamon Compl. ¶ 27. On March 28, 2012 and April 15, 2012, respectively, Arcapita and Tadhamon reinvested the Tadhamon Placements for an additional term, resulting in new maturity dates of April 30, 2012 and May 16, 2012. Tadhamon Compl. ¶ 36.

[3]     Based on Arcapita's pre-existing relationship with the Defendants, Arcapita already owed millions in unmatured debt to each of the Defendants at the time of the Placements. Arcapita owed $9,774,096.15 to BisB as a result of investments that BisB made with Arcapita on December 1, 2011. BisB Compl. ¶¶ 3, 16-20. Arcapita owed $18,497,734.48 to Tadhamon as a result of multiple investments that Tadhamon made with Arcapita between September 2009 and January 2012. Tadhamon Compl. ¶¶ 17-19.

APP273

stay, and claims disallowance.  BisB Compl. ¶ 1; Tadhamon Compl. ¶ 1.  The Committee seeks,

among other things, to compel the Defendants to comply with their obligations under the

Placement Agreements by turning over the Placement Proceeds.  Alternatively, the Committee

seeks to have the Placements avoided and recover the funds as an improper payment of

antecedent debts under Sections 547(b) and 550 of the Bankruptcy Code.  BisB Compl. ¶ 6;

Tadhamon Compl. ¶ 6.

## DISCUSSION

### A.  The Doctrine of Personal Jurisdiction

Fed. R. Civ. P. 12(b)(2), incorporated herein by Bankruptcy Rule 7012(b), provides for

dismissal of a case for lack of personal jurisdiction.  *See* Fed. R. Bankr. P. 7012(b).  To survive a

Rule 12(b)(2) motion, a party must make a prima facie showing that jurisdiction exists.  *See*

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 673

(2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).

This "must include an averment of facts that, if credited by the ultimate trier of fact, would

suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks*, 714 F.3d at 673

(quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).   "[A]

court may consider materials outside the pleadings, but must credit plaintiffs' averments of

jurisdictional facts as true."  *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556,

566-67 (S.D.N.Y. 2012).

In a Rule 12(b)(2) motion, all pleadings and affidavits are to be construed in a light most

favorable to the plaintiff and all doubts resolved in the plaintiff's favor.  *See In re Terrorist*

*Attacks*, 714 F.3d at 673 (citing *Penguin Grp.*, 609 F.3d at 34).  This is "notwithstanding a

controverting presentation by the moving party."  *In re Stillwater Capital*, 851 F. Supp. 2d at 567

APP274

(quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)). But where a "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction — and plaintiffs do not counter that evidence — the allegation may be deemed refuted." *In re Stillwater Capital*, 851 F. Supp. 2d at 567 (quoting *Schenker v. Assicurazioni Generali S.p.A., Consol.*, 2002 U.S. Dist. LEXIS 12845, at *12 (S.D.N.Y. July 15, 2002)). Furthermore, "in determining whether a plaintiff has met [its] burden, [a court] will not draw argumentative inferences in the plaintiff's favor . . . nor must [it] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673.

A court must conduct a two-part inquiry to determine whether personal jurisdiction exists over a defendant. First, the court needs to examine whether the defendant has "the requisite minimum contacts with the United States at large." *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010) (citing *Cruisephone, Inc. v. Cruise Ships Catering & Servs., N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002)). If such contacts are found to exist, the court must then determine the reasonableness of exercising personal jurisdiction over the defendant under the circumstances and whether doing so would "offend 'traditional notions of fair play and substantial justice.'" *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (quoting *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal.*, 480 U.S. 102, 113 (1987) (internal quotations omitted); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996)); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) ("Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant

APP275

must present a compelling case that the present of some other considerations would render jurisdiction unreasonable.") (internal quotations omitted).

When examining the first question of "minimum contacts," courts differentiate between "specific" and "general" personal jurisdiction. *See In re Terrorist Attacks*, 714 F.3d at 673. Either is adequate to satisfy the minimum contacts requirement of the Due Process Clause. *See id*. at 674 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)). Specific jurisdiction is established when a foreign defendant "'purposefully direct[s] his activities at residents of the forum' and . . . the underlying cause of action 'arise[s] out of or relate[s] to those activities.'" *Madoff*, 460 B.R. at 117 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *see also Bank Brussels Lambert*, 305 F.3d at 127 ("Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction— minimum contacts exist where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there.") (internal citations and quotations omitted).

In contrast, general jurisdiction "is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *In re Terrorist Attacks*, 714 F.3d at 674 (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568; *Helicopteros*, 466 U.S. at 414-16 & nn.8-9). Since "general jurisdiction is not related to the events giving rise to the suit, . . . courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'" *In re Terrorist Attacks*, 714 F.3d at 674 (quoting *Helicopteros*, 466 U.S. at 416 & n. 9).

APP276

If minimum contacts are present, a court must then turn to the second question of whether the exercise of jurisdiction will "offend 'traditional notions of fair play and substantial justice.'" *Madoff Inv. Sec.*, 460 B.R. at 117 (quoting *Asahi Metal Indus.*, 480 U.S. at 113; *Metro. Life Ins. Co.*, 84 F.3d at 567). In determining whether the assertion of jurisdiction is reasonable in a given case, courts will consider the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Bank Brussels Lambert*, 305 F.3d at 129 (internal citations and quotations omitted).

