**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA, BANK B.S.C. (c),
et al.,

               Appellant,

      against

BAHRAIN ISLAMIC BANK,

               Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ARCAPITA, BANK B.S.C. (c),
et al.

               Appellant,

      against

TADHAMON CAPITAL B.S.C.,

               Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM DECISION AND**
**ORDER**

15-cv-03828 (GBD)

15-cv-03829 (GBD)

GEORGE B. DANIELS, District Judge:

      Plaintiff-Appellant, the official committee of unsecured creditors for the above-captioned

chapter 11 action ("Committee"), began adversary proceedings in the United States Bankruptcy

Court for the Southern District of New York against Defendants-Appellees Bahrain Islamic Bank

("BisB"), and Tadhamon Capital B.S.C. ("Tadhamon," and together with BisB, "Banks"),

respectively, seeking, *inter alia*, the avoidance of a preferential transfer. In a single decision, the

Bankruptcy Court dismissed the adversary proceedings with prejudice, finding that it lacked personal jurisdiction over the Banks. It also denied the Committee's request to engage in jurisdictional discovery. The Committee appeals the dismissal, the decision to dismiss with (as opposed to without) prejudice, and the decision to deny the Committee's request to engage in jurisdictional discovery.[1] After carefully reviewing the record and the parties' briefs, and with the benefit of oral argument, this Court has concluded that the Bankruptcy Court erred when it held that it lacked personal jurisdiction over the Banks. Therefore, this Court vacates the Bankruptcy Court's orders dismissing with prejudice the underlying adversary proceedings for lack of personal jurisdiction, and remands the adversary proceedings to the Bankruptcy Court.[2]

## I.    Background Facts[3]

Before filing for chapter 11 bankruptcy on March 19, 2012, Arcapita Bank B.S.C.(c) was licensed as an Islamic wholesale bank by the Central Bank of Bahrain, and was headquartered in Bahrain. (BisB Complaint, included in Joint Appendix Vol. 1, attached to Brief for Appellant, (Case No. 15-cv-03828, ECF No. 16-1), at APP005 ¶ 12.[4])

---

[1] Because each of the Banks' underlying motions to dismiss and the Committee's instant appeals raise the same issues, and because the Bankruptcy Court addressed both of the Banks' motions to dismiss in a single opinion, this Court likewise addresses both appeals together.

[2] Because this Court has determined that the Bankruptcy Court may exercise personal jurisdiction over the Banks, it does not opine on the Committee's appeals of the Bankruptcy Court's decisions to dismiss the actions with (as opposed to without) prejudice, or to deny the Committee's alternative request to engage in jurisdictional discovery.

[3] The parties agree that the facts are not in dispute. (Reply Brief for Appellant, (ECF No. 20), at 1 ("As the Banks acknowledge, the facts in this case are not in dispute." (Brackets and citation omitted)); Brief for Appellees, (ECF No. 17), at 1 ("The facts in this case are not in dispute.").)

[4] All citations are to the record in Case No. 15-cv-03828 unless otherwise noted. Additionally, because the ECF bates stamp numbers printed on the documents included in this record are often unreadable, this opinion often cites to the Appendix page designation found in the lower-right corner of each page.

BisB is an Islamic commercial bank also headquartered in Bahrain.  (*Id.* at APP005 ¶ 13.)
BisB maintains correspondent bank accounts[5] in the United States at Deutsche Bank, Standard
Chartered Bank, and JP Morgan Chase Bank.  (*Id.* at APP005 ¶ 14.)

Tadhamon is also a Bahraini corporation.  (Tadhamon Complaint, included in Joint
Appendix Vol. 1, attached to Brief for Appellant, (ECF No. 16-1), APP019 ¶ 13.)  Tadhamon does
not maintain any correspondent bank accounts in the United States.  (*See* Transcript Regarding
Hearing Held on March 9, 2014 re: Motion to Dismiss Adversary Proceeding, (ECF No. 16-2), at
APP154:19-21.).

In March 2012, Arcapita hired BisB to make one investment, and Tadhamon to make two
investments, respectively, on its behalf.  (*See* BisB Complaint at APP008 ¶¶ 27-31; Tadhamon
Complaint at APP022-023 ¶¶ 27-34.)  Each transaction was executed in accordance with an
agreement ("Placement Agreement") that Arcapita had entered into with each Bank.[6]  (*See* BisB
Complaint at APP007 ¶¶ 23-26; Tadhamon Complaint at APP021-022 ¶¶ 22-26.)  The Placement
Agreements provided that the Banks to which the agreement applied would formally initiate each
investment transaction by submitting an offer to Arcapita to purchase commodities or securities on
Arcapita's behalf.  The Banks' offer set forth: (1) the amount, in a specific currency, of the funds
Arcapita would transfer to the Bank if it accepted the Bank's offer (the "Placement"); (2) the specific
bank account into which Arcapita would transfer, and the Bank would receive, the funds; (3) the

---

[5] "A correspondent bank account is a domestic account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds.  Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to . . . the United States." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) ("*Licci IV*") (internal citations and quotation marks omitted).