### B. No Specific Jurisdiction Exists Over the Defendants

As to the first prong of the jurisdictional inquiry, the Defendants argue that their actions do not represent the necessary minimum contacts to comport with due process. They argue that because the transactions here took place between foreign entities under agreements negotiated, signed and performed in a foreign country and that the one-time use of correspondent accounts in New York to receive funds from Arcapita was not significant enough to impart jurisdiction. The Committee counters that the Defendants purposefully availed themselves of the benefits of the U.S. banking system by using New York correspondent accounts and that the Committee's underlying claims arise from or relate to the use of those accounts.[4]

Central to the Committee's jurisdictional arguments is the use of correspondent bank accounts, which are

---

[4] The Committee states that it currently lacks the information necessary to determine whether the Defendants are subject to general jurisdiction, but reserves its right to assert such jurisdiction pending discovery. BisB Obj. 8 n.6; Tadhamon Obj. 8 n.6. The only question before the Court, therefore, is whether specific jurisdiction exists over the Defendants.

APP277

accounts in domestic banks held in the name of foreign financial institutions. Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions. . . . Without correspondent banking . . . it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries.

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 (2d Cir. 2012) (internal citations and quotations omitted). The mere existence of a correspondent account by itself is insufficient to establish minimum contacts over a foreign bank. *See Tamam*, 677 F. Supp. 2d at 727 (in the context of discussion on CPLR § 302(a)(1), stating that "courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction.")[5] (collecting cases); *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 336-38 (2012).[6] Rather, the issue is whether the Defendants' *use* of a correspondent account in these cases conveys specific jurisdiction upon them.

We begin with Tadhamon. Arcapita transferred the Tadhamon Placement funds to a correspondent bank account at HSBC Bank in New York that was maintained by Khaleeji Commercial Bank, which is Tadhamon's Bank in Bahrain. Tadhamon Compl. ¶28; Rashdan

---

[5]     Many of the cases cited by the parties and discussed in this decision involve personal jurisdiction under the New York long-arm statute – specifically the first prong of CPLR 302(a)(1) – which states that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state. . . ." NY CPLR § 302(a)(1). The Second Circuit has stated that "despite the fact that [S]ection 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013). It is not surprising, therefore, that the parties rely on such cases in their pleadings.

[6]     In connection with their maintenance of correspondent accounts in the United States, BisB and TIIB (Tadhamon's parent) have designated agents for service of process in the United States as required under the Patriot Act and participate in the Clearing House Interbank Payments System in New York. Tadhamon Compl. ¶ 14; BisB Compl. ¶ 14. But courts have held that such actions do not constitute the necessary minimum contacts to satisfy due process. "If these PATRIOT Act certifications were sufficient minimum contacts to satisfy due process, every foreign bank that opens a correspondent account in the United States would be subject to jurisdiction. Clearly, that is not the case. Moreover, the fact that these PATRIOT Act certifications require foreign banks to designate a proxy to accept service of process by the U.S. Government does not indicate that Defendants should reasonably foresee being haled into a U.S. court . . . ." *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 732 (S.D.N.Y. 2010).

APP278

Decl. ¶ 7. The funds were then transferred from the HSBC account to an account held by Tadhamon at Khaleeji in Bahrain. Tadhamon Compl. ¶ 28. It did not even maintain its own correspondent account, but instead used an account maintained in the United States by another bank. But Tadhamon's use of a third party's correspondent bank account is insufficient to establish specific jurisdiction. Minimum contacts will be found "where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert*, 305 F.3d at 127 (internal citations and quotations omitted). Tadhamon made a conscious decision to forego maintenance of a correspondent account in the United States and has clearly not benefitted from the privilege of doing business here under these circumstances. If anything, Tadhamon has accepted the inconvenience caused by its lack of a correspondent account in the United States, and therefore arranged an alternate means of payment through a third party when transacting business in US currency. Thus, Tadhamon has not directed its activities towards residents of this forum in a way that supports personal jurisdiction. *See Madoff*, 460 B.R. at 117.[7]

Unlike Tadhamon, the BisB Placement funds were transferred to BisB's own correspondent bank account at JP Morgan Chase Bank in New York. BisB Compl. ¶ 15.[8] This one-time use of BisB's own correspondent bank account is a closer call than Tadhamon. But it too ultimately falls short given all the other facts here. The use of this correspondent bank account was neither the beginning nor the end of the Placement, but rather a transitory intermediate step. The transaction began with the negotiation and signing of the contract in

---

[7]     Even if one views Khaleeji as Tadhamon's agent, the use of this correspondent bank account does not provide a basis for personal jurisdiction for the same reasons discussed below as to BisB.

[8]     BisB maintains correspondent bank accounts in the United States at Deutsche Bank, Standard Chartered Bank and JP Morgan Chase Bank. BisB Compl. ¶ 14.

APP279

Bahrain between Bahraini parties. It ended with the funds being transferred out of the country the same day for investment. So while the use of the account is admittedly a contact, it is too weak to satisfy due process requirements. *See Burger King*, 471 U.S. at 475 ("[P]urposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of *random, fortuitous, or attenuated contacts*.") (internal citations and quotations omitted) (emphasis added).