[6] Arcapita and BisB executed their Placement Agreement on or about July 10, 2003.  (BisB Complaint at APP007 ¶ 23.)  Arcapita and Tadhamon, on the other hand, executed their Placement Agreement on March 15, 2012, the same day on which Arcapita and Tadhamon entered into the specific placement transactions at the heart of the litigation between the Committee and Tadhamon.  (Tadhamon Complaint at APP021-022 ¶¶ 22-23, 27.)

commodity or securities that the Bank would purchase with the funds on Arcapita's behalf; (4) a pre-determined rate of return that Arcapita would earn on its investment; and (5) a maturity date— i.e., the date on which the Bank would transfer back to Arcapita its initial investment plus an agreed upon profit rate, minus a fee. (*See* Declaration of Mohammed Ebraim Mohammed in Support of Motion to Dismiss [] Defendant Bahrain Islamic Bank ("Mohammed Decl."), (ECF No. 16-1), Exhibit A, at APP040 ¶ 4.1, *id.* at APP043; Declaration of Waleed Rashdan in Support of Motion to Dismiss [] Defendant Tadhamon Capital B.S.C. ("Rashdan Decl."), (ECF No. 16-1), Exhibit A, at APP063, Exhibit B, at APP069.)

On or around March 14, 2012, Arcapita accepted an investment offer from BisB. Pursuant to the terms of the offer, Arcapita transferred $10 million to a BisB-designated account, specifically, BisB's JP Morgan Chase correspondent bank account located in New York. (BisB Complaint at APP008 ¶¶ 27-28.) The same day that it received the money in its New York correspondent bank account, BisB purchased 14,245 troy ounces of palladium on Arcapita's behalf through a broker in London. (Mohammed Decl. at APP035 ¶ 10; Declaration of Nicholas A. Bassett in Support of the Objection of the Official Committee of Unsecured Creditors to Bahrain Islamic Bank's Motion to Dismiss the Complaint ("Bassett Decl."), (ECF No. 16-1), Exhibits A-C, at APP081-086.) The investment was set to mature on March 29, 2012. (BisB Complaint at APP008 ¶ 31.) Before Arcapita made the $10 million Placement, it was already indebted to BisB in the amount of $9,774,096.15. (*Id.* at APP006 ¶¶ 20, 22.)

On or about March 15, 2012, Arcapita accepted two investment offers from Tadhamon. (Tadhamon Complaint at APP022 ¶ 27.) Pursuant to the terms of the offers, Arcapita made two $10 million transfers to a Tadhamon-designated New York HSBC correspondent bank account maintained by Khaleeji Commercial Bank B.S.C. ("Khaleeji"), Tadhamon's bank in Bahrain. (*Id.* at APP022 ¶ 28.) After receiving the funds, Khaleeji transferred the funds to Tadhamon's account

at Khaleeji in Bahrain.  (*Id.*)  Tadhamon then used the funds to purchase Bahranian securities on Arcapita's behalf.  (Rashdan Decl. at APP054 ¶ 13.)  The investments were set to mature on March 30, 2012 and April 16, 2012, respectively.[7]  (Tadhamon Complaint at APP 022-023 ¶¶ 32-33.)  Before Arcapita made the two Placements totaling $20 million, it was already indebted to Tadhamon in the amount of $18,497,734.48.  (*Id.* at APP020-021 ¶¶ 19, 21.)

On March 19, 2012, less than a week after executing all three Placements, Arcapita filed for bankruptcy.  (BisB Complaint at APP008 ¶ 30; Tadhamon Complaint at APP022 ¶ 31.)

On each of the applicable maturity dates, the Banks failed to remit any of the proceeds owed to Arcapita.  (BisB Complaint at APP008 ¶ 32; Tadhamon Complaint at APP022-023 ¶¶ 32-35.)  On April 30, 2012, Arcapita delivered demand letters to the Banks, informing the Banks that the funds were property of the bankruptcy estate of Arcapita.  (BisB Complaint at APP008-009 ¶ 33; Tadhamon Complaint at APP023-024 ¶ 37.)  In response, each Bank asserted that it was withholding all or nearly all of the funds as a setoff against the existing debts owed by Arcapita to each Bank.  (BisB Complaint at APP009 ¶ 34; Tadhamon Complaint at APP024 ¶ 38.)  In December 2012, Tadhamon returned to Arcapita approximately $2 million, the difference between the antecedent debt Arcapita owed Tadhamon and the total amount that Arcapita had transferred to Tadhamon in connection with the Tadhamon Placements.  (Tadhamon Complaint at APP024 ¶ 40.)  BisB has failed to return any portion of the funds Arcapita transferred in connection with the Placement it made with BisB.  (BisB Complaint at APP 009 ¶ 36.)