The Committee raises several arguments in support of jurisdiction, but none are persuasive. The Committee first argues that the Defendants took sufficient affirmative steps by designating the correspondent accounts where Arcapita should transfer funds. BisB Compl. ¶ 28; Tadhamon Compl. ¶ 28. The Committee reasons that these actions amount to purposeful availment of the United States banking system. But this argument is undermined by the fact that it was Arcapita that actually transferred the funds to the correspondent accounts. BisB Compl. ¶ 28 ("To execute the Placement, Arcapita, at BIB's direction, transferred $10 million in funds from its account at JP Morgan Chase Bank in New York to BIB's account at JP Morgan Chase Bank in New York."); Tadhamon Compl. ¶ 28 ("To execute the Placements, Arcapita transferred a total of $20 million in funds from its account at JP Morgan Chase Bank in New York to an account designated by Tadhamon at HSBC Bank in New York.") As noted by the Supreme Court,

> '[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'

*Burger King*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In any event, the mere knowing receipt of funds at a correspondent bank account is insufficient to

APP280

establish jurisdiction.  *See, e.g., Rushaid v. Pictet & Cie*, 2014 N.Y. Misc. LEXIS 3888, at *8

(N.Y. Sup. Ct. Aug. 26, 2014) ("While plaintiffs submitted documents showing that defendants

knew of the third-party monetary transfers from a New York correspondent account for the

benefit of the Pictet accounts, this alone does not constitute purposeful conduct.  This passive

receipt of funds do not constitute 'volitional acts' by defendants and, as such, defendants did not

avail themselves of the privilege of conduction activities within the forum State, and thereby

neglect to invoke the benefits and protections of its laws.") (internal citations and quotations

omitted); *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 159 (1st Dept. 2010) ("[T]he

mere payment into a New York account does not alone provide a basis for New York

jurisdiction, especially when all aspects of the transaction occur out of state, absent more

extensive New York banking relating to the transaction at issue.") (internal citations and

quotations omitted).

The Committee further argues that the Defendants instructed Arcapita to transfer the

funds to the correspondent accounts, providing Arcapita with the Swift codes[9] necessary to

effectuate the transfer.  *See* Rashdan Decl., Exs. B & C; Decl. of Nicholas A. Bassett, Exs. D &

E [BisB ECF No. 15].  But such acts are not a substantial connection sufficient for jurisdiction.

As the Supreme Court has counseled, specific jurisdiction is appropriate only

> where the contacts proximately result from actions by the defendant himself that
> create a 'substantial connection' with the forum State.  *Thus where the defendant
> 'deliberately' has engaged in significant activities within a State . . . or has
> created 'continuing obligations' between himself and residents of the forum*, he
> manifestly has availed himself of the privilege of conducting business there, and

---

[9]     A SWIFT Code "[w]ithin the context of international payment transactions, is a code issued by the Society
for Worldwide Interbank Financial Telecommunications (SWIFT) that enables banks worldwide to be identified
without the need to specify an address or bank number.  SWIFT codes are used mainly for automatic payment
transactions."  Khwaja Masoom, *The Entrepreneur's Dictionary of Business and Financial Terms* 525 (2013); *see
also* Cambridge Dictionaries Online (April 15, 2015, 2:44 p.m.),
http://dictionary.cambridge.org/us/dictionary/business-english/swift-code (defining SWIFT Code as "the number
used by a particular financial organization for sending and receiving payments on the SWIFT system.")

APP281

because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76 (internal citations and quotations omitted) (emphasis added).

The Defendants' instructions to Arcapita to transfer the funds to a correspondent account held by a third party are the type of "attenuated" acts that do not qualify as the basis for specific jurisdiction. *Burger King*, 471 U.S. at 475. Without more, the Court finds that the Defendants use of this account is not a strong enough action on which to rest personal jurisdiction.[10]

And despite the use of the correspondent bank accounts, neither Defendant would have reasonably foreseen being haled into court in the United States. Neither maintains a presence in the United States. The Defendants do not and have never maintained offices, staff or telephone numbers in the United States. Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2. They do not do business in the United States, do not solicit business or clients in the United States and do not advertise in the United States. Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2. Indeed, these Placement Agreements were executed in Bahrain and provide that they are governed by the laws of Bahrain. Rashdan Decl. ¶ 5 & Ex. A, § 7.1; Mohammed Decl. ¶ 7 & Ex. A, § 12. Given all these facts, the Defendants would reasonably assume that any suit relating to the Placement Agreements would be in Bahrain under Bahraini law. *Cf. Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("The Second Circuit has indicated that entering into a contract with a New York choice of law clause is 'a significant factor in a personal jurisdiction analysis because the parties . . . invoke the benefits and protections of New York law.") (quoting *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22-23

---

[10] The Defendants claim that the correspondent accounts were used to accommodate Arcapita's desire to transfer the funds in U.S. dollars, but there is no evidence of this in the record. *See* Tadhamon Reply at 1-2; Hr'g Tr. 62:8-16 (March 19, 2014). The Court does not need to reach that issue for purposes of this decision.

APP282

(2d Cir. 2004); *AIG Fin. Prod. Corp. v. Public Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 673

F. Supp. 2d 354, 364 (S.D.N.Y. 2009)); *see also Budget Blinds, Inc. v. White*, 536 F.3d 244, 261

(3d Cir. 2008) ("[A] choice-of-law provision 'standing alone would be insufficient to confer

jurisdiction,' but combined with other facts, it may reinforce a party's 'deliberate affiliation with

the forum State and the reasonable foreseeability of possible litigation there.'") (quoting *Burger*

*King*, 471 U.S. at 482); *Atlantic Fin. Fed. v. Bruno*, 698 F. Supp. 568, 573 (E.D. Pa. 1988) ("A

choice of law provision is only a factor to show whether defendants could reasonably foresee

that their acts would have effect in Pennsylvania; it does not itself vest jurisdiction.").[11]

      The Committee relies most heavily on three cases, but all of them are distinguishable.