---

[7] Shortly before each of these dates, Tadhamon "roll[ed]-over" each of the $10 million Placements for an additional one-month term.  The Placements' maturity dates then became April 30, 2012 and May 16, 2012, respectively.  (Tadhamon Complaint at APP023 ¶ 36.)

## II.   Procedural History

In June 2013, the Bankruptcy Court confirmed the proposed plan of reorganization in Arcapita's bankruptcy. (*See* Memorandum of Decision ("Decision"), included in Joint Appendix Vol. 2, attached to Brief for Appellant, (ECF No. 16-2), at APP273.) The Bankruptcy Court subsequently entered an order granting the Committee leave, standing, and the authority to pursue claims against the Banks. (*Id.*)

On August 26, 2013, pursuant to the authority granted by the Bankruptcy Court, the Committee commenced these adversary proceedings against the Banks to recover the funds transferred by Arcapita and received by the Banks. (*See* BisB Complaint; Tadhamon Complaint.) The adversary proceedings asserted that at the time Arcapita and the Banks entered into the Placements, Arcapita was insolvent, the Placements occurred less than ninety days before it filed for bankruptcy, and that the Placements were improperly made to pay off the debts Arcapita owed each Bank.[8] (BisB Complaint at APP011-012 ¶¶ 49-57; Tadhamon Complaint at APP026-027 ¶¶ 54-62.)

On November 18, 2013, the Banks moved to dismiss the adversary complaints asserting that (i) the Bankruptcy Court lacked personal jurisdiction over the Banks; (ii) the Committee's claims were barred by the presumption against extraterritoriality; and (iii) the claims were barred by principles of international comity. (*See generally*, Motions to Dismiss the Complaint, (ECF No. 16-1), at APP031-076.)

On April 17, 2015, the Bankruptcy Court issued its decision concluding that the transfers to the New York correspondent bank accounts designated by each of the Banks was an insufficient basis on which to establish specific personal jurisdiction over the Banks. The Bankruptcy Court

---

[8] The Committee also asserted claims for breach of contract, turnover, violation of the automatic stay, and claim disallowance. (BisB Complaint at APP003 ¶ 1; Tadhamon Complaint at APP017 ¶ 1.)

held that "while the use of the [correspondent bank] account[s were] admittedly a contact [with the United States,] it [was] too weak to satisfy due process requirements," because the use of the correspondent bank accounts was "neither the beginning nor the end of the Placement, but rather a transitory step." (Decision at APP278-279.) The Bankruptcy Court also emphasized that "the use of the accounts was not central to the alleged wrong" because the causes of action were all "based upon the alleged setoff by the [Banks]," and the receipt of the transfers themselves were not themselves improper at the time they occurred. (*Id.* at APP287-288, 288 n.12.)

## III.   Standard of Review

This Court reviews *de novo* the dismissal of a case for lack of personal jurisdiction over the defendant. *See Licci IV*, 732 F.3d at 167. "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). In a Rule 12(b)(2) motion, "a court may consider materials outside the pleadings, but must credit plaintiffs' averments of jurisdictional facts as true." *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2012). Furthermore, all pleadings and affidavits are to be construed in the light most favorable to the plaintiff and all doubts resolved in the plaintiff's favor. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).

Determining whether a bankruptcy court may exercise personal jurisdiction over a foreign defendant is a two-prong inquiry. First, the bankruptcy court must determine whether the defendant has "the requisite minimum contacts with the United States at large." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (citation omitted). Where the plaintiffs ask the court to assert specific jurisdiction over the defendants, the inquiry focuses on the "affiliation between the forum and the underlying controversy . . . ." *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (alterations

and citation omitted).[9]   Thus, the defendant must have contact with the forum, and the underlying cause of action must "arise out of or relate to" that contact.   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted).

Second, the court must determine whether exercising personal jurisdiction over the defendant will offend "traditional notions of fair play and substantial justice."   *Asahi Metal Indus. Co., Ltd. v. Super Ct. Cal.*, 480 U.S. 102, 113 (1987) (citation omitted).   Factors relevant to the analysis include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum . . . in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient and effective relief."   *Licci IV*, 732 F.3d at 170 (citations, quotation marks and alterations omitted).