While courts in each of the three cases found personal jurisdiction based on the use of an

account, the cases all involved a greater quality of contact with the United States than are present

here. The first of these cases, *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012),

involved the use of a correspondent bank account to make dozens of international transfers. In

the case, plaintiffs from the United States, Canada and Israel brought suit against Lebanese

Canadian Bank ("LCB") for injuries sustained in rocket attacks by Hisballah. *Id.* at 330. The

plaintiffs alleged that LCB had assisted Hizballah in committing the attacks by facilitating

international monetary transactions through the Shahid Foundation, an entity that had been

identified as the "financial arm" of Hizballah. *Id.* at 331. LCB's sole point of contact with the

United States was a correspondent bank account that it maintained with American Express Bank

in New York. *Id.* at 332. The plaintiffs alleged, in part, that LCB had used this account to make

dozens of international wire transfers on behalf of Shahid. *See id.* Concluding that the case

---

[11]     The Tadhamon Placement Agreement even provides that the parties submit to the jurisdiction of the Bahraini courts for any proceedings arising from or in connection with the contract. Rashdan Decl. Ex. A, § 7.2.

APP283

presented issues not previously addressed by New York state courts, the Second Circuit certified

questions to the New York Court of Appeals as to whether a foreign bank's maintenance and use

of a correspondent bank account at a New York financial institution established personal

jurisdiction under the New York long-arm statute.  *See Licci v. Lebanese Canadian Bank, SAL*,

673 F.3d 50, 62-63, 66, 74 (2d Cir. 2012).

      In answering these certified questions, the New York Court of Appeals noted that a court

must "closely examine the defendant's contacts for their quality," noting that in other cases, a

focus on the nature and extent of a defendant's involvement in the deposit of funds in a

correspondent account was "essentially adventitious."  *Licci*, 20 N.Y.3d at 338.  The court stated

that such an analysis "may be complicated by the nature of inter-bank activity, especially given

the widespread use of correspondent accounts nominally in New York to facilitate the flow of

money worldwide, often for transactions that otherwise have no other connection to New York,

or indeed the United States."  *Id.*  Ultimately, the court found that "a foreign bank's repeated use

of a correspondent account in New York on behalf of a client – in effect, a 'course of dealing' –

show[s] purposeful availment of New York's dependable and transparent banking system, the

dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of

New York and the United States."  *Id*. at 339.  The New York Court of Appeals then found that

the plaintiffs' claims arose from the bank's transaction of business in New York because LCB's

use of a "New York account 'dozens' of times indicate[d] desirability and a lack of coincidence."

*Id*. at 340.

      After receiving this guidance from the New York Court of Appeals, the Second Circuit

addressed whether the exercise of personal jurisdiction over LCB was consistent with

constitutional due process.  The Second Circuit focused on the connection between the wire

APP284

transfers and the alleged unlawful conduct, noting that the transfers were "a part of the principal wrong at which the plaintiffs' lawsuit is directed." *Licci*, 732 F.3d at 170. While reiterating that the "mere maintenance" of a correspondent account was not enough to support personal jurisdiction, the Second Circuit stated that

> in connection with this particular jurisdictional controversy – a lawsuit seeking redress for the allegedly unlawful provision of banking services for which the wire transfers are a part – allegations of LCB's repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Sahid, in order to further Hisballah's terrorist goals, are sufficient.

*Id.* at 171. Like the New York Court of Appeals, the Second Circuit focused on the fact that the transfers in *Licci* were recurring, stating that "the plaintiffs allege wire transfers through AmEx that numbered in the dozens and totaled several million dollars, so it cannot be said that LCB's contacts with New York were 'random, isolated, or fortuitous.'" *Id.* The Second Circuit ultimately found that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful availment of the privilege of doing business in New York,' . . . so as to permit the subjecting of LCB to specific jurisdiction within the Southern District of New York consistent with due process requirements." *Id.* at 170-71 (quoting *Bank Brussels Lambert*, 305 F.3d at 127). Unlike the Defendants' conduct here, therefore, the defendant in *Licci* repeatedly used a correspondent account which was integrally related to the unlawful conduct at issue in the lawsuit.

The Committee's second case fails for similar reasons. In *Dale v. Banque SCS Alliance S.A.*, 2005 U.S. Dist. LEXIS 20967 (S.D.N.Y. September 22, 2005), the court was confronted with allegations of RICO violations against a Swiss corporation. The plaintiff insurance companies alleged that the defendant had assisted a third party in defrauding them. The illegally

18

obtained funds were laundered through a series of fraudulent wire transfers to and from the

defendant's four correspondent bank account in New York and other accounts maintained

outside of New York. The court preliminarily noted that under CPLR § 302(a)(1), "[a] single

transaction would be sufficient to fulfill this requirement, so long as the relevant cause of action

also arises from that transaction." *Id.* at *11 (quoting *Bank Brussels Lambert v. Fiddler

Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999)). In fact, the defendant maintained

several correspondent bank accounts in New York that were used to effect a number of the

unlawful funds transfers. *See Dale*, 2005 U.S. Dist. LEXIS 20967, at *12. The court therefore

found that the complaint stated a prima facie case for personal jurisdiction under the New York

long-arm statute, C.P.L.R. § 302(a)(1).

Finally, the Committee cites to the single use of a correspondent account to sustain

personal jurisdiction in *Correspondent Services Corp. v. J.V.W. Investments Ltd.*, 120 F. Supp.