## IV.   Personal Jurisdiction and Correspondent Bank Accounts

### A.   The *Licci* Case

In a series of opinions, this Court, the Second Circuit, and the New York Court of Appeals all confronted a jurisdictional dispute similar to the one now before this Court on appeal: whether the use of a correspondent bank account provides a sufficient basis to exercise personal jurisdiction over a foreign bank.   *See generally*, *Licci v. Am. Express Bank, Ltd.*, 704 F. Supp. 2d 403 (S.D.N.Y. 2010) ("*Licci I*"); *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*"); *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012) (*Licci III*); *Licci IV*, 732 F.3d 161.   Although the factual circumstances of the instant actions are not identical, the reasoning contained within the opinions guides the resolution of the instant appeal.

---

[9] In addition to asserting specific jurisdiction, "[a] court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State."   *Licci IV*, 732 F.3d at 169 n.6 (quoting *Goodyear*, 131 S. Ct. at 2851).   From the outset of the adversary proceedings, the Committee acknowledged that the Complaint failed to plead a prima facie case with regard to general jurisdiction.   (*See* Decision at APP277 n.4.)

In *Licci*, the plaintiffs alleged that Lebanase Canadian Bank, SAL ("LCB"), which was headquartered in Beirut, "intentionally and/or negligently provided Hizbollah with wire transfer services involving millions of dollars, and such transferred funds enabled and assisted Hizbollah to carry out terrorist attacks, including . . . rocket attacks that harmed plaintiffs [in Israel]." *Licci I*, 704 F. Supp. 2d at 405. The causes of action against LCB were dismissed for lack of personal jurisdiction, *id.* at 407-08, and the plaintiffs appealed.

When the case first reached the second circuit, it undertook a fairly comprehensive review of New York case law to determine "whether a foreign bank's frequent use of a correspondent account in New York to effect international wire transfers on behalf of an overseas client is an act directed with sufficient purposefulness at New York to constitute a transaction of business in that state under the long-arm statute."[10] *Licci II*, 673 F.3d at 63. It concluded, however, that the scope and application of the long-arm statute's "transaction of business" test was uncertain in this context. *See id.* at 65-66. It also attempted to discern "whether, as a matter of New York law, the plaintiffs' . . . claims, as they are alleged by the plaintiffs, 'arise from' the defendants' transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)." *Id.* at 70. It found that ambiguities in the New York Court of Appeals articulation of the applicable standard also undermined the court's confidence to correctly determine whether the plaintiffs had satisfied the second prong of the test under § 302(a)(1). *Id.* at 70-74. Given this uncertainty, the court certified two questions to the New York Court of Appeals:

> (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transaction" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

---

[10] "Determining personal jurisdiction over a foreign defendant in a federal-question case . . . requires [a court to first] look to the law of the forum state to determine whether personal jurisdiction will lie." *Licci IV*, 732 F.3d at 168.

> > (2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the
> > [Alien Tort Statute], or for negligence or breach of statutory duty
> > in violation of Israeli law, "arise from" LCB's transaction of
> > business in New York within the meaning of N.Y. C.P.L.R. §
> > 302(a)(1)?

*Id.* at 74-75 (brackets omitted).

The New York Court of Appeals accepted the questions, and addressed each in turn. With regard to the first "transaction of business" question, the court engaged in an extensive analysis of *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 384 N.Y.S.2d 124 (1976).[11] *Licci III*, 20 N.Y.3d at 335-38, 960 N.Y.S.2d 695. *Amigo Foods* involved the unknowing—and, therefore, unauthorized—one-time receipt of funds by a defendant's New York correspondent bank. *See id.* at 335-37 (summarizing the facts in *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 61 A.D.2d 896 (1st Dep't 1978), *aff'd* 46 N.Y. 2d 855 (1979)). Because the defendant had "passively and unilaterally been made the recipient of funds" by another actor, the *Amigo Foods* court concluded that the defendant had "not purposely availed itself of the privilege of conducting activities in New York . . . ." *Id.* at 337, 960 N.Y.S.2d 695 (quoting *Amigo Foods*, 61 A.D.2d at 897 (emphasis and internal quotation marks omitted)). In other words, the defendant had not "transacted business" within the meaning of the first prong of New York's long-arm statute. *See id.* at 337-389, 60 N.Y.S.2d 695. Significantly, *Amigo Foods* did not hold that jurisdiction did not lie simply because the defendant's use of the correspondent account was limited to a single instance;[12]

---

[11] The Second Circuit had also focused on *Amigo Foods* and its progeny in its initial attempt to discern how to apply the "transaction of business" prong. *Licci II*, 673 F.3d at 63-66.

[12] Indeed, it has long been recognized that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's [New York] activities . . . were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (discussing application of § 302(a)(1)) (citation omitted).

nor did it hold that jurisdiction did not lie because the defendant had received, rather than transferred, the funds at issue.