2d 401 (S.D.N.Y. 2000). In that case, the third-party plaintiff—a Dominican corporation—

sought to recover an investment that had been transferred to the New York correspondent

account of the third-party defendant—a Bahamian bank. The defendant argued that the court did

not have personal jurisdiction under the New York long-arm statute, as it was a foreign

defendant without contacts, offices, telephone listings or personnel in New York. In analyzing

whether the third-party defendant was transacting business in the jurisdiction, the court

recognized that "even a single action within New York is sufficient to confer jurisdiction under §

302(a) *if it has a sufficient nexus with the cause of action*." *Id.* at 404 (emphasis added). In

looking at the totality of the circumstances, the court noted that the defendant acknowledged that

it held securities accounts at a New York brokerage firm which it used to "facilitate international

financial transactions for itself and for its clients, including the . . . mutual fund purchases . . .

APP286

requested on behalf of [the third party plaintiff] JVW." *Id*. at 404. The court found that not only did the defendant maintain an account in New York to facilitate international business transactions, but it also used the account for the purchase and delivery of the securities, with the unauthorized purchase being at the very root of the action in the case. *Id*. at 405. Thus, it concluded that "[t]he single purposeful act of transferring JVW's funds to New York constitutes the 'transaction of business' from which this cause of action *directly arises*." *Id*. at 404-05 (emphasis added). As such, the jurisdictional conclusion in *Correspondent Services* was based upon the plaintiff's fraud claim directly arising from the defendant's unauthorized purchase of the stock in the context of the defendant's general use of its New York accounts for itself and various clients. By contrast, the money here passed through these correspondent bank accounts once, but only as part of a transaction that began in Bahrain between Bahraini parties under a Bahraini contract and that ended overseas. *See Pramer SCA*, 907 N.Y.S.2d at 159 (mere payment into New York account insufficient where all aspects of transaction occurred out of state).

Moreover, the use of the accounts was not central to the alleged wrong. For example, the Committee has alleged causes of action for breach of contract and the turnover of assets under Sections 541, 542 and 550 and violation of the automatic stay under Section 362, all of which are based upon the alleged setoff by the Defendants and their failure to transfer the Placement Proceeds to Arcapita upon the maturity dates. Thus, the alleged unlawful action was the Defendants' subsequent refusal to return money to Arcapita; it was not the Defendants' original receipt of these transfers under the Placement Agreements, an act which no party has alleged was

APP287

improper.  Thus, the one-off use of the correspondent account by BisB is unrelated to the setoff issue, let alone central to its adjudication.[12]

### C.  Jurisdictional Discovery Is Not Appropriate

The Committee states that it lacks sufficient information to determine whether the Defendants are subject to the general jurisdiction of this Court, but reserves the right to assert such jurisdiction pending discovery.  It initially requested discovery to find "(i) additional facts which further demonstrate that significant and numerous aspects of the Transfers involved contacts with the United States and (ii) additional contacts [the Defendant] has or has had with New York or elsewhere in the United States independent of those that are the subject matter of this lawsuit, which would subject it to the general jurisdiction of this Court."  Tadhamon Obj. at 18; *see* BisB Obj. at 17.  But the Committee offered no information to support their contention that jurisdictional discovery would yield evidence as to personal jurisdiction.  The Committee subsequently narrowed its discovery request, stating that "we should be permitted to take discovery to understand the use of correspondent bank accounts in the United States, because to the extent that it's dozens and dozens of times, the Court has no evidence before it whatsoever."  Hr'g Tr. 106:1-5, March 19, 2014.  This request would be inapplicable to specific jurisdiction, due to a lack of connection with the transactions at issue in this case.

Additionally, the Committee has not shown enough to make such discovery relevant on the issue of general jurisdiction.  "At the jurisdictional stage, '. . . courts enjoy broad discretion in deciding whether to order discovery.'"  *Tymoshenko v. Firtash*, 2013 WL 1234943, at *7 (S.D.N.Y. March 27, 2013) (quoting *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.

---

[12]     The Committee also asserts a cause of action for a preferential transfer under Sections 547 and 550, and one under Section 502(d), but the use of the correspondent account is not the actionable conduct in and of itself. Rather, the use of the correspondent account only gave rise to a claim due to the debtors' bankruptcy filing, assuming that United States law would apply to the dispute regarding the holdback of funds.

2d 765, 811 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008)).  While the failure to allege a

prima facie case for jurisdiction is not necessarily a bar to jurisdictional discovery, courts have

generally been unwilling to grant additional discovery on jurisdictional issues in such

circumstances.  *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 609 (S.D.N.Y. 2012); *see also*

*Licci v. American Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010); *Ehrenfeld v.*

*Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007); *Langenberg v. Sofair*, 2006 WL 2628348, at *5

(S.D.N.Y. Sept. 11, 2006).  In the Second Circuit, courts "have allowed jurisdictional discovery

where a plaintiff has made 'a sufficient start toward establishing personal jurisdiction.'"

*Hollenbeck v. Comeq, Inc.*, 2007 U.S. Dist. LEXIS 63547, at *8 (N.D.N.Y. Aug. 28, 2007)

(quoting *Uebler v. Boss Media*, 363 F. Supp.2d 499, 506 (E.D.N.Y. 2005)); *see also Smit v.*

*Isiklar Holding A.S.*, 354 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) ("[A] court may order limited

discovery targeted at the missing jurisdictional elements, if plaintiff has shown that such an

exercise would serve to *fill any holes* in its showing.").  A party cannot base their request on

mere "'speculations or hopes . . . that further connections to [the forum] will come to light in

discovery' . . . ."  *Firtash*, 2013 WL 1234943, at *7 (quoting *Rosenberg v. PK Graphics*, 2004

WL 1057621, at *1 (S.D.N.Y. May 10, 2004)).