After summarizing the holding in *Amigo Foods*, the court stated that the first prong of the long-arm statute is satisfied by a "defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." *Id.* at 338, 960 N.Y.S.2d 695. The court cautioned, however, that the "jurisdictional inquiry under C.P.L.R. 302 (a) (1) necessarily requires examination of the particular facts in each case." *Id.* It reiterated that the defendant in *Amigo Foods* had not "transacted business" within the meaning of the first prong of N.Y. C.P.L.R. § 302(a)(1) because its "use of the account . . . was essentially adventitious—i.e., it was not even [its own] doing." *Id.*, 960 N.Y.S.2d 695.

The court then applied the proposition *Amigo Foods* stood for to the first certified question: whether use of a correspondent bank account "dozens" of times constitutes a "transaction of business" under New York's long-arm statute.  The court held that "the repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339, 960 N.Y.S.2d 695 (internal citation omitted).  The court relied on LCB's repeated use to determine "whether [the] maintenance and use of a correspondent account [was] *purposeful* or *coincidental*," *id.* at 339, 960 N.Y.S.2d 695 (emphasis added), in other words, to ensure that the use was not "adventitious," *id.* at 338, 960 N.Y.S.2d 695.  It did not hold that repeated use of a correspondent account was a requisite to satisfy the first prong of § 302(a)(1).

Addressing what "arises from" means, the New York Court of Appeals first stated that the defendant's transaction of business need not have caused the plaintiff's injury, and that "the inquiry

under the statute is relatively permissive." *Id.* at 339, 960 N.Y.S.2d 695. It went on to state that so long as there is "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim," jurisdiction will lie. *Id.* at 340, 960 N.Y.S.2d 695. Furthermore, the court clarified that even if only "one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction . . . ." *Id.* at 341, 960 N.Y.S.2d 695. Finally, the court stated the inquiry logically focuses on the defendant's conduct, rather than the plaintiff's injuries, since "personal jurisdiction is fundamentally about a court's control over the person of the defendant . . . ." *Id.* at 340, 960 N.Y.S.2d 695.

The court then applied these principles to the second certified question: whether the plaintiffs' claims in *Licci* "ar[o]se from LCB's transaction of business in New York." The court held that they did: "the complaint alleges that LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars. Taken as true, LCB arguably thereby violated duties owed to plaintiffs under the various statutes asserted as a basis for subject matter jurisdiction." *Id.* Although "[n]ot all elements of the causes of action pleaded [we]re related to LCB's use of the correspondent account," "[a]nd the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets," these facts did not defeat jurisdiction. *Id.* at 341, 960 N.Y.S.2d 695. LCB "deliberately" used its New York correspondent bank account, rather than "once or twice *by mistake*." *Id.* at 340-41, 960 N.Y.S.2d 695 (emphasis added). Accordingly, the court held that there was "an articulable nexus" between these uses and the plaintiffs' claims. The assertion of specific personal jurisdiction was appropriate. *Id.*

When the case returned to the Second Circuit, the court summarized the New York Court of Appeals' analysis and holdings, and then proceeded to analyze whether exercising jurisdiction over

LCB also comported with constitutional due process. *Licci IV*, 732 F.3d at 168-69. Before doing

so, the court noted that although "personal jurisdiction permitted under [New York's] long-arm

statute may theoretically be prohibited under due process analysis," it "expect[ed] such cases to be

rare." *Licci IV*, 732 F.3d at 170. The court explained that

> [i]t would be unusual, indeed, if a defendant transacted business in
> New York and the claim asserted arose from that business activity
> within the meaning of section 302(a)(1), and yet, in connection with
> the same transaction of business, the defendant cannot be found to
> have purposefully availed itself of the privilege of doing business in
> the forum and to have been able to foresee being haled into court
> there, or the assertion of specific jurisdiction would somehow
> otherwise offend traditional notions of fair play and substantial
> justice.

*Id.* In fact, the Second Circuit stated that it was unaware of any such case where jurisdiction had

lied under New York's long-arm statute, but the exercise of jurisdiction would violate constitutional

due process. *Id.*

Unsurprisingly, then, the Second Circuit went on to hold that exercising personal jurisdiction

over LCB was consistent with due process. The court held that LCB's use of the correspondent

account as an instrument to achieve the wrong complained of satisfied the minimum contacts'

component of the due process inquiry. *Id.* at 173. In reaching this conclusion, it relied on the fact

that although "LCB could have . . . processed U.S.-dollar-denominated wire transfers . . . through

correspondent accounts anywhere in the world," it instead "deliberately chose to process the . . .

wire transfers through [an account] in New York." *Id.* at 171. Accordingly, its "in-forum activity

sufficiently reflect[ed] [its] 'purposeful availment' of the privilege of carrying on its activities here,

. . . even [though] the effects of [its] entire course of conduct [we]re felt elsewhere." *Id.* at 173. In

sum, the court justified the assertion of jurisdiction over LCB by explaining that "[i]t should hardly

be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it

might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Id.* at 171-72.