The need for discovery is also undermined by the declarations supplied by the

Defendants stating that they do not and have never maintained offices, staff or telephone

numbers in the United States.  Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2.  They state that they do

not do business in the United States, do not solicit business or clients in the United States and do

not advertise in the United States.  Rashdan Decl. ¶ 2; Mohammed Decl. ¶ 2.[13]  These additional

---

[13]      The Committee notes that these declarations do not address accounts held in the United States and the
frequency of their usage.  But the Committee cites no cases holding that use of a correspondent account is enough to
confer general jurisdiction and the case law seems to suggest the opposite.  *See In re Terrorist Attacks*, 714 F.3d at
681 (concluding that "the alleged use of correspondent bank accounts and the maintenance of a website that allows

APP289

facts before the Court only confirm that the requested jurisdictional discovery is inappropriate.

*See A.W.L.I. Group, Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 575 (E.D.N.Y.

2011) ("[J]urisdictional discovery is not permitted where, as here, the defendant submits an

affidavit that provides all the necessary facts and answers all the questions regarding

jurisdiction.")

## CONCLUSION

For the reasons stated above, the Court finds that it lacks personal jurisdiction over the

Defendants due to an absence of minimum contacts with the jurisdiction. Accordingly, it is

unnecessary to reach the other grounds for dismissal raised by the Defendants.[14] The Defendants

should settle an order on three days' notice.

Dated: New York, New York
     April 17, 2015

                           **/s/ Sean H. Lane**            
                           UNITED STATES BANKRUPTCY JUDGE

---

account holders to manage their accounts are insufficient to support the exercise of general personal jurisdiction" against foreign defendants.)

[14]     Thus, the Court does not address the Defendants' arguments for dismissal based on international comity and the presumption against extraterritorial application of United States law. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of the jurisdiction of a . . . court, without which the court is powerless to proceed to an adjudication."). But those alternative arguments for dismissal raise serious concerns about the Committee's claims here. *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036 (2d Cir. 1996) (discussing whether pre-petition transfers by the debtor to certain banks should be governed by United States bankruptcy law before an American bankruptcy court or should proceed overseas and concluding that international comity supported deferring to the courts and laws of England); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014).