The court then analyzed whether exercising jurisdiction over LCB would nevertheless be unreasonable because doing so would offend traditional notions of fair play and substantial justice. The court concluded that it would not. *Id.* at 174. It explained that modern communication and transportation eased any burden of defending the case in New York. *Id.* at 174. Additionally, the court explained that although the plaintiffs' injuries occurred in Israel, the United States and New York both have an interest in monitoring banks and banking activity to ensure that their financial systems are not used for nefarious ends. *Id.* Based on a consideration of these factors, and the absence of any compelling interest that outweighed them, the court held that exercising jurisdiction over LCB in New York was not unconstitutional. *Id.*

## B. The Banks' Selection of New York Correspondent Accounts are "Minimum Contacts" on which to Assert Personal Jurisdiction

The *Licci* litigation yields several insights applicable to the instant appeal. First, the use of a correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute so long as the use was purposeful and not coincidental or adventitious. *Licci III*, 20 N.Y.3d at 338-39; *see Licci II*, 673 F.3d at 65-66. Second, under the "relatively permissive" second prong, the defendant's use of the correspondent bank account need not be at the "very root" of the plaintiff's claim. *See Licci III*, 20 N.Y.3d at 339-41 (stating jurisdiction lies "over those claims in some way *arguably* connected to the transaction [of business in New York]" (emphasis added)). Rather, as long as the use of the correspondent bank account is not "completely unmoored" from one of the elements of the plaintiff's cause of action, the prong is satisfied. *Id.* at 340. Third, although the jurisdictional analysis under the New York long-arm statute and constitutional due process are not completely coextensive, they closely

14

resemble one another, and this resemblance is "particularly evident with respect to [long-arm statute subdivision] § 302(a)(1)." *Licci II*, 673 F.3d at at 61 n.11. Thus, when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located. *Id.* at 171-72.

Although this is an adversary proceeding arising out of a chapter 11 bankruptcy reorganization,[13] given the striking similarities between the analysis conducted under N.Y. C.P.L.R. § 302(a)(1) and constitutional due process, whether jurisdiction lies under § 302(a)(1) is particularly probative of the ultimate inquiry.[14] *Licci II*, 673 F.3d at 61 n.11 (noting that "[i]n many cases, the jurisdictional analysis under the New York long-arm statute may closely resemble the analysis under the Due Process Clause," and that the "similarity of state-law and constitutional standards appears particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1)"); *Licci IV*, 732 F.3d at 170 (stating it would be "rare" for there to be jurisdiction under § 302(a)(1) and not under due process analysis).

The Banks' purposeful use of correspondent bank accounts in New York constitutes a "transaction of business" within New York. The Banks, not Arcapita, set the terms of each placement transaction, and then presented those terms in an offer to Arcapita. ((Mohammed Decl., Exhibit A, at APP040 ¶ 4.1; Rashdan Decl., Exhibit A, APP060 ¶ 5.1-5.2.) The Banks selected U.S.

---

[13] *Compare Madoff*, 460 B.R. at 117 (stating that due process is the only jurisdictional inquiry in bankruptcy case and citing case law for proposition that defendant need only have contact with United States, not forum state), *with Licci IV*, 732 F.3d at 168 ("Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires [a court to first] look to the law of the forum state to determine whether personal jurisdiction will lie.").

[14] Furthermore, as the Bankruptcy Court noted, many of the cases cited by the parties involved jurisdictional analysis under § 302(a)(1).

dollars as the currency in which to execute the transaction.[15]  (*Id.* at APP043; Bassett Decl., Exhibits A-C, at APP081-086.)  The Banks designated New York correspondent bank accounts to receive the funds from Arcapita.  (*Id.* at APP043; Bassett Decl., Exhibits A-C, at APP081-086.)  The Banks' selection of dollars and their decision to utilize New York's banking system to effectuate the transfer was no less deliberate than LCB's use of New York's banking system in *Licci*.  Additionally, unlike the defendant in *Amigo Foods*, the Banks' contacts with New York were not established passively through another entity's unilateral action.  In fact, the Banks were not simply complicit, or even mere participants, in the selection of the New York correspondent bank accounts.  Rather, the selection of the New York correspondent bank accounts that received the funds *originated with* the Banks; they *actively directed* the funds at issue into those New York accounts.

The Committee's cause of action for the avoidance of a preferential transfer "arises from" the Banks' use of the New York correspondent bank accounts.  A party seeking the avoidance of a preferential transfer must show, *inter alia*, "(1) a *transfer* to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such *transfer* was made."  11 U.S.C. § 547(b) (emphasis added).  The Banks' New York contacts—*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts—are at the heart of this cause of action.  The receipt of the funds in New York is precisely the conduct targeted by the Committee, and the activity that the cause of action seeks to have voided.