APP290

Order Granting Motion to Dismiss the Complaint Against Bahrain Islamic Bank

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------X
In re:                                        :
                                              :
ARCAPITA BANK B.S.C.(c), et al.,              :        Chapter 11
                                              :        Case No. 12-11076 (SHL)
                 Debtors.                     :        (Jointly Administered)
-------------------------------------------------------------X
OFFICIAL COMMITTEE OF UNSECURED               :
CREDITORS OF ARCAPITA BANK B.S.C.(c),         :
et al.,                                       :
                                              :
                 Plaintiff,                   :        Adv. Pro. No. 13-01434 (SHL)
                                              :
         v.                                   :
                                              :
BAHRAIN ISLAMIC BANK,                         :
                                              :
                 Defendant.                   :
-------------------------------------------------------------X
```

## ORDER GRANTING MOTION TO DISMISS THE COMPLAINT

Upon consideration of the Complaint dated August 26, 2013 (Docket No. 1) (the

"Complaint"), the Motion of Defendant Bahrain Islamic Bank to Dismiss the Complaint (Docket

Nos. 8 and 9) (the "Motion") filed by Bahrain Islamic Bank ("BISB"), the Objection of The

Official Committee of Unsecured Creditors of Arcapita Bank to Defendant Bahrain Islamic

Bank's Motion to Dismiss the Complaint (Docket Nos. 14 and 15) (the "Objection"), filed by

The Official Committee of Unsecured Creditors of Arcapita Bank (the "Committee"), the Reply

Memorandum of Law of Defendant Bahrain Islamic Bank in Further Support of Motion to

Dismiss (Docket Nos. 17 and 18) (the "Reply") filed by BISB, and all declarations and other

pleadings filed in connection therewith; and due and proper notice of the Motion having been

provided, and it appearing that no other or further notice need be provided; and a hearing having

been held on March 19, 2014 and the arguments of counsel for BISB and the Committee having

APP292

been heard; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found, pursuant

to Fed. R. Civ. P. 12(b)(2), incorporated and made applicable herein pursuant to Fed. R. Bankr.

P. 7012(b), that the Court lacks personal jurisdiction over BISB; and the Objection having been

overruled; and upon due deliberation and sufficient cause appearing therefor, it is hereby

     **ORDERED** that, for the reasons set forth in the Court's Memorandum of Decision dated

April 17, 2015 (Docket No. 23), the Motion is GRANTED; and it is further

     **ORDERED** that the Complaint is dismissed in its entirety with prejudice; and it is further

     **ORDERED** that this Court shall retain jurisdiction with respect to all matters arising

from, or relating to, the interpretation or implementation of this Order.

Dated: New York, New York
     April 28, 2015

                                  _**/s/ Sean H. Lane**_
                                    Honorable Sean H. Lane
                                    United States Bankruptcy Judge

APP293

Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against
Tadhamon Capital B.S.C.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X

In re:                                                                    :
                                                                          :
ARCAPITA BANK B.S.C.(c), <u>et al.</u>,                    :          Chapter 11
                                                                          :          Case No. 12-11076 (SHL)
                            Debtors.                              :          (Jointly Administered)

--------------------------------------------------------------X

OFFICIAL COMMITTEE OF UNSECURED              :
CREDITORS OF ARCAPITA BANK B.S.C.(c),        :
<u>et al.</u>,                                                        :
                                                                          :
                            Plaintiff,                            :          Adv. Pro. No. 13-01435 (SHL)
                                                                          :
                            v.                                       :
                                                                          :
TADHAMON CAPITAL B.S.C.,                             :
                                                                          :
                            Defendant.                         :

--------------------------------------------------------------X

## <u>ORDER GRANTING MOTION TO DISMISS THE COMPLAINT</u>

Upon consideration of the Complaint dated August 26, 2013 (Docket No. 1) (the

"<u>Complaint</u>"), the Motion of Defendant Tadhamon Capital B.S.C. to Dismiss the Complaint

(Docket Nos. 8 and 9) (the "<u>Motion</u>") filed by Tadhamon Capital B.S.C. ("<u>Tadhamon</u>"), the

Objection of The Official Committee of Unsecured Creditors of Arcapita Bank to Defendant

Tadhamon Capital B.S.C.'s Motion to Dismiss the Complaint (Docket No. 14) (the "<u>Objection</u>"),

filed by The Official Committee of Unsecured Creditors of Arcapita Bank (the "<u>Committee</u>"),

the Reply Memorandum of Law of Defendant Tadhamon Capital B.S.C. in Further Support of

Motion to Dismiss (Docket No. 16) (the "<u>Reply</u>") filed by Tadhamon, and all declarations and

other pleadings filed in connection therewith; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and a hearing

having been held on March 19, 2014 and the arguments of counsel for Tadhamon and the

Committee having been heard; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found, pursuant to Fed. R. Civ. P. 12(b)(2), incorporated and made applicable herein pursuant to Fed. R. Bankr. P. 7012(b), that the Court lacks personal jurisdiction over Tadhamon; and the Objection having been overruled; and upon due deliberation and sufficient cause appearing therefor, it is hereby

      **ORDERED** that, for the reasons set forth in the Court's Memorandum of Decision dated April 17, 2015 (Docket No. 21), the Motion is GRANTED; and it is further

      **ORDERED** that the Complaint is dismissed in its entirety with prejudice; and it is further

      **ORDERED** that this Court shall retain jurisdiction with respect to all matters arising from, or relating to, the interpretation or implementation of this Order.

Dated: New York, New York
      April 28, 2015

                      ***/s/ Sean H. Lane***
                      Honorable Sean H. Lane
                      United States Bankruptcy Judge

APP296

Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against
Bahrain Islamic Bank

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Official Committee of*
*Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                            :

In re:                                     :

                                            :         Chapter 11

ARCAPITA BANK B.S.C.(c), et al.,        :         Case No. 12-11076 (SHL)

                                            :         Confirmed

                    Reorganized Debtors.     :

                                            :

-------------------------------------------------------------x
                                            :

OFFICIAL COMMITTEE OF UNSECURED   :

CREDITORS OF ARCAPITA BANK B.S.C.(c), :

et al.,                                      :

                                            :         Adv. Pro. No. 13-1434 (SHL)

                     v.                       :

                                            :

BAHRAIN ISLAMIC BANK              :

                                            :

-------------------------------------------------------------x

## <u>NOTICE OF APPEAL</u>

        Pursuant to 28 U.S.C. § 158(a), Plaintiff, the Official Committee of Unsecured

Creditors of Arcapita Bank B.S.C.(c), *et al.*, hereby files this Notice of Appeal of this Court's

Order Granting Motion to Dismiss the Complaint, entered April 28, 2015 [Docket No. 24] (the

"Order"), a copy of which is attached hereto as Exhibit A. The prescribed fee accompanies this

Notice of Appeal.

      The names of the parties to the Order appealed from and the names, addresses,

and telephone numbers of their respective attorneys are as follows:

_Appellant Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c)_
Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

_Appellee Bahrain Islamic Bank_
John A. Bicks
Lani A. Adler
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

Dated: May 12, 2015
New York, NY

        By:   /s/ Evan R. Fleck           
        Evan R. Fleck
        MILBANK, TWEED, HADLEY & McCLOY LLP
        28 Liberty Street
        New York, NY 10005
        Telephone: (212) 530-5000

        Counsel for the Official Committee of Unsecured
        Creditors of Arcapita Bank B.S.C.(c), _et al._

APP299

Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

In re:                                               :
                                                     :
ARCAPITA BANK B.S.C.(c), <u>et al.</u>,              :         Chapter 11
                                                     :         Case No. 12-11076 (SHL)
                       Debtors.                      :         (Jointly Administered)
-------------------------------------------------------------X
OFFICIAL COMMITTEE OF UNSECURED                      :
CREDITORS OF ARCAPITA BANK B.S.C.(c),                :
<u>et al.</u>,                                       :
                                                     :
                       Plaintiff,                    :         Adv. Pro. No. 13-01434 (SHL)
                                                     :
                 v.                                  :
                                                     :
BAHRAIN ISLAMIC BANK,                                :
                                                     :
                       Defendant.                    :
-------------------------------------------------------------X

## <u>ORDER GRANTING MOTION TO DISMISS THE COMPLAINT</u>

Upon consideration of the Complaint dated August 26, 2013 (Docket No. 1) (the

"<u>Complaint</u>"), the Motion of Defendant Bahrain Islamic Bank to Dismiss the Complaint (Docket

Nos. 8 and 9) (the "<u>Motion</u>") filed by Bahrain Islamic Bank ("<u>BISB</u>"), the Objection of The

Official Committee of Unsecured Creditors of Arcapita Bank to Defendant Bahrain Islamic

Bank's Motion to Dismiss the Complaint (Docket Nos. 14 and 15) (the "<u>Objection</u>"), filed by

The Official Committee of Unsecured Creditors of Arcapita Bank (the "<u>Committee</u>"), the Reply

Memorandum of Law of Defendant Bahrain Islamic Bank in Further Support of Motion to

Dismiss (Docket Nos. 17 and 18) (the "<u>Reply</u>") filed by BISB, and all declarations and other

pleadings filed in connection therewith; and due and proper notice of the Motion having been

provided, and it appearing that no other or further notice need be provided; and a hearing having

been held on March 19, 2014 and the arguments of counsel for BISB and the Committee having

been heard; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found, pursuant

to Fed. R. Civ. P. 12(b)(2), incorporated and made applicable herein pursuant to Fed. R. Bankr.

P. 7012(b), that the Court lacks personal jurisdiction over BISB; and the Objection having been

overruled; and upon due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED** that, for the reasons set forth in the Court's Memorandum of Decision dated

April 17, 2015 (Docket No. 23), the Motion is GRANTED; and it is further

**ORDERED** that the Complaint is dismissed in its entirety with prejudice; and it is further

**ORDERED** that this Court shall retain jurisdiction with respect to all matters arising

from, or relating to, the interpretation or implementation of this Order.

Dated: New York, New York
      April 28, 2015

                                   */s/ Sean H. Lane*
                                   Honorable Sean H. Lane
                                   United States Bankruptcy Judge

APP302

Notice of Appeal of Order Granting Motion to Dismiss the Complaint Against
Tadhamon Capital B.S.C.

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Counsel for Official Committee of*
*Unsecured Creditors of Arcapita Bank B.S.C.(c), et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                              :

In re:                    :

                    :        Chapter 11

ARCAPITA BANK B.S.C.(c), <u>et al.</u>,    :        Case No. 12-11076 (SHL)

                    :        Confirmed

          Reorganized Debtors.    :

                    :

------------------------------------------------------------x
                              :

OFFICIAL COMMITTEE OF UNSECURED  :
CREDITORS OF ARCAPITA BANK B.S.C.(c),  :
<u>et al.</u>,                  :

                    :        Adv. Pro. No. 13-1435 (SHL)

          v.             :

                    :

TADHAMON CAPITAL B.S.C.      :

                    :

------------------------------------------------------------x

## <u>NOTICE OF APPEAL</u>

        Pursuant to 28 U.S.C. § 158(a), Plaintiff, the Official Committee of Unsecured

Creditors of Arcapita Bank B.S.C.(c), *et al.*, hereby files this Notice of Appeal of this Court's

Order Granting Motion to Dismiss the Complaint, entered April 28, 2015 [Docket No. 22] (the

"Order"), a copy of which is attached hereto as Exhibit A.  The prescribed fee accompanies this

Notice of Appeal.

The names of the parties to the Order appealed from and the names, addresses,

and telephone numbers of their respective attorneys are as follows:

*Appellant Official Committee of Unsecured Creditors of Arcapita Bank B.S.C.(c)*
Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Appellee Tadhamon Capital B.S.C.*
John A. Bicks
Lani A. Adler
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

Dated: May 12, 2015
New York, NY

By:  /s/  Evan R. Fleck
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5000

Counsel for the Official Committee of Unsecured
Creditors of Arcapita Bank B.S.C.(c), *et al.*

APP305

Exhibit A

APP306

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------X
In re:                                          :
                                                :
ARCAPITA BANK B.S.C.(c), et al.,                :      Chapter 11
                                                :      Case No. 12-11076 (SHL)
                    Debtors.                     :      (Jointly Administered)
-------------------------------------------------------------X
OFFICIAL COMMITTEE OF UNSECURED                 :
CREDITORS OF ARCAPITA BANK B.S.C.(c),           :
et al.,                                          :
                                                :
                    Plaintiff,                  :      Adv. Pro. No. 13-01435 (SHL)
                                                :
              v.                                :
                                                :
TADHAMON CAPITAL B.S.C.,                         :
                                                :
                    Defendant.                   :
-------------------------------------------------------------X
```