---

[15] The Bankruptcy Court noted that "[t]he Banks had claimed that the correspondent accounts were used to accommodate Arcapita's desire to transfer the funds in U.S. dollars, but there was no evidence of that in the record." (Decision at APP282 n.10.) This Court is mindful of its obligation to construe all pleadings and affidavits in the light most favorable to the plaintiff and to resolve all doubts in the plaintiff's favor. *See Penguin Grp.*, 609 F.3d at 34. Given that the record demonstrates BisB presented the Placement offer to Arcapita, absent any contrary evidence, the decision to conduct the transaction in dollars is properly viewed as originating with, and thus attributable to, BisB. With respect to Tadhamon, the Tadhamon Placement Agreement states that Arcapita and Tadhamon would jointly determine the currency in which each Placement would be executed. (Rashdan Decl., Exhibit A, at APP061 ¶ 5.6.) Tadhamon is therefore equally responsible for this decision, and cannot claim that the decision to use U.S. dollars should not be attributed to it.

That specific jurisdiction may be asserted under N.Y. C.P.L.R. § 302(a)(1) is strong evidence that the assertion of jurisdiction comports with constitutional due process. This is so because the jurisdictional test to comport with constitutional due process is strikingly similar to the test under § 302(a)(1). *Licci II*, 673 F.3d at 61 n.11. In fact, to this Court's knowledge, no court has yet held that § 302(a)(1) confers jurisdiction, but that asserting such jurisdiction would nonetheless violate constitutional due process. *See Licci IV*, 732 F.3d at 170 (stating that it would be "rare" for there to be jurisdiction under § 302(a)(1), but the exercise of such jurisdiction would be unconstitutional and that to Second Circuit's knowledge, the situation had never arisen).[16]

"Where the [plaintiff's] claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (internal brackets omitted (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). The Banks' selection and uses of the New York correspondent bank accounts were undoubtedly "contacts" with the United States, and the Committee's preferential transfer cause of action "arise[s] out of or relate[s] to " to those contacts.[17] BisB did not purchase commodities in the United States with the funds, but instead purchased palladium through a London broker. Similarly, Tadhamon did not purchase or invest in United States securities; instead, it used the funds to make Bharaini

---

[16] Neither party contends that the purposeful selection and use of a correspondent bank account in New York to receive millions of dollars is a particularly rare case.

[17] The Banks argue that, pursuant to the terms of the Placement Agreements, they were acting as Arcapita's agent, and so the New York correspondent bank accounts are not the Banks' contacts, but Arcapita's. (Brief for Appellees at 12-14.) Although the Banks' acted as Arcapita's agent when purchasing commodities and securities on its behalf, the Banks made the decision on where to receive the funds to make those purchases in their sole discretion. They could have received the funds elsewhere and still performed their duties under the Placement Agreements and offers. The Banks' decisions to utilize New York correspondent bank accounts were made independently, and therefore properly attributable to the Banks.

investments. Nevertheless, both Banks deliberately chose to receive Arcapita's funds in U.S. dollars and designated correspondent bank accounts in New York to receive the funds, even though they presumably could have performed the Placement transactions without ever directing the funds through New York or anywhere else in the United States. The Banks are therefore similarly situated to the defendant in *Licci*, who also could have utilized accounts elsewhere in the world. *Licci IV*, 732 F.3d at 171 (the defendant "could have . . . processed U.S.-dollar-denominated wire transfers to [its client] through correspondent accounts anywhere in the world"). The Banks' deliberate choice to utilize the New York correspondent bank accounts and, more generally, New York's and the United States's banking system, are United States contacts attributable to them.[18, 19] Additionally, the Committee's causes of action for the avoidance of preferential transfers arise out of or relate to the Banks' contacts with the forum. In other words, if preferential transfers are found to have occurred, they occurred at the time the funds were transferred into the New York correspondent bank accounts at the Banks' direction.[20]

---

[18] The Bankruptcy Court found that "Tadhamon's use of a third party's correspondent bank account is insufficient to establish specific jurisdiction," because "Tadhamon made a conscious decision to forgo maintenance of a correspondent account in the United States and has clearly not benefitted from the privilege of doing business here under these circumstances." This Court disagrees. The fact that Tadhamon utilized Khaleeji's correspondent account, rather than its own, does not alter the fact that Tadhamon is the entity that instructed Arcapita to make two wire transfers, totaling $20 million, to accounts located in New York. Contrary to the Bankruptcy Court's suggestion, Tadhamon sought to, and in fact, did take advantage of the United States's dependable and transparent banking system by receiving the funds into a New York account before transferring them to its own account in Bahrain. Because Tadhamon directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a "contact" properly attributed to Tadhamon. In any case, as the Bankruptcy Court noted, Khaleeji acted as Tadhamon's agent when it received the funds, and thus, Khaleeji's receipt of the funds in New York can be imputed to Tadhamon.