## ORDER GRANTING MOTION TO DISMISS THE COMPLAINT

Upon consideration of the Complaint dated August 26, 2013 (Docket No. 1) (the

"Complaint"), the Motion of Defendant Tadhamon Capital B.S.C. to Dismiss the Complaint

(Docket Nos. 8 and 9) (the "Motion") filed by Tadhamon Capital B.S.C. ("Tadhamon"), the

Objection of The Official Committee of Unsecured Creditors of Arcapita Bank to Defendant

Tadhamon Capital B.S.C.'s Motion to Dismiss the Complaint (Docket No. 14) (the "Objection"),

filed by The Official Committee of Unsecured Creditors of Arcapita Bank (the "Committee"),

the Reply Memorandum of Law of Defendant Tadhamon Capital B.S.C. in Further Support of

Motion to Dismiss (Docket No. 16) (the "Reply") filed by Tadhamon, and all declarations and

other pleadings filed in connection therewith; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and a hearing

having been held on March 19, 2014 and the arguments of counsel for Tadhamon and the

APP307

Committee having been heard; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion

and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

found, pursuant to Fed. R. Civ. P. 12(b)(2), incorporated and made applicable herein pursuant to

Fed. R. Bankr. P. 7012(b), that the Court lacks personal jurisdiction over Tadhamon; and the

Objection having been overruled; and upon due deliberation and sufficient cause appearing

therefor, it is hereby

ORDERED that, for the reasons set forth in the Court's Memorandum of Decision dated

April 17, 2015 (Docket No. 21), the Motion is GRANTED; and it is further

ORDERED that the Complaint is dismissed in its entirety with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising

from, or relating to, the interpretation or implementation of this Order.

Dated: New York, New York
     April 28, 2015

                     */s/ Sean H. Lane*
                     Honorable Sean H. Lane
                     United States Bankruptcy Judge

APP308