[19] The Bankruptcy Court also concluded that the Banks' "mere knowing receipt of funds at a correspondent bank account is insufficient to establish jurisdiction." (Decision at APP 280-81.) As this record makes clear, however, the Banks' did not merely knowingly receive the funds in a correspondent account, but actively selected the correspondent bank accounts in New York and directed the funds to these accounts. Thus, the Banks' connection to New York was not passive, but active and volitional.

[20] In a footnote, the Bankruptcy Court stated that the Banks' use of the New York correspondent bank accounts could not serve as the basis to assert jurisdiction over the Banks for the Committee's preferential

As the Second Circuit stated, "[i]t should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *See Licci*, 732 F.3d at 171-72. Just like the defendant in *Licci*, the Banks deliberately chose to effectuate the Placements by directing the transfer of millions of dollars through New York. The exercise of jurisdiction over the Banks for a cause of action that relates to those transfers is constitutional.

Finally, asserting jurisdiction over the Banks does not somehow render "mere maintenance" of a correspondent account in the United States sufficient to support personal jurisdiction over the account-holder in connection with any controversy. Had the record demonstrated that Arcapita, as opposed to the Banks, selected the U.S. dollar and the New York accounts to effectuate the Placements, the Banks' contacts with the United States would have been adventitious, and jurisdiction would not have lied. But where, as here, the defendant's in-forum activity reflects its "purposeful availment" of the privilege of carrying on its activities here, the defendant has established minimum contacts sufficient to confer a court with jurisdiction over it, even if the effects of the defendant's conduct are felt entirely outside of the United States. *Licci IV*, 732 F.3d at 173. Had the Banks wished to avoid being subject to jurisdiction in the United States in connection with these particular Placements, they could have presented Arcapita with Placement offers designating non-U.S. accounts to receive the Placement funds.

---

transfer cause of action because "the use of the correspondent account [was] not the actionable conduct in and of itself." (Decision at APP 288.)  Due process analysis, however, closely tracks N.Y. C.P.L.R. § 302(a)(1), the application of which has never been held unconstitutional, and there is undoubtedly an articulable nexus between the preferential transfer cause of action and the Banks' use of the New York correspondent accounts.

## C.  Assertion of Personal Jurisdiction is "Reasonable"

Only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable" can a defendant that has purposefully directed its activities at the forum defeat jurisdiction on due process grounds. *Licci IV*, 732 F.3d at 173 (quoting *Burker King*, 471 U.S. at 477).  The Second Circuit has identified several factors relevant to determining reasonableness, including: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient and effective relief." *Licci IV*, 732 F.3d at 170 (quoting *Bank Brussels*, 305 F.3d at 129).

These factors support the constitutional exercise of personal jurisdiction over the Banks. With regard to the first factor, courts have held that the burden imposed on a defendant forced to litigate far from home is substantially mitigated by the conveniences of modern communication and transportation. *Bank Brussels*, 305 F.3d at 129-30.  With regard to the second factor, the United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable. *Picard v. Chais (In re Bernard L. Madoff Investment Secs. LLC)*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010) (stating that "[t]he United States has a strong interest in applying the provisions of its bankruptcy code"); *U.S. Lines, Inv. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*, 68 B.R. 690, 699 (Bankr. S.D.N.Y. 1986) (finding that United States had strong interest in adjudicating dispute because it arose "solely under [the United States' bankruptcy] laws and concern[ed] a vital protection provided by federal statute to those who seek to reorganize"). Indeed, it does not seem prudential to allow foreign creditors to potentially obtain priority over domestic creditors based simply on their foreign status. Third, the Committee has a strong interest in obtaining convenient and effective relief, and it is unclear whether it would be able to bring a

similar causes of action to those grounded in the United States bankruptcy code in a non-U.S. forum. Although it is true that the Banks must defend themselves in a foreign legal system, and this weighs in the Banks' favor, this factor alone is not dispositive, otherwise a United States court could never constitutionally exercise jurisdiction over a non-U.S. entity. *See Asahi*, 480 U.S. at 114. Given that the balance of factors weigh in the Committee's favor, the exercise of personal jurisdiction over the Banks' in this particular action comports with constitutional due process.

**V.    Conclusion**

The Banks' selection and use of correspondent bank accounts in New York provides a sufficient basis for a court to assert personal jurisdiction over them. Accordingly, this Court vacates the Bankruptcy Court's orders dismissing with prejudice the Committee's underlying adversary proceedings against each Bank, and remands them to the Bankruptcy Court.

Dated: March 30, 2016
       New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